## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD.; THL TUBE AND PIPE INDUSTRIES LLC; AND KHK SCAFFOLDING AND FORMWORK LLC, )<br><br>Plaintiffs, )<br>v. )<br>UNITED STATES, )<br>Defendant, )<br>and )<br>WHEATLAND TUBE COMPANY, )<br>Defendant-Intervenor. ) | Before: Jennifer Choe-Groves, Judge<br><br>Court No. 23-00113 |

### ORDER

Upon consideration of the motion of Plaintiffs, Universal Tube and Plastic Industries, Ltd.; THL Tube and Pipe Industries LLC; and KHK Scaffolding and Formwork LLC ("Plaintiffs" or "Universal"), for judgment on the agency record pursuant to Rule 56.2 of the Rules of this Court, and all other papers and proceedings herein; it is hereby

**ORDERED** that Plaintiffs' motion is hereby granted; and it is further

**ORDERED** that the final results of *Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 28,483 (May 4, 2023), are remanded to the U.S. Department of Commerce with instructions to take such further action as required by the Court's decision in this matter.

Dated: _____          By: _____
New York, New York                              Jennifer Choe-Groves, Judge

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD.; THL TUBE AND PIPE INDUSTRIES LLC; AND KHK SCAFFOLDING AND FORMWORK LLC, )<br><br>Plaintiffs, )<br>v. )<br>UNITED STATES, )<br>Defendant, )<br>and )<br>WHEATLAND TUBE COMPANY, )<br>Defendant-Intervenor. | Before: Jennifer Choe-Groves, Judge<br><br>Court No. 23-00113 |

## PLAINTIFFS' RULE 56.2 MOTION FOR
## <u>JUDGMENT ON THE AGENCY RECORD</u>

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiffs Universal Tube and Plastic Industries, Ltd.; THL Tube and Pipe Industries LLC; and KHK Scaffolding and Formwork LLC hereby move for judgment on the agency record with respect to their complaint challenging the final results of the U.S. Department of Commerce's administrative review of the antidumping duty order against circular welded carbon-quality steel pipe from the United Arab Emirates.  *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 28,483 (May 4, 2023), and accompanying Issues and Decision Memorandum (April 27, 2023).  The *Final Results* covered U.S. entries made from December 1, 2020, through November 30, 2021.

For the reasons explained in the accompanying memorandum, Plaintiffs Universal Tube and Plastic Industries, Ltd.; THL Tube and Pipe Industries LLC; and KHK Scaffolding and

**Court No. 23-00113, Motion for Judgment on the Agency Record**

Formwork LLC respectfully move for this Court to hold that the contested portions of the *Final Results* are not supported by substantial evidence and are otherwise not in accordance with law. Plaintiffs Universal Tube and Plastic Industries, Ltd.; THL Tube and Pipe Industries LLC; and KHK Scaffolding and Formwork LLC further move for the Court to remand this matter to Commerce for disposition consistent with the order and opinion of the Court.

Respectfully submitted,

/s/ Robert G. Gosselink

Robert G. Gosselink
Jonathan M. Freed
Kensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Plaintiffs Universal Tube and
Plastic Industries, Ltd.; THL Tube and Pipe
Industries LLC; and KHK Scaffolding and
Formwork LLC

Dated:  October 26, 2023

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD.; THL TUBE AND PIPE INDUSTRIES LLC; AND KHK SCAFFOLDING AND FORMWORK LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Before: Jennifer Choe-Groves, Judge |
| UNITED STATES, | ) ) | Court No. 23-00113 |
| Defendant, | ) ) | |
| and | ) ) | |
| WHEATLAND TUBE COMPANY, | ) ) | |
| Defendant-Intervenor. | ) ) | |

### CERTIFICATE OF COMPLIANCE

The undersigned counsel at Trade Pacific PLLC certifies that the Memorandum of Law in Support of Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record, dated October 26, 2023, complies with the word-count limitation described in the Standard Chambers Procedures.  The memorandum of law contains 7047 words according to the word-count function of the word-processing software used to prepare the memorandum.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Plaintiffs

Dated:  October 26, 2023

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD.; THL TUBE AND PIPE INDUSTRIES LLC; AND KHK SCAFFOLDING AND FORMWORK LLC, | ) ) ) ) ) ) |
| Plaintiffs, | ) **PUBLIC VERSION** |
| v. | ) |
| | ) Before: Jennifer Choe-Groves, Judge |
| UNITED STATES, | ) |
| | ) Court No. 23-00113 |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| WHEATLAND TUBE COMPANY, | ) |
| | ) |
| Defendant-Intervenor. | ) |

**MEMORANDUM IN SUPPORT OF THE MOTION OF
UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD.; THL TUBE AND PIPE
INDUSTRIES LLC; AND KHK SCAFFOLDING AND FORMWORK LLC FOR
JUDGMENT ON THE AGENCY RECORD**

Robert G. Gosselink
Jonathan M. Freed
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Universal Tube and
Plastic Industries, Ltd.; THL Tube
and Pipe Industries LLC; and KHK
Scaffolding and Formwork LLC

Dated:  October 26, 2023

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ................................................................................................... ii

I.      INTRODUCTION ..................................................................................................... 1

II.     STATEMENT PURSUANT TO RULE 56.2(c) .............................................. 1

III.    STATEMENT OF FACTS ..................................................................................... 2

IV.     STANDARD OF REVIEW ................................................................................. 11

V.      ARGUMENT .......................................................................................................... 13

      A.      Commerce Should Not Have Compared the Selling Prices of Sales Made in
          Different Quarters in Its Cohen's *d* Differential Pricing Analysis Statutory
          Framework for Establishing Normal Value ........................................................ 13

      1.      Commerce's Decision to Rely on a Quarterly Cost and Sales Comparison
          Methodology Was Supported by Substantial Evidence ..................................... 13

      2.      Commerce's Decision to Conduct Its Differential Pricing Analysis by Comparing
          Selling Prices Across POR Quarters Conflicted With Its Quarterly Price
          Comparison Approach and Thus Was Supported by Substantial Evidence ........ 16

      3.      Judicial Precedent Does Not Support Commerce's Inconsistent Actions in This
          Review        ........................................................................................... 20

VI.     RELIEF REQUESTED ......................................................................................... 24

## **TABLE OF AUTHORITIES**

Page

### **Cases**

*Appleton Papers Inc. v. United States*, 37 CIT 1034, 929 F.Supp.2d 1329 (2013)..................... 12

*Asociacion Columbiana de Exportadores de Flores v. United States*, 22 CIT 173, 6 F. Supp. 2d 865 (1998)........................................................................................................................... 13

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 608 Fed. Appx. 948 (Fed. Cir. 2015) ...................................................................................................................... 21

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) .......................................... 13

*Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 636 F. Supp. 961 (1986) .............. 12

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ..... 11, 19

*Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197 (1938) ....................................... 12

*Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607 (1966)........................................................... 12

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996)............................................. 11

*Good Samaritan Hospital v. Shalala*, 508 U.S. 402, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993)... 20

*JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015)...................................... 21

*Koyo Seiko Co v. United States*, 20 F.3d 1156 (Fed. Cir. 1994)................................................. 17

*Mitsubishi Heavy Indus. v. United States*, 22 CIT 541, 15 F. Supp. 2d 807 (1998)................... 12

*Nan Ya Plastics Corporation, Ltd. v. United States*, 128 F. Supp. 3d 1345 (Ct. Int'l Trade 2015) ..................................................................................................................................20-21

*NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995).......................................... 13

*Nucor Corp. v. United States*, 32 CIT 1380, 594 F. Supp. 2d 1320 (2008)................................ 13

*PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009)........................................ 13

*Rhone Poulenc, Inc. v. United States*, 20 CIT 573, 927 F. Supp. 451 (1996) ............................ 13

*Star Fruits S.N.C. v. United States*, 393 F.3d 1277 (Fed. Cir. 2005).......................................... 12

*Timex V.I., Inc. v. United States*, 157 F.3d 879 (Fed. Cir. 1998)................................................ 11

*United States v. Mead Corporation*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)..... 19

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .......................................................... 12

*Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998) ...................................... 12

### **Statutes**

5 U.S.C. § 706(2)(A)................................................................................................................. 12

19 U.S.C. § 1516a..................................................................................................................... 11

19 U.S.C. § 1677(35)(A)........................................................................................................... *16*

19 U.S.C. § 1677f-1(d) .......................................................................................................... *passim*

### **Regulations**

19 C.F.R. § 351.102 ................................................................................................................. 16

19 C.F.R. § 351.414(b)(1).......................................................................................................... 17

19 C.F.R. § 351.414(b)(3).......................................................................................................... 17

19 C.F.R. § 351.414(c)(1) ........................................................................................................ 9, 17

19 C.F.R. § 351.414(e).............................................................................................................. 9, 15

**Other Authorities**

*Antidumping Methodologies for Proceedings that Involve Significant Cost Changes Throughout the Period of Investigation (POI)/{POR} that May Require Using Shorter Cost Averaging Periods*, 73 Fed. Reg. 26,364 (Dep't Commerce May 9, 2008) ........................................ 14, 16

*Carbon and Certain Alloy Steel Wire Rod from Canada*, 71 Fed. Reg. 3,822 (Dep't Commerce Jan. 24, 2006) ..................................................................................................................... 13

*Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Affirmative Preliminary Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 36,881 (Dep't Commerce June 8, 2016) ........................................................................................................ 3

*Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 75,030 (Dep't Commerce October 28, 2016) ........................................................................................................................ 3

*Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 28,483 (Dept. Commerce May 4, 2023) ........................................................................................................... 2, 11

*Circular Welded Carbon-Quality Steel Pipe From the United Arab Emirates: Preliminary Results of Antidumping Duty Administrative Review*; 2020–2021, 87 Fed. Reg. 79862 (December 28, 2022) ("*Preliminary Results*") ............................................................... *passim*

*Concrete Reinforcing Bar From Taiwan*, 82 Fed. Reg. 34,925 (Dep't Commerce Jul 27, 2017) 14

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 6487 (Dep't Commerce Feb. 4, 2022) ....................................................................................... 2

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1 at 842–43, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4177–78 ......................................... 17

## MEMORANDUM IN SUPPORT OF MOTION FOR
## JUDGMENT UPON THE AGENCY RECORD

**I.     INTRODUCTION**

Plaintiffs, Universal Tube and Plastic Industries, Ltd.; THL Tube and Pipe Industries

LLC; and KHK Scaffolding and Formwork LLC, foreign producers and exporters of circular

welded carbon-quality steel pipe from the United Arab Emirates, submit this memorandum in

support of their motion for judgment on the agency record.  This case concerns a decision by the

U.S. Department of Commerce to conduct a differential pricing analysis for Universal by

comparing selling prices in different quarters of the POR to determine whether there was a

pattern of prices that differed significantly among purchasers, regions, and time periods.  Given

that Commerce separately determined as part of a quarterly cost and price analysis that making

selling price comparisons across quarters of the POR was not lawful or acceptable, Commerce's

cross-quarterly comparison of selling prices for its differential pricing analysis was arbitrary and

an abuse of discretion, necessarily resulting in a determination unsupported by substantial

evidence.  An assessment of the law and the administrative record in this case does not support

Commerce's actions or conclusions in this matter.

**II.     STATEMENT PURSUANT TO RULE 56.2(c)**

Plaintiffs, Universal Tube and Plastic Industries, Ltd.; THL Tube and Pipe Industries

LLC; and KHK Scaffolding and Formwork LLC, move for judgment on the agency record with

respect to their complaint challenging the final results of the U.S. Department of Commerce's

administrative review of the antidumping duty order against circular welded carbon-quality steel

pipe from the United Arab Emirates.  *See Circular Welded Carbon-Quality Steel Pipe from the*

*United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2020-2021,*

88 Fed. Reg. 28,483 (Dept. Commerce May 4, 2023) ("*Final Results*"), PD 129.[1]  The

challenged determination, findings, and conclusions are set forth in Commerce's unpublished

Issues and Decision Memorandum (April 27, 2023) ("*Final Decision Memorandum*"), PD 124.

Plaintiffs seek judgment upon the agency record and a remand of Commerce's determination

with respect to one issue: whether Commerce acted arbitrarily – and was it an abuse of discretion

– when Commerce on one hand made a factual determination that prices and costs during the

review period fluctuated to such a degree that it was impermissible for Commerce to compare

U.S. and home market sales made in different quarters of the POR (thus requiring a change to

Commerce's margin calculation program), and on the other hand nonetheless compared sales

made in different quarters of the POR for purposes of its differential pricing analysis.  Because

Commerce acted inconsistently, and failed to explain or justify its contradictory approaches, this

Court should remand the case to Commerce with instructions to reconsider aspects of its final

results determination in accordance with the Court's decision.

## III.   STATEMENT OF FACTS

On February 4, 2022, Commerce initiated the fifth administrative review of the AD order

on circular welded carbon-quality steel pipe from the United Arab Emirates for the period

December 1, 2020, through November 30, 2021.[2]  The review covered numerous producers and

exporters of subject merchandise, including Plaintiffs, Universal Tube and Plastic Industries,

Ltd. ("UTP"); THL Tube and Pipe Industries LLC ("TTP"); and KHK Scaffolding and

Formwork LLC ("KHK") (collectively, "Universal").  In the original less-than-fair-value

---

[1]   Citations to public record documents from Commerce's Administrative Record List are
     designated as "PD," and citations to confidential record documents are designated as "CD."

[2]   *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg.
     6487 (Dep't Commerce Feb. 4, 2022), PD 7.

investigation, Commerce determined that UTP, KHK, and TTP's predecessor (Universal Tube and Pipe Industries LLC) not only were affiliated, but also had significantly intertwined business and production operations. As such, Commerce collapsed UTP, KHK, and TTP into a single entity and considered the three producers to be one respondent.[3] In every segment of the proceeding since that time, Commerce has treated the three Universal producers as a collapsed single entity; and on March 18, 2022, Commerce selected Universal as a mandatory respondent in the fifth administrative review.[4]

In April and May, 2022, Universal submitted timely responses to sections A through D of Commerce's antidumping duty questionnaire.[5] In its Section D response, Universal provided its costs of production for all models of circular welded pipe products that Universal sold in the UAE and in the United States during the POR on <u>both an annual and quarterly basis</u>.[6] Normally, Commerce calculates weighted-average costs for the entire POR, but this approach can cause distortions during a time of significant cost changes. Because of significant fluctuations during the POR in Universal's hot-rolled steel input costs, which affected both the costs of production and the selling prices of the subject circular welded pipe produced, Universal advocated that Commerce adopt a quarterly cost and sales comparison approach.

---

[3]   *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Affirmative Preliminary Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 36,881 (Dep't Commerce June 8, 2016), unchanged in *Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 75,030 (Dep't Commerce October 28, 2016).

[4]   *See* Commerce Memorandum "2020-2021 Antidumping Duty Administrative Review of Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Selection of Respondent for Individual Examination" (March 18, 2022), PD 22.

[5]   *See* Universal Letter, "Section A Questionnaire Response" (April 15, 2022) ("Universal Section A"), CD 5-25, PD 39-47; *see also* Universal's Letter, "Sections B-D Questionnaire Response" (May 27, 2022) ("Universal Section BCD"), CD 38-57, PD 65-82.

[6]   *See* Universal Section BCD, at Exhibit D-1, CD 43, PD 82.

The administrative record supported such a methodology.  Record evidence showed, for

example, that Universal experienced significant changes (i.e., changes that exceeded 25 percent)

between its high and low quarterly COM during the POR and in the cost of the hot-rolled steel

coil used to produce the circular welded pipe.  In addition, record evidence showed that the cost

and price movements from quarter to quarter for Universal's top sales volume CONNUMs in the

U.S. and home markets trended in the same direction throughout the POR.

Specifically, worksheets and charts in Universal's Section D response demonstrated that

Universal's costs increased significantly during the POR, with an average quarterly COM

difference of [    ] percent and a maximum quarterly COM variance of [    ] percent for the top

five U.S. market CONNUMs.  *See* Universal Section BCD, at Exhibit D-3, CD 43, PD 82.

**TOP 5 U.S. CONNUMS -- VARIATION IN TOTAL COM, HOT-ROLLED STEEL COSTS, AND AVERAGE NET PRICES**

| Obs | CONNUM | QTR | | TOTCOM | MIN | MAX | Difference from MIN | | DIRMAT1 | MIN | MAX | Difference from MIN | | USNETPRI | MIN | MAX | Difference from MIN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | [ | | | | | | | | | | | | | | | | | ] |
| 2 | [ | | | 2,775.00 | | | | | | | | | | | | | | ] |
| 3 | [ | | | | | | | | | | | | | | | | | ] |
| 4 | [ | | | | | | | | | | | | | | | | | ] |
| 5 | [ | | | | | | | | | | | | | | 1,550.00 | | | ] |
| 6 | [ | | | | | | | | | | | | | | | | | ] |
| 7 | [ | | | | | | | | 3,000.00 | | | | | | | | | ] |
| 8 | [ | | | | | | | | | | | | | | | | | ] |
| 9 | [ | | | | | | | | | 1,587.00 | | | | | | | | ] |
| 10 | [ | | | | | | | | | | | | | | | | | ] |
| 11 | [ | | | | | | | | | | | | | | | | | ] |
| 12 | [ | | | 2,994.00 | | | | | | | | | | | | | | ] |
| 13 | [ | | | | | | | | | | | | | | | | | ] |
| 14 | [ | | | | | | | | | | | | | | | | | ] |
| 15 | [ | | | | | | | | | | | | | | | | | ] |
| 16 | [ | | | | | | | | | | | | | | | | | ] |
| 17 | [ | | | 2,117.00 | | | | | | | | | | | | | | ] |
| 18 | [ | | | | | | | | | | | | | | | | | ] |
| 19 | [ | | | | | | | | 2,812.00 | | | | | | | | | ] |
| 20 | [ | | | | | | | | | | | | | | | | | ] |
| [ | | | | | | | | | | | | | | | | | | ] |

In the home market, the trends were the same, where there was an average quarterly

COM difference of [    ] percent and a maximum quarterly COM variance of [    ] percent for the

top CONNUMs sold.  For the hot-rolled steel material used to produce the pipe, the quarterly

cost differences were even larger ranging from [        ] percent and [        ] percent for the

top five U.S. and home market CONNUMs, respectively.  Importantly, Universal's U.S. net

selling prices had even greater quarterly differences with an average quarterly net price variance

of [   ] percent and a maximum quarterly net price variance of [   ] percent for the top five U.S.

market CONNUMs.  In the home market, the top five CONNUMs sold had an average quarterly

net price difference of [   ] percent and the maximum quarterly net price variance was as high as

[   ] percent.  *See* Universal Section BCD, at Exhibit D-3, CD 43, PD 82.

**TOP 5 HOME MARKET CONNUMS -- VARIATION IN TOTAL COM, HOT-ROLLED STEEL COSTS, AND AVERAGE NET PRICES**

| Obs | CONNUM | QTR | TOTCOM | MIN | MAX | Difference from MIN | DIRMAT1 | MIN | MAX | Difference from MIN | HMNETPRI | MIN | MAX | Difference from MIN |
|-----|--------|-----|--------|-----|-----|---------------------|---------|-----|-----|---------------------|----------|-----|-----|---------------------|
| 1  | [ | | | | | | | | | | | | | ] |
| 2  | [ | | | | | | | | | | | | | ] |
| 3  | [ | | | | | | | | | | 4,210.00 | | | ] |
| 4  | [ | | | | | | | | | | | | | ] |
| 5  | [ | | | | | | | | | | | | | ] |
| 6  | [ | | | | | | | | | | | | | ] |
| 7  | [ | | | | | | | | | | | | | ] |
| 8  | [ | | 3,670.00 | | | | | | | | | | | ] |
| 9  | [ | | | 2,443.00 | | | | | | | 3,011.86 | | | ] |
| 10 | [ | | | | | | | | | | | | | ] |
| 11 | [ | | | | | | | | | | | | | ] |
| 12 | [ | | | | | | | | | | | | | ] |
| 13 | [ | | | | | | | | 1,774.00 | | | | | ] |
| 14 | [ | | 2,050.00 | | | | | | | | | | | ] |
| 15 | [ | | | | | | | | | | | | | ] |
| 16 | [ | | | | | | | | | | | | | ] |
| 17 | [ | | | | | | 1,111.00 | | | | | | | ] |
| 18 | [ | | | | | | | | | | | | | ] |
| 19 | [ | | | | | | | | | | 3,707.00 | | | ] |
| 20 | [ | | | | | | | | | | | | | ] |

[                              ]

Furthermore, Commerce found that Universal's U.S. and home market sales prices correlated

with the COM and the hot-rolled steel costs during the same periods.  Charts that Universal

provided for the top-five CONNUMs sold in the U.S. and home markets during the POR

demonstrated not only that the costs and selling prices varied significantly across the POR

quarters, but – as shown in the charts below – they also moved in the same direction for [

] quarters for which comparisons were possible. *See* Universal Section BCD, at Exhibit D-3,

CD 43, PD 82.

[

]

News articles on the record addressed the continuous, sustained rise in hot-rolled steel coil costs over the POR and further substantiated Universal's substantial changes in costs and selling prices across the POR quarters:

- "On August 11, 2020, Steel Market Update reported the benchmark price of hot-rolled steel at **$440**/ton ($22/cwt), with lead times averaging about four weeks. SMU's check of the market on Aug. 9-11, 2021, put the average hot-rolled coil (HRC) price at an astounding **$1,900**/ton ($95/cwt), with lead times in excess of

10 weeks."[7]

- "Since March 2020, steel prices are up a staggering **215%**. The benchmark price for hot-rolled steel hit another all-time high {on July 1, 2021}, climbing to **$1,825**.  Prior to the pandemic, it traded in the **$500 to $800** range."[8]

- "Hot-rolled carbon steel prices have continued to climb, reaching more than **$1,100** per net ton by the end of January 2021 {and} market prices for flat-rolled carbon steel products — hot-rolled coil, cold-rolled coil and galvanized coil — have reached historical highs, jumping more than **60%** in the past four months."[9]

- "No one will dispute that steel prices have dominated the headlines in 2021. Fueled by trillions in government stimulus to keep the economy from succumbing to the fallout from COVID, steel demand far exceeded supply for most of the year. The benchmark price for hot-rolled steel **quadrupled**, from less than **$500**/ton to a peak of **$1,955**/ton, in a September-to-September comparison."[10]

On December 28, 2022, Commerce published its preliminary results of the 2020-2021

administrative review, assigning Universal a preliminary dumping margin of 2.61%.  *See*

*Circular Welded Carbon-Quality Steel Pipe From the United Arab Emirates: Preliminary*

*Results of Antidumping Duty Administrative Review*; 2020–2021, 87 Fed. Reg. 79862 (December

28, 2022) ("*Preliminary Results*"), PD 110.  In the *Preliminary Results*, Commerce concluded

that Universal's changes in costs of manufacturing and selling prices during the POR were

significant and that record evidence demonstrated that the selling prices during the shorter

quarterly cost-averaging periods could be linked accurately with the COP and CV during the

same shorter cost-averaging periods.  *See Decision Memorandum for the Preliminary Results of*

---

[7]   "Historic Steel Price Rally Celebrates One-Year Anniversary," *The Fabricator* (August 17, 2021), in Universal Section BCD, at Exhibit D-3, CD 43, PD 82.

[8]   "Steel Prices Are Up 200%. When Will the Bubble Pop?," *Finance Steel Industry* (July 8, 2021) in Universal Section BCD, at Exhibit D-3, CD 43, PD 82.

[9]   "Metal Prices in a Bull Market Amid Healthy Demand," *ABF Journal* (June 17, 2021) in Universal Section BCD, at Exhibit D-3, CD 43, PD 82.

[10]   "Steel Prices Dominate Manufacturing News in 2021," *The Fabricator* (November 17, 2021) in Universal Section BCD, at Exhibit D-3, CD 43, PD 82.

*the 2020-2021 Administrative Review of the Antidumping Duty Order on Circular Welded*

*Carbon-Quality Steel Pipe from the United Arab Emirates* (Dec. 20, 2022) ("*Preliminary*

*Decision Memorandum*"), at 23, PD 105.  Commerce made the following specific findings:

      i.     Significance of Cost Changes

In prior cases, we established 25 percent as the threshold (between the high- and
low-quarter COM) for determining that the changes in COM are significant
enough to warrant a departure from our standard annual-average cost approach.
In the instant case, record evidence shows that Ajmal and Universal experienced
significant cost changes (*i.e.*, changes that exceeded 25 percent) between the high
and low quarterly COM during the POR.

      ii.    Linkage Between Sales and Cost Information

Consistent with past precedent, because we found the changes in COM to be
significant, we evaluated whether there is evidence of a linkage between the COM
changes and the sales prices during the POR.  Absent a surcharge or other pricing
mechanism, Commerce may alternatively look for evidence of a pattern showing
that changes in selling prices reasonably correlate to changes in unit COM.  To
determine whether a reasonable correlation existed between the sales prices and
underlying COM during the POR, we compared weighted-average quarterly
prices to the corresponding quarterly COM for high volume control numbers.
Our comparison revealed that sales prices and COM for Ajmal and Universal
showed reasonable correlation.

After reviewing this information and determining that changes in selling prices
correlate reasonably to changes in unit COM, we preliminarily determine that
there is linkage between Ajmal's and Universal's changing sales prices and COM
during the POR.  Thus, we preliminarily determine that a shorter cost-averaging
period approach, based on a quarterly average COP, is appropriate for Ajmal and
Universal because we found significant cost changes in COM as well as
reasonable linkage between costs and sales prices.

     iii.   Linkage Between Sales and Cost Information

In light of the factors discussed above, for the preliminary results, we have
employed an alternative costing methodology to calculate direct material costs for
Ajmal and Universal.  We calculated total COM for each CONNUM using the
quarterly weighted-average per-unit cost of direct materials and the annual
weighted-average per-unit conversion costs.

*Preliminary Decision Memorandum*, at 23-24, PD 105.  Because of the significant changes in

Universal's steel material costs, total costs of manufacture, and selling prices, Commerce could

not rely on its normal sales comparison approach and instead adopted a quarterly cost calculation

and quarterly selling price comparison methodology.  To ensure that sales made in one quarter of

the POR were not compared to sales made in another quarter, Commerce specifically revised its

normal dumping margin calculation program (1) to override the normal hierarchy of

contemporaneous months for price averaging established in 19 C.F.R. § 351.414(e); and (2) to

restrict all price-to-price comparisons of identical and similar products to sales made within the

same 3-month quarters of the POR.  *See* Commerce's Market-Economy Macros Program

(December 22, 2022), at Lines 4854 and 4971, CD 222; *see also* Commerce's Preliminary

Margin Calculation Program (December 22, 2022), at Line 1002, CD 225, and Commerce's

Preliminary Comparison Market Program (December 22,2022), at Line 1532, CD 224 (for

programming that established the U.S. and comparison market quarters).

At the same time that Commerce adopted a quarterly cost and price comparison approach

in the *Preliminary Results*, Commerce also applied a "differential pricing" analysis to determine

whether application of the alternate average-to-transaction sales comparison method would be

appropriate in this review.  *Preliminary Decision Memorandum*, at 10, PD 105; *see also* 19

C.F.R. 351.414(c)(1) and 19 U.S.C. § 1677f-1(d)(1)(B) of the Act.  In conducting this analysis,

Commerce evaluated all of Universal's U.S. sales to determine whether there was a pattern of

prices that differed significantly among purchasers, regions, and time periods.  Commerce

defined purchasers based on consolidated customer codes, and compared sales to individual

customers to sales to all customers throughout the POR regardless of when the sales occurred.

*Preliminary Decision Memorandum*, at 11, PD 105.  Commerce determined regions based on zip

codes, and compared sales to certain regions to sales to all regions throughout the POR

regardless of when the sales occurred.  *Id.*  Finally, Commerce defined time periods by the quarter within the POR based upon the U.S. date of sale, and compared sales made in individual quarters to sales made in all the remaining quarters of the POR.  *Id.*  In the first stage of the differential pricing analysis, Commerce applied the "Cohen's *d* test," and found that the extent to which Universal's selling prices to certain customers, to particular regions, and in different time periods differed from the prices of all other sales was large (i.e., Universal's sales to particular purchasers, regions, and time periods passed the Cohen's *d* test because the calculated Cohen's *d* coefficient exceeded the threshold of what Commerce considered "large" (i.e., 0.8).  *Preliminary Decision Memorandum*, at 11, PD 105.

On February 10, 2023, Universal submitted a substantive case brief to Commerce, specifically challenging Commerce's decision to compare the selling prices of sales made in different quarterly periods for its differential pricing analysis.  *See* Universal Case Brief (February 10, 2023), at 2-6, CD 230, PD 117.  Universal's brief emphasized (1) that Commerce had found significant cost changes between Universal's high and low quarterly COM during the POR, (2) that Commerce had found a close linkage between Universal's changing selling prices and quarterly COM for the same periods, and (3) that the change in COM and selling prices for Universal between quarters was so significant that it warranted a departure from Commerce's price comparison methodology such that any comparison of selling prices among and between the different POR quarters was unacceptable.

On May 4, 2023, Commerce issued its final results of the 2020-2021 administrative review, in which it continued to rely on quarterly costs and continued to limit its sales comparisons only to sales within the same quarters (i.e., Commerce refused to compare selling prices across quarters).  Commerce also continued to find that a percentage of Universal's U.S.

sales passed the Cohen's *d* test, primarily because Commerce compared selling prices across quarters and found a pattern of prices that differed significantly among time periods.  This finding, according to Commerce, warranted application of the average-to-transaction method to those sales that passed the Cohen's *d* test in the calculation of Universal's weighted-average dumping margin.  *See Circular Welded Carbon-Quality Steel Pipe From the United Arab Emirates: Final Results of Antidumping Duty Administrative Review*; 2020–2021, 88 Fed. Reg. 28483 (May 4, 2023) ("*Final Results*"), PD 129.  This appealed ensued.

## IV.    <u>STANDARD OF REVIEW</u>

In reviewing the final results of an antidumping duty ("AD") administrative review, the Court deems the agency determination unlawful when it is not supported by substantial evidence on the record, or otherwise is not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). To determine whether Commerce's interpretation and application of the AD statute is "in accordance with law," the Court undertakes the two-step analysis prescribed by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).

Under *Chevron*'s first prong, the Court reviews Commerce's construction of a statutory provision to determine whether "Congress has directly spoken to the precise question at issue." *Id.* at 842. "To ascertain whether Congress had an intention on the precise question at issue, {the Court} employ{s} the 'traditional tools of statutory construction.'" *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998). The first tool is the statute's text; "if the text answers the question, that is the end of the matter." *Id.* If the Court determines that the statute is silent or ambiguous with respect to the specific issue, the Court next examines whether Commerce's construction of the statute is permissible. *See Chevron*, 467 U.S. at 843. This is an inquiry into the reasonableness of Commerce's interpretation. *See Fujitsu Gen. Ltd. v. United States*, 88 F.3d

1034, 1038 (Fed. Cir. 1996).

Commerce's exercise of discretion in cases brought pursuant to 19 U.S.C. § 1516a are

subject to the default standard of the Administrative Procedure Act ("APA") which authorizes a

reviewing court to "set aside agency action, findings, and conclusions found to be . . . arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C.

§ 706(2)(A); *see also Solar World Americas, Inc. v. United States,* 962 F.3d 1351, 1359 n.2 (Fed.

Cir. 2020) (noting that, in cases reviewed under 28 U.S.C. § 2640(b), APA § 706 review applies

"since no law provides otherwise").  "Courts look for a reasoned analysis or explanation for an

agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or

an abuse of discretion."  *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir.

1998).  In determining whether Commerce's interpretation is reasonable, the Court considers

"the express terms of the provisions at issue, the objectives of those provisions, and the

objectives of the antidumping scheme as a whole."  *See Mitsubishi Heavy Indus. v. United

States*, 22 CIT 541, 545, 15 F. Supp. 2d 807, 813 (1998).  The Court "will not allow an agency,

under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the

guiding purpose of the statute."  *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399,

405, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987).  Moreover, an abuse of

discretion occurs where the decision is "based on an erroneous interpretation of the law, on

factual findings that are not supported by substantial evidence, or an unreasonable judgment in

weighing relevant factors."  *Appleton Papers Inc. v. United States*, 37 CIT 1034, 1037, 929

F.Supp.2d 1329, 1334 (2013) (*citing Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281

(Fed. Cir. 2005)).

Additionally, "{t}he substantiality of evidence must take into account whatever in the

record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). Substantial evidence is "more than a mere scintilla," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 619-20 (1966) (*quoting Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)); *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). For a determination to satisfy this standard, "{t}here must be a rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962); *Nucor Corp. v. United States*, 32 CIT 1380, 594 F. Supp. 2d 1320, 1331-32 (2008). This Court has found Commerce's determinations unlawful "where Commerce has relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." *Rhone-Poulenc, Inc. United States*, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996); *see also Asociacion Columbiana de Exportadores de Flores v. United States*, 22 CIT 173, 184–85, 6 F. Supp. 2d 865, 879–80 (1998) (stating that a change in practice requires Commerce to explain the basis for its change and that such basis must be in accordance with law and supported by substantial evidence). Finally, even where Commerce has acted in conformity with its statutory and regulatory obligations, the resulting duty rate must be examined for its accuracy and fairness. *See NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995).

## V.   ARGUMENT

### A.   Commerce Should Not Have Compared the Selling Prices of Sales Made in Different Quarters in Its Cohen's *d* Differential Pricing Analysis

#### 1.   Commerce's Decision to Rely on a Quarterly Cost and Sales Comparison Methodology Was Supported by Substantial Evidence

When determining normal value based on home market or third country sales, 19 U.S.C. § 1677b(b) requires that Commerce disregard sales that are made below the cost of production.

To conduct this analysis, Commerce usually compares prices to a weighted-average of costs incurred throughout the entire POR (i.e., annual costs). *See Carbon and Certain Alloy Steel Wire Rod from Canada*, 71 Fed. Reg. 3,822 (Dep't Commerce Jan. 24, 2006), Issues and Decision Memorandum, at Comment 5; *Antidumping Methodologies for Proceedings that Involve Significant Cost Changes Throughout the Period of Investigation (POI)/{POR} that May Require Using Shorter Cost Averaging Periods*, 73 Fed. Reg. 26,364, 26,365 (Dep't Commerce May 9, 2008) ("*Cost Averaging Methodology*"). According to Commerce, "{r}elying on an annual average cost tends to smooth out … short-terms per-unit fluctuations resulting in a normalized average production costs to be compared to sales prices over the same extended period of time." *Id.*, 73 Fed. Reg. at 26,365 (citations omitted).

But Commerce deviates from its standard methodology when it determines that there are significant changes in costs during the POR. *See generally id.*, 73 Fed. Reg. 26,364; *see also Steel Concrete Reinforcing Bar From Taiwan*, 82 Fed. Reg. 34,925 (Dep't Commerce Jul 27, 2017), Issues and Decision Memorandum, at Comment 2. In such instances, Commerce typically relies on shorter quarterly-average costs, provided that there is a linkage (i.e., a reasonable correlation) between the costs of production and the selling prices during the shorter averaging periods. *See id.* That is exactly what happened in this case. As noted above, Commerce concluded that record evidence showed that Universal had experienced significant cost changes (*i.e.*, changes that exceeded 25 percent) between the high and low quarterly COM during the POR; that there was linkage between Universal's changing selling prices and COM during the POR such that changes in selling prices correlated reasonably to changes in unit COM; and that it therefore was necessary for Commerce to employ an alternative costing methodology that relied on Universal's quarterly direct material costs. *See Preliminary Decision*

*Memorandum*, at 23-24, PD 105.  As a fundamental part of this approach, Commerce also limited its price comparisons for purposes of calculating dumping to sales made only within the same quarter.  That is, because of the significant cost and selling price changes among and between quarters, Commerce disregarded the regulatory contemporaneous month matching hierarchy of 19 C.F.R. § 351.414(e) (i.e., same month, then three months back, and then two months forward), and modified its margin calculation program specifically to prevent any inter-quarter sales price comparisons.  *See* Commerce's Market-Economy Macros Program (December 22, 2022), at Lines 4854 and 4971, CD 222.

When a company experiences significant cost fluctuations during a POR, then evidence that the company's prices reacted to cost fluctuations during the POR logically suggests that the cost fluctuations impacted the company's pricing practices.  In such cases, it is reasonable to infer that cost fluctuations are germane to Commerce's inquiry into whether, and to what extent, the company engaged in underselling during the POR.  In addition, it is reasonable for Commerce to find, based on such inferences, that the circumstances provide a compelling reason to depart from its standard practice and calculate an accurate dumping margin by calculating different costs for different quarters of the POR and limiting sales comparisons only to sales made within the same quarter.  When a company's costs and prices change from quarter to quarter, it is reasonable for Commerce to conclude that comparing sales across quarters is meaningless because the selling prices within each quarter are independent of selling prices in all other quarters.

Here, Commerce made the exact determination that Universal's costs and prices changed so significantly from quarter to quarter that Universal's sales in different quarters were "incomparable."  That is, the circumstances during the POR were such that Commerce

reasonably concluded that whether, and to what extent, Universal engaged in underselling during the POR would not be discernible by comparing the selling prices of sales made in different quarters because the selling prices in the United States and the UAE *in each quarter* were independent of the selling prices levels in other quarters.  *See Preliminary Decision Memorandum*, at 23-24, PD 105.  Under such circumstances, comparing selling prices across quarters not only would *not* help calculate an accurate dumping margin, but also could be distortive because it would serve so meaningful purpose.  Because record evidence showed that Universal's prices reacted to cost-fluctuations, and that restricting selling price comparisons to sales made within the same quarter furthered Commerce's goal of calculating a dumping margin that accurately reflected Universal's normal selling practices, Commerce's judgment was reasonable and its departure from its standard methodology was justified.  *See Cost Averaging Methodology*, 73 Fed. Reg. 26,365, citing, *inter alia*, 19 C.F.R. § 351.102.

> **2.      Commerce's Decision to Conduct Its Differential Pricing Analysis by Comparing Selling Prices Across POR Quarters Conflicted With Its Quarterly Price Comparison Approach and Thus Was Supported by Substantial Evidence**

But after having determined that it was not appropriate to calculate Universal's dumping margin by comparing the selling prices of U.S. and home market sales made in different POR quarters, Commerce nonetheless did exactly that, i.e., Commerce compared the selling prices of U.S. sales made in different POR quarters for purposes of its differential pricing analysis.  This approach was inconsistent with its dumping margin calculation modifications and an abuse of discretion, and rendered Commerce's Cohen's *d* analysis unsupported by substantial evidence.

Under the statute, Commerce calculates a respondent's dumping margin by determining the "amount by which the normal value {i.e., home market price} exceeds the export price or constructed export price {i.e., U.S. price} of the subject merchandise.  19 U.S.C. § 1677(35)(A).

The statute and regulations identify three methods for comparing normal value to export price or constructed export price: (1) the average-to-average ("A–A") comparison methodology; (2) the transaction-to-transaction ("T–T") comparison methodology; and (3) the average-to-transaction ("A–T") comparison methodology.

In administrative reviews, Commerce typically uses the A–A methodology, comparing the weighted-average of the normal values to the weighted-average of the export prices or constructed export prices for comparable merchandise. *See* 19 U.S.C. § 1677f–1(d)(1)(A)(i); 19 C.F.R. § 351.414(b)(1); *see also* 19 C.F.R. § 351.414(c)(1) (providing that, in both investigations and administrative reviews, agency "will use the average-to-average method unless the {agency} determines another method is appropriate in a particular case"). In contrast, when using the A–T methodology, Commerce compares the weighted average of the normal values to the export prices or constructed export prices in individual transactions. 19 U.S.C. § 1677f–1(d)(1)(B); 19 C.F.R. § 351.414(b)(3).

The statute authorizes Commerce to use the A–T comparison methodology as an exception to the other two methodologies. *See* 19 U.S.C. § 1677f–1(d)(1)(B). Specifically, Commerce may use the A–T methodology in cases involving "masked" dumping – that is, where a respondent sells its goods in the United States at dumped prices "to particular customers or regions {or at particular times}, while selling at higher prices to other customers or regions {or at other times}." *See* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1 at 842–43, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4177–78. When a respondent's sales are structured in this fashion, use of the A–A methodology may understate actual dumping by measuring average dumping over the review period as a whole, while masking dumping from discrete, specific targeted sales. In contrast, use of the A–T

methodology unmasks such dumping by, among other things, determining a dumping margin for each individual sale. *See, e.g., Koyo Seiko Co. v. United States,* 20 F.3d 1156, 1159 (Fed.Cir.1994) (explaining "masked dumping," and noting that, "{b}y using individual U.S. prices in calculating dumping margins, Commerce is able to identify a merchant who dumps {its} product intermittently – sometimes selling below the foreign market value and sometimes selling above it," which is pricing behavior generally not captured by Commerce's A–A methodology).

Pursuant to the statute, Commerce may use the A–T methodology where (i) "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and (ii) {Commerce} explains why such differences cannot be taken into account" using one of the other methodologies. 19 U.S.C. § 1677f–1(d)(1)(B)(i)–(ii). In this case, Commerce applied a "differential pricing" analysis to determine whether the "pattern" and "significant difference" criteria of 19 U.S.C. § 1677f–1(d)(1)(B)(i) were satisfied, and whether application of the alternate A-T comparison method would be appropriate.

In conducting its analysis, Commerce evaluated all of Universal's U.S. sales to determine whether there was a pattern of prices that differed significantly among purchasers, regions, and time periods. Commerce defined purchasers based on consolidated customer codes, and compared Universal's sales to individual customers to Universal's sales to all customers throughout the POR *regardless of when the sales occurred*. *Preliminary Decision Memorandum*, at 11, PD 105. Commerce determined regions based on zip codes, and compared Universal's sales to certain regions to Universal's sales to all regions throughout the POR *regardless of when the sales occurred*. *Id.* Finally, Commerce defined time periods by the quarter within the POR

based upon the U.S. date of sale, and compared Universal's sales made in *individual* quarters to

Universal's sales made in *all the remaining quarters of the POR. Id.*

In the first stage of the differential pricing analysis, Commerce applied the "Cohen's *d*

test," and found that the extent to which prices in particular time periods differed from the prices

of all other sales was large (i.e., the sales to particular time periods passed the Cohen's *d* test

because the calculated Cohen's *d* coefficient exceeded the large (i.e., 0.8) threshold).[11]  But, as

discussed above, Commerce already had determined in this review (1) that Universal had

significant cost changes between its high and low quarterly costs of manufacturing during the

POR, (2) that there was a close linkage between Universal's changing selling prices and

quarterly costs of manufacturing for the same periods, and (3) that the change in Universal's

costs of manufacturing and selling prices between and among quarters was so significant that

Commerce, in fact, modified its margin calculation program specifically to prevent comparisons

of sales in different quarters.  Having already concluded that it could not compare the selling

prices of sales made in different POR quarters, it was inconsistent and contradictory for

Commerce to compare the selling prices of Universal's U.S. sales across the four quarters of the

POR as part of its differential pricing analysis.

While "considerable weight should be accorded to an executive department's

construction of a statutory scheme it is entrusted to administer," *Chevron U.S.A. Inc. v. Natural*

*Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the

case for judicial deference is less compelling with respect to agency positions that are

inconsistent.  *See United States v. Mead Corporation*, 533 U.S. 218, 228, 121 S.Ct. 2164, 150

---

[11]   Ultimately, Commerce applied the A–T method to some of Universal's U.S. sales and the A–A method to the remainder of Universal's U.S. sales.  *Preliminary Decision Memorandum*, at 12, PD 105.

L.Ed.2d 292 (2001) ("the fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, *its consistency*, formality, and relative expertness, and to the persuasiveness of the agency's position") (emphasis added).[12]  The law demands a certain orderliness.  In this case, because Commerce adopted two inconsistent positions simultaneously without explanation or justification, Commerce acted arbitrarily.  Commerce's decision to compare U.S. sales from different POR quarters as part of its differential pricing analysis when Commerce already had resolved that it could *not* make such cross-quarterly sales comparisons as part of its dumping calculation was an inconsistent and contradictory determination that cannot be deemed supported by substantial evidence.

### 3.  Judicial Precedent Does Not Support Commerce's Inconsistent Actions in This Review

There have not been many proceedings at Commerce or at the Court that involve the intersection of differential pricing and Commerce's use of quarterly costs and quarterly price comparisons.  In fact, we have found only one case that addresses the joining of these antidumping duty concepts.  In *Nan Ya Plastics Corporation, Ltd. v. United States*, 128 F. Supp. 3d 1345 (Ct. Int'l Trade 2015), the Court addressed Nan Ya's challenge of Commerce's application of the A–T price comparison methodology based on Commerce's finding that Nan Ya had engaged in "masked" or "targeted" dumping.  Specifically, Nan Ya claimed that the differences in prices that it charged for PET film during the POR correlated with differences in the cost of materials used to produce its merchandise, and that Commerce erred by failing to

---

12    *See also Good Samaritan Hospital v. Shalala*, 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) ("{T}he consistency of an agency's position is a factor in assessing the weight that position is due").

consider such evidence in its targeted dumping analysis (i.e., that Commerce improperly

"refused to consider undisputed evidence that the price differences in this cases simply reflect

differences in raw material costs – and not selective pricing").  *See* 128 F. Supp. 3d at 1345.  In

response, Defendant United States claimed that "Nan Ya's explanation for *why* there was a

pattern of prices that differed significantly among time periods and customers was not relevant"

to Commerce's targeted dumping analysis.  *Id.* (emphasis in original).  Ultimately, the Court

agreed that nothing in the statute or the legislative history required Commerce to consider the

*causation* of any pattern of prices that Commerce might identify under 19 U.S.C. § 1677f-

1(d)(1)(B).

In reaching this conclusion, the Court relied on two decisions of the U.S. Court of

Appeals for the Federal Circuit.  In the first case, *JBF RAK LLC v. United States*, the Court of

Appeals considered whether it was an abuse of discretion for Commerce to refuse to consider

evidence that a pricing pattern identified by Commerce was not due to targeted sales, but instead

was for "a valid business purpose."  *See Nan Ya Plastics*, 128 F. Supp. 3d at 1357, *citing JBF

RAK*, 790 F.3d 1358, 1368 (Fed. Cir. 2015).  The Court of Appeals held that 19 U.S.C. § 1677f-

1(d)(1)(B) does not obligate Commerce to determine the reasons *why* there is a pattern of export

prices for comparable merchandise that differs significantly among purchase, regions, or time

periods."  *Id.*  In the second case, *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United

States*, the Court of Appeals considered whether Commerce was required to evaluate if a pattern

of prices identified by the agency in a targeted dumping analysis (i.e., the predecessor to

Commerce's differential pricing analysis) was due to "increases in raw material costs," and not

due to any intentional targeted dumping scheme.  *See Nan Ya Plastics*, 128 F. Supp. 3d at 1358,

*citing Borusan*, 608 Fed. Appx. 948 (Fed. Cir. 2015).  In rejecting this claim, the Court of

Appeals held that nothing in the language of the statute required Commerce to take the extra analytical step of considering alternate explanations for the pricing patterns observed.  *See Borusan*, 608 Fed. Appx. At 949.

All of these cases involved appeals in which plaintiffs challenged Commerce's failure to consider evidence that factors other than targeted dumping/differential pricing might account for price patterns that Commerce identified through its analyses.  But Universal is not alleging that Commerce failed to consider *why* Universal's prices were different or what the *cause* of such differences might have been.  Nor is Universal challenging Commerce's observation that the statute does not contain an intent requirement for any pricing patterns.  *See Final Decision Memorandum*, at 14-15, PD 124.  Rather, Universal challenges Commerce's comparisons of Universal's selling prices in different quarters of the POR for its differential pricing analysis when it simultaneously determined that such comparisons were improper and unlawful and when Commerce specifically modified its normal dumping calculation programs to eliminate such comparisons.[13]  To be clear, Universal challenges only the arbitrary and inconsistent decision by Commerce to proceed with cross-quarterly selling price comparisons under one provision of the statute while refusing to make such cross-quarterly comparisons under another.[14]

---

[13]  In its case brief before Commerce, Universal also argued that because Commerce had determined that Universal's selling price differences among quarters were driven by cost differences, Commerce could not conclude that price differences among Universal's U.S. sales in the four quarters of the POR related instead to differential pricing.  *See* Universal Case Brief (February 10, 2023), at 2-6, CD 230, PD 117.  That is, because Commerce should not have attributed quarterly price differences to imputed masked dumping when Commerce had determined that Universal's price differences among quarters were due to significant cost differences.  *Id.*  In this appeal, Universal is not focusing on "why" any pricing pattern existed, and challenges only Commerce's inconsistent approaches.

[14]  In the *Final Results*, Commerce did not address its inconsistent approaches at all and responded to Universal's arguments only by discussing the absence of any causation and intent requirements in 19 U.S.C. § 1677f-1(d)(1)(B), as addressed in *JBF RAK* and *Borusan*.  See *Final Decision Memorandum*, at 14-15, PD 124.

At this point, it is important to reiterate that the antidumping duty statute does not *require* Commerce to consider *quarterly* price comparisons in its differential pricing analysis under 19 U.S.C. § 1677f-1(d)(1)(B) to determine if "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time."[15]   That is, Commerce could have considered other periods of time to determine whether the "pattern" and "significant difference" criteria were satisfied or *not considered periods of time at all*.   That is, 19 U.S.C. § 1677f-1(d)(1)(B) specifies that Commerce "may" determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or CEPs) of individual transactions for comparable merchandise if there is a pattern of prices for comparable merchandise that differs significantly among purchasers, regions, or periods of time.   But the statute does not mandate that Commerce *must* measure whether there is a pattern of prices that differs significantly or why the A–A method or the T–T method cannot account for such differences.   The statutory permissive "may" means that there are circumstance where Commerce need not consider certain criteria, such as periods of time, when evaluating whether a pattern of prices that differs significantly existed.

And this case involves just such a circumstance.   But, here, Commerce did not consider alternate periods of sales comparisons or decide not to consider periods of time at all in its differential pricing analysis.   Instead, Commerce selected the *exact same* POR quarterly periods of time that it already had determined (as part of its quarterly cost and sales methodology) to be

---

[15]   As Commerce conceded when declining to modify its Cohen's *d* differential pricing analysis in the *Final Results*, "{a}s an initial matter, we note that there is nothing in section 777A(d) of the Act that mandates how Commerce measures whether there is a pattern of prices that differs significantly or explains why the A–A method or the T–T method cannot account for such differences."   *Final Decision Memorandum*, at 11, PD 124.

specific periods of time across which comparisons of selling prices *could not be made*.  Because

Commerce adopted an approach under 19 U.S.C. § 1677f-1(d)(1)(B) that was specifically

inconsistent with its decision not to compare selling prices across quarters of the POR, the results

of Commerce's differential pricing analysis therefore were arbitrary and unsupported by

substantial evidence.

## VI.   <u>RELIEF REQUESTED</u>

For the reasons stated above, it was unlawful for Commerce to conduct a differential

pricing analysis for Universal by comparing Universal's selling prices in different quarters of the

POR to determine whether a pattern of prices existed that differed significantly among

purchasers, regions, and time periods when Commerce separately determined as part of its

quarterly cost and price analysis that selling price comparisons of Universal's sales across

quarters of the POR were not permissible.  As a result of this inconsistent approach, Commerce's

differential pricing analysis was unreasonable and unsupported by substantial evidence, and the

Court should remand to Commerce for further consideration.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink
Jonathan M. Freed
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Universal Tube and
Plastic Industries, Ltd.; THL Tube
and Pipe Industries LLC; and KHK
Scaffolding and Formwork LLC

Dated:  October 26, 2023