UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD.; THL TUBE AND PIPE INDUSTRIES LLC; AND KHK SCAFFOLDING AND FORMWORK LLC, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> WHEATLAND TUBE COMPANY, <br><br> Defendant-Intervenor. | Before: Jennifer Choe-Groves, Judge <br> Court No. 23-00113 |

**DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

                                                                                        Roger B. Schagrin, Esq.
                                                                                        Luke A. Meisner, Esq.
                                                                                        SCHAGRIN ASSOCIATES
                                                                                         900 Seventh Street, NW,
                                                                                          Suite 500
                                                                                          Washington, DC 20001
                                                                                          (202) 223-1700
                                                                                         *Counsel for Wheatland Tube Company*

Dated: January 24, 2024

# Table of Contents

STATEMENT PURSUANT TO RULE 56.2(c)(1) ................................................................ 1

    I.   Administrative Determination Under Review .................................................... 1

    II.  Issue Presented for Review ................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 2

SUMMARY OF ARGUMENT ........................................................................................ 5

STANDARD OF REVIEW ............................................................................................... 5

ARGUMENT ..................................................................................................................... 7

    I.   Commerce Correctly Applied Both Its Quarterly Cost Methodology and Its Differential Pricing Analysis ................................................................................ 7

        A.   19 U.S.C. § 1677f-1(d)(1)(B) Does Not Require Commerce To Consider Causation When Applying Differential Pricing Analysis ............................. 7

        B.   Commerce Acted Reasonably When It Applied Both Quarterly Cost and Differential Pricing Analysis ................................................................. 12

    II.  Conclusion ....................................................................................................... 15

CERTIFICATE OF COMPLIANCE

# Table of Authorities

**Cases**

*Ad Hoc Shrimp Trade Action Committee v. United States*, 802 F.3d 1339 (Fed. Cir. 2015) .......... 6

*Altx, Inc. v. United States*, 370 F.3d 1108 (Fed. Cir. 2004) ............................................................. 6

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. U.S.*, 608 Fed. Appx. 948 (Fed. Cir. 2015) ................................................................................................................................ 8, 9, 10, 11

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ............. 6

*Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966) .................................................. 6

*Eregli Demir ve Celik Fabrikalari T.A.S. v. United States*, 308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018) ..................................................................................................................................... 4

*Golden Dragon Precise Copper Tube Group, Inc. v. U.S.*, 2015 WL 4927515, 37 ITRD 1927 (Ct. Int'l Trade Aug. 19, 2015) ............................................................................................... 12

*Hitachi Metals, Ltd. v. United States*, 949 F.3d 710 (Fed. Cir. 2020) ........................................... 6

*JBF RAK v. United States*, 790 F.3d 1358 (Fed. Cir. 2015) ................................................... passim

*Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367 (Fed. Cir. 2022) ................. 2, 3

*Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375 (Fed. Cir. 2008) ............................ 6

*Nan Ya Plastics Corporation, Ltd. v. United States*, 128 F. Supp. 3d 1345 (Ct. Int'l Trade 2015) ................................................................................................................................. 9, 10, 11

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978 (Fed. Cir. 1994) ........................................................................................................................................... 6

*The Timken Company v. United States*, 179 F. Supp. 3d 1168 (Ct. Int'l Trade 2016) .............. 9, 10

*Union Steel Manufacturing Co., Ltd. v. Unites States*, 190 F. Supp. 3d 1326 (Ct. Int'l Trade 2016) ........................................................................................................................................... 3

*Wheatland Tube Co. v. United States*, 495 F.3d 1355 (Fed. Cir. 2007) ........................................ 6

**Statutes**

19 U.S.C. § 1516a ....................................................................................................................... 5, 6

19 U.S.C. § 1677f-1 .............................................................................................................. 2, 4, 7, 9

**Administrative Determinations**

*Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 28,483 (Dep't Commerce May 4, 2023) ....................................................................................................... 1, 4

*Circular Welded Carbon-Quality Steel Pipe From the United Arab Emirates: Preliminary Results of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 79862 (Dep't Commerce Dec. 28, 2022) ................................................................................... passim

# DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of this Court, Defendant-Intervenor Wheatland Tube Company ("Wheatland") hereby submits its response to the motion for judgment on the agency record filed by Plaintiffs Universal Tube and Plastic Industries, Ltd., KHK Scaffolding and Formwork LLC, and THL Pipe and Tube Industries (collectively, "Universal" or "Plaintiffs") (ECF No. 24).

## STATEMENT PURSUANT TO RULE 56.2(c)(1)

### I. Administrative Determination Under Review

The determination challenged here is the final results issued by the Department of Commerce ("Commerce") for the 2020-21 administrative review of the antidumping ("AD") duty order on circular welded carbon-quality steel pipe ("CWP") from the United Arab Emirates. *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 28,483 (Dep't Commerce May 4, 2023) (P.R. 129), and accompanying Issues and Decisions Memorandum (Apr. 27, 2023) ("IDM") (P.R. 124).

### II. Issue Presented for Review

This case presents a single issue for the Court to review:

(1) Was Commerce's decision to apply both the agency's quarterly cost methodology when calculating Universal's costs of production and its differential pricing analysis to unmask potential targeted dumping was supported by substantial evidence and otherwise in accordance with law?

**STATEMENT OF FACTS**

On February 4, 2022, Commerce initiated an administrative review of the AD order on CWP from the United Arab Emirates covering the period of December 1, 2020 to November 30, 2021. Commerce selected Universal as one of the two mandatory respondents for individual examination. *See Circular Welded Carbon-Quality Steel Pipe From the United Arab Emirates: Preliminary Results of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 79,862 (Dep't Commerce Dec. 28, 2022) (P.R. 110) and accompanying Preliminary Decision Memorandum ("PDM") at 1 (P.R. 105).

On December 28, 2022, Commerce preliminarily determined that sales of the subject merchandise were made at prices less than normal value. *See* PDM at 1. When investigating whether sales are made at less than normal value, Commerce applies a two-stage differential pricing analysis to determine whether to apply the average-to-average ("A-A") method or the average-to-transaction ("A-T") method to calculate a respondent's weighted-average dumping margin. *Id.* at 10. In the first stage, Commerce determines whether there is a pattern of prices that differs significantly among purchasers, regions, or time periods by applying the Cohen's *d* test to evaluate variations in prices. *Id.* Commerce then determines whether an identified pattern of prices supports considering an application of the A-T to some or all sales by applying the ratio test. *See id.* at 10-11; *see also Mid Continent Steel & Wire, Inc. v. U.S.*, 31 F.4th 1367, 1371 (Fed. Cir. 2022). If the results of the first stage of the analysis indicate that an alternative comparison method should be considered, Commerce moves to the second stage, where it tests whether applying the alternative method results in a "meaningful difference." PDM at 11-12; *see also Mid Continent*, 31 F.4th at 1371. The goal of this analysis, and applying an alternative calculation methodology, is to address potential distortions from "masked" or "targeted"

dumping in which an exporter's "unduly low pricing" for some U.S. sales are "offset by the exporter's other, higher sales if only overall averages are considered." *Mid Continent*, 31 F.4th at 1370-71. Commerce is not required to determine whether a respondent *intentionally* engaged in targeted dumping; the differential pricing analysis is intent-neutral. *See JBF RAK v. U.S.*, 790 F.3d 1358, 1368 (Fed. Cir. 2015).

In the underlying review, Commerce applied its differential pricing analysis and preliminarily confirmed "the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods" for Universal. PDM at 12. Based on the results of this analysis, Commerce applied the A-T comparison methodology to all of Universal's U.S. sales that passed the Cohen's *d* test and the A-A methodology to Universal's U.S. sales that did not pass. *Id.*

Separately, when calculating a respondent's average costs for the period of review ("POR"), Commerce will deviate from its normal practice of calculating an annual weighted-average cost when significant cost changes during the POR could distort the resulting average cost. PDM at 23. For this test, Commerce evaluates "(1) whether the change in the cost of manufacturing (COM) during the POR was significant; and (2) whether the record evidence indicates that sales made during the shorter cost-averaging periods could be accurately linked with the {cost of production} or {constructed value} during the same shorter cost-averaging periods." *Id.* Changes in cost of at least 25 percent between low- and high-cost quarters are considered "significant." *Id.*; *see also Union Steel Mfg. Co., Ltd. v. U.S.*, 190 F. Supp. 3d 1326, 1332 (Ct. Int'l Trade 2016). If these two conditions are met, Commerce will calculate *quarterly*, rather than annual, averages for the cost of manufacturing and production. PDM at 23-24. This is

3

described as applying the "quarterly cost methodology." *See id*. The goal of the quarterly cost methodology is to address distortions to average costs, which could lead to distortions in, for example, Commerce's determinations of whether home market sales were made below cost and should be disregarded for purposes of calculating normal value. *See id.* at 23; *see also Eregli Demir ve Celik Fabrikalari T.A.S. v. U.S.*, 308 F. Supp. 3d 1297, 1320-21 (Ct. Int'l Trade 2018).

In this review, Commerce preliminarily determined that changes between low- and high-cost quarterly COM exceeded 25 percent for both respondents, and that there was a reasonable correlation between sales price and COM during the POR. PDM at 23. Therefore, Commerce applied its quarterly cost methodology when calculating the cost of manufacturing and production for both respondents. *Id.* at 24.

On February 10, 2023, Universal filed a case brief challenging Commerce's application of the differential pricing analysis in the preliminary results. *See* Universal Case Brief (Feb. 10, 2023) at 2-6 (P.R. 117). Universal argued that because Commerce already attributed differences in its sales prices to cost differences, Commerce cannot conclude that the price differences in its U.S. sales among the four POR quarters contribute to a pattern of differential pricing. *See* Universal Case Brief at 3. On February 17, 2023, Wheatland filed a rebuttal brief demonstrating that Commerce correctly applied its differential pricing analysis in the preliminary results. *See* Wheatland Rebuttal Brief (Feb. 17, 2017) (P.R. 118).

On April 27, 2023, Commerce issued its final results of review. *See* IDM at 2 (P.R. 124). In the final results, Commerce rejected Universal's arguments that Commerce improperly applied its differential pricing analysis after applying its quarterly cost methodology. IDM at 10, 23-24. Commerce noted that, as the Court of Appeals for the Federal Circuit ("Federal Circuit")

has held, Section 777A(d)(1)(B) of the Tariff Act of 1930 (19 U.S.C. § 1677f-1(d)(1)(B)) provides that the agency "is not required to determine why there is a pattern of prices that differs significantly among purchasers, regions, or time periods." *Id.* at 14 (citing *JBF RAK*, 790 F.3d 1358).

On June 22, 2023, Universal filed a complaint with the Court of International Trade ("CIT") challenging Commerce's final results in this administrative review. *See* Universal Complaint (Oct. 22, 2023) (ECF No. 10). On October 26, 2023, Universal filed a Rule 56.2 motion for judgment on the agency record. *See* Universal's Rule 56.2 Br. (Oct. 26, 2023) (ECF No. 24) ("Pls.' Br.").

## SUMMARY OF ARGUMENT

Contrary to the Plaintiffs' arguments, the decision by Commerce to apply both its quarterly cost methodology and differential pricing analysis simultaneously in the same administrative review is consistent with the statute and CIT and Federal Circuit precedent. Both the CIT and the Federal Circuit have held that, when applying its differential pricing analysis, Commerce is not required to consider the reasons for an existing pattern of export prices— only whether such a pattern exists. Thus, it does not matter that one potential explanation for a pattern of price differences among time periods might be the fact that a respondent's costs fluctuated over those time periods. Commerce may still find that a pattern of price differences among time periods exists as part of its differential pricing analysis.

## STANDARD OF REVIEW

When reviewing a final determination by Commerce in an antidumping investigation or administrative review, the Court must uphold the agency's determination unless it is

5

"unsupported by substantial evidence or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The "substantial evidence" standard requires "more than a mere scintilla" of evidence, and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1380 (Fed. Cir. 2008) (citing *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994)). However, "{a}n agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence." *Ad Hoc Shrimp Trade Action Committee v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (citing *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). The reviewing court "must affirm {an agency} decision if it is reasonable and supported by the record as a whole, even if some evidence detracts from {the agency's} conclusion." *Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 716 (Fed. Cir. 2020) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004)).

An agency's decision must also be "in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). To determine whether a decision based on the agency's interpretation of a governing statute is "in accordance with law," the reviewing court applies the *Chevron* test. *Wheatland Tube Co. v. U.S.*, 495 F.3d 1355, 1359 (Fed. Cir. 2007) (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984)). If Congress' intent is clear from the text of the statute, the decision is "in accordance with law" if it "give{s} effect to the unambiguously expressed intent of Congress." *Id.* If the statute is "silent or ambiguous" on the given issue, the reviewing court must uphold an agency's "reasonable" interpretation of the statute. *Id.* at 1360.

# ARGUMENT

I. **Commerce Correctly Applied Both Its Quarterly Cost Methodology and Its Differential Pricing Analysis**

Plaintiff concedes that Commerce's decision to rely on a quarterly cost methodology was supported by substantial evidence. *See* Pls.' Br. at 13. In the underlying review, Commerce identified significant cost changes between the high and low quarterly costs of manufacturing during the POR, and a linkage between these changes and the sales prices of subject merchandise during the POR. *See* PDM at 23. However, Plaintiffs argue that "{h}aving already concluded that it could not compare the selling prices of sales made in different POR quarters, it was inconsistent and contradictory for Commerce to compare the selling prices of Universal's U.S. sales across the four quarters of the POR as part of its differential pricing analysis." Pls.' Br. at 19. As demonstrated below, these two concepts – quarterly costs and differential pricing – are different methodologies to address different questions, and Commerce acted consistently with established precedent in declining to adjust its differential pricing analysis based on findings made pursuant to its quarterly cost methodology.

   A. **19 U.S.C. § 1677f-1(d)(1)(B) Does Not Require Commerce To Consider Causation When Applying Differential Pricing Analysis**

The statute provides at 19 U.S.C. § 1677f-1(d)(1)(B) that Commerce may use the A-T methodology – comparing the weighted average of normal values to the export price or constructed export price of *individual* transactions – to determine whether subject merchandise is being sold at less than fair value if "there is a pattern of export prices (or constructed export prices) … that differ significantly among purchasers, regions, or periods of time" and if Commerce determines "such differences cannot be taken into account using" by using the A-A or T-T methodology. 19 U.S.C. § 1677f-1(d)(1)(B); *see also* 19 U.S.C. § 1677f-1(d)(1)(A). The

7

statute does not provide detailed guidance on comparing different sets of U.S. prices for purposes of determining the existence of a pattern of significant price differences. The only obligations imposed on Commerce are: (1) to examine whether there is a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods and, if such a pattern exists; and (2) to explain why such differences cannot be taken into account using the average-to-average or transaction-to-transaction comparison methods. *See id.* The statute does not require Commerce to discern why such patterns arise, instead focusing on the prices of the U.S. sales alone – i.e., "export prices" or "constructed export prices." *Id.*

The Court should reject Plaintiffs' argument that, because Plaintiffs' prices were linked with significant changes in costs between the four quarters of the POR, Commerce could not analyze whether prices differed significantly among periods of time pursuant to § 1677f-1(d)(1)(B). *See* Pls.' Br. at 16-17. This would require Commerce to consider an alternative explanation for the identified pattern of significantly differing prices, which the Federal Circuit has already determined – twice – that Commerce is not required to do under the statute. *See JBF RAK v. U.S.*, 790 F.3d 1358, 1368 (Fed. Cir. 2015); *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. U.S.*, 608 Fed. Appx. 948, 949-950 (Fed. Cir. 2015).

These Federal Circuit opinions – *JBF RAK v. United States* and *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States* – were published on the same day, and addressed similar arguments. In *JBF RAK*, the appellant argued that "Commerce must consider evidence that price patterns" identified through differential pricing analysis "do not constitute targeted dumping," and that Commerce had erred by refusing to consider evidence that there was a "valid business purpose" for the pricing pattern Commerce had identified. *JBF RAK*, 790 F.3d at 1367-68. According to the appellant, "the pricing pattern found by Commerce was the result of market

8

conditions." *Id.* Similarly, in *Borusan*, the appellant argued that the pattern of differing export prices identified by Commerce was due to "increases in raw material costs" rather than targeted dumping, and that Commerce had erred by refusing to consider this "alternate explanation for the observed pricing pattern." *Borusan*, 608 Fed. Appx. at 949.

The Federal Circuit rejected both challenges. In *JBF RAK*, the Federal Circuit held that "Section 1677f–1(d)(1)(B) does not require Commerce to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods." *JBF RAK*, 790 F.3d at 1368. Additionally, the Federal Circuit noted that there was "no intent requirement" in the statute which would require to Commerce to determine whether a respondent had intended to engage in targeted dumping. *Id.* In *Borusan*, the Federal Circuit held that Commerce is not required to consider alternative explanations presented by respondents. *See Borusan*, 608 Fed. Appx. at 949. Specifically, the Federal Circuit noted that, per its *Chevron* analysis, the statute was silent on whether Commerce was required "to take {this} extra analytical step," and Commerce's interpretation of the statute – that consideration of the respondent's alternate explanation was not required – was a "permissible construction of the statute." *Id.*

The CIT has relied on these cases to determine that "nothing in the statute or the legislative history required Commerce to consider the causation of any pattern of prices that Commerce might identify under 19 U.S.C. § 1677f-1(d)(1)(B)." *Nan Ya Plastics Corp., Ltd. v. United States*, 128 F. Supp. 3d 1345, 1357 (Ct. Int'l Trade 2015). The CIT has also interpreted this precedent to support a finding that even if Commerce's differential pricing analysis "may capture differences in price that are not due to targeted dumping," such analysis is not "unlawful" because, per *JBF RAK*, Commerce is not required to determine *why* the pattern of

9

export prices exists. *The Timken Company v. United States*, 179 F. Supp. 3d 1168, 1179 (Ct. Int'l Trade 2016).

In *Nan Ya Plastics v. United States*, the plaintiff challenged Commerce's application of the differential pricing analysis and the A-T methodology on the grounds that Commerce had failed to consider "record evidence … indicating that differences in the prices that Nan Ya charged for PET film correlated with fluctuations in the cost of inputs that Nan Ya used to produce its merchandise," rather than targeted dumping. *Nan Ya Plastics*, 128 F. Supp. 3d at 1356. The CIT sustained Commerce's decision, holding that the Federal Circuit's precedent in *JBF RAK* and *Borusan* – "establish{ing} that Commerce is under no obligation to consider evidence that factors other than targeted dumping may account for price patterns that the agency identifies through targeted dumping analyses" – was "dispositive of" the plaintiff's argument. *Id.* at 1357-58.

Similarly, in *Timken*, a respondent challenged Commerce's differential pricing analysis as "flawed" on various grounds, including that "it captures tiny differences such as exchange rate fluctuations that are not the result of targeted dumping." *Timken*, 179 F. Supp. 3d at 1177. The CIT upheld Commerce's differential pricing analysis, stating that "whether NTN's U.S. sales were not intentionally targeted or whether the price differences were due to an external factor, such as shifting exchange rates, Commerce's {differential pricing} methodology lawfully identifies a pattern of export prices that differ significantly," and that, pursuant to the Federal Circuit's decision in *JBF RAK*, this was all that Commerce was required to establish under the statute. *Id.* at 1179.

All four cases in this line of jurisprudence are directly relevant to Plaintiffs' appeal in this case, and all four cases dictate that Plaintiffs' challenge to Commerce's final results must fail.

Plaintiffs argue like the appellant in *JBF RAK* that the pricing pattern found by Commerce was "the result of market conditions," like the appellant in *Borusan* and the plaintiff in *Nan Ya* that the pricing pattern is attributable to changes in costs rather than targeted dumping, and like the plaintiff in *Timken* that the pricing pattern reflects external factors other than intentional targeting. *JBF RAK*, 790 F.3d at 1368; *see* Pls.' Br. at 16; *Borusan*, 608 Fed. Appx. at 949; *Nan Ya*, 128 F. Supp. 3d at 1356; *Timken*, 179 F. Supp. 3d at 1177. The courts rejected all these challenges on the basis that Commerce is under no obligation to determine whether a respondent's pricing practices may be attributable to a "legitimate commercial reason" or any other external reason. *Borusan*, 608 F. App'x at 949. Therefore, as in *Nan Ya*, Plaintiffs' argument "must fail" under the existing Federal Circuit precedent. *Nan Ya*, 128 F. Supp. 3d at 1358.

Plaintiffs attempt in vain to distinguish their argument from the arguments raised in *Nan Ya* and *Borusan* on the grounds that they are "not alleging that Commerce failed to consider *why* Universal's prices were different or what the *cause* of such differences might have been," but instead are arguing that Commerce should have taken cross-quarterly cost distinctions into consideration when conducting its differential pricing analysis. Pls.' Br. at 22 (emphasis original). However, this is a distinction without a difference. For Commerce, considering cross-quarterly cost distinctions in its differential pricing analysis would, in fact, require them to "consider evidence that factors other than targeted dumping/differential pricing might account for price patterns that Commerce identified through its analyses"— which Plaintiff itself acknowledges has failed as a basis for appeal before the Federal Circuit and the CIT in *JBF RAK*, *Borusan*, and *Nan Ya*. *Id.*

The CIT has previously rejected efforts to draw meaningless distinctions in order to require Commerce to consider causation, alternate explanations, or intent, despite the Federal

11

Circuit precedent affirming otherwise. In *Golden Dragon Precise Copper Tube Group, Inc. v. United States*, the plaintiff argued against Commerce's "application of a 'mixed' alternative methodology" on the grounds that the price variations identified through Commerce's differential pricing analysis were due to respondent's contractual agreement to set its prices according to "the externality of the London Metals Exchange … spot prices," rather than "a targeted dumping strategy." *Golden Dragon Precise Copper Tube Grp., Inc. v. United States*, 2015 WL 4927515, 37 ITRD 1927, at *6-7 (Ct. Int'l Trade Aug. 19, 2015). The plaintiff attempted to distinguish its argument by arguing that it was requesting only that Commerce "weigh the fact that it … did not 'set' or 'adjust' its U.S. sale prices during the POR," rather than arguing that Commerce should consider the respondent's "intent." *Id.* at *7. However, the CIT explained that "it would seem inescapable that for Commerce to consider that prices were not 'set pursuant to a targeted dumping strategy' would involve consideration of intent." *Id.* The exact same is true in the present case.

### B. Commerce Acted Reasonably When It Applied Both Quarterly Cost and Differential Pricing Analysis

Commerce's application of both its quarterly cost methodology and its differential pricing analysis is not, as Plaintiffs assert, "inconsistent." Pls.' Br. at 22. First, as discussed above, Commerce acted according to this Court's and the Federal Circuit's precedent when it applied the differential pricing analysis without considering *why* the pattern of export prices existed. It was thus not "inconsistent" for Commerce to not consider whether the pattern it identified was caused by changes in quarterly costs. Second, the quarterly cost methodology and differential pricing analysis are different tests for different purposes. The purpose of quarterly cost analysis is to determine whether to deviate from Commerce's normal methodology of calculating an annual

12

weighted-average cost during a time of significant cost changes, to address possible distortions in the annual weighted-average cost. *See* PDM at 23. In contrast, the purpose of the differential pricing analysis is to determine whether there is a difference in prices based on customer, region, or time period such that Commerce should deviate from its normal A-A methodology for calculating the weighted-average dumping margin. *See* U.S.C. § 1677f-1(d)(1)(B).

According to Plaintiffs, it was "inconsistent" for Commerce to consider quarterly price comparisons in its differential pricing analysis, because the agency had determined not to compare selling prices across quarters as part of its quarterly cost methodology based on the finding that there were "significant cost and selling price changes among and between quarters" through its quarterly cost analysis. Pls.' Br. at 15, 23-24. In other words, Plaintiffs attempt to graft the findings of the quarterly cost methodology (determining whether there were changes in costs and prices across quarters) to the differential pricing analysis (determining whether there is a pattern of significant changes in price across time periods). Taken to its logical conclusion, however, if Universal is correct that Commerce had already found a pattern of price differences across the quarters of the POR for *all* of its U.S. sales through its quarterly cost methodology, then it does not follow that Commerce should not apply the A-T methodology to any of its sales based on the lack of a pattern of price differences across different quarters of the POR. Rather, based on Commerce's finding through its quarterly cost methodology that there is a pattern of price differences based on time period for *all* of Universal's U.S. sales, the agency would have to apply the A-T methodology for *all* of Universal's U.S. sales and not only Universal's U.S. sales that passed the Cohen's *d* test.

The above discussion exposes the logical fallacy in Universal's argument equating the results of Commerce's quarterly cost methodology to the results of the agency's differential pricing analysis. As discussed above, these are two different tests used for different purposes. The results of one methodology with respect to changes in prices across quarters cannot be applied to achieve the outcome of the other methodology. Any attempt to do so leads to absurd results.

Finally, not only is there nothing inconsistent with Commerce applying both its quarterly cost methodology and its differential pricing analysis in the same proceeding, it is also necessary to apply both tests simultaneously to ensure that a respondent does not take advantage of a period of rapidly changing costs to engage in masked dumping. As mentioned, the quarterly cost methodology allows Commerce to accurately measure whether a respondent is making sales below cost or otherwise selling at prices below normal value during a time of rapidly changing costs. If Commerce were to abandon its differential pricing analysis whenever it applied its quarterly cost methodology, this would allow respondents to take advantage of large swings in costs over the POR to help mask their dumping behavior. Commerce's differential pricing analysis and the use of the A-T methodology will unmask dumping that is targeted at a time period when costs have swung to low levels. If Commerce were precluded from applying its differential pricing analysis under these circumstances, it would also be precluded from addressing such masked dumping. This result would be fundamentally at odds with the statute and Congressional intent.

## II. Conclusion

For the foregoing reasons, Commerce's decision to apply both the quarterly cost methodology and the differential pricing analysis in the underlying review was supported by substantial evidence and otherwise in accordance with law. The agency's final results should, therefore, be upheld.

Respectfully Submitted,

/s/ Luke A. Meisner
Roger B. Schagrin, Esq.
Luke A. Meisner, Esq.
SCHAGRIN ASSOCIATES
900 Seventh Street, NW,
Suite 500
Washington, DC 20001
(202) 223-1700
*Counsel for Wheatland Tube Company*

Dated: January 24, 2024

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing response brief contains 4,131 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in the Court's Chamber's Procedures.

*/s/ Luke A. Meisner*

Luke A. Meisner, Esq.


Dated: January 24, 2024