**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:   THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., et al., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Court No. 23-00113 ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) ) |
| and | ) ) |
| WHEATLAND TUBE COMPANY, | ) ) |
| Defendant-Intervenor. | ) ) ) |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
<u>RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD</u>**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:
BRISHAILA BROWN
Attorney
Office of the Chief Counsel
  for Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.
Telephone:  (202) 482-0131

KELLY M. GEDDES
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-2867
Email: kelly.geddes2@usdoj.gov

January 24, 2024

*Attorneys for Defendant*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:   THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____
                                                        )
UNIVERSAL TUBE AND PLASTIC                )
INDUSTRIES, LTD., et al.,                           )
                                                        )
                          Plaintiffs,                  )
                                                        )
            v.                                          )            Court No. 23-00113
                                                        )
UNITED STATES,                                    )
                                                        )
                          Defendant,                 )
                                                        )
            and                                         )
                                                        )
WHEATLAND TUBE COMPANY,             )
                                                        )
                          Defendant-Intervenor.   )
_____)

## ORDER

Upon consideration of the plaintiffs' Rule 56.2 motion for judgment on the agency

record, defendant's opposition, and all other pertinent papers, it is hereby

ORDERED that the plaintiffs' Rule 56.2 motion for judgment on the agency record is

denied; and it is further

ORDERED that judgment shall issue for the United States.


Dated: _____, 2024                    _____
         New York, New York                                                   JUDGE

## <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 56.2 ................................................................ 2

    I.    Administrative Determination Under Review ......................................... 2

    II.    Issue Presented For Review ..................................................................... 2

STATEMENT OF FACTS ..................................................................................... 2

SUMMARY OF THE ARGUMENT ...................................................................... 5

ARGUMENT ......................................................................................................... 6

    I.    Standard Of Review ................................................................................ 6

    II.    Commerce's Comparison Of Prices Of United States Sales Across Quarters In Its Differential Pricing Analysis Is Supported By Substantial Evidence And In Accordance With Law ................................ 8

        A.    Methodology For Determining Cost Of Production ................................... 8

        B.    Methodology For Comparing Normal Value To Export Prices To Identify Dumping ........................................................................ 10

        C.    Commerce's Determination To Account For Time Periods In Its Differential Pricing Analysis Is Supported By Substantial Evidence And In Accordance With Law .......................................... 14

CONCLUSION ................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Apex Frozen Foods Priv. Ltd. v. United States*, 144 F. Supp. 3d 1308 (Ct. Int'l Trade 2016)..... 19

*Atl. Sugar Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984).................................................... 7

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 608 F. App'x 948 (Fed. Cir. 2015)................................................................................................................. 5, 15, 16, 17

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966)..................................................................... 6

*Corus Staal BV v. United States*, 502 F. 3d 1370 (Fed. Cir. 2007) ....................................... 17, 19

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996)............................................ 6, 7

*JBF RAK LLC v. United States*, 790 F.3d 1358 (Fed. Cir. 2015) ........................................ passim

*King Supply Co., LLC v. United States*, 674 F. 3d 1343 (Fed. Cir. 2012) ................................... 19

*Nan Ya Plastics Corp., Ltd. v. United States*, 128 F. Supp. 3d 1345 (Ct. Int'l Trade 2015) . passim

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006)........................................... 7

*PAM, S.p.A. v. United States*, 582 F.3d 1336 (Fed. Cir. 2009)...................................................... 6

*Paul Muller Industrie GmbH & Co. v. United States*, 502 F. Supp. 2d 1271 (Ct. Int'l Trade 2007) ............................................................................................................................................. 18

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990)....................................... 18

*Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714 (Ct. Int'l Trade 2001)..... 7

*Soc Trang Seafood Joint Stock Co. v. United States*, 321 F. Supp. 3d 1329 (Ct. Int'l Trade 2018) ............................................................................................................................................. 19

*Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021)........................................................ 7

*U.S. Steel Grp. v. United States*, 96 F.3d 1352 (Fed. Cir. 1996) .................................................. 7

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009)...................................................................... 6

**Statutes**

19 U.S.C. § 1677b.................................................................................................................. passim

19 U.S.C. § 1677f-1 .............................................................................................................. passim

**Regulations**

19 C.F.R. § 351.309 ..................................................................................................................... 17

19 C.F.R. § 351.414 ..................................................................................................................... 10

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:   THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____

|  |  |  |
|---|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., et al., | ) ) ) |  |
|  | ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | Court No. 23-00113 |
| UNITED STATES, | ) ) |  |
| Defendant, | ) ) |  |
| and | ) ) |  |
| WHEATLAND TUBE COMPANY, | ) ) |  |
| Defendant-Intervenor. | ) ) |  |

_____

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade (USCIT R.), defendant, the United States, respectfully submits its response to the motion for judgment on the agency record filed by plaintiffs, Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding and Formwork LLC (collectively, Universal).  Universal challenges aspects of the final results of the Department of Commerce's 2020-2021 administrative review of the antidumping duty order on circular welded carbon-quality steel pipe from the United Arab Emirates (UAE).  As we demonstrate below, the Court should deny plaintiffs' motion for judgment on the agency record because Commerce's final results are supported by substantial evidence and in accordance with law.

**STATEMENT PURSUANT TO RULE 56.2**

I.      **Administrative Determination Under Review**

The administrative determination under review is the final results of the 2020-2021 administrative review of the antidumping duty order on circular welded carbon-quality steel pipe from the United Arab Emirates (UAE). *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 28,483 (Dep't of Commerce May 4, 2023) (P.R. 123) (Final Results) and accompanying Issues and Decision Memorandum (IDM) (P.R. 124). The period of review is December 1, 2020 through November 30, 2021.

II.     **Issue Presented For Review**

Whether Commerce's inclusion of time periods in its Cohen's *d* test to determine whether there was a pattern of prices that differ significantly during the period of review was supported by substantial evidence and in accordance with the law.

**STATEMENT OF FACTS**

On February 4, 2022, Commerce initiated an administrative review of its antidumping duty order on circular welded carbon-quality steel pipe from the UAE. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 6,487 (Dep't of Commerce Feb. 4, 2022) (Initiation Notice) (P.R. 7). Commerce selected Universal for individual examination as a mandatory respondent based on Customs and Border Protection data.[1] *See* Respondent Selection Memorandum (March 18, 2022) (P.R. 22) (C.R. 4).

---

[1]  Commerce also selected Ajmal Steel Tubes & Pipes Ind. L.L.C./Ajmal Steel Tubes & Pipes Ind. L.L.C. Branch 1 (collectively, Ajmal) as a mandatory respondent. Ajmal did not challenge Commerce's final results.

On December 28, 2022, Commerce published its preliminary results, including an antidumping rate of 2.61 percent for Universal.  *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Preliminary Results of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 79,862 (Dep't of Commerce Dec. 28, 2022) (Preliminary Results) (P.R. 104), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 105).[2]

As part of its antidumping margin calculation, Commerce calculates a normal value for the subject merchandise based on sales of the subject merchandise in the exporting country.  19 U.S.C. § 1677b(a)(1).  In doing so, Commerce may exclude from its calculation any sales made at less than the cost of production.  19 U.S.C. § 1677b(b).  To calculate the cost of production, Commerce's normal practice is to calculate an annual weighted-average cost for the period of review.  PDM at 23.  However, Commerce recognizes that possible distortions may result from this method if a respondent experiences significant cost changes during portions of the period of review.  In its preliminary results, Commerce concluded that Universal did experience such cost changes during the period of review, and therefore used quarterly weighted-average costs instead of annual weighted-average costs to calculate the cost of production.

Commerce also performed a differential pricing analysis of Universal's sales in the United States, pursuant to 19 U.S.C. § 1677f-1(d)(1)(B).  PDM at 10-12.  Commerce conducts this analysis to determine whether the sales prices differ significantly between different purchasers, regions, or time periods.  *Id.* at 10.  If significant differences exist, Commerce's usual methods for determining whether dumping is occurring—comparing average prices to

---

[2] On February 3, 2023, Commerce corrected the docket number in the heading of the Preliminary Results.  *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Preliminary Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 7,404 (Dep't of Commerce February 3, 2023) (P.R. 110).  No substantive changes were made to the preliminary results in the corrected notice.

average normal values—might not capture more targeted dumping practices.  Commerce therefore compared Universal's prices across purchasers, regions, and time periods.  *Id.* at 12. With respect to time periods, Commerce followed its normal practice of defining time period by quarter.  *See id.* at 11.  Commerce found that there were significant differences in price across these dimensions.  *Id.* at 12.  Commerce further found that its usual methodologies could not account for these differences.  *Id*.  Accordingly, where the sales prices associated with a particular purchaser, region, or time period different sufficiently from the prices of other sales, Commerce determined whether dumping occurred for those transactions by comparing the weighted average of the normal values to the prices of the individual transactions, pursuant to 19 U.S.C. § 1677f-1(d)(1)(B).  PDM at 12.

Following the preliminary results, Commerce received administrative case briefs from Universal and the petitioners.  *See* Universal's Administrative Case Brief (February 10, 2023) (P.R. 117) (C.R.  230);  Petitioners' Administrative Case Brief (February 10, 2023) (P.R. 116) (C.R. 229); Petitioners' Rebuttal Case Brief (February 17, 2023) (P.R. 118) (C.R. 231). Universal stated that Commerce correctly departed from its standard annual cost approach to a quarterly cost approach based on significant cost variation over the period of review.  *See* Universal's Administrative Case Brief at 2.  However, Universal argued that this same cost variation required Commerce to also adjust its differential pricing analysis by declining to consider any variations in price from quarter to quarter, because Commerce had identified those price variations as resulting from quarterly cost variations.  *Id.* at 4-5.

Commerce issued its final results on May 4, 2023.  Commerce continued to find significant cost variations from quarter to quarter and to therefore apply a quarterly cost methodology.  *See* Final Results Calculations for Universal (Dep't of Commerce April 28, 2023)

(P.R. 126) (C.R. 243).[3]  Commerce also continued to compare prices across quarters as part of its differential pricing analysis, and continued to find significant differences in export prices across different purchasers, regions, or time periods.  IDM at 10-15.  For certain transactions, Commerce therefore continued to determine whether dumping occurred by comparing average normal values to the export prices for the individual transactions.  *Id.* at 15.

This litigation followed.

## SUMMARY OF THE ARGUMENT

Commerce's final results are supported by substantial evidence and in accordance with law.  Commerce reasonably interpreted 19 U.S.C. § 1677f-1(d)(1)(B), the statute governing its differential pricing analysis, when it compared prices across quarters to determine whether Universal's pricing behavior differed significantly between purchasers, regions, or time periods.  As the Federal Circuit has repeatedly affirmed, the statute does not require that Commerce consider whether changes in costs caused the changes in prices over time.  *JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015); *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 608 F. App'x 948, 949 (Fed. Cir. 2015).  For that reason, the Court has already rejected the argument that where Commerce finds changes in price over time that correlate with changes in costs, and therefore uses a quarterly cost methodology, it should not consider those price changes over time in its differential pricing analysis.  *Nan Ya Plastics Corp., Ltd. v. United States*, 128 F. Supp. 3d 1345, 1357-58 (Ct. Int'l Trade 2015).  Accordingly, the fact that Commerce found changes in costs over time that justified a quarterly approach to its

---

[3]  On May 4, 2023, Commerce issued a notification of, and correction of, the inadvertent, duplicate publication of the final results in the *Federal Register*.  *See Circular Welded Carbon-Quality Steel Pipe From the United Arab Emirates: Final Results of Antidumping Duty Administrative Review, 2020–2021; Correction*, 88 Fed. Reg. 30,726 (Dep't of Commerce May 4, 2023) (P.R. 129).

*calculation of the cost of production* did not preclude Commerce from considering quarter-to-quarter changes in price for the purpose of its *differential pricing analysis*. Rather, Commerce's reasoned determination to do so is consistent with the statute, supported by substantial evidence, and in accordance with law.

Plaintiffs also failed to exhaust their administrative remedies with respect to the argument that Commerce could have used a unit of time other than quarters for its differential pricing analysis. Plaintiffs did not raise this specific argument in their administrative case brief, and none of the exceptions to the exhaustion requirement apply.

## ARGUMENT

### I.    Standard Of Review

In reviewing the final results of Commerce's antidumping duty administrative reviews, "the Court of International Trade must sustain 'any determination, finding or conclusion' found by Commerce unless it is 'unsupported by substantial evidence on record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

"The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). Further, even if the Court may draw two inconsistent conclusions from the record evidence, that possibility "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court will sustain Commerce's factual determination as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from them.  *See Atl. Sugar Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *see also Shandong Huarong Gen.  Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001).

The Court affords Commerce a great deal of deference when "a statute fails to make clear 'any Congressionally mandated procedure of methodology for assessment of the statutory tests.'" *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)).  In the absence of any congressionally mandated methodology, the Federal Circuit has held that "Commerce 'may perform its duties in the ways it believes most suitable.'"  *Id.*; *see also Fujitsu Gen Ltd*, 88 F.3d at 1039  (requiring "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when Commerce exercises its technical expertise to select and apply methodologies to implement dictates of the trade statute).  Commerce's approach must involve a reasonable interpretation and implementation of the statute.  *Stupp Corp. v. United States*, 5 F.4th 1341, 1353 (Fed. Cir. 2021) ("Our precedents make clear that the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness, not substantial evidence") (citations omitted); *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 667 (Fed. Cir. 2019) ("In carrying out its statutorily assigned tasks, Commerce has discretion to make reasonable choices within statutory constraints"); *JBF RAK*, 790 F.3d 1358, 1364 (holding that Commerce's interpretation of 19 U.S.C. § 1677f-

l(d)(1)(B)(i) was reasonable and that "because Congress did not provide for a direct

methodology, Commerce properly filled that gap") (cleaned up).

## II.    Commerce's Comparison Of Prices Of United States Sales Across Quarters In Its Differential Pricing Analysis Is Supported By Substantial Evidence And In Accordance With Law

Universal argues that it was not appropriate for Commerce to compare export prices

across quarters for the purpose of determining whether there were significant changes in price

across purchasers, regions, or time periods.  Pl. Br. at 16.  According to Universal, this approach

is inconsistent with Commerce's choice to calculate costs of production on a quarterly basis due

to changes in costs over the course of the period of performance.  However, as set forth below,

this Court has already rejected this precise argument as barred by Federal Circuit precedent.  *See*

*Nan Ya*, 128 F. Supp. 3d at 1357-58.  Ultimately, Commerce simply followed its statutory

mandate and its standard practice when it considered quarter-to-quarter changes in price as part

of its differential pricing analysis.

### A.    Methodology For Determining Cost Of Production

As part of its dumping margin calculation, Commerce calculates a normal value for the

subject merchandise.  19 U.S.C. § 1677b.  As part of that process, it calculates a weighted-

average cost of production to ensure that the normal value is not based on sales that were made

below the cost of production. weighted-average cost of production in order to calculate a normal

value for the subject merchandise.  19 U.S.C. § 1677b(b).  Commerce ultimately compares the

normal value to the United States sales prices during the period of review to determine if the

merchandise was sold for less than fair value.  The process for determining the appropriate

weighted-average cost of production is distinct from the process of comparing the normal value

to United States prices to determine dumping.

In its cost of production analysis conducted under 19 U.S.C. § 1677b(b), Commerce's normal practice is to calculate a single annual weighted-average cost for the period of review. *See* PDM at 23. However, this may distort the results when the costs of production change significantly throughout the period of review. Therefore, Commerce will deviate from its normal methodology of calculating an annual weighted-average cost and rely on quarterly costs if two criteria are met: (1) the change in the cost of manufacturing recognized by the respondent during the period of review is significant; and (2) the record evidence indicates that sales prices during the shorter cost averaging periods could be reasonably linked with the cost of production or constructed value during the same shorter cost averaging periods. *Id.* For the first criterion, Commerce considers any change over 25% to be significant. *Id.* Commerce found the changes in Universal's costs over the period of review to exceed this 25% threshold. *Id.*

Turning to the second criterion, whether there was a correlation between changes in the sales prices and the changes in the underlying costs of manufacturing during the period of review, Commerce compared the weighted-average quarterly sales prices to the corresponding quarterly costs of manufacturing for high volume control numbers.[4] PDM at 23; *see also* Preliminary Results Calculation Memorandum for Universal (December 20, 2022) (P.R. 108) (C.R. 218) at 2-3. This comparison revealed that the sale prices and the quarterly costs of manufacturing were trending in the same direction during the period of review for the majority of quarters and control numbers. *See* Preliminary Results Calculation Memorandum for

---

[4] A "control number," sometimes referred to as a "CONNUM," is Commerce jargon for a unique product (defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding). All products whose product hierarchy characteristics are identical are deemed to be part of the same CONNUM and are regarded as "identical" merchandise for purposes of the price comparison.

Universal at 3.  Therefore, Commerce found that there was a reasonable correlation between the sales prices and costs of manufacturing for Universal during the period of review.  *Id.*

Accordingly, Commerce determined that both criteria under 19 U.S.C. § 1677b(b) were met and a departure from Commerce's standard annual cost methodology was warranted.  PDM at 23-24.  Commerce therefore calculated Universal's cost of production on a quarterly, rather than annual, basis.  *Id. at* 3.

**B.      Methodology For Comparing Normal Value To Export Prices To Identify Dumping**

To calculate the dumping margin, Commerce must compare its calculated normal value to the export prices throughout the period of review to determine whether subject merchandise is being, or is likely to be, sold at less than fair value in the United States.  To perform this pricing comparison, the statute instructs Commerce to generally rely on one of two methodologies:  the "average-to-average" method, in which Commerce compares the weighted average of the normal values to the weighted average of the export prices, or the "transaction-to-transaction" method, in which Commerce compares the normal value of an individual transaction to the export price of an individual transaction.  19 U.S.C. § 1677f-1(d)(1)(A).  Commerce generally relies on the average-to-average method, using the transaction-to-transaction method only under particular circumstances not relevant here.  19 C.F.R. § 351.414(c)(2).

In addition, the statute provides for a third method—the "average-to-transaction" method—wherein Commerce compares the weighted average of the normal values to the export prices of individual transactions.  19 U.S.C. § 1677f-1(d)(1)(B).  Commerce may use this method if it determines that (i) there is a pattern of export prices for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and (ii) those differences cannot be taken into account using the average-to-average or transaction-to-transaction methodologies.  *Id.*

In this manner, Commerce can identify targeted cases of dumping that would not be identified through a simple comparison of averages.

Commerce conducts a differential pricing analysis to determine whether the average-to-transaction method should be used rather than one of the standard comparison methods. Its differential pricing analysis consists of two stages, addressing the two criteria in 19 U.S.C. § 1677f-1(d)(1)(B). The first stage is comprised of the "Cohen's *d* test" and the "ratio test." The Cohen's *d* test considers whether price differences exhibited among different purchasers, regions, or time periods are significant. The ratio test evaluates the extent that these significant price differences are exhibited in the exporter's pricing behavior to determine whether there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time. The second stage, if applicable, is the "meaningful difference" test, which examines whether the average-to-average comparison method can account for the price differences exhibited in the respondent's pricing behavior, or if the average-to-average method fails to so and may therefore result in masked dumping.

### 1. **The Cohen's *d* Test**

In the first stage of the differential pricing analysis, Commerce first applies the Cohen's *d* test. The Cohen's *d* coefficient measures the extent of the difference between the weighted-average price of a test group and the weighted-average price of a comparison group. For the comparable merchandise, the Cohen's *d* coefficient is calculated when the test and comparison groups of data for specific purchaser, region, or time period have at least two observations, and when the sales quantity for the comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise. Then, the Cohen's *d* coefficient is used to gauge the extent to which the prices for this particular purchaser, region, or time period differ

significantly from the prices of all other sales of comparable merchandise.  The extent of these differences can be quantified by three fixed thresholds defined by the Cohen's *d* test: small, medium, or large (0.2, 0.5, and 0.8, respectively).  The large threshold provides the strongest indication that there is a significant difference between the mean of the test and the comparison groups.

In this case, Commerce found the extent of the difference to be significant, and the sales in the test group were found to pass the Cohen's *d* test because the calculated Cohen's *d* coefficient is equal to or exceeds the large (*i.e.*, 0.8) threshold.  *See* PDM at 11-12.

### 2.  **The Ratio Test**

The second part of the first stage of Commerce's differential pricing analysis is the "ratio test."  Commerce uses the ratio test to evaluate the extent to which significant price differences are exhibited in a respondent's pricing behavior and whether a "pattern" exists during the period of review, consistent with 19 U.S.C. § 1677f-1(d)(1)(B).  For the ratio test, the results of the Cohen's *d* test are aggregated by totaling the value of the sales found to pass that test.  If 33 percent or less of the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test, then the results of the Cohen's *d* test do not support consideration of an alternative to the average-to-average method.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results support consideration of the application of an average-to-transaction method to those sales identified as passing the Cohen's *d* test as an alternative to the average-to-average method and application of the average-to-average method to those sales identified as not passing the Cohen's *d* test.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's *d* test account for 66 percent or more of the value of total sales, then the identified

pattern of prices that differ significantly supports the consideration of the application of the average-to-transaction method to all sales as an alternative to the average-to-average method.

Here, Commerce found that 65.42 percent of the value of Universal's United States sales passed the Cohen's *d* test, confirming the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Commerce therefore considered whether to apply the average-to-transaction method to those sales identified as passing the Cohen's *d* test.  *See* PDM at 12; IDM at 15.

### 3.  The Meaningful Difference Test

If both tests in the first stage of the differential pricing analysis, the Cohen's *d* test and the ratio test (*i.e.*, the pattern test), demonstrate the existence of a pattern of prices that differ significantly such that an alternative comparison method should be considered then Commerce moves on to the second stage of the differential pricing analysis.  PDM at 11.  In the second stage, Commerce examines whether using only the average-average method can appropriately account for such differences.  In considering this question, Commerce tests whether using an alternative comparison method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the average-to-average method (*i.e.*, the meaningful difference test).  *Id.* at 10-11.  If the difference between the two calculations is meaningful, then this demonstrates that the average-to-average method cannot account for differences in the pattern of prices and, therefore, an alternative comparison method would be appropriate.  *Id.* at 11.  The difference in weighted-average dumping margins is considered meaningful if there is (1) a 25 percent relative change in the weighted-average dumping margins between the average-to-average method and the appropriate alternative method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the average-to-average method and the appropriate alternative method move across the

*de minimis* threshold.  If either of these two conditions are met, then the difference between the two calculations is meaningful, and an alternative comparison method would be appropriate to unmask dumping.

In this case, Commerce determined that there was a meaningful difference between the weighted-average dumping margin calculated using the average-to-average method and the weighted-average dumping margin calculated using the average-to-transaction method to the United States sales that passed the Cohen's *d* test and the average-to-average method to the United States sales that did not pass the Cohen's *d* test.  Universal Preliminary Calculation Memo at 8.  Therefore, Commerce concluded that it was appropriate to use the average-to-transaction method for the sales that passed the Cohen's *d* test.

### C.    Commerce's Determination To Account For Time Periods In Its Differential Pricing Analysis Is Supported By Substantial Evidence And In Accordance With Law

Universal argues that because Commerce calculated a quarterly rather than annual weighted-average cost of production based on a finding that the cost of production changed throughout the period of review, Commerce was not permitted to conduct a differential analysis that considered whether there were significant differences in prices across quarters during the period of review.  Pl. Br. at 18-19.  Universal's argument is essentially an argument that the differential pricing analysis cannot consider differences in price caused by changes in the cost of production.  However, the Federal Circuit has already considered and rejected this argument.  Not only are Universal's attempts to distinguish this case unavailing, this Court already rejected an identical attempt in *Nan Ya Plastics Corp., Ltd. v. United States*, 128 F. Supp. 3d 1345, 1352 (Ct. Int'l Trade 2015).

14

The Federal Circuit has affirmed that when conducting its differential price analysis, Commerce is not required to investigate a respondent's intention or subjective reasons for differing prices.  *See* IDM at 14.  The Federal Circuit has held:

> Section 1677f-1(d)(1)(B) does not require Commerce to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods…the {Court of International Trade} did not err in finding there is no intent requirement in the statute, and we agree with the {Court of International Trade} that requiring Commerce to determine the intent of a targeted dumping respondent "would create a tremendous burden on Commerce that is not required or suggested by the statute."

*JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015).  For these reasons, the Federal Circuit specifically rejected the idea that Commerce must consider whether a pattern of differing prices over time "occurred due to increases in raw material costs."  *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 608 F. App'x 948, 949 (Fed. Cir. 2015).

Pursuant to *JBF RAK* and *Borusan*, this Court has already rejected the precise argument Universal makes here.  In *Nan Ya*, Commerce similarly determined to use a quarterly costing approach because Commerce found "a reasonable correlation between the fluctuations in Nan Ya's production costs and changes in the prices charged by the company."  *Nan Ya*, 128 F. Supp. At 1352.  Nan Ya argued that because of this record evidence that its price changes over time were caused by changes in cost, Commerce should not have used those price changes to justify the use of the average-to-transaction method.  *Id.* at 1356.  The Court explained that it had already rejected a "virtually identical" argument in *Borusan*.  *Id.* at 1358.  The Court also noted that Commerce's decision to use a quarterly cost methodology was made "in a different context."  *Id.* at 1352.

There is no meaningful distinction between this case and *Nan Ya*.  Universal relies entirely on Commerce's decision to use quarterly rather than annual weighted-average costs of production, based on Commerce's finding of a correlation between Universal's cost and price changes, to argue that Commerce should be prohibited from comparing prices across periods of time as part of its differential pricing analysis.  Pl. Br. at 14-16.  The Court should find here, as it did in *Nan Ya*, that this argument is precluded by the holdings in *JBF RAK* and *Borusan*.

Universal attempts to distinguish its argument by stating that it "is not alleging that Commerce failed to consider *why* Universal's prices were different or what the *cause* of such differences might have been," but rather is "challeng{ing} Commerce's comparisons of Universal's selling prices in different quarters of the {period of review} for its differential pricing analysis when it simultaneously determined that such comparisons were improper and unlawful and when Commerce specifically modified its normal dumping calculation programs to eliminate such comparisons."  Pl. Br. at 22.  But Commerce never found that comparing prices across quarters was "improper and unlawful," Pl. Br. at 22, nor that the sales in different quarters were "incomparable."  Pl. Br. at 15.  These are Universal's words, and they do not accurately characterize Commerce's determinations.  Rather, they amount to a rhetorical attempt to differentiate this case from *Nan Ya* when in fact the cases are materially identical.

As explained above, Commerce simply followed its normal practice of determining whether significant fluctuations in costs from quarter to quarter correlated with fluctuations in sales such that a quarterly weighted-average cost of production would yield more accurate results than an annual weighted-average cost of production, which might be distortive.  PDM at 23-24.  This is a separate question from whether prices differentiated between quarters for the purpose of the Cohen's *d* test; Commerce's cost determinations are governed by a different provision of the

statute than its differential pricing analysis.  *See* 19 U.S.C. § 1677b(b), and 19 U.S.C. § 1677f-1(d)(1)(B), respectively.  Commerce followed the statute and its established practice when it relied on quarterly costs, and Commerce also followed the statute and its established practice when it performed its differential pricing comparisons on a quarterly basis.  In arguing that these determinations were inconsistent, Universal is just using different words to make the same argument as the plaintiffs in *JBF RAK*, *Nan Ya* and *Borusan*: that if changes in price across time appear to be caused by changes in cost, Commerce should not consider those price changes in determining whether to apply the average-to-average or the average-to-transaction method of comparison.  This argument has been decisively rejected.

Further, Universal fails to get around the statutory language expressly permitting Commerce to use the average-to-transaction method when there are significant differences in prices between different time periods.  19 U.S.C. § 1677f-1(d)(1)(B).  Universal argues that because the statutory language is permissive, Commerce is not required to consider patterns of prices over periods of time in all cases, and should not have done so here.  Instead, Universal argues Commerce could have considered only whether there were differences in price across purchasers or regions, or used a period of time other than quarters to determine whether there were differences across periods of time.  Pl. Br. at 3.

As an initial matter, Universal failed to exhaust its argument that Commerce could have considered other periods of time to determine whether the "pattern" and "significant difference criteria" were satisfied.  Pl. Br. at 23.  This Court has recognized that failure to raise an argument in an administrative case brief, as required by 19 C.F.R. § 351.309, is a basis to decline to entertain a new argument raised for the first time in litigation.  *Corus Staal BV v. United States*, 502 F. 3d 1370, 1379 (Fed. Cir. 2007) (recognizing that the exhaustion requirement protects

administrative agency authority and promotes judicial efficiency).  Also, Commerce's regulation

at 19 C.F.R. § 351.309 (c)(2) provides that case briefs must raise specific arguments ahead of the

final results ("The case brief must present all arguments that continue in the submitter's view to

be relevant to the Secretary's {} final results, including any arguments presented before the date

of publication of the {} preliminary results.").

In its administrative case brief before Commerce, Universal argued that Commerce

should not include time periods in its Cohen's *d* differential pricing analysis, but did not raise the

alternative argument that Commerce should use a unit of time other than quarters to assess

differences in prices over time periods.  *See* Universal Administrative Case Brief at 2-3 ("To

ensure that the results of Commerce's Cohen's *d* test are not inappropriately impacted by

significant changes in quarterly direct material costs and consequent changes in quarterly prices,

Commerce in the final results must limit the first part of its Cohen's *d* differential pricing

analysis to a comparison of groups of sales data only for particular purchasers and regions, and

*not for time periods*.") (emphasis added).  Nor did Universal suggest a specific alternative time

period.  A party's obligation to exhaust its administrative remedies in proceedings before

Commerce applies both to broad issues and arguments related to those issues.  *See Rhone*

*Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (disagreeing with the

contention that court can consider new arguments so long as the general issue was raised at the

agency level); *Paul Muller Industrie GmbH & Co. v. United States*, 502 F. Supp. 2d 1271, 1275

(Ct. Int'l Trade 2007) (holding that when a party raises a general issue, but fails to incorporate a

specific argument among other arguments that relate to the same issue, it fails to exhaust its

administrative remedies with respect to the argument).  The exceptions to the exhaustion

requirements are limited, as the Court "generally takes a 'strict view' of the requirement that

parties exhaust their administrative remedies before the Department of Commerce in trade cases." *Corus Staal BV*, 502 F.3d at 1379.  Therefore, this Court should decline to entertain Universal's arguments concerning the use of a different time period in its Cohen's *d* analysis.

Additionally, Universal offers no reason that it was unreasonable or unlawful for Commerce to consider price changes across time periods, and specifically across quarters, for its differential analysis, other than its implicit argument, barred by the Federal Circuit's precedent, that it should not have done so because evidence suggested that costs varied over time. Commerce simply followed the statutory language and its standard practice by considering time periods, and by defining time periods by quarters.  *See* IDM at 11; *see also* Universal Preliminary Calculation Memo at 3.  The Federal Circuit has held that this practice is reasonable. *See, e.g., Apex Frozen Foods Priv. Ltd. v. United States*, 144 F. Supp. 3d 1308, 1313-35 (Ct. Int'l Trade 2016), *aff'd, Apex II*, 862 F.3d 1337 (Fed. Cir. 2017)*; see also Soc Trang Seafood Joint Stock Co. v. United States*, 321 F. Supp. 3d 1329, 1338 (Ct. Int'l Trade 2018) (finding "Commerce's differential pricing analysis, as applied, constitutes a reasonable methodology for identifying patterns of prices that differ significantly and is therefore in accordance with law").

At most, in suggesting that Commerce should have conducted its differential pricing analysis using a different unit of time, or without considering time at all, Universal identifies different approaches that Commerce could have taken but fails to articulate why Commerce's chosen methodology was unreasonable.  That a plaintiff can point to evidence that detracts from the agency's conclusion or the possibility of drawing two inconsistent conclusions from the evidence does not preclude the agency's antidumping determination from being supported by substantial evidence.  *King Supply Co., LLC v. United States*, 674 F. 3d 1343, 1348 (Fed. Cir. 2012).  As set forth above, Commerce's determination here is consistent with its practice, the

statute, and with ample precedent supporting Commerce's practice of not considering the reason for price fluctuation during a given period.

Therefore, Commerce's decision to use quarterly time periods in the Cohen's *d* analysis is reasonable and in accordance with the statute.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny the plaintiffs' motion for judgment on the agency record and sustain Commerce's final results in their entirety.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICA M. McCARTHY
Director

/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

/s/ Kelly M. Geddes
OF COUNSEL:                        KELLY M. GEDDES
BRISHAILA BROWN                    Trial Attorney
Attorney                          Commercial Litigation Branch
Office of the Chief Counsel       Civil Division
  for Trade Enforcement and Compliance   Department of Justice
U.S. Department of Commerce       P.O. Box 480
Washington, D.C.                  Ben Franklin Station
Telephone:  (202) 482-0131        Washington, D.C.  20044
                                  Telephone: (202) 307-2867
                                  Email: kelly.geddes2@usdoj.gov

January 24, 2024                  *Attorneys for Defendant*

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 5,734 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>/s Kelly M. Geddes</u>
Kelly M. Geddes