A-520-807
Remand
Slip Op. 24-85
POR: 12/01/2020 – 11/30/2021
**Public Document**
E&C/OII: Team

***Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries, LLC, and KHK Scaffolding & Formwork, LLC v. United States***
**Consol. Court No. 23-00113, Slip Op. 24-85 (CIT July 26, 2024)**
**Circular Welded Carbon Quality Steel Pipe from the United Arab Emirates**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the opinion and remand order of the U.S. Court of International Trade (the Court) issued in *Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries, LLC, and KHK Scaffolding & Formwork, LLC v. United States*, Slip Op. 24-85, Consol. Court No. 23-00113 (CIT 2024) (*Remand Order*). This action arises out of the 2020-2021 administrative review of the antidumping duty (AD) order on circular welded carbon-quality steel pipe from the United Arab Emirates, covering the period of review (POR) December 1, 2020, through November 30, 2021.[1] Universal Tube and Plastic Industries, Ltd.; THL Tube and Pipe Industries, LLC; and KHK Scaffolding & Formwork, LLC (collectively, Universal), the plaintiff in this action, was one of the two mandatory respondents in the underlying administrative review.

---

[1] *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 FR 28483 (May 4, 2023) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM); *see also Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review, 2020-2021; Correction*, 88 FR 30726 (May 12, 2023) (acknowledging the inadvertent duplicate publication of the *Final Results* in the *Federal Register*).

The Court remanded to Commerce to reconsider or further explain its use of a same- and inter-quarter comparison in the same administrative review.  The Court observed that, as Commerce had resorted to quarterly cost-averaging periods, its comparison of U.S. price with normal value in the dumping margin calculation was limited to the quarter of the U.S. date of sale, what the Court referred to as a "same-quarter" comparison.[2]  The Court further observed that, as part of the Cohen's *d* test, Commerce compared U.S. sale prices between different quarters of the POR, what the Court referred to as an "inter-quarter" comparison.[3]  Universal argued that Commerce's two approaches to price comparisons within the same administrative review were "internally inconsistent, arbitrary and contrary to law."[4]  The Court remanded to Commerce its "internally inconsistent determinations"[5] "for Commerce to reconsider or provide further explanation in accordance with this Opinion."[6]  In doing so, the Court observed that, if resorting to a "same-quarter" comparison in one segment of the administrative review was justified to avoid "distortive results," then "it does not follow" that an "inter-quarter" comparison should be used "in a different segment of the administrative review."[7]  Commerce finds it is appropriate to continue to calculate Universal's weighted-average dumping margin as it did in the *Final Results*, as well as to perform the Cohen's *d* test as it did therein.  Consistent with the Court's *Remand Order*, we further explain our determinations to do so below.

---

[2] *See Remand Order* at 12.
[3] *Id.* at 13.
[4] *Id.* at 14 (internal citation omitted).
[5] To avoid confusion regarding summary of the Court's opinion, we removed the term "seemingly" in describing the Court's holding here.  *See* Comment 1 below; *see also* Draft Remand at 1.
[6] *Id.* at 18.
[7] *Id.* at 17-18.

## II.     BACKGROUND

Commerce published the *Final Results* on May 4, 2023.[8]  As discussed therein, Universal argued that "Commerce must avoid false findings of masked dumping that result from the use of the {average-to-transaction (A-to-T)} approach that was adopted because of price differences among quarters that have already been demonstratively linked to cost changes and not 'targeted dumping';"[9] and, therefore, "Commerce cannot conclude that the price differences in U.S. sales among the four POR quarters relate to masked dumping."[10]  Commerce disagreed with Universal's argument based on the U.S. Court of Appeals for the Federal Circuit's (Federal Circuit's) opinion in *JBF RAK* "affirming that Commerce is not required to determine why there is a pattern of prices that differs significantly among purchasers, regions, or time periods."[11] Accordingly, Commerce made no changes to the Cohen's *d* test for the *Final Results*.

Commerce normally will base a respondent's costs of production (COP) on period-wide weighted-average costs.[12]  However, this may result in distortions "during a time of significant cost changes."[13]

> In determining whether to deviate from our normal methodology of calculating an annual weighted-average cost, we evaluate the case specific record evidence by

---

[8] *See Final Results*.

[9] *See Final Results* IDM at 9 (citing Universal's Letter, "Case Brief," dated February 10, 2023 (Universal's Case Brief) at 5-6).

[10] *Id.* at 8 (citing Universal's Case Brief at 3).

[11] *Id.* at 14 (citing *JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015) (*JBF RAK*) ("Here, {the Court} did not err in finding there is no intent requirement in the statute, and we agree with {the Court} that requiring Commerce to determine the intent of a targeted dumping respondent 'would create a tremendous burden on Commerce that is not required or suggested by the statute.'" (citing *JBF RAK LLC v. United States*, 991 F. Supp. 2d 1343, 1355 (CIT 2014) (*JBF RAK CIT*)); *see also Borusan Mannesmann Boru Snayi ve Ticaret A.Ş. v. United States*, 608 Fed. Appx. 948, 948-49 (Fed. Cir. 2015) (*Borusan*)).

[12] The COP is "the sum of the cost of materials and fabrication for the foreign like product, plus amounts for general and administrative and {financial} expenses." *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates:  Preliminary Results of Antidumping Duty Administrative Review; 2020-2021*, 87 FR 79862 (December 28, 2022) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 24; *see also Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates:  Preliminary Results of Antidumping Duty Administrative Review; 2020-2021; Correction*, 88 FR 7404 (February 3, 2023) (correcting the inadvertent erroneous heading docket number "A-520-8807" in the *Preliminary Results*).

[13] *See Preliminary Results* PDM at 23.

examining two primary criteria: (1) whether the change in the cost of manufacturing (COM) during the POR was significant; and (2) whether the record evidence indicates that sales made during the shorter cost-averaging periods could be accurately linked with the COP or {constructed value (CV)} during the same shorter cost-averaging periods.[14]

Commerce determined in the *Preliminary Results* that Universal "experienced significant cost changes (*i.e.*, changes that exceeded 25 percent) between the high and low quarterly COM during the POR"[15] and that "changes in selling prices reasonably correlate to changes in unit COM."[16] Thus, Commerce used an "alternative costing methodology" to calculate the "total COM for each {control number} using the quarterly weighted-average per-unit cost of direct materials and the annual weighted-average per-unit conversion costs."[17] This analysis and finding remained unchanged in Commerce's *Final Results*.

Because Commerce resorted to quarterly cost-averaging periods, *i.e.*, the quarterly cost methodology, it also made changes to its margin calculations, as detailed in the *Preliminary Results* for this administrative review. First and foremost, Universal's COP was calculated based on quarterly weighted-average direct material costs,[18] such that Universal's product-specific COPs were defined on a quarterly basis. For the sales-below-cost test, Universal's comparison market prices were compared with the merchandise's quarterly COP to determine whether "within an extended period of time, such sales {below cost} were made in substantial quantities."[19] With the change to quarterly cost-averaging periods, Commerce also changed the three comparison methodologies, and limited the comparison of U.S. price to normal value where the normal value was within the same quarter as the U.S. date of sale. Normal value is

---

[14] *Id.* (internal citation omitted).
[15] *Id.*
[16] *Id.*
[17] *Id.* at 24.
[18] *Id.*
[19] *Id.* at 24-25.

based on either the sale prices of identical, or the most similar, foreign like product in a viable home or third-country market, *i.e.*, the comparison market, or the CV of the subject merchandise.[20]  For price-based normal value using either average-to-average (A-to-A) or A-to-T comparisons, normal value in an administrative review is defined as the contemporaneous, monthly weighted-average comparison market price which further reflects additional statutory adjustments.  For CV-based normal value, normal value is defined as the COP, selling expenses and profit, as well as additional statutory adjustments.  As observed by Universal, when quarterly cost-averaging periods are used, the monthly, price-based weighted-average normal values are limited to the quarter, rather than the 90/60 day window, of the U.S. date of sale.[21]  Further, when quarterly cost-averaging periods are used, the CV-based normal value is based on the quarterly weighted-average COP of the date of the U.S. sale.  This methodology remained unchanged in Commerce's *Final Results*.

Separately, to determine whether the A-to-A method was appropriate in this review, Commerce also performed a differential pricing analysis to examine the two statutory requirements provided in sections 777A(d)(1)(B)(i) and (ii) of the Tariff Act of 1930, as amended (the Act), *i.e.*, the "pattern requirement" and "meaningful difference requirement," respectively.  To examine whether there is a pattern of prices that differ significantly among purchasers, regions, or time periods, Commerce used:  (1) the Cohen's *d* test to determine whether prices differed significantly; and (2) the ratio test to determine whether the extent of prices which differ significantly amount to a pattern.[22]

---

[20] *Id.* at 25-26.
[21] *See* Memorandum, "2020-2021 Administrative Review of the Antidumping Duty Order on Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates:  Final Results Calculations for Universal," April 27, 2023, at 3.
[22] *See Preliminary Results* PDM at 10-12.

> The Cohen's *d* coefficient is a generally recognized statistical measure of the extent of the difference between the mean (*i.e.*, weighted-average price) of a test group and the mean (*i.e.*, weighted-average price) of a comparison group. … {T}he Cohen's *d* coefficient is used to evaluate the extent to which the {U.S.} prices to the particular purchaser, region, or time period {*i.e.*, the test group} differ significantly from the {U.S.} prices of all other sales of comparable merchandise {*i.e.*, the comparison group}.[23]

The Cohen's *d* coefficient is calculated as the difference between the mean U.S. prices of the test and comparison groups, divided by the "dispersion" of prices within the test and comparison groups (*i.e.*, as measured by the standard deviation within each of the group).[24]  When the Cohen's *d* coefficient is equal to or greater than an established threshold, then the sales prices within the test group are found to have "passed" the Cohen's *d* test and to be at prices that differ significantly.[25]  This approach did not change with the *Final Results*.

Universal alleged that Commerce's "application of the 'same-quarter comparison' and the 'inter-quarter comparison' within the same administrative review was internally inconsistent, arbitrary, and contrary to law."[26]  Universal agreed with Commerce's decision to rely on quarterly cost-averaging periods and its "same-quarter comparison," *i.e.*, limiting the normal value to the quarter of the U.S. date of sale.[27]  However, Universal argued that Commerce's decision to conduct its Cohen *d* test by comparing U.S. prices across POR quarters, *i.e.*, "inter-quarter comparisons," conflicted with its limiting of U.S. price to normal value comparisons.[28]

In its July 26, 2024, *Remand Order*, the Court directed Commerce to reconsider or further explain its comparison of U.S. prices between quarters of the POR as part of its Cohen's

---

[23] *Id.* at 11.
[24] *See Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367, 1369 (Fed. Cir. 2022) (The Cohen's *d* coefficient "is a ratio whose numerator is the difference between means of the prices of the two groups and whose denominator is a figure, reflecting the general dispersion of the pricing data, that serves as a benchmark against which to judge the significance of the difference stated in the numerator.").
[25] *See Preliminary Results* PDM at 11.
[26] *See Remand Order* at 14.
[27] *Id.* at 13.
[28] *Id.*

*d* test while, in the same review, limiting its comparison of U.S. price to a normal value within the same quarter as the U.S. date of sale for the calculation of individual dumping margins.[29]

## III.    ANALYSIS

In accordance with the Court's instructions, we further explain below why it is reasonable to limit comparisons of U.S. price with normal value within the same quarter as the U.S. date of sale for the calculation of individual dumping margins, and, within the same review, to compare U.S. prices between quarters during the POR as part of the Cohen's *d* test.

### 1.    Federal Circuit Precedent Supports Commerce's Approach

The Court noted that concerns over possible "distortive results" justified the "same-quarter comparison" for one "segment" of Commerce's analysis in this administrative review.[30] It then held that "it does not follow from this" that an "inter-quarter comparison" should be used "in a different segment of the administrative review."[31] Consequently, it remanded Commerce to "explain why it was reasonable to apply the 'inter-quarter comparison' and the 'same-quarter comparison' in the same administrative review."[32] Federal Circuit holdings present support that it was reasonable to apply the "inter-quarter comparison" and the "same-quarter comparison" in the same administrative review because the cause(s) of price differences observed as part of the pattern requirement need not be discerned.

The Federal Circuit in *JBF RAK* held:

Section {777A(d)(1)(B) of the Act} does not require Commerce to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods, nor does it mandate which comparison methods Commerce must use in administrative reviews. As a result, Commerce looks to its practices in {AD} investigations for guidance. Here, {the Court} did not err in finding there is no intent requirement in

---

[29] *Id*. at 18.
[30] *Id*. at 17-18.
[31] *Id*. at 18.
[32] *Id*.

7

the statute, and we agree with {the Court} that requiring Commerce to determine the intent of a targeted dumping respondent "would create a tremendous burden on Commerce that is not required or suggested by the statute."[33]

There may be many reasons for significantly different prices between purchasers, regions, or time periods. Changing production costs undoubtably may be one of these reasons. The Federal Circuit, however, has held that there is "no intent requirement in the statute" which would obligate Commerce to divine the causes for such price differences under section 777A(d)(1)(B) of the Act. In other words, if Commerce finds that significant price differences exist between purchasers, regions, or time periods, then there is no explaining away these differences based on the reasons for them such that Commerce's finding is rendered invalid. Such a finding is purely factual; what may have caused significant price differences cannot "excuse" such differences for purposes of section 777A(d)(1)(B) of the Act. Although changing production costs may have an impact on changing prices, Federal Circuit precedent provides that Commerce need not evaluate the many possible causes for significantly changing prices between purchasers, regions, or time periods.

In *JBF RAK*, plaintiff JBF RAK argued:

> because of its sales practice{s}, it could not target customers, regions or periods of time and the pricing pattern found by Commerce was the result of market conditions. Thus, according to JBF RAK, it was "arbitrary, capricious and an abuse of discretion to refuse to consider evidence which would tend to establish that the pricing pattern was not due to targeted sales but, instead, was for a valid business purpose."[34]

Although not detailed in JBF RAK's argument, "valid business purpose{s}" could include covering the costs of selling the merchandise, including changing COP of the sold merchandise. In *Borusan*, however, there is no such ambiguity:

---

[33] *See JBF RAK*, 790 F.3d at 1368 (citing *JBF RAK CIT*, 991 F. Supp. 2d at 1355); *see also Borusan*, 608 Fed. Appx. at 948-49; *see also Final Results* IDM at 14-15.
[34] *See JBF RAK*, 790 F.3d at 1368 (internal citations omitted).

> Borusan on appeal challenges Commerce's decision to use the {A-T} method of {section 777A(d)(1)(B) of the Act} because, according to Borusan, Commerce failed to consider if the observed "pattern of export prices . . . that differ significantly among . . . periods of time," {section 777A(d)(1)(B) of the Act}, in Borusan's products occurred due to *increases in raw material costs*, and not due to Borusan's pursuit of any intentional targeted dumping scheme. Borusan does not challenge Commerce's statistical analysis under {section 777A(d)(1)(B) of the Act} as applied to Borusan's products, and only contests Commerce's decision to perform the {A-T} targeted dumping analysis without also considering Borusan's alternate explanation for the observed pricing pattern.[35]

Thus, the Federal Circuit in *Borusan* held that section 777A(d)(1)(B) of the Act does not require Commerce to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods, even when changes in production costs are evidenced.[36]

Consistent with these opinions, if Commerce is not required to identify the reasons for a respondent's price differences under section 777A(d)(1)(B)(i) of the Act, then it follows that such reasons are not relevant to the price comparison analysis it performs under this section of the Act. Consequently, even if a respondent's different prices across quarters may be (partially) explained by its changing production costs across these quarters, that does not make Commerce's "inter-quarter comparison" as part of the Cohen's *d* test in any way distortive. Because the reasons why a firm's prices differ significantly are simply not relevant under Commerce's analysis pursuant to section 777A(d)(1)(B)(i) of the Act, these reasons, whatever they may be, cannot distort this analysis and its results.

Thus, while the fact that production costs significantly fluctuate and prices reasonably correlate with such fluctuations is relevant to Commerce's analysis "*in a different context*,"[37] and

---

[35] *See Borusan*, 608 Fed. Appx. at 949 (emphasis added).
[36] *Id*.
[37] *See Nan Ya Plastics Corp. v. United States,* 128 F. Supp. 3d 1345, 1351-52 (CIT 2015) ("If Commerce identifies a pattern of export prices or constructed export prices that differ significantly among purchasers, regions, or periods of

justify the use of quarterly cost-averaging periods, which leads to the "same-quarter comparison" of U.S. price with normal value to minimize potential distortions in that *different context*, *i.e.*, the comparison methodology to calculate the respondent's individual dumping margins, they do not similarly justify deviating from Commerce's "inter-quarter comparison" for purposes of its Cohen's *d* test in the context of section 777A(d)(1)(B)(i) of the Act. As is clear from the text of the statue, and as supported by Federal Circuit precedent, Commerce does not need to identify the reasons why a respondent's U.S. prices differ significantly in the context of section 777A(d)(1)(B)(i) of the Act, and accordingly such reasons do not similarly introduce distortions into that analysis.

Consequently, it is "reasonable to apply the 'inter-quarter comparison' and the 'same-quarter comparison' in the same administrative review"[38] because each is applied in a different context. In only one of these contexts, *i.e.*, the comparison of U.S. price with normal value as part of the appropriate comparison methodology, are the kinds of distortions due to significant cost fluctuations justifying resort to a "same-quarter comparison" relevant. Conversely, in the context of the pattern requirement, the reasons for different U.S. prices are not relevant, and, thus, do not justify departing from the "inter-quarter comparison" in the Cohen's *d* test in *that* context.

---

time (whether through the *Nails* test or the newer differential pricing analysis), Commerce then considers whether the {A-to-A} comparison methodology can account for the observed price differences. . . . *In a different context*, Commerce acknowledged in the *Preliminary Results* that Nan Ya 'experienced significant changes' in its {COP} due to volatility in the prices of certain primary inputs {thereby leading to Commerce's decision to use its} 'quarterly costing approach.'" (emphasis added)).
[38] *See Remand Order* at 18.

**2.      Commerce's "Inter-Quarter Comparisons" in the Cohen's *d* Test and "Same-Quarter Comparisons" in Its Margin Calculations Is Reasonable**

The kind of distortions that can result from significantly fluctuating production costs between two quarters within the POR are relevant in the separate "context" of Commerce's margin calculations, namely in the determination of normal value, because price-based normal value is compared to cost in the sales-below-cost test, and constructed value-based normal value is based on cost.  Fluctuating production costs, the determination of normal value, and the comparison of normal value with U.S. price is used to calculate a respondent's weighted-average dumping margin, and, thus, production costs are part of Commerce's determination whether the A-to-A method can account for any differences in a respondent's pricing behavior in the U.S. market under section 777A(d)(1)(B)(ii) of the Act, *i.e.*, the meaningful difference requirement. However, fluctuating production costs do not introduce distortions into the comparison of U.S. prices with other U.S. prices in the Cohen's *d* test performed under section 777A(d)(1)(B)(i) of the Act, as explained below.

**i.      Use Of An "Inter-Quarter Comparison" Is Reasonable Because Alleged Distortions Due to Significant Differences in Production Costs During the POR Are Irrelevant for the Cohen's *d* Test**

As discussed above, Commerce will normally use one of two standard comparison methodologies, generally the A-to-A method, to calculate a respondent's weighted-average dumping margin.[39]  Due to concerns of distortions caused by masked dumping, Commerce may resort to the A-to-T method to address masked dumping if two statutory requirements, *i.e.*, the pattern requirement and the meaningful difference requirement, are met.  The pattern requirement requires Commerce to find that there existed a pattern of prices that differ significantly for comparable merchandise among purchasers, regions, or time periods.  The SAA

---

[39] *See* section 777A(d)(1)(A) of the Act; *see also* 19 CFR 351.414(c)(1)-(2).

frames this requirement as finding that conditions existed within the respondent's U.S. pricing

behavior could lead to "targeted" or masked dumping:

> In part, the reluctance to use an {A-A} methodology {the A-to-A method was
> introduced into U.S. law as a result of the Uruguay Round Agreements Act} has
> been based on a concern that such a methodology *could conceal* "targeted
> dumping." In such situations, an exporter may sell at a dumped price to particular
> customers or regions, while selling at higher prices to other customers or regions.[40]

If a pattern of prices is found to exist, then the meaningful difference requirement determines

whether one of the standard comparison methodologies, generally the A-to-A method, can

account for the differences exhibited in the respondent's U.S. pricing behavior, and the extent to

which masked dumping is present in the results of the margin calculations using the A-to-A

method:

> New section 777A(d)(l)(B) provides for a comparison of average normal values to
> individual export prices or constructed export prices in situations where an average-
> to-average or transaction-to-transaction methodology cannot account for a pattern
> of prices that differ significantly among purchasers, regions, or time periods, *i.e.*,
> *where targeted dumping may be occurring*. Before relying on this methodology,
> however, Commerce must establish and provide an explanation why it cannot
> account for such differences through the use of an average-to-average or
> transaction-to-transaction comparison.[41]

As such, the pattern requirement serves as a "canary in the coal mine" to alert Commerce to the

possibility that masked dumping may be distorting results of the margin calculations, and the

meaningful difference requirement actually identifies whether there is a hazard in the coal mine

(*i.e.*, masked dumping) that needs to be remedied.

   To examine the pattern requirement as part of the differential pricing analysis, Commerce

uses the Cohen's *d* test to examine whether prices differ significantly amount purchasers,

regions, or time periods, and the ratio test to determine whether the extent of any observed

---

[40] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316,
Vol. 1 (1994) (SAA), at 842 (emphasis added).
[41] *Id.* at 843 (emphasis added).

significant prices differences support finding a pattern of prices that differ significantly. A finding of a pattern foretells nothing about whether masked dumping exists, nor does it have an impact on Commerce's individual margin calculations; there is no normal value involved in the Cohen's *d* or ratio tests and no comparison of U.S. price with normal value. Finding of a pattern only indicates whether conditions exist, *i.e.*, significant price differences among purchasers, regions, or time periods, which could lead to masked dumping—the "canary in the coal mine." The finding of a pattern is the equivalent of the canary laying lifeless on the floor of its cage, indicating that there is a potential hazard which should be examined. If Commerce does find that a pattern existed for the respondent, then it will examine the meaningful difference requirement and determine whether the A-to-A method can account for the differences in U.S. prices presented by the respondent's pricing behavior and decisions. However, if no pattern is found to exist, *i.e.*, the canary is alive and well, then there is no evidence of conditions which might lead to masked dumping, and Commerce would simply use the A-to-A method.

For this "initial warning sign" phase of the differential pricing analysis, it is reasonable to compare U.S. prices between quarters, *i.e.*, to use an "inter-quarter comparison," as well as to compare U.S. prices between purchasers and regions. Such differences, if they exist, only demonstrate whether conditions exist where masked dumping might occur. Such differences *do not* indicate that there is masked dumping, or even any dumping at all, which requires a comparison with normal value. This examination under the Cohen's *d* test is just an early indicator that something *might* be there to further investigate. Whether dumping exists, and whether the A-to-A method can account for difference in U.S. prices, whether driven by changing production costs or a myriad of other market factors and corporate priorities, is

considered when addressing the meaningful difference requirement of the Act.[42]  Given the function of the Cohen's *d* test, and its purpose as part of the differential pricing analysis, the comparison of U.S. prices between quarters within the POR, *i.e.*, "inter-quarter comparisons," or between purchasers or regions, introduces no "distortions" in the results of Commerce's margin calculations.  Rather, it operates exactly as intended:  if it reveals significant differences in U.S. prices between different quarters of the POR, or purchasers or regions, then this is indeed a reasonable indication that conditions exist where masked, or "targeted," dumping *may* be occurring, warranting further investigation.

>    ii.    **The Comparison Methodologies, as Examined Under the Meaningful Difference Requirement, Appropriately Include Quarterly Cost-Averaging Periods and Limitations on the Comparison of U.S. Price with Normal Value**

Whether the A-to-A method can account for the respondent's pricing behavior in the U.S. market, including potential masked dumping, is ultimately determined through the meaningful difference test.  Potential concerns of distortions in the margin calculations due to significant differences in production costs during the POR are, appropriately, addressed as part of the comparison methodology, *i.e.*, the comparison of U.S. price with normal value.  The appropriate comparison methodology for a given respondent is determined as a result of the meaningful difference test, not as part of the Cohen's *d* and ratio test.

The meaningful difference test determines whether the A-to-A method can account for differences in the pricing behavior of the respondent in the U.S. market once conditions have been identified, *i.e.*, the pattern of prices, the "canary in the coal mine," which could lead to masked dumping.  Whether the A-to-A method can account for such differences is determined

---

[42] *See* section 777A(d)(1)(B)(ii) of the Act.

by comparing the results of applying the A-to-A method and the results of applying an alternative comparison methodology based on the A-to-T method.[43]  As discussed above, as in the instant review, where Commerce has resorted to quarterly cost-averaging periods and the resulting changes to its margin calculations, including limiting the normal value to the same quarter as the U.S. date of sale, *i.e.*, "same-quarter comparisons," the quarterly cost methodology is part of the comparison methodology in an administrative review, whether based on A-to-A comparisons, A-to-T comparisons, or even transaction-to-transaction (T-to-T) comparisons.  The upshot of this is that, when comparing the results of the A-to-A method and an alternative comparison method based on the A-to-T method in the meaningful difference test, Commerce is comparing two margin calculation approaches that *both use a "same-quarter comparison," i.e.*, two dumping margin calculations that *both* limit the normal value to the quarter of the U.S. date of sale as a result of the changes in the respondent's production costs over the POR. Consequently, if, pursuant to the meaningful difference test, Commerce determines that the A-to-A method cannot account for the respondent's pricing behavior in the U.S. market, such result is *not* due to changes in the respondent's production costs over the POR, which have been controlled for in the underlying "same-quarter comparisons" in each of the comparison methodologies (*i.e.*, the A-to-A method and an alternative comparison method based on A-to-T comparisons) examined in the meaningful difference test.  Thus, this test of Commerce's differential pricing analysis controls for a respondent's changing production costs over the POR

---

[43] The Federal Circuit has repeatedly upheld the meaningful difference test as reasonably implementing the statutory directive for Commerce to examine whether the respondent's pricing behavior in the U.S. market can be accounted for by the A-to-A method.  *See Stupp Corp. v. United States*, 5 F.4th 1341, 1356 (Fed. Cir. 2021); *see also Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1346 (Fed. Cir. 2017).

and not the pattern test which only looks at whether conditions exist in which masked dumping might be a consideration.

In sum, the "inter-quarter comparison" in the Cohen's *d* test does not introduce potential distortions into Commerce's margin calculations, as there is no margin calculations performed as part of the Cohen's *d* and ratio tests. Any concern for potential distortions is addressed as part of the comparison methodology used to perform the margin calculations, whether the comparison methodology is based on A-to-A comparisons, A-to-T comparisons, or even T-to-T comparisons. Accordingly, Commerce's comparison of U.S. prices between quarters during the POR as part of the Cohen's *d* test, *i.e.*, "inter-quarter comparisons," and Commerce's limiting normal value to the same quarter as the U.S. price's date of sale, *i.e.*, a "same quarter comparison" in its margin calculation is not arbitrary,[44] but these different approaches are reasonable given the purpose of each in Commerce's dumping analysis.

## IV. INTERESTED PARTY COMMENTS

On August 29, 2024, Commerce released the draft results of redetermination to all interested parties and invited parties to comment.[45] On September 5, 2024, Commerce received comments from Universal only.[46] As explained below, we continue to reach the same conclusions that we reached in the Draft Redetermination. Our discussion of interested party comments is below.

---

[44] To avoid confusion with respect to the Court's opinion, we have removed the term "internally inconsistent" here. *See* Comment 1 below; *see also* Draft Redetermination at 15.
[45] *See* Draft Results of Redetermination Pursuant to Court Remand, *Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries, LLC, and KHK Scaffolding & Formwork, LLC. v. United States*, Consol. Court No. 23-00113, Slip Op. 24-85 (CIT July 26, 2024), dated August 29, 2024 (Draft Redetermination).
46 *See* Universal's Letter, "Comments on Draft Remand Redetermination," dated September 5, 2024 (Universal Comments).

**Comment 1:   Commerce Did Not Misconstrue the Court's Findings**

*Universal's Comments:*

The following is the verbatim executive summary submitted by Universal.[47]  For further

details, *see* Universal Comments at 4-6.

> In the final results of redetermination, Commerce should pay particular attention to the findings of the Court and not reinterpret, misconstrue, or mischaracterize what the Court found.  In the {Draft Redetermination}, Commerce references the Courts instructions regarding "seemingly internal inconsistent determinations," "concerns over possible distortive results," and the Cohen's *d* test introducing "potential distortions into Commerce's margin calculations."  But the Court did not qualify its statements as such, and Commerce should refrain from interpretations of the Court's opinion and order that deviate from the Court's actual language.[48]

**Commerce's Position:**  Universal asserts that Commerce's reference in the draft results of

redetermination to the "seeming{}" internal inconsistency between its use of a same- and inter-

quarter comparison in the same review, as well as its statement that its use of these comparisons

"is not" internally inconsistent are at odds with the Court's finding that these comparisons are

internally inconsistent.[49]  While we clarify below our summary of the Court's holding,

Commerce's approach in the Draft Redetermination was consistent with the Court's holding that

provided Commerce the opportunity to further explain its determination.

We acknowledge that the Court found Commerce's use of a same- and inter-quarter

comparison in the same review to be "internally inconsistent."[50]  However, the Court provided

Commerce the opportunity on remand to "provide further explanation" for its determination to

use a same- and inter-quarter comparison in the same review.[51]  Namely, the Court held that

---

[47] *See* Universal Comments at 2.
[48] *See* Universal Comments at 2.
[49] *Id*. at 4-5 (citing Draft Redetermination at 2, 15).
[50] *See Remand Order* at 18.
[51] *See Remand Order* at 18.  *See also id*. at 17 ("Commerce here must either make consistent determinations, or reasonably explain any inconsistency in {using a same- and inter-quarter comparison in the same review}").

> {s}imilar to NSK Ltd., Commerce here must either make consistent determinations, or reasonably explain any inconsistency in why Commerce should be permitted to calculate Universal's cost of production using the 'same-quarter comparison,' while then comparing the sales prices of U.S. sales made in different quarters using the 'inter-quarter comparison' for purposes of Commerce's differential pricing analysis.[52]

The Court also held that:

> {b}ecause Commerce did not explain why it was reasonable to apply the "inter-quarter comparison" and the 'same-quarter comparison' in the same administrative review, the Court holds that Commerce's internally inconsistent determinations are not in accordance with law.  The Court remands for Commerce to reconsider or provide further explanation in accordance with this Opinion."[53]

Thus, Commerce's remand is in accordance with the Court's order that explicitly provided Commerce the opportunity to provide a reasonable explanation for applying the "inter-quarter comparison" and the "same-quarter comparison" in the same administrative review. Accordingly, contrary to Universal's claim, we are not "prevent{ed} { } from ever satisfactorily explaining the inconsistency."[54]

Universal also alleges that Commerce's reference to "concerns over possible distortive results" misconstrues the Court's opinion.[55]  However, the Court had specifically cited, and was specifically discussing in the section of the *Remand Order* to which Universal refers, that Commerce's rationale for resorting to a same-quarter comparison was "because of possible distortions."[56]

Finally, Universal contends that Commerce's various statements to the effect that the inter-quarter comparison employed as part of the Cohen's *d* test is not "distortive" misconstrues

---

[52] *See Remand Order* at 17.
[53] *Id.* at 18.
[54] *See* Universal Comments at 5.
[55] *Id.* at 5 (citing Draft Results of Redetermination at 7).
[56] *See Remand Order* at 18.

the Court's opinion.[57]  These statements were consistent with the Court's *Remand Order*.  The Court remanded "{b}ecause Commerce did not explain why it was reasonable to apply the 'inter-quarter comparison' and the 'same-quarter comparison' in the same administrative review," and provided Commerce the opportunity on remand to "provide further explanation" for applying these different comparisons in "different segment{s}" of the same review.[58] Commerce's statements to the effect that the Cohen's *d* test inter-quarter comparison is not "distortive" were made in compliance with the Court's request for further explanation.  Namely, Commerce made them as part of explaining why, although resort to a same-quarter comparison in one "segment" of the administrative review was justified due to concerns over possible distortions, these concerns did not similarly justify deviating from the inter-quarter comparison in the Cohen's *d* test "segment" of the review, as this inter-quarter comparison does not introduce any distortions.[59]

Accordingly, while we clarify our summary of the Court's holding, in part, Commerce's remand complies with the Court's order because it "provide{s} further explanation in accordance with {the Court's} Opinion."[60]

**Comment 2:   Whether Commerce's Explanation of Relevant Case Law Has Already Been Rejected**

*Universal's Comments:*

The following is the verbatim executive summary submitted by Universal.  For further details, *see* Universal Comments at 6-7.

> The heart of Commerce's defense at the U.S. Court of International Trade of why it was reasonable to apply its "inter-quarter comparison" and the "same-quarter comparison" in the same administrative review was that when conducting its

---

[57] *See* Universal Comments at 6 (citing Draft Results of Redetermination at 9-10).
[58] *See Remand Order* at 18.
[59] *See generally* "Analysis" section of Draft Results of Redetermination.
[60] *See Remand Order* at 18.

differential price analysis, Commerce is not required to investigate a respondent's intentions or subjective reasons for differing prices when conducting its differential pricing analysis.  In the {Draft Redetermination}, Commerce makes the same argument, claiming that the causes of price differences observed as part of the pattern requirement need not be discerned. But the Court already considered Commerce's "non causation" argument on appeal and disregarded it.[61]

**Commerce's Position:**  We disagree with Universal's premise that the Court has already rejected Commerce's explanation that the Federal Circuit's holdings in *JBF RAK* and *Borsuan* and CIT decision in *Nan Ya* support its approach.  Universal does not identify where in the *Remand Order* the Court discussed the Federal Circuit and CIT decision discussed in the Draft Redetermination.  Moreover, Commerce specifically crafted its discussion of these opinions in response to the Court's *Remand Order*.  In the Draft Redetermination, Commerce linked these opinions specifically to the Court's concern expressed in the *Remand Order* about distortive results resulting from an inter-quarter comparison in the Cohen's *d* test when costs fluctuate significantly and prices reasonably correlate with such fluctuations:[62]

> Consistent with these opinions, if Commerce is not required to identify the reasons for a respondent's price differences under section 777A(d)(1)(B)(i) of the Act, then it follows that such reasons are not relevant to the price comparison analysis it performs under this section of the Act.  *Consequently, even if a respondent's different prices across quarters may be (partially) explained by its changing production costs across these quarters, that does not make Commerce's "inter-quarter comparison" as part of the Cohen's d test in any way distortive.  Because the reasons why a firm's prices differ significantly are simply not relevant under Commerce's analysis pursuant to section 777A(d)(1)(B)(i) of the Act, these reasons, whatever they may be, cannot distort this analysis and its results.*[63]

---

[61] *See* Universal Comments at 2.
[62] *See Remand Order* at 17-18 ("The Court observes that if Commerce's comparison of costs and prices would lead to distortive results because of significant fluctuations from quarter to quarter, thus justifying the 'same-quarter comparison' examining sales prices only within specific quarters, it does not follow that costs and prices from sales in different quarters should be compared across quarters (the 'inter-quarter comparison') in a different segment of the administrative review.').
[63] *See* Draft Redetermination at 9 (emphasis added).

As the Court gave Commerce the option to provide further explanation for its use of different comparisons in different "segment{s}" of the review, Commerce discussed the relevance of Federal Circuit and Court of International Trade holdings as part of this further explanation.

**Comment 3:    Whether Commerce's Explanation of "In Different Context" Has Already Been Rejected**

*Universal's Comments:*

The following is the verbatim executive summary submitted by Universal.  For further details, *see* Universal Comments at 7.

> Similarly, Commerce insisted at the Court that its decision to use a quarterly cost methodology was made "in a different context" from its decision to compare inter-quarterly pricing as part of its Cohen's *d* analysis.  In the {Draft Redetermination}, Commerce again raises the "in a different context" argument as the basis for its internally inconsistent approach. But, again, the Court did not accept Commerce's "different context" justification when it pursued this line of reasoning on appeal. In the final remand results, Commerce should not rely on explanations for its simultaneous same-quarter comparison and inter-quarter comparison approach that the Court already has rejected.[64]

**Commerce's Position:**  Similar to its assertion concerning Federal Circuit precedent, Universal also claims that the Court has already rejected Commerce's "defense at the Court … to use a quarterly cost methodology {because it} was made 'in a different context' from its decision to compare inter-quarterly pricing as part of its Cohen's *d* analysis."[65]  However, consistent with the *Remand Order* which instructed Commerce to reconsider or provide further explanation in accordance with its opinion,[66] we further explain our methodologies herein.

The different contexts in which Commerce used "same-quarter" comparisons and "inter-quarter comparisons" are relevant because there are several key differences between the analysis that is undertaken to determine if quarterly cost-averaging periods are warranted, and the

---

[64] *See* Universal Comments at 2-3.
[65] *Id.* at 7 (citing Commerce Opposition Brief to the Court at 15, Draft Redetermination at 9).
[66] *See Remand Order* at 17.

analysis that indicates whether U.S. prices differ significantly among regions, purchasers, or time periods. The quarterly cost methodology compares the costs relative to one another between just two quarters (*i.e.*, the quarter with the highest cost and the quarter with the lowest cost). For the majority of the five CONNUMs with the largest volume of sales in each market, if there is a significant difference between the highest and lowest cost, we then look to home market and U.S. prices of those same CONNUMs to observe whether the changes in prices roughly correlate to the changes in cost between the two quarters. By contrast, the Cohen's *d* test, compares only U.S. prices (not production costs) across all four quarters, not just two, and determines not simply if there is a trend in prices, but rather if there are significant differences. Significance is measured relative to the variation in prices within the test group (*i.e.*, a given quarter) and the comparison group (*i.e.*, all other quarters in the POR), and not the relative change between two specific quarters. Further, the Cohen's *d* test is performed for *all* CONNUMs sold in the U.S. market and not just the five CONNUMs with the largest sale volumes. Therefore, the Cohen's *d* test is a comprehensive examination of U.S. prices which measures the significance of the difference in U.S. prices between quarters, whereas the quarterly cost test involves a more limited examination of a subset of U.S. prices, the purpose of which is to determine whether costs fluctuate significantly and does not determine the significance of the differences in U.S. prices.

**Comment 4:  Comparison of U.S. Prices Between Quarters as Part of The Cohen's *d* Test is Reasonable**

*Universal's Comments*

The following is the verbatim executive summary submitted by Universal. For further details, *see* Universal Comments at 8-9.

The question in this case is when Commerce has determined that inter-quarter comparisons of costs and prices would lead to distortive margin results because of significant fluctuations from quarter to quarter – thus justifying a margin calculation methodology that compares selling prices only within quarters – can sales in different quarters be reliably compared across quarters for purposes of establishing a pattern of prices that differs significantly for comparable merchandise among time periods?  Commerce explains that the pattern requirement of the Cohen's *d* test serves as a "canary in the coal mine" to alert Commerce to the possibility that masked dumping may be distorting results of the margin calculations.  But having already determined that the comparison of sales between quarters would lead to distortions, Commerce has not explained why a pattern of prices resulting from inter-quarter sales comparisons would be reliable in the first place.

Commerce claims that potential concerns of distortion in the margin calculations due to significant differences in production costs during the {POR} are addressed as part of the comparison of U.S. price with normal value, and that the appropriate comparison methodology for a given respondent is determined as a result of the meaningful difference test, and not as part of the Cohen's *d* and ratio test.  But the meaningful difference requirement does not involve comparisons of costs or sales within or between quarters of the {POR}, and thus does not explain why it is reasonable for Commerce to apply the inter-quarter comparison and the same-quarter comparison in the same administrative review.  In the final remand results, Commerce needs to explain how the meaningful difference test is relevant to the Court's decision regarding the internal inconsistency of Commerce's sales comparisons or exclude this explanation entirely.[67]

**Commerce's Position:**

In its comments, Universal asks:

{W}hen Commerce has determined that inter-quarter comparisons of costs and prices would lead to distortive margin results because of significant fluctuations from quarter to quarter – thus justifying a margin calculation methodology that compares selling prices only within quarters – can sales in different quarters be reliably compared across quarters for purposes of establishing a pattern of prices that differs significantly for comparable merchandise among time periods?[68]

To answer this question, one must first define accurately the two situations, *i.e.*, "same-quarter comparisons" and "inter-quarter comparisons," which Universal is discussing.  The first, "same-quarter comparisons," reflects the comparison of U.S. prices with normal value to calculate

---

[67] *See* Universal's Comments at 3-4.
[68] *Id.* at 3, 8.

individual dumping margins, where the production costs are a determinative input into normal value. The second relates to the comparison of one group of U.S. prices with a second group of U.S. prices, the comparison of which is not dependent on the production costs.

As summarized by the Court, Commerce "stated that it deviates from the normal practice of using the annual weighted-average cost method if using the annual weighted-average cost method during a time of *significant cost changes results in possible distortions*."[69] The possible distortions are the result of significant differences in production costs between two specific quarters within the POR. Production costs are an integral part of the calculation of normal value and are provided for under section 773(b) of the Act, a subsection of section 773 of the Act describing normal value. As discussed above, the change to quarterly cost-averaging periods causes other changes in Commerce's calculation of normal value. As the potential for distortions originates with the changes in the production costs, these changes are limited to where production costs are involved in the calculation of normal value, such as in the sales-below-costs test, the difference-in-merchandise (DIFMER) adjustment for price-based normal value, and the COP for CV-based normal value. Because of the changes in normal value as a result of using quarterly cost-averaging periods, the contemporaneity window for price-based normal values,[70] normally a 90/60 day window around the U.S. date of sale, is also limited to the quarter of the U.S. date of sale, *i.e.*, the "same-quarter comparisons." These changes are all precipitated by the defining of the production costs on a quarterly basis rather than on a period-wide basis, and are incorporated in the various comparison methodologies where dumping margins are calculated. Consequently, each of the comparison methodologies are adjusted to address the possible

---

[69] *See Remand Order* at 11 (citing *Preliminary Results* PDM at 23).
[70] *See* 19 CFR 351.414(f).

distortions caused by significant different production costs over the POR, and to provide "a fair comparison" of U.S. price with normal value.

Conversely, U.S. price is defined under section 772 of the Act which does not include production costs. U.S. prices are calculated as "the price at which the subject merchandise is sold (or agreed to be sold)"[71] with appropriate adjustments.[72]  Thus, in contrast to the calculation of normal value, U.S. price is not determined by the cost of production, and, therefore, when comparing U.S. prices to each other in the *Cohen's d* test, the potential distortions which may be caused by the significant changes in costs do not render use of inter-quarter comparisons in the *Cohen's d* test unreliable.

In its question, Universal states that "Commerce has determined that inter-quarter comparisons of *costs and prices* would lead to distortive margin results…"[73]  As discussed above, the possible distortions arise in the comparison of U.S. price with normal value, where the normal value is dependent upon the production costs of the respondent.  Thus, if "a fair comparison" is to be made, Commerce revises is comparison methodologies to account for significant changes in production costs when calculating individual dumping margins, *i.e.*, the comparison of U.S. price with normal value, by limiting such comparison to the same quarter. Unlike the calculation of normal value, the calculation of U.S. prices is not based on production costs, and, therefore, there is not concern that the inter-quarter comparison of certain U.S. prices with other U.S. prices are distorted by changing production costs and thus, such comparison need not be limited to the same quarter as with the comparison of U.S. price with normal value.

---

[71] *See* sections 772(a) and (b) of the Act.
[72] *See* sections 772(c)-(f) of the Act.
[73] *See* Universal's Comments at 3, 8 (emphasis added).

Nonetheless, as stated in the Draft Redetermination, U.S. prices may be driven by changing production costs or a myriad of other market factors and corporate priorities.[74]  The Federal Circuit has stated that "{section 777A(d)(1)(B) of the Act} does not require Commerce to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods,"[75] which may include when productions costs have been alleged to be the cause of the differences in U.S. prices.[76] Irrespective of the causes which have resulted in the differences in the respondent's U.S. prices, these differences only indicate where masked dumping may be occurring,[77] *i.e.*, the "canary in the coal mine."  Universal's apparent assumption appears to be that the only reason that U.S. prices are found to differ in the Cohen's *d* test is because of the differing production costs, given Universal's proposed remedy to eliminate time period from the Cohen's *d* test.[78]  However, even if this apparent assumption is true,[79] and the comparison methodology accounts for the differing production costs over the POR by limiting the comparison of U.S. price with normal value within the same quarter as the U.S. date of sale, then each of the comparison methodologies, i.e., the A-to-A or T-to-T methods, and the A-to-T method, will take into account the differing

---

[74] *See* Draft Redetermination at 13.

[75] *See JBF RAK*, 790 F.3d at 1368.  ("JBF RAK {had argued} 'because of its sales practice[s], it could not target customers, regions or periods of time and the pricing pattern found by Commerce was the result of market conditions.'  Thus, according to JBF RAK, it was 'arbitrary, capricious and an abuse of discretion to refuse to consider evidence which would tend to establish that the pricing pattern was not due to targeted sales but, instead, was for a valid business purpose.'"  *Id.* (internal citations omitted)).

[76] *See* Borusan, 608 Fed. Appx. at 949 ("Borusan on appeal challenges Commerce's decision to use the A-T method of {section 777A(d)(1)(B) of the Act} because, according to Borusan, Commerce failed to consider if the observed "pattern of export prices . . . that differ significantly among . . . periods of time," {section 777A(d)(1)(B) of the Act}, in Borusan's products occurred due to increases in raw material costs, and not due to Borusan's pursuit of any intentional targeted dumping scheme.").

[77] *See* SAA at 843.

[78] *See* Universal's Comments at 10 (Commerce should "{limit} the first part of the Cohen's d {test} to a comparison of groups of sales data only for particular purchasers and regions, and not for quarterly time periods" (emphasis in original)).

[79] A finding that prices generally correlate with different production costs over the POR in the quarterly cost methodology does not equate to a finding that prices differ significantly by time period as part of the Cohen's *d* test. As discussed above, the quarterly cost test and the Cohen's *d* test use notably different analyses which are not interchangeable with each other.

production costs and potential distortion therefrom.  The comparison methodologies each account for differing production costs, the possibility of masked dumping because of differing production costs and prices will have been accounted for, and the calculated results will accurately reflect the respondent's dumping, if any, in the U.S. market.

The same logic applies to the situation where there are additional reasons that U.S. prices differ between quarters beyond the differences in production costs.  As with Universal's apparent assumption that differing production costs alone result in differing U.S. prices by time period in the Cohen's *d* test, each of the comparison methodologies will continue to account for the different production costs and the potential distortions therefrom.

Contrary to Universal's assertion that the meaningful difference test is not relevant,[80] this test examines whether the A-to-A method can account for the respondent's pricing behavior, and the resulting prices, in the U.S. market.[81]  If a pattern of prices is found to exist, then the meaningful difference test compares the weighted-average dumping margin calculated by applying the A-to-A method to all U.S. sales with the weighted-average dumping margin calculated using an alternative comparison methodology based on the A-to-T method.  As discussed above, the quarterly cost methodology results in changes to each of the comparison methodologies, including the use of quarterly cost-averaging periods and limiting the comparison of U.S. price with a normal value for the same quarter as the U.S. date of sale.  Accordingly, the meaningful difference test incorporates these changes made in the calculation of the dumping margins to account for the significant differences in the production costs, such that the results are not distorted.

---

[80] *See* Universal's Comments at 9 ("{T}he meaningful difference requirement does not involve comparisons of costs or sales within or between quarters of the POR, and thus does not explain why it is reasonable for Commerce to apply the inter-quarter comparison and the same-quarter comparison in the same administrative review.").
[81] *See Preliminary Results* PDM at 11-12.

In sum, the statute provides for "a fair comparison" of U.S. price with normal value, along with the commensurate goal to address and minimize distortions in the comparison of U.S. price with normal value. Accordingly, Commerce has a quarterly cost methodology which is used in the calculation of normal value when production costs differ significantly. If found, quarterly cost-averaging periods are used rather than period-wide cost-averaging periods to account for possible distortions due to the changing costs. As a result of the use of quarterly cost-averaging periods, the comparison of U.S. price with normal value is limited to "same-quarter comparisons." The use of the quarterly cost methodology is all part of ensuring that "a fair comparison" is made pursuant to the statute.

In contrast, the purpose of the pattern requirement is to identify circumstances which may lead to masked, or "targeted," dumping. The statute provides that Commerce examine a respondent's U.S. sales between purchasers, regions, and time periods to ascertain whether a pattern exists.[82] Accordingly, in the differential pricing analysis, Commerce uses the *Cohen's d* test to determine whether the observed price differences are significant, and the ratio test determines whether the extent of the significant price differences evidences a pattern. Federal Circuit cases present support that it was reasonable to apply the "inter-quarter comparison" and the "same-quarter comparison" in the same administrative review because the cause(s) of price differences observed as part of the pattern requirement need not be discerned.[83] Further, the "inter-quarter comparison" in the *Cohen's d* test does not introduce potential distortions into Commerce's margin calculations as there are no margin calculations performed as part of the *Cohen's d* test. Any concern for potential distortions is addressed as part of the comparison methodology used to perform the margin calculations, whether the comparison methodology is

---

[82] *See* section 777A(d)(1)(B)(i) of the Act.
[83] *See* JBF *RAK*, 790 F.3d at 1368; *see also* Borusan, 608 Fed. Appx. at 949.

based on A-to-A comparisons, A-to-T comparisons, or T-to-T comparisons.  Therefore, it is reasonable for Commerce to use "inter-quarter comparisons" as part of the *Cohen's d* test, and Commerce's "same-quarter comparisons" as part of the quarterly cost methodology.

**Comment 5:   Recalculation of Universal's Weighted-Average Dumping Margin**

*Universal's Comments*

The following is the verbatim executive summary submitted by Universal.  For further details, *see* Universal's Comments at 10.

> Commerce's {Draft Redetermination} do{es} not provide a reasonable explanation for Commerce's inconsistent determinations, nor do they admit that Commerce's determinations are inconsistent in the first place.  Because Commerce has not provided a sufficient explanation for its internally inconsistent determinations, Commerce should re-calculate Universal's weighted-average dumping margin in the final remand results, and should determine the appropriate comparison methodology for the margin calculation by limiting the first part of its Cohen's *d* {test} to a comparison of groups of sales data only for particular purchasers and regions, and not for time periods.[84]

**Commerce's Position:**  The Court remanded for Commerce "to reconsider or provide further explanation in accordance with {the Court's} Opinion."[85]  Accordingly, as Commerce has provided further reasonable explanation, as detailed above, Commerce has not re-calculated Universal's weighted-average dumping margin.

---

[84] *See* Universal's Comments at 4.
[85] *See Remand Order* at 18.

## V.      FINAL RESULTS OF REDETERMINATION

Because we continue to find our calculations in the *Final Results* were appropriate, as further explained above, we have made no changes to our margin calculations, and the weighted-average dumping margin for Universal continues to be 2.63 percent.[86]

9/23/2024

X _____

Signed by: RYAN MAJERUS

Ryan Majerus,
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[86] *See Final Results*, 88 FR at 28484.