## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD.; THL TUBE AND PIPE INDUSTRIES LLC; AND KHK SCAFFOLDING AND FORMWORK LLC, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> WHEATLAND TUBE COMPANY, <br><br> Defendant-Intervenor. | Before: Jennifer Choe-Groves, Judge <br> Court No. 23-00113 |

## DEFENDANT-INTERVENOR'S COMMENTS IN SUPPORT OF THE FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

Roger B. Schagrin, Esq.
Luke A. Meisner, Esq.
Alessandra A. Palazzolo, Esq.
SCHAGRIN ASSOCIATES
900 Seventh Street, NW,
Suite 500
Washington, DC 20001
(202) 223-1700
*Counsel for Wheatland Tube Company*

Dated: November 18, 2024

## Table of Contents

I.   INTRODUCTION ................................................................................................................ 1

II.   COMMERCE COMPLIED WITH THE COURT'S REMAND INSTRUCTIONS ........... 2

   A.   Commerce Reasonably Explains Why It Was Appropriate to Use Both "Inter-Quarter Comparisons" and "Same Quarter Comparisons" In Different Contexts Within the Same Review ................................................................................................................................ 2

   B.   Commerce Explains Why Inter-Quarterly Comparisons Are Reasonable in the Context of Calculating Dumping Margins ........................................................................................ 6

   C.   Commerce's Discussion of the Meaningful Difference Test is Not Irrelevant ..................... 8

III.   CONCLUSION ............................................................................................................... 10

## Table of Authorities

**Cases**

*Aventis Pharms. Inc. v. Amino Chemicals Ltd.,* 715 F.3d 1363 (Fed. Cir. 2013) ........................... 5
*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 608 Fed. Appx. 948 (Fed. Cir. 2015) ................................................................................................................................ 7-8
*Colakoglu Metalurji A.S. v. United States*, 553 F. Supp. 3d 1344 (Ct. Int'l Trade 2021) ............... 4
*FAG Kugelfischer Georg Schafer Ag v. United States*, 332 F.3d 1370 (Fed. Cir. 2003) ................. 4
*Fischer S.A. Comercio, Industria & Agricultura v. United States*, 36 C.I.T. 1604 (2012) ............. 4
*JBF RAK v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015) .................................................. 7
*Rebar Trade Action Coal. v. United States*, 503 F. Supp. 3d 1295 (Ct. Int'l Trade 2021) .............. 5
*Union Steel v. United States*, 36 C.I.T. 288 (2012), *aff'd*, 713 F.3d 1101 (Fed. Cir. 2013) ............ 4

**Statutes**

19 U.S.C. § 1677a ........................................................................................................................... 3
19 U.S.C. § 1677b(b) ...................................................................................................................... 3
19 U.S.C. § 1677f-1(d)(1)(B) .................................................................................................. 5, 7-8

I.      INTRODUCTION

Defendant-Intervenor Wheatland Tube Company ("Wheatland") submits these comments in support of the U.S. Department of Commerce's ("Commerce") final results of redetermination filed on September 23, 2024, ECF No. 39 ("Remand Results"), pursuant to *Universal Tube and Plastic Indus., Ltd. v. United States*, Court No. 23-00113, Slip Op. 24-85 (Ct. Int'l Trade July 26, 2024), ECF No. 38 ("Remand Order"). As demonstrated below, Commerce's Remand Results satisfy the Remand Order's requirement for Commerce to "reconsider or provide further explanation" for "why it was reasonable to apply the 'inter-quarter comparison' and the 'same-quarter comparison' in the same administrative review." Remand Order at *18. Accordingly, the Remand Results should be affirmed.

In their comments in opposition to Commerce's final redetermination results, Plaintiffs Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding and Formwork LLC ("Plaintiffs") argue that Commerce "fails to justify its inconsistent approaches," "does not explain why inter-quarterly comparisons are reasonable," "misplace{s}" its "reliance on different contexts," and that "the meaningful difference requirement is not relevant to the remand." *See* Comments of Pls. in Opposition to the Final Results of Redetermination Pursuant to Ct. Remand ("Pls.' Comments") (Oct. 18, 2024) (ECF 41). However, these arguments should be rejected because they ignore or mischaracterize Commerce's explanations for why its methodologies were reasonable, which do satisfy the Court's remand instructions in Slip. Op. 24-85.

1

## II. COMMERCE COMPLIED WITH THE COURT'S REMAND INSTRUCTIONS

### A. Commerce Reasonably Explains Why It Was Appropriate to Use Both "Inter-Quarter Comparisons" and "Same Quarter Comparisons" In Different Contexts Within the Same Review

Plaintiffs argue that Commerce "fails to justify its inconsistent approaches" and that Commerce's "'different context' argument" is not a "reasonable explanation" for using inter-quarter and same-quarter comparison methodologies within the same review. Pls.' Comments at 3 and 8. However, as Commerce notes in the Remand Results, the Court did *not* reject Commerce's argument that the different contexts in which the inter-quarter and same quarter comparisons were applied in this review meant that its methodology was reasonable and not inconsistent. Remand Results at 21. Instead, the Court asked Commerce to "reconsider or provide further explanation" for why this methodology was reasonable, which Commerce does in its Remand Results. *Id.*

In particular, Commerce explains in the Remand Results that the different contexts in which it applies same-quarter and inter-quarter comparisons in this review "are relevant because there are several key differences between the analysis that is undertaken to determine if quarterly cost-averaging periods are warranted, and the analysis that indicates whether U.S. prices differ significantly among regions, purchasers, or time periods." Remand Results at 21-22. These differences explain why the comparison of costs would lead to distortive effects in one context (*i.e.*, the calculation of normal value) but such distortions are not an issue in another context (*i.e.*, whether there is a pattern of prices that differ significantly among purchasers, regions, or time periods). As Commerce explains in the Remand Results:

> … one must first define accurately the two situations, i.e., "same-quarter comparisons" and "inter-quarter comparisons," which Universal is discussing. The first, "same quarter comparisons," reflects the comparison of U.S. prices with normal value to calculate individual dumping margins, *where the production costs*

2

> *are a determinative input into normal value*. The second relates to the comparison of one group of U.S. prices with a second group of U.S. prices, *the comparison of which is not dependent on the production costs*.
>
> *Id.* at 23-24 (emphasis added).

Additionally, Commerce explained that

> Production costs are an integral part of the calculation of normal value and are provided for under section 773(b) of the Act, a subsection of section 773 of the Act describing normal value. As discussed above, the change to quarterly cost-averaging periods causes other changes in Commerce's calculation of normal value. As the potential for distortions originates with the changes in the production costs, these changes are limited to where production costs are involved in the calculation of normal value …
>
> *Id.* at 24.

In contrast, Commerce explains that "U.S. price is defined under section 772 of the Act which does not include production costs" and "therefore, when comparing U.S. prices to each other in the Cohen's *d* test, the potential distortions which may be caused by the significant changes in costs do not render use of inter-quarter comparisons in the Cohen's *d* test unreliable." *Id.* at 25.

In other words, Commerce found that "significant cost changes" could potentially distort normal value and comparisons involving normal value but not U.S. prices and comparisons of different U.S. prices for purposes of the Cohen's *d* test. Commerce therefore reasonably determined to apply same-quarter comparisons to address potential cost-based distortions in the context where the potential cost-based distortions could impact normal value calculations, and reasonably determined to apply inter-quarter comparisons in a different context that would not be distorted by changing costs. Thus, Commerce's Remand Results provide a reasonable explanation of this methodology and satisfy the Court's instructions to explain why its methodology was reasonable.

Contrary to the Plaintiffs' claims, it is perfectly reasonable for Commerce to apply different comparison methodologies in different contexts, and this does not mean that the agency

3

is being inconsistent. According to the Plaintiffs, "it is *essential* that Commerce not adopt inconsistent approaches under different provisions of the antidumping statute." Pls. Comments at 8-9 (emphasis added). However, this Court and the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") have recognized that while a specific term should not be given contradictory meanings throughout the statute, "terms may be interpreted differently in different contexts." *Fischer S.A. Comercio, Industria & Agricultura v. United States*, 36 C.I.T. 1604, 1617 (2012) (citing *Union Steel v. United States*, 36 C.I.T. 288 (2012), *aff'd*, 713 F.3d 1101 (Fed. Cir. 2013) (upholding application of zeroing methodology during administrative reviews but not investigations as permissible.); *FAG Kugelfischer Georg Schafer Ag v. United States*, 332 F.3d 1370, 1373 (Fed. Cir. 2003) (upholding different interpretations of "foreign like product" under different contexts). For example, in *Colakoglu Metalurji A.S. v. United States*, this court upheld Commerce's practice of using different methodologies to calculate the non-selected respondents' rates in antidumping duty ("ADD") and countervailing duty ("CVD") investigations. 553 F. Supp. 3d 1344 (Ct. Int'l Trade 2021). The court recognized that the different purposes of each type of proceeding warranted Commerce using different methodologies:

> Such an interpretation reflects the differences between ADD and CVD investigations. As Commerce explains, as opposed to an ADD investigation in which Commerce analyzes companies' "pricing behavior," in a CVD investigation, "Commerce's concern is with government subsidization and the extent to which different companies may use or benefit from subsidy programs." … Thus, CVD rates depend on individual companies' use of specific subsidy programs. In the ADD context, on the other hand, Commerce must assess pricing behavior based on a comparison between U.S. prices and the respondent's home country prices. … The different inquiries Commerce must make in the ADD and CVD contexts support Commerce's interpretation of the SAA's differing explanations for how to calculate rates for non-selected respondents.

> *Id.* at 1350.

4

Here, Plaintiffs fail to point to any specific statutory term that Commerce interpreted in a contradictory manner when it limited comparisons to same-quarter comparisons as part of its quarterly cost methodology but allowed inter-quarter comparisons as part of its differential pricing analysis. The quarterly cost methodology and differential pricing analysis are different tests for different purposes. The purpose of quarterly cost analysis is to determine whether to deviate from Commerce's normal methodology of calculating an annual weighted-average cost during a time of significant cost changes, to address possible distortions in the annual weighted-average cost. *See, e.g., Rebar Trade Action Coal. v. United States*, 503 F. Supp. 3d 1295, 1298 (Ct. Int'l Trade 2021). In contrast, the purpose of the differential pricing analysis is to determine whether there is a difference in prices based on customer, region, or time period such that Commerce should deviate from its normal average-to-average methodology for calculating the weighted-average dumping margin. *See* 19 U.S.C. § 1677f-1(d)(1)(B). There is thus nothing "inconsistent" about conducting comparisons using different time periods in these two different contexts.

The Federal Circuit has reversed lower court decisions for failing to recognize that different contexts may require different approaches or interpretations. *See, e.g., Aventis Pharms. Inc. v. Amino Chemicals Ltd.,* 715 F.3d 1363, 1375 (Fed. Cir. 2013) ("The district court's artificial truncation of the claim term for the expediency of a single interpretation across different contexts was error."). As discussed above, consistent with the Court's instructions in the Remand Order, Commerce has explained why it used only same-quarter comparisons in one context and inter-quarter comparisons in another contexts. The Court should recognize the validity of this explanation and affirm the Remand Results.

### B. Commerce Explains Why Inter-Quarterly Comparisons Are Reasonable in the Context of Determining Differential Pricing

Many of Plaintiffs' complaints about Commerce's Remand Results are simply the same argument in different forms: Plaintiffs argue that "Commerce does not explain why inter-quarterly comparisons are reasonable" while asserting that "Commerce's reliance on different contexts is misplaced." Pls.' Comments at 6, 8. As discussed in Section II.A., Commerce does explain in its Remand Results that it reasonably used inter-quarterly comparisons in the context of comparing U.S. prices with the Cohen's $d$ test, which is used to determine which comparison methodology Commerce should use to calculate dumping margins:

> The quarterly cost methodology compares the costs relative to one another between just two quarters (i.e., the quarter with the highest cost and the quarter with the lowest cost). For the majority of the five CONNUMs with the largest volume of sales in each market, if there is a significant difference between the highest and lowest cost, we then look to home market and U.S. prices of those same CONNUMs to observe whether the changes in prices roughly correlate to the changes in cost between the two quarters. By contrast, the Cohen's $d$ test, compares only U.S. prices (not production costs) across all four quarters, not just two, and determines not simply if there is a trend in prices, but rather if there are significant differences. *Significance is measured relative to the variation in prices within the test group (i.e., a given quarter) and the comparison group (i.e., all other quarters in the POR), and not the relative change between two specific quarters*. Further, the Cohen's $d$ test is performed for all CONNUMs sold in the U.S. market and not just the five CONNUMs with the largest sale volumes. *Therefore, the Cohen's d test is a comprehensive examination of U.S. prices which measures the significance of the difference in U.S. prices between quarters, whereas the quarterly cost test involves a more limited examination of a subset of U.S. prices, the purpose of which is to determine whether costs fluctuate significantly and does not determine the significance of the differences in U.S. prices*.

Remand Results at 22 (emphasis added).

There is no merit to Plaintiffs' argument that "Commerce is unconcerned in the Remand Results that improper sales comparisons might lead to a *false* finding of a pattern of price differences, and fails to explain to the Court why it is reasonable to rely on a pattern of prices

6

among quarters resulting from and established by a comparison of non-comparable selling prices." Pls.' Comments at 7 (emphasis added). As an initial matter, Plaintiffs fail to show why making inter-quarterly comparisons of U.S. price as part of the differential pricing analysis is "improper." Presumably, it is because Commerce determined that it would be improper to make inter-quarterly comparisons of costs to home market prices as part of the quarterly cost methodology. However, as discussed above, the inter-quarterly comparisons of U.S. price for the differential pricing analysis are not improper because: (i) the comparisons involve comparisons of different data points; and (ii) they take place in a different statutory context with a different purpose than the quarterly cost methodology. Indeed, at no point in Commerce's quarterly cost analysis did the agency determine that U.S. prices are "non-comparable" to other U.S. prices. Simply put, because the inter-quarterly comparisons of different U.S. prices are not "improper," there are no concerns that they lead to a "false" finding of a pattern of price differences.

In addition, as Commerce also explains in its Remand Results, Federal Circuit precedent supports its determination that is reasonable to apply the "inter-quarter comparison" and the "same-quarter comparison" in the same administrative review. *See* Remand Results at 7-8. In *JBF RAK*, the Federal Circuit held that "Section {777A(d)(1)(B) of the Act} does not require Commerce to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods." *See id.* at 7 (quoting *JBF RAK v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015)). As such, the Federal Circuit affirmed that Commerce was not required to examine the possible causes of the identified pattern of export prices, even if the respondent argued that a specific "business purpose" or practice caused the pattern. *See id.* at 8 (citing *JBF RAK*, 790 F.3d at 1368). Additionally, in *Borusan*, the Federal Circuit explicitly rejected the appellant's argument that Commerce erred by

7

failing to consider whether the observed pattern of export prices "in Borusan's products occurred due to increases in raw material costs, and not due to Borusan's pursuit of any intentional targeted dumping scheme." *Id.* at 9 (quoting *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 608 Fed. Appx. 948, 949 (Fed. Cir. 2015)).

Therefore, even putting aside Commerce's explanations for why the potential cost distortions that justify Commerce's use of a "same-quarter comparison" in one context within the administrative proceeding do not present the same issues in the context of Commerce's differential pricing analysis (*i.e.*, the Cohen's *d* and meaningful difference tests), it is clear from Federal Circuit precedent that "Commerce does not need to identify the reasons why a respondent's U.S. prices differ significantly in the context of section 777A(d)(1)(B)(i) of the Act, and accordingly such reasons do not similarly introduce distortions into that analysis." *Id.* at 10. Commerce's use of inter-quarter comparisons in this context was therefore reasonable and consistent with Federal Circuit precedent.

C.  **Commerce's Discussion of the Meaningful Difference Test Is Not Irrelevant**

In their comments, Plaintiffs argue that since "the meaningful difference requirement does not involve comparisons of costs or sales within or between quarters of the period of review," it is not relevant to "the Court's decision regarding the inconsistency of Commerce's sales comparisons." Pls.' Comments at 9-10. In fact, Commerce directly addresses this assertion, which the Plaintiffs also made in their comments on Commerce's draft remand. *See* Remand Results at 27. What Commerce explains, and Plaintiffs now completely ignore, is that the Cohen's *d* test is only the first stage of a two-stage process – *i.e.*, the differential pricing analysis – and the meaningful difference test is the second stage. *Id.* As Commerce explains in the Remand Results:

> If a pattern of prices is found to exist {in the Cohen's *d* analysis}, then the meaningful difference test compares the weighted-average dumping margin calculated by applying the A-to-A method to all U.S. sales with the weighted-average dumping margin calculated using an alternative comparison methodology based on the A-to-T method. As discussed above, the quarterly cost methodology results in changes to each of the comparison methodologies, including the use of quarterly cost-averaging periods and limiting the comparison of U.S. price with a normal value for the same quarter as the U.S. date of sale. Accordingly, *the meaningful difference test incorporates these changes made in the calculation of the dumping margins to account for the significant differences in the production costs, such that the results are not distorted*.
>
> *Id.* (emphasis added).

As such, the "meaningful difference" stage of the analysis is not simply *relevant* to the question of whether it was reasonable for Commerce to apply inter- and same-quarter comparisons in different contexts in the same administrative review, but it is actually key to *why* Commerce's actions were not inconsistent.

As Commerce explains in its Remand Results, the "function" and "purpose as part of the differential pricing analysis" of the Cohen's *d* test is to examine whether there are "significant differences in U.S. prices between different quarters of the POR, or purchasers or regions" which indicate "that conditions exist where masked, or 'targeted,' dumping *may* be occurring, warranting further investigation." *Id.* at 14. The meaningful difference test is part of that further investigation, as the stage at which Commerce determines "whether the A-to-A method can account for differences in the pricing behavior of the respondent in the U.S. market once conditions {of potentially masked dumping} have been identified." *Id.* In its comments on Commerce's Remand Results, Plaintiffs draw on Commerce's "canary in the coal mine" metaphor to argue that "{i}f Commerce shuts down the coal mine because its canary had a heart attack, then its warning system really was not reliable or justifiable in the first place." Pls.' Comments at 7. In doing so, Plaintiffs ignore Commerce's explanation that the meaningful

9

difference test *is* the safeguard that prevents the metaphorical coal mine from shutting down over a false alarm:

> The finding of a pattern is the equivalent of the canary laying lifeless on the floor of its cage, indicating that there is a potential hazard which should be examined. If Commerce does find that a pattern existed for the respondent, then it will examine the meaningful difference requirement and determine whether the A-to-A method can account for the differences in U.S. prices presented by the respondent's pricing behavior and decisions.
>
> Remand Results at 13.

Additionally, Commerce explains that the meaningful difference stage of "Commerce's differential pricing analysis *controls for a respondent's changing production costs over the POR*," while "the pattern test {*i.e.,* the Cohen's *d* test} … only looks at whether conditions exist in which masked dumping might be a consideration." Remand Results at 15-16.

### III.    CONCLUSION

For the foregoing reasons, the Court should sustain Commerce's Remand Results. Contrary to Plaintiffs' arguments, the Remand Results satisfy the Court's instructions to reconsider or explain why its comparison methodologies were reasonable.

Respectfully Submitted,

/s/ Luke A. Meisner
Roger B. Schagrin, Esq.
Luke A. Meisner, Esq.
Alessandra A. Palazzolo, Esq.
SCHAGRIN ASSOCIATES
900 Seventh Street, NW,
Suite 500
Washington, DC 20001
(202) 223-1700
*Counsel for Wheatland Tube Company*

Dated: November 18, 2024

## **CERTIFICATE OF COMPLIANCE**

    I hereby certify that the foregoing brief contains 3,016 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in the Court's Chamber's Procedures.

                                                                                       */s/ Luke A. Meisner*

                                                                                       Luke A. Meisner, Esq.

Dated: November 18, 2024