## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | Court No. 23-00113 ) ) |
| and | ) ) |
| WHEATLAND TUBE COMPANY, | ) ) |
| Defendant-Intervenor. | ) ) ) |

## <u>ORDER</u>

Upon consideration of plaintiffs' comments regarding the remand redetermination, defendant's response thereto, and all other pertinent papers, it is hereby

ORDERED that the remand redetermination is sustained; and further

ORDERED that final judgment is entered in favor of the United States.


Date:_____                    _____

    New York, NY                                   Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | | |
|---|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | Court No. 23-00113 |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WHEATLAND TUBE COMPANY, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

## <u>DEFENDANT'S RESPONSE TO COMMENTS ON REMAND REDETERMINATION</u>

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:

KELLY M. GEDDES

VANIA WANG
Senior Attorney
U.S. Department of Commerce
Office of the Chief Counsel for
Trade Enforcement & Compliance
Washington, D.C. 20230

Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 307-2867

November 21, 2024

Attorneys for Defendant, United States

# TABLE OF CONTENTS

BACKGROUND ......................................................................................................... 2

ARGUMENT ............................................................................................................. 5

I.     Standard Of Review ......................................................................................... 5

II.    Commerce's Explanation For Using Same Quarter Comparisons For Its Cost Averaging Methodology And Inter-Quarter Comparisons For The Cohen's *d* Test Is Reasonable And In Accordance With Law ................................................. 7

       A.     Commerce Has Fully Explained Why Fluctuating Production Costs Do Not Distort Commerce's Cohen's *d* Test In The Context Of Its Differential Pricing Analysis................................................................. 7

       B.     Universal Fails To Engage With Commerce's Reasoned Explanation ................ 10

CONCLUSION ........................................................................................................ 15

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Bethlehem Steel Corp. v. United States*, 223 F. Supp. 2d 1372 (Ct. Int'l Trade 2002) ................. 5

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367 (Fed. Cir. 2021) ........................................................................................................ 6

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966).................................................................. 6

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996)............................................ 5, 6

*Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996) ........................................................ 6

*JBF RAK LLC v. United States*, 790 F.3d 1358 (Fed. Cir. 2015) ............................................ 9, 10

*Nan Ya Plastics Corp. v. United States*, 128 F. Supp. 3d 1345 (Ct. Int'l Trade 2015) ............... 11

*Nexteel Co. v. United States*, 28 F.4th 1226 (Fed. Cir. 2022)........................................................ 6

*PAM, S.p.A. v. United States*, 582 F.3d 1336 (Fed. Cir. 2009)...................................................... 6

*Pastificio Lucio Garofalo, S.p.A. v. United States*, 783 F. Supp. 2d 1230 (Ct. Int'l Trade 2011) 14

*Seah Steel Corp. v. United States*, 704 F. Supp. 2d 1353 (Ct. Int'l Trade 2010) ........................ 14

*Smith-Corona Grp. v. United States*, 713 F.2d 1568 (Fed. Cir. 1983) .......................................... 6

*Stupp Corp. v. United States*, 619 F. Supp. 3d 1314 (Ct. Int'l Trade 2023)................................. 13

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009)...................................................................... 6

**Statutes**

19 U.S.C. § 1516a ...................................................................................................................... 5

19 U.S.C. § 1677a ...................................................................................................................... 13

19 U.S.C. § 1677b...................................................................................................................... 2, 12

19 U.S.C. § 1677f-1 ................................................................................................................... 3, 8, 14, 15

**Other Authorities**

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) ................................................................................................ 8

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC, <br><br>        Plaintiffs, <br><br>        v. <br><br> UNITED STATES, <br><br>        Defendant, <br><br>        and <br><br> WHEATLAND TUBE COMPANY, <br><br>        Defendant-Intervenor. | Court No. 23-00113 |

## DEFENDANT'S RESPONSE TO COMMENTS ON REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to the comments submitted by plaintiffs Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding and Formwork LLC (collectively, Universal) (ECF No. 41), concerning the Department of Commerce's remand redetermination. *See* Remand Results (Sep. 23, 2024) (ECF No. 39). As discussed below, the remand redetermination complies with this Court's remand order in *Universal Tube et al. v. United States*, Court No. 23-00113, Slip Op. 24-85 (Ct. Int'l Trade Jul. 26, 2024) (remand order) and is supported by substantial evidence and in accordance with law. Accordingly, the Court should sustain Commerce's remand redetermination.

## BACKGROUND

On February 4, 2022, Commerce initiated an administrative review of its antidumping duty order on circular welded carbon-quality steel pipe from the United Arab Emirates. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 6,487 (Dep't of Commerce Feb. 4, 2022) (P.R. 7).[1]  Commerce selected Universal for individual examination as a mandatory respondent based on U.S. Customs and Border Protection data. *See* Respondent Selection Memorandum (Mar. 18, 2022) (P.R. 22, C.R. 4).

On December 28, 2022, Commerce published its preliminary results. *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Preliminary Results of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 79,862 (Dep't of Commerce Dec. 28, 2022) (P.R. 104), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 105).  In accordance with its practice for calculating the normal value for the subject merchandise, Commerce had excluded from its calculation sales made at less than the cost of production.  19 U.S.C. § 1677b (b).  To calculate cost of production, Commerce normally calculates an annual weighted-average cost for the period of review.  PDM at 23.  However, in its preliminary results, Commerce concluded that Universal experienced significant cost changes from quarter to quarter during the administrative review.  PDM at 23-24.  Commerce therefore used quarterly weighted-average costs to determine the cost of production for each of quarter to determine which sales to exclude from its calculation of the normal value.  *Id.*

---

[1]  Public documents on the administrative record are designated as "P.R." and confidential documents are designated as "C.R."  All P.R. and C.R. references in this brief cite to the administrative investigation record.  References to the public documents on the administrative record for the remand redetermination are designated as "P.R.R."

Commerce also performed a differential pricing analysis of Universal's sales in the United States, pursuant to 19 U.S.C. § 1677f-1(d)(1)(B).  PDM at 10-12.  Commerce conducts this analysis to determine whether the sales prices differ significantly between different purchasers, regions, or time periods.  *Id.* at 10.  If significant differences exist, Commerce's usual methods for determining whether dumping is occurring—comparing weighted-average U.S. prices to weighted-average normal values—might not capture targeted dumping. Commerce therefore compared Universal's prices across purchasers, regions, and time periods. *Id.* at 12.  With respect to time periods, Commerce followed its normal practice of defining time period by quarter.  *See id.* at 11.  Commerce found that there were significant differences in U.S. price among purchasers, regions, and time periods.  *Id.* at 12.  Commerce further found that its usual method, the average-to-average method, could not account for these differences.  *Id.* Accordingly, for U.S. prices that passed the Cohen's *d* test, Commerce compared the weighted average of the normal values to the export prices of the individual transactions, pursuant to 19 U.S.C. § 1677f-1(d)(1)(B) (the average-to-transaction method).  *Id.* at 12.

On May 4, 2023, Commerce published its final results, in which it continued to use the quarterly cost methodology and the average-to-transaction method.  *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2020- 2021*, 88 Fed. Reg. 28,483 (Dep't of Commerce May 4, 2023), P.R. 123, and accompanying Issues and Decision Memorandum (IDM), P.R. 124.

Universal challenged Commerce's final results, arguing that it was inconsistent for Commerce to calculate cost of production on a quarterly basis as part as of its normal value calculation while also comparing sales across quarters for the purpose of its differential pricing analysis.  Among other things, Universal argued that Commerce's analysis of whether sales

prices varied across "time periods" could have used a time period other than quarters for its analysis. Commerce had not addressed this particular argument in its determination because Universal did not raise it during the administrative review, and we argued that Universal had waived the argument.

This Court held that Universal had not waived its argument that Commerce should have used a different unit of time in its differential pricing analysis, because Commerce was generally on notice that Universal was challenging Commerce's comparison of prices across time periods. Remand Order at 9-10. The Court then concluded that Commerce had failed to explain why it was reasonable to compare prices across quarters for its differential pricing analysis while rejecting price comparisons across quarters in its calculation of the normal value. *Id.* at 16-18. The Court remanded for reconsideration or further explanation. *Id.* at 18.

On August 29, 2024, Commerce issued draft remand results and invited interested parties to comment. *See* Draft Remand Redetermination (Aug. 29, 2024) (P.R.R. 1). On September 5, 2024, Universal submitted draft remand comments. *See* Universal Draft Remand Cmts (Sept 5, 2024) (P.R.R. 2). After considering the draft remand comments, Commerce issued its final remand results on September 23, 2024. *See* Remand Results.

In the final remand results, Commerce provided further explanation as to why it was reasonable to use same-quarter comparison when comparing normal value with U.S. price while using inter-quarter comparisons when comparing U.S. prices with other U.S. prices. *Id*. In particular, Commerce provided a detailed explanation of the purpose and process of its differential pricing analysis. Remand Results at 11-16. Commerce explained that this analysis, aimed at ensuring that a respondent's dumping margin accounts for targeted dumping —that is, dumping limited to only a subset of sales, such as sales to a particular customer or during a

particular timeframe—first considers whether there is a pattern of U.S. prices that differ significantly (a risk of targeted dumping), whatever the cause. *Id.* at 11-14. At this stage, Commerce compares U.S. prices across quarters because the purpose of the analysis is to identify whether prices differ significantly among time periods. *Id.* The fact that in the same proceeding, Commerce also found that production costs fluctuate over time, which affects normal value such that U.S. prices in one quarter should not be compared to a normal value that is based in part on costs from other quarters, has no bearing. *Id.* Commerce further explained that at a later stage of the differential pricing analysis, the meaningful difference test, Commerce determines whether there is a meaningful difference in the dumping margins when Commerce compares individual transaction export prices to the weighted-average normal values rather than comparing weighted-average export prices to weighted-average normal values. *Id.* at 14-16. As Commerce thoroughly describes in the remand results, at this stage, where Commerce is once again comparing U.S. prices to normal values (rather than U.S. prices to U.S. prices), Commerce once again limits its comparison to same-quarter comparisons between U.S. price in cases where Commerce applies a quarterly cost methodology. *Id.*

## **ARGUMENT**

### I.    **Standard Of Review**

"The same standard of review applies to the review of a remand determination as to the review of the original determination." *Bethlehem Steel Corp. v. United States*, 223 F. Supp. 2d 1372, 1375 (Ct. Int'l Trade 2002). Accordingly, the "court will sustain {Commerce's} determination upon remand if it complies with the court's remand order, is supported by substantial evidence on the record, and is otherwise in accordance with law." *Id.* (citing 19 U.S.C. § 1516a(b)(1)(B)(i)); *see also Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996). "The specific factual findings on which {Commerce} relies in applying its

interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009).  Even if the Court may draw two inconsistent conclusions from the record evidence, that possibility "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Commerce has "broad discretion in executing" antidumping law, *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983), and the Court affords "tremendous deference" to Commerce's administration of those laws, *id.* at 1582.  The Federal Circuit has explained that:

> Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts.  This deference is both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise in identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute, as opposed to interpreting the meaning of the statue itself where ambiguous.

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (citations omitted).  *See also Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367, 1374-75 (Fed. Cir. 2021) (same); *Nexteel Co. v. United States*, 28 F.4th 1226, 1239 (Fed. Cir. 2022) (finding that "Commerce has selected a methodology consistent with the statutory language, which we afford greater deference than under the *Chevron* framework") (citing *Fujitsu*, 88 F.3d at 1039).

II.    **Commerce's Explanation For Using Same Quarter Comparisons For Its Cost Averaging Methodology And Inter-Quarter Comparisons For The Cohen's *d* Test Is Reasonable And In Accordance With Law**

Commerce complied with the remand order by providing further explanation as to why it was reasonable to only compare U.S. prices to normal values within the same-quarter, which Commerce determines is appropriate to do when the quarterly cost methodology is used, but to identify prices that differ significantly over time by comparing U.S. prices across quarters. The two calculations, which we described in detail in our prior brief, *see* ECF No. 27 at 8-14, occur in different contexts. Comparing U.S. prices across quarters is not distortive in identifying a pattern of prices that differ significantly among time periods, but rather is the entire purpose of that analysis. In contrast, when normal value is relevant, using the quarterly cost methodology causes Commerce to limit comparison of U.S. prices to normal value to the same quarter even in the average-to-transaction method, which Commerce ultimately used to calculate Universal's dumping margin. Accordingly, Universal has failed to identify any unreasonable inconsistency, and Commerce's remand results should be sustained.

A.    **Commerce Has Fully Explained Why Fluctuating Production Costs Do Not Distort Commerce's Cohen's *d* Test In The Context Of Its Differential Pricing Analysis**

In the remand results, Commerce provides a thorough explanation of why fluctuating production costs do not distort the Cohen's *d* test as part of its differential pricing analysis. To put it simply, the differential pricing analysis is aimed at identifying price differences among time periods—such differences do not distort the analysis, but rather are precisely what the analysis is aimed at identifying.

To fully explain this concept, Commerce's remand determination provides a detailed discussion of the purpose of the differential pricing analysis. Remand Results at 11-16. Typically, Commerce calculates dumping margins using the "average-to-average" methodology,

which compares weighted-average export prices to weighted-average normal values, but there is

"a concern that such a methodology could conceal 'targeting dumping.'"  Statement of

Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316,

Vol. 1 (1994) at 842-43); *see also* Remand Results at 12.  If targeted dumping is occurring—that

is, if there are individual instances of dumping that are not reflected in the broad average sales

prices—this can be addressed by comparing the export prices of individual transactions to the

weighted-average normal value of the merchandise.  Accordingly, 19 U.S.C. § 1677f-1(d)(l)(B)

"provides for a comparison of average normal values to individual export prices or constructed

export prices in situations where an average-to-average or transaction-to-transaction

methodology cannot account for a pattern of prices that differ significantly among purchasers,

regions, or time periods, *i.e.*, where targeted dumping may be occurring."  *Id.*

Accordingly, Commerce starts by determining whether there is "a pattern of prices that

differ significantly among purchasers, regions or time periods."  Remand Results at 5.  At this

point in the process, Commerce is not making comparisons to calculate a margin or identify

dumping, but rather is looking for a pattern among time periods.  *See* Remand Results at 12.

There is nothing distortive about comparing prices from different quarters in order to do so.

Accordingly, the Cohen's *d* test "operates exactly as intended" when using inter-quarter

comparisons, because these reveal if there are significant prices differences in U.S. prices

between different quarters of the period of review and that further investigation into possible

targeted dumping is warranted.  Remand Results at 14.  "Such differences do not indicate that

there is masked dumping, or even any dumping at all, which requires a comparison with normal

value.  This examination under the Cohen's *d* test is just an early indicator that something might

be there to further investigate."  Remand Results at 13.  Accordingly, at this stage, Commerce

does not consider the cause of any price differences, just whether such differences exist.  The Federal Circuit has repeatedly upheld this practice.  *See* Remand Results at 7-9 (citing *JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015); *Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. v. United States*, 608 F. App'x 948, 948-49 (Fed. Cir. 2015)).

At the second stage of Commerce's analysis—the meaningful difference test— Commerce does once again compare export prices of individual transactions to weighted-average normal values to assess dumping.  *See* Remand Results at 14-16.  Specifically, Commerce compares weighted-average export prices to weighted-average normal values to calculate a dumping margin (the average-to-average method),  and compares the export prices of individual transactions to weighted-average normal values (the average-to-transaction method) to determine whether they result in a meaningfully different dumping margin.  *Id.*  But because Commerce chose to calculate normal value using the quarterly cost methodology, this process never involves any comparison of U.S. prices from one quarter with normal value  from another quarter.  *See* Remand Results at 15.  Rather, "Commerce is comparing two margin calculation approaches that *both use a 'same-quarter comparison,' i.e.*, two dumping margin calculations that *both* limit the normal value to the quarter of the U.S. date of sale as a result of the changes in the respondent's production costs over the {period of review}."  Remand Results at 15 (emphasis in original).  As a result, if the meaningful difference test finds that the average-to-average method cannot account for the respondent's pricing behavior in the U.S. market, "such result is *not* due to changes in the respondent's production costs over the {period of review}, which have been controlled for in the underlying 'same-quarter comparisons' in each of the comparison methodologies (*i.e.*, the {average-to-average} method and an alternative comparison method

based on {average-to-transaction} comparisons) examined in the meaningful difference test." Remand Results at 15 (emphasis in original).

In this manner, Commerce does not "shut{ } down the coal mine because its canary had a heart attack," as Universal contends, but rather, finding the canary dead—that is, finding a pattern of prices that differ significantly among purchasers, regions, or time periods—Commerce continues its analysis with another test, the meaningful difference test, to identify whether a hazard exists. To forego any assessment of price differences over time simply because there were also cost fluctuations over time would allow respondents to use cost fluctuations as an excuse to take advantage of masked dumping.

In short, the Cohen's *d* test is not distorted by inter-quarter comparisons.

### B.    Universal Fails To Engage With Commerce's Reasoned Explanation

Universal mischaracterizes Commerce's reasoning as an argument that Commerce "is permitted to adopt inconsistent approaches because it does not need to understand or recognize the reasons for any price differences." Universal Cmts at 3. Indeed, Commerce observed in its remand results that when conducting a differential pricing analysis, Commerce is not required to determine the cause of prices differing significantly. *See* Remand Results at 7-9 (citing *JBF RAK*, 790 F.3d at 1368). Rather, Commerce is tasked with identifying a pattern of prices that differ significantly, regardless of the cause, to determine if there is a *risk* of targeted dumping that warrants further scrutiny. *Id.* Commerce made this point to address Universal's implication that Commerce should not have found a pattern of differential pricing when Commerce had also identified price difference corresponding to fluctuating costs, an argument the Federal Circuit has explicitly rejected. *See Borusan*, 608 F. App'x at 948-49 (rejecting argument that Commerce should not find a pattern of differential pricing where the differences result from cost increases rather than an intentional dumping scheme).

But, as detailed above, Commerce *also* fully addressed Universal's argument regarding Commerce's "inconsistent" practices by explaining why cross-quarter comparisons risk distorting certain analyses (those aiming to identify dumping at a given moment) but not others (those deliberately assessing changes over time). *See* Remand Results at 9-10 (citing *Nan Ya Plastics Corp. v. United States*, 128 F. Supp. 3d 1345, 1351-52 (Ct. Int'l Trade 2015) ("If Commerce identifies a pattern of export prices or constructed export prices that differ significantly among purchasers, regions, or periods of time…Commerce then considers whether the {average-to-average} comparison methodology can account for the observed price differences. . . . *In a different context*, Commerce acknowledged in the *Preliminary Results* that Nan Ya 'experienced significant changes' in its cost of production due to volatility in the prices of certain primary inputs") (emphasis added)). Universal ignores Commerce's explanation of why a same-quarter comparison in one context does not call for a same-quarter comparison in another, how the Cohen's *d* test acts in the differential pricing analysis as a whole, and how fluctuating production costs are taken into account in the meaningful difference test.

Universal asserts that Commerce's "reliance on different contexts" is misplaced. But in doing so, Universal fails to engage in Commerce reasoning, explained above, as to *why* the different contexts at issue here justify different methodologies. Universal criticizes Commerce for "fail{ing} to identify…the statutory provision under which it adopts a quarterly cost of production and sales comparison approach" and for failing to "explain where the statute requires Commerce to identify the *reasons* for adopting such a quarterly approach." Universal Cmts at 8-9. But Commerce's application of a quarterly cost methodology is not challenged in this case—Commerce's differential price analysis is. Moreover, this argument does not change the validity of Commerce's explanation as to why the different contexts called for different analyses. In any

event, Commerce's use of quarterly production costs is consistent with the statute, which

instructs that "a fair comparison shall be made between the export price or constructed export

price and normal value."  19 U.S.C. § 1677b(a).  To fairly compare export price to normal value,

Commerce reasonably calculates normal value using the quarterly cost methodology to avoid

distortions caused by cost fluctuations.  *See* Remand Results at 24-25, 28.

Universal next argues that the meaningful difference test is "not relevant to the remand"

because it "does not explain why it is reasonable for Commerce to apply the inter-quarter

comparison and the same-quarter comparison in the same administrative review."  Universal

Cmts at 9-10.  This argument, too, fails to engage with—let alone undermine—Commerce's

explanation as to why this alleged "inconsistency" is reasonable.  In any event, Commerce

reasonably discussed the meaningful difference test to fully explain the role of the Cohen's *d* test

in context.  *See* Remand Results at 14-16.  Further, by arguing that Commerce is relying on a

"false finding of a pattern of a price differences," Universal has implied that Commerce's

differential pricing analysis unfairly treats differences in price driven by fluctuations in cost as

targeted dumping.  Commerce reasonably explained that this concern is addressed at the

meaningful difference analysis stage, when Commerce accounts for the cost differences over

time by using quarterly costs in its analysis of whether there is a different result between the

average-to-average methodology and the average-to-transaction methodology of calculating

Universal's dumping margin.  *Id.*

Indeed, the meaningful difference test illustrates the consistency across Commerce's

approach, because at this stage Commerce compares U.S. prices to normal values, and once

again limits this analysis to within-quarter comparisons.  Universal is therefore incorrect to assert

that "the meaningful difference requirement does not involve comparison of costs or sales within

or between quarters." Universal Cmts at 9. Ultimately, Universal is asking the Court to ignore

the broader context of Commerce's Cohen's *d* analysis so that Universal can inaccurately

characterize that analysis as inconsistent with other portions of Commerce's review. However,

this Court has properly considered the full context of Commerce's differential pricing analysis,

including the meaningful test, to determine the reasonableness of Commerce's calculation of the

Cohen's *d* test. *See, e.g.*, *Stupp Corp. v. United States*, 619 F. Supp. 3d 1314, 1327-28 (Ct. Int'l

Trade 2023).

    Universal contends that because Commerce found a linkage between fluctuations in the

costs of manufacturing and fluctuations in sale prices, Commerce's remand results were

incorrect in stating that "the calculation of U.S. prices is not based on production costs, and,

therefore, there is not concern that the inter-quarter comparison of certain U.S. prices with other

U.S. prices are distorted by changing production costs." Universal Cmts at 10 (quoting Remand

Results at 25). However, the statement that Universal identifies is part of Commerce's

explanation regarding how a comparison of U.S. prices with normal value differs from a

comparison of U.S prices with other U.S. prices, and the root of the distortions from fluctuating

production costs is when U.S. prices are compared with normal value. Remand Results at 23-25.

Commerce explained that the calculation of production costs affects normal value. *Id.* at 24-25.

When using Commerce's normal cost averaging methodology creates distortions in normal

value, Commerce deviates from its normal cost averaging methodology, uses the quarterly cost

methodology, and adjusts the comparison of normal value with U.S. price to address the possible

distortions caused by significant different production costs over the period of review. *Id.* By

contrast, U.S. price is "the price at which the subject merchandise is sold (or agreed to be sold)."

19 U.S.C. § 1677a. The U.S. price is established by agreement between the seller and the buyer.

13

Whether Commerce uses its normal cost averaging methodology or the quarterly cost methodology has no impact on the calculation of the U.S. price. Nothing in Commerce's calculation of U.S. price is dependent upon the costs of manufacturing. Remand Results at 25. Consequently, the distortions that may occur when U.S. price is compared with normal value will not occur when certain U.S prices are compared with other U.S. prices. *Id.* at 25.

Moreover, when Commerce compares U.S. prices to normal value, Commerce does not seek to identify changes over time; rather, by statute, it seeks to compare export prices to contemporaneous normal values. *See* 19 U.S.C. § 1677f-1(d)(2); *see also Pastificio Lucio Garofalo, S.p.A. v. United States*, 783 F. Supp. 2d 1230, 1238 (Ct. Int'l Trade 2011) (explaining the contemporaneous comparison requirement in 19 U.S.C. § 1677f-1(d)(2), which Commerce implements as the "90/60 window"); *Seah Steel Corp. v. United States*, 704 F. Supp. 2d 1353, 1373 (Ct. Int'l Trade 2010) (explaining that explaining the change in contemporaneous period for that case); Remand Results at 24. When Commerce uses the quarterly cost methodology, Commerce shortens the cost averaging period, that is, the period for which costs are defined, and commensurately limits the contemporaneity window period. *Pastificio*, 783 F. Supp. 2d at 1238; *Seah Steel*, 704 F. Supp. 2d at 1373; Remand Results at 24. This is because normal value is dependent on the cost of production, whose definition has been shortened from a period-wide average to a quarterly average, and, therefore, the contemporaneity of the normal value with the U.S. price must also be limited.[2] *Seah Steel*, 704 F. Supp. 2d at 1373. Thus, contemporaneity is relevant to Commerce's statutory analysis under 19 U.S.C. § 1677f-1(d)(2).

---

[2] We note that when high inflation is present, and costs are defined as monthly indexed costs, then the contemporaneity of the normal value is limited to the month of the U.S. date(s) sale for both an investigation or a review. *Seah Steel Corp.*, 704 F. Supp. 2d at 1373.

By contrast, the Cohen's *d* test, which compares U.S. prices "among…periods of time" as required by 19 U.S.C. § 1677f-1(d)(1)(B)(i), does not have a contemporaneity requirement. In that context, Commerce is not relying on any assumptions about production costs but is simply considering whether the prices were different at different times, for any reason. Changes to the production costs over time may *explain* changes in price over time, as Commerce has acknowledged, *see* Remand Results at 26, but this does not mean the Cohen's *d* test was distorted. Rather, the Cohen's *d* test accurately identified a pattern of U.S. prices that differ significantly over time.

Finally, despite Universal's repeated assertion that Commerce did not comply with the remand order, Commerce's remand results fully addressed the concerns raised by the Court in that order. This Court found that Commerce "must either make consistent determinations, or reasonably explain any inconsistency" and that Commerce "did not explain why it was reasonable to apply the 'inter-quarter comparison' and the 'same-quarter comparison' in the same administrative review." Remand Order at 17-18. This Court remanded "for Commerce to reconsider or provide further explanation in accordance with this Opinion." Remand Order at 18. On remand, Commerce opted to provide further explanation and explained why it is reasonable to compare U.S. price with normal value within the same quarter for the calculation of individual dumping margins and to compare U.S. prices between quarters during the period of review as part of the Cohen's *d* test in Commerce's differential pricing analysis. Therefore, Commerce complied with the remand order.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's remand redetermination and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:                              /s/ Kelly M. Geddes
                                         KELLY M. GEDDES
VANIA WANG                               Trial Attorney
Senior Attorney                          U.S. Department of Justice
U.S. Department of Commerce              Civil Division
Office of the Chief Counsel for          Commercial Litigation Branch
Trade Enforcement & Compliance           P.O. Box 480, Ben Franklin Station
Washington, D.C. 20230                   Washington, DC 20044
                                         Telephone: (202) 307-2867

November 21, 2024                        Attorneys for Defendant, United States

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the word-count limitation, in that it contains 4,362 words according to the word-count function of the word-processing software used to prepare the memorandum, including text, footnotes, and headings.

/s/ Kelly Geddes