A-520-807
Remand
Court No. 23-00113
POR:  12/01/2020 – 11/30/2021
**Public Document**
E&C/OII:  CM

***UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE
INDUSTRIES, LLC, and KHK SCAFFOLDING & FORMWORK, LLC, v. United States***
**Court No. 23-00113 (CIT June 17, 2025)**
**Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the

Court), in *Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and*

*KHK Scaffolding & Formwork LLC.  v. United States*, Court No. 23-00113, issued on June 17,

2025 (*Remand Order*).  This action arises out of the final results of the 2020-2021 administrative

review on the antidumping duty order on circular welded carbon-quality steel pipe from the

United Arab Emirates (UAE),[1] which included the finding of sales at less than normal value

(NV) for the respondents Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe

Industries LLC, and KHK Scaffolding and Formwork LLC (collectively, Universal).

Pursuant to the Court's *Remand Order*, Commerce has reconsidered its application of the

Cohen's *d* test as part of its differential pricing analysis.  As a result of our analysis, we made

revisions to Universal's margin calculations from the *Final Results*.  These revisions resulted in a

---

[1] *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates:  Final Results of Antidumping
Duty Administrative Review; 2020-2021*, 88 FR 28483 (May 4, 2023) (*Final Results*), and accompanying Issues and
Decision Memorandum (IDM); *see also Circular Welded Carbon-Quality Steel Pipe from the United Arab
Emirates:  Final Results of Antidumping Duty Administrative Review, 2020-2021; Correction*, 88 FR 30726 (May
12, 2023) (acknowledging the inadvertent duplicate publication of the *Final Results* in the *Federal Register*).

weighted-average dumping margin of 3.64 percent for Universal, a departure from the *Final Results*.

## II.    BACKGROUND

In the *Final Results*, Commerce calculated an estimated weighted-average dumping margin for Universal based on the application of the average-to-transaction (A-to-T) comparison methodology to all Universal's U.S. sales.[2]  Universal challenged the *Final Results* before this Court, which included a challenge to Commerce's use of time-periods as part of the Cohen's *d* test in the same dumping analysis that includes Commerce's quarterly-cost methodology.  The Court ordered a redetermination so that Commerce could bring its differential pricing analysis into concordance with *Marmen*.[3]

In *Marmen*, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) held that it is unreasonable for Commerce to use the Cohen's *d* test as part of its differential pricing analysis when the test is applied to data that do not satisfy the statistical criteria of normal distribution, equal variability, and equally and sufficiently numerous.[4]  In doing so, the Federal Circuit held that "Commerce may re-perform a differential pricing analysis, and *that analysis may not rely on Cohen's* d *test* for data sets like those here {*i.e.*, the data underlying the differential pricing analysis in the *Marmen* investigation that the Federal Circuit found do not conform to the three statistical criteria}," but it also held that Commerce may develop and justify a different analytical approach for evaluating whether price differences among purchasers, regions, or time periods are significant.[5]  Consequently, in *Stupp Corp.*, the Federal Circuit remanded "to Commerce, which

---

[2] *See Final Results*, 87 FR at 20391.
[3] *See, generally*, *Remand Order*.
[4] *See Marmen Inc. v. United States*, 134 F.4th 1334, 1348 (Fed. Cir. 2025) (*Marmen*); *see also Stupp Corp. v. United States*, 2025 U.S. App. LEXIS 9616 (Fed. Cir. 2025) (non-precedential) (*Stupp*).
[5] *See Marmen*, 134 F.4th at 1334 (emphasis added).

may re-perform a differential pricing analysis without relying on Cohen's *d*."[6]  On June 17, 2025, the Court ordered remand in this case for Commerce to reconsider its differential pricing analysis in light of *Stupp* and *Marmen*.[7]

On December 30, 2025, Commerce released the draft results of redetermination to all interested parties and invited them to comment.[8]  On January 5, 2026, Wheatland Tube Company (Wheatland) filed timely comments in support of the Draft Redetermination.[9]  On January 9, 2026, Universal filed timely comments in opposition to the Draft Redetermination.[10]

After considering the comments raised by Universal, we have made no changes to the Draft Redetermination with regards to Commerce's differential pricing analysis.  Therefore, the final weighted-average dumping margin for Universal is 3.64 percent.

## III.    ANALYSIS

### A.    Commerce's Application of the Price Difference Test

Following the Federal Circuit's decisions in *Marmen* and *Stupp*, Commerce sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under section 777A(d)(1)(B)(i) of the Tariff Act of 1930, as amended (the Act), to identify whether prices for comparable merchandise differ significantly among purchasers, regions, and time periods.[11]  To comply with the Federal Circuit's holdings in *Marmen* and *Stupp*, Commerce discontinued the use of the Cohen's *d* test in administrative proceedings and

---

[6] *See Stupp*, 2025 U.S. App. LEXIS 9616, at 8.
[7] *See Remand Order* at 1.
[8] *See* Draft Results of Redetermination Pursuant to Voluntary Remand, Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding & Formwork LLC.  v. United States, Court No. 23-00113 (CIT June 17, 2025)," dated December 30, 2025 (Draft Redetermination).
[9] *See* Wheatland's Letter, "Comments on Draft Results of Redetermination," dated January 5, 2026 (Wheatland Comments).
[10] *See* Universal's Letter, "Comments on Draft Results of Redetermination," dated January 9, 2026 (Universal Comments).
[11] *See Alternatives to the Use of Cohen's d; Request for Comment*, 90 FR 21277 (May 19, 2025).

adopted a new test for evaluating whether price differences among purchasers, regions, or time periods are significant.[12]  Additionally, and concurrent with this change, Commerce also discontinued the use of the "mixed method" in administrative proceedings.  In its revised differential pricing analysis, Commerce adopted the "price difference test" as part of its differential pricing analysis to determine whether prices differ significantly.  Accordingly, for these final results of redetermination, in light of Commerce's revised approach in administrative proceedings pursuant to the Federal Circuit's decision in *Marmen*, and in accordance with this Court's *Remand Order*, Commerce reconsidered and discontinued its application of the Cohen's *d* test as part of its differential pricing analysis, and, in the alternative, applied the "price difference test," as detailed below.

i.       **Comparisons to Normal Value**

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to determine whether Universal's sales of the subject merchandise from the UAE to the United States were made at less than NV, Commerce compared the export price (EP) and the constructed export price (CEP) to the NV as described in the "Export Price/Constructed Export Price" section of the *Preliminary Results*.[13]

1.       **Determination of Comparison Method**

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates a weighted-average dumping margin by comparing weighted-average NVs to weighted-average EPs (or CEPs) (*i.e.*, the average-to-average (A-to-A) method) unless Commerce determines that another method is

---

[12] *See, e.g., Certain Corrosion-Resistant Steel Products from the United Arab Emirates:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 90 FR 42226 (August 29, 2025) (*CORE Steel from the UAE*), and accompanying IDM at Comment 2.
[13] *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates:  Preliminary Results of Antidumping Duty Administrative Review; 2020-2021*, 87 FR 79862 (December 28, 2022) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 15-16.

appropriate in a particular situation.  In a less-than-fair-value (LTFV) investigation, Commerce examines whether to compare weighted-average NVs with the EPs (or CEPs) of individual sales (*i.e.*, the A-to-T method) as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.  Although section 777A(d)(1)(B) of the Act does not strictly govern Commerce's examination of this question in the context of an administrative review, Commerce nevertheless finds that the issue arising under 19 CFR 351.414(c)(1) in an administrative review is, in fact, analogous to the issue in an LTFV investigation.

In numerous investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the A-to-T method is appropriate in a particular situation, consistent with 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act.  Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method in this administrative review.  Commerce will continue to evaluate its approach in this area based on comments received in this review and the application of the differential pricing analysis on a case-by-case basis, and on Commerce's additional experience with addressing the potential masking of dumping that can occur when Commerce uses the A-to-A method in calculating a respondent's weighted-average dumping margin.

The differential pricing analysis used in these preliminary results examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods.  The analysis evaluates all U.S. sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists.  If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the A-to-A method to calculate the weighted-average dumping margin.  The

analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise.  Purchasers are based on the reported consolidated customer codes.  Regions are defined using the reported destination code (*i.e.*, ZIP code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau.  Time periods are defined by the quarter within the period of review based upon the reported date of sale.  For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP (or CEP) and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "price difference test" is applied to determine whether prices differ significantly.  For comparable merchandise, the price difference test examines whether the weighted-average net price to a given purchaser, region, or time period is within two percent of the weighted average net price to all other purchasers, regions, or time periods.  If the weighted-average net price to the given purchaser, region, or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions, or time periods, then the prices to that given purchaser, region, or time period are found to differ significantly and those sales to the given purchaser, region, or time period pass the price difference test.

Next, the "ratio test" assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test.  The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the period of review.  If 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support

consideration of the A-to-T method.  If more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of prices existed during the period of review.  Consequently, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-to-A method and using the alternative A-to-T method.

If both tests in the first stage (*i.e.*, the price difference test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that the A-to-T method could be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the A-to-A method can account for such differences.  In considering this question, Commerce examines whether using the A-to-T method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method.  If the difference between the two calculations is meaningful, then this demonstrates that the A-to-A method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the A-to-T method may be appropriate.  A difference in the weighted-average dumping margins is considered meaningful if:  (1) there is a 25 percent relative change in the weighted-average dumping margins between the A-to-A method and the A-to-T method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-to-A method and the A-to-T method move across the *de minimis* threshold.

## 2.  Results of the Differential Pricing Analysis

For Universal, based on the results of the differential pricing analysis, Commerce finds that 95.71 percent of the value of U.S. sales pass the price difference test,[14] and confirms the

---

[14] *See* Memorandum, "Antidumping Duty Administrative Review of Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates:  Draft Remand Redetermination Analysis Memorandum for Universal Tube and

existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Further, Commerce determines that the A-to-A method cannot account for such differences because there is a 25 percent relative change between the weighted-average dumping margin calculated using the A-to-A method and the weighted-average dumping calculated using the A-to-T method.  Thus, for the final results of this redetermination, Commerce is continuing to apply the A-to-T method to calculate the weighted-average dumping margin for Universal.

## IV.    INTERESTED PARTY COMMENTS

As noted above, Commerce issued its Draft Redetermination and provided interested parties with an opportunity to comment.  Commerce received comments from Wheatland and Universal.  We address the interested parties' comments below.

**Comment 1:   Whether Commerce's Remand Results Comply with the Court's Direction**

*Wheatland's Comments*:

The following is the verbatim executive summary submitted by Wheatland.[15]  For further details, *see* Wheatland Comments at 2.

> Commerce's application of its "price difference test" to determine a revised weighted average dumping margin of 3.64 percent for Universal Tube and Plastic Industries, Ltd. ("Universal") complies with Commerce's instructions to conduct further proceedings in conformity with *Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025).

*Universal's Comments*:

The following is the verbatim executive summary submitted by Universal.[16]  For further details, *see* Universal Comments at 5-8.

---

Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding and Formwork LLC," dated December 30, 2025 (Universal Redetermination Analysis Memorandum), at 2.
[15] *See* Universal Comments at 2.
[16] *Id.*

The Court's June 17, 2025, remand instructed Commerce to act "in conformity with the CAFC's opinion in *Marmen*," thus indicating that the Court expected Commerce to proceed in accordance with the principles articulated in, and underlying, the Federal Circuit's decision in *Marmen*. In *Marmen*, the Federal Circuit held that it was "unreasonable for Commerce to use Cohen's *d* as part of its differential pricing analysis when the test is applied to data sets that do not satisfy the statistical assumptions" on which Cohen's *d* is predicated. *See Marmen*, 134 F.4th at 1348. The principle that the Court expected Commerce to follow on remand therefore was that any differential pricing test may be applied only to data sets that satisfy the assumptions on which the test is predicated. Commerce's new price different test assumes that the pricing data compared are "comparable." But in this case, the change in Universal's COM and selling prices between quarters was so significant that Commerce changed its price comparison methodology to prevent any and all comparisons of selling prices among and between the different POR quarters, thus establishing that inter-quarter selling prices were "not comparable." By applying its new price difference test to Universal's variable quarterly sales data, Commerce in the *Draft Remand* disregards – rather than follows – the principle established in *Marmen* that any differential pricing test may be applied only to data sets that satisfy the assumptions on which the test is predicated.

**Commerce's Position:** While Wheatland supports the Draft Redetermination as "complying with the {Court's} "instructions to conduct further proceedings in conformity with *Marmen*,"[17] Universal asserts that Commerce's Draft Redetermination "deviates from that instruction."[18] We disagree with Universal's assertion that Commerce's approach in the Draft Redetermination was inconsistent with the Court's holding that provided Commerce the opportunity to conduct "further proceedings in conformity with *Marmen*."[19]

In *Marmen*, the Federal Circuit held that Commerce's use of the Cohen's *d* test in the differential pricing analysis is unreasonable "when the underlying data is not normally distributed, equally variable, and equally and sufficiently numerous."[20] The Federal Circuit, however in applying its holding in *Marmen*, stated that "Commerce … may re-perform a

---

[17] *Id.* at 3.
[18] *Id.* at 5-6.
[19] *See Remand Order* at 1.
[20] *See Marmen*, 134 F.4th at 1348.

differential pricing analysis without relying on Cohen's *d*."[21]  Commerce has since discontinued its reliance on the Cohen's *d* test and adopted the "price difference test" as part of its revised differential pricing analysis to determine whether prices differ significantly.[22]

The differential pricing analysis used in these final results of redetermination examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods.  The analysis evaluates all U.S. sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists.  If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the A-to-A method to calculate the weighted-average dumping margin.  The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise.  Purchasers are based on the reported consolidated customer codes.  Regions are defined using the reported destination code (*i.e.*, state or ZIP code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau.  Time periods are defined by the quarter within the period of investigation based upon the reported date of sale.  For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP (or CEP) and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "price difference test" is applied to determine whether prices differ significantly.  For comparable merchandise, the price difference test examines whether the weighted-average net price to a given purchaser,

---

[21] *See Stupp*, *Stupp Corp. v. United States*, No. 2023-1663, 2025 WL 1178392, *6 (Fed. Cir. April 23, 2025) (*Stupp*).
[22] *See CORE Steel from the UAE* IDM at Comment 2.

region, or time period is within two percent of the weighted-average net price to all other

purchasers, regions, or time periods.  If the weighted-average net price to the given purchaser,

region, or time period falls outside of the plus or minus two percent band around the weighted-

average net price to all other purchasers, regions, or time periods, then the prices to that given

purchaser, region, or time period are found to differ significantly and those sales to the given

purchaser, region, or time period pass the price difference test.

Accordingly, as Commerce no longer uses the Cohen's *d* test and its related threshold,

those assumptions are no longer relied upon when Commerce utilizes the price difference test.

Thus, Commerce's remand is in accordance with both the Court's *Remand Order* that explicitly

provided Commerce with the opportunity to provide further explanation and to conduct further

proceedings in conformity with *Marmen*.[23]

### Comment 2:    Whether The Draft Redetermination Impermissibly Includes in Its Differential Pricing Analysis a Comparison of Net Selling Prices of Sales Made in Different Quarters of the POR

*Universal's Comments*:

The following is the verbatim executive summary submitted by Universal.[24]  For further

details, *see* Universal Comments at 8-20.

> In this remand proceeding, Commerce maintained its conclusion from the
> administrative review that record evidence showed that Universal had experienced
> significant cost changes (*i.e.*, changes that exceeded 25 percent) between the high
> and low quarterly COM during the POR; that there was linkage between
> Universal's changing selling prices and COM during the POR such that changes in
> selling prices correlated reasonably to changes in unit COM; and that it therefore
> was necessary for Commerce to employ an alternative costing methodology that
> relied on Universal's quarterly costs.  As a fundamental part of this approach,
> Commerce also limited its price comparisons for purposes of calculating dumping
> to sales made only within the same quarter.  That is, because of the significant cost
> and selling price changes among and between quarters, Commerce used a modified

---

[23] *See Remand Order* at 1; *see also Stupp*, 2025 WL 1178392 at *6 (relying on *Marmen* and stating that Commerce "may re-perform a differential pricing analysis without relying on Cohen's *d*").
[24] *See* Universal Comments at 2-3.

margin calculation program in the Draft Remand specifically to prevent any inter-quarter sales price comparisons. Because record evidence showed that Universal's prices reacted to cost-fluctuations, and that restricting selling price comparisons to sales made within the same quarter furthered Commerce's goal of calculating a dumping margin that accurately reflected Universal's normal selling practices, Commerce's approach is reasonable and its departure from its standard methodology is justified.

But after having determined again that it is not appropriate to calculate Universal's dumping margin by comparing the selling prices of U.S. and home market sales made in different POR quarters, Commerce has done exactly that in the Draft Remand. That is, as in the Final Determination, Commerce again has compared the selling prices of U.S. sales made in different POR quarters for purposes of its differential pricing analysis. As the U.S. Court of International Trade found in its first remand, because Commerce's decision to compare U.S. sales from different POR quarters as part of its price difference test when Commerce separately determined that it cannot make such cross-quarterly sales comparisons as part of its dumping calculation is an inconsistent and contradictory determination, the Draft Remand is inconsistent and cannot be deemed supported by substantial evidence. In the final remand redetermination, Commerce must modify its analysis to ensure that it conducts no inter-quarter comparisons of net U.S. selling prices (for purchasers, regions, or time periods) when it evaluates whether Universal's prices differ significantly among purchasers, regions, and time periods.

The use of the permissive "may" in 19 U.S.C. § 1677f-1(d)(1)(B) means that there are circumstances where Commerce need not consider certain criteria, such as periods of time, when evaluating whether a pattern of prices that differ significantly existed. This case involves just such a circumstance. But in the Draft Remand, Commerce has not considered alternate periods of sales comparisons in its differential pricing analysis or considered that it would be more appropriate not to consider periods of time at all. Instead, Commerce has selected the exact same POR quarterly periods of time that it separately has determined (as part of its quarterly cost and sales methodology) to be specific periods of time across which comparisons of selling prices may not be made. Because Commerce's Draft Remand adopts an approach under 19 U.S.C. § 1677f1(d)(1)(B) that is specifically inconsistent with its decision not to compare selling prices across quarters of the POR, the results of Commerce's differential pricing analysis in the Draft Remand are arbitrary and inconsistent, and must be changed.

The Court's remand for Commerce to conduct further proceedings in conformity with Marmen does not mean that Commerce may ignore the Court's previous remand and the Court's previous instructions. The two remands by the Court are not separate or alternative directives. Rather, Commerce must follow both remands, and implement the instructions contained therein uniformly and concurrently. But the Draft Remand does not mention the same-quarter/interquarter sales comparison inconsistency, and fails to provide any

explanation or justification for continuing to compare prices across quarters for its new differential pricing analysis at the same time that it precludes all cross-quarterly comparisons in its dumping margin calculations. Because Commerce adopts an approach in the Draft Remand that is inconsistent and provides no explanation at all for its internally inconsistent determinations, Commerce must reconsider its approach in the final remand redetermination. Specifically, Commerce should limit its differential pricing analysis to a comparison of groups of sales data only for particular purchasers and regions, and not for quarterly time periods, and then re-calculate Universal's weighted-average dumping margin.

**Commerce's Position:** We disagree with Universal. The kind of distortions that can result from significantly fluctuating production costs between two quarters within the POR are relevant in the separate "context" of Commerce's margin calculations, namely in the determination of normal value, because price-based normal value is compared to cost in the sales-below-cost test, and constructed value-based normal value is based on cost. Fluctuating production costs, the determination of normal value, and the comparison of normal value with U.S. price is used to calculate a respondent's weighted-average dumping margin, and, thus, production costs are part of Commerce's determination whether the A-to-A method can account for any differences in a respondent's pricing behavior in the U.S. market under section 777A(d)(1)(B)(ii) of the Act, *i.e.*, the meaningful difference requirement. However, fluctuating production costs do not introduce distortions into the comparison of U.S. prices with other U.S. prices in the modified differential pricing test performed under section 777A(d)(1)(B)(i) of the Act, as explained below.

      i.    **Use Of An "Inter-Quarter Comparison" Is Reasonable Because Alleged Distortions Due to Significant Differences in Production Costs During the POR Are Irrelevant for the Cohen's *d* Test**

As discussed above, Commerce will normally use one of two standard comparison methodologies, generally the A-to-A method, to calculate a respondent's weighted-average dumping margin.[25] Due to concerns of distortions caused by masked dumping, Commerce may

---

[25] *See* section 777A(d)(1)(A) of the Act; *see also* 19 CFR 351.414(c)(1)-(2).

resort to the A-to-T method to address masked dumping if two statutory requirements, *i.e.*, the

pattern requirement and the meaningful difference requirement, are met.  The pattern

requirement requires Commerce to find that there existed a pattern of prices that differ

significantly for comparable merchandise among purchasers, regions, or time periods.  The SAA

frames this requirement as finding that conditions existed within the respondent's U.S. pricing

behavior could lead to "targeted" or masked dumping:

> In part, the reluctance to use an {A-to-A} methodology {the A-to-A method was introduced into U.S. law as a result of the Uruguay Round Agreements Act} has been based on a concern that such a methodology *could conceal* "targeted dumping."  In such situations, an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions.[26]

If a pattern of prices is found to exist, then the meaningful difference requirement determines

whether one of the standard comparison methodologies, generally the A-to-A method, can

account for the differences exhibited in the respondent's U.S. pricing behavior, and the extent to

which masked dumping is present in the results of the margin calculations using the A-to-A

method:

> New section 777A(d)(l)(B) provides for a comparison of average normal values to individual export prices or constructed export prices in situations where an average-to-average or transaction-to-transaction methodology cannot account for a pattern of prices that differ significantly among purchasers, regions, or time periods, *i.e.*, *where targeted dumping may be occurring*.  Before relying on this methodology, however, Commerce must establish and provide an explanation why it cannot account for such differences through the use of an average-to-average or transaction-to-transaction comparison.[27]

As such, the pattern requirement serves as a "canary in the coal mine" to alert Commerce to the

possibility that masked dumping may be distorting results of the margin calculations, and the

---

[26] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 842 (emphasis added).

[27] *Id.* at 843 (emphasis added).

meaningful difference requirement actually identifies whether there is a hazard in the coal mine (*i.e.*, masked dumping) that needs to be remedied.

To examine the pattern requirement as part of the differential pricing analysis, Commerce uses the modified differential pricing test to examine whether prices differ significantly amount purchasers, regions, or time periods, and the ratio test to determine whether the extent of any observed significant prices differences support finding a pattern of prices that differ significantly. A finding of a pattern foretells nothing about whether masked dumping exists, nor does it have an impact on Commerce's individual margin calculations; there is no normal value involved in the modified differential pricing or ratio tests and no comparison of U.S. price with normal value. Finding of a pattern only indicates whether conditions exist, *i.e.*, significant price differences among purchasers, regions, or time periods, which could lead to masked dumping— the "canary in the coal mine." The finding of a pattern is the equivalent of the canary laying lifeless on the floor of its cage, indicating that there is a potential hazard which should be examined. If Commerce does find that a pattern existed for the respondent, then it will examine the meaningful difference requirement and determine whether the A-to-A method can account for the differences in U.S. prices presented by the respondent's pricing behavior and decisions. However, if no pattern is found to exist, *i.e.*, the canary is alive and well, then there is no evidence of conditions which might lead to masked dumping, and Commerce would simply use the A-to-A method.

For this "initial warning sign" phase of the differential pricing analysis, it is reasonable to compare U.S. prices between quarters, *i.e.*, to use an "inter-quarter comparison," as well as to compare U.S. prices between purchasers and regions. Such differences, if they exist, only demonstrate whether conditions exist where masked dumping might occur. Such differences *do*

*not* indicate that there is masked dumping, or even any dumping at all, which requires a comparison with normal value. This examination under the modified differential pricing test is just an early indicator that something *might* be there to further investigate. Whether dumping exists, and whether the A-to-A method can account for difference in U.S. prices, whether driven by changing production costs or a myriad of other market factors and corporate priorities, is considered when addressing the meaningful difference requirement of the Act.[28] Given the function of the modified differential pricing test, and its purpose as part of the total differential pricing analysis, the comparison of U.S. prices between quarters within the POR, *i.e.*, "inter-quarter comparisons," or between purchasers or regions, introduces no "distortions" in the results of Commerce's margin calculations. Rather, it operates exactly as intended: if it reveals significant differences in U.S. prices between different quarters of the POR, or purchasers or regions, then this is indeed a reasonable indication that conditions exist where masked, or "targeted," dumping *may* be occurring, warranting further investigation.

    ii.    **The Comparison Methodologies, as Examined Under the Meaningful Difference Requirement, Appropriately Include Quarterly Cost-Averaging Periods and Limitations on the Comparison of U.S. Price with Normal Value**

Whether the A-to-A method can account for the respondent's pricing behavior in the U.S. market, including potential masked dumping, is ultimately determined through the meaningful difference test. Potential concerns of distortions in the margin calculations due to significant differences in production costs during the POR are, appropriately, addressed as part of the comparison methodology, *i.e.*, the comparison of U.S. price with normal value. The appropriate

---

[28] *See* section 777A(d)(1)(B)(ii) of the Act.

comparison methodology for a given respondent is determined as a result of the meaningful difference test, not as part of the modified differential pricing and ratio test.

The meaningful difference test determines whether the A-to-A method can account for differences in the pricing behavior of the respondent in the U.S. market once conditions have been identified, *i.e.*, the pattern of prices, the "canary in the coal mine," which could lead to masked dumping. Whether the A-to-A method can account for such differences is determined by comparing the results of applying the A-to-A method and the results of applying an alternative comparison methodology based on the A-to-T method.[29] As discussed above, as in the instant review, where Commerce has resorted to quarterly cost-averaging periods and the resulting changes to its margin calculations, including limiting the normal value to the same quarter as the U.S. date of sale, *i.e.*, "same-quarter comparisons," the quarterly cost methodology is part of the comparison methodology in an administrative review, whether based on A-to-A comparisons, A-to-T comparisons, or even transaction-to-transaction (T-to-T) comparisons. The effect of this is that, when comparing the results of the A-to-A method and an alternative comparison method based on the A-to-T method in the meaningful difference test, Commerce is comparing two margin calculation approaches that *both use a "same-quarter comparison," i.e.*, two dumping margin calculations that *both* limit the normal value to the quarter of the U.S. date of sale as a result of the changes in the respondent's production costs over the POR. Consequently, if, pursuant to the meaningful difference test, Commerce determines that the A-to-A method cannot account for the respondent's pricing behavior in the U.S. market, such result is

---

[29] The Federal Circuit has repeatedly upheld the meaningful difference test as reasonably implementing the statutory directive for Commerce to examine whether the respondent's pricing behavior in the U.S. market can be accounted for by the A-to-A method. *See Stupp Corp. v. United States*, 5 F.4th 1341, 1356 (Fed. Cir. 2021); *see also Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1346 (Fed. Cir. 2017).

*not* due to changes in the respondent's production costs over the POR, which have been controlled for in the underlying "same-quarter comparisons" in each of the comparison methodologies (*i.e.*, the A-to-A method and an alternative comparison method based on A-to-T comparisons) examined in the meaningful difference test. Thus, this test of Commerce's differential pricing analysis controls for a respondent's changing production costs over the POR and not the pattern test which only looks at whether conditions exist in which masked dumping might be a consideration.

In sum, the "inter-quarter comparison" in the modified differential pricing test does not introduce potential distortions into Commerce's margin calculations, as there is no margin calculation performed as part of the differential pricing and ratio tests. Any concern for potential distortions is addressed as part of the comparison methodology used to perform the margin calculations, whether the comparison methodology is based on A-to-A comparisons, A-to-T comparisons, or even T-to-T comparisons. Accordingly, Commerce's comparison of U.S. prices between quarters during the POR as part of the differential pricing test, *i.e.*, "inter-quarter comparisons," and Commerce's limiting normal value to the same quarter as the U.S. price's date of sale, *i.e.*, a "same quarter comparison" in its margin calculation is not arbitrary, but these different approaches are reasonable given the purpose of each in Commerce's dumping analysis.

### iii.  Judicial Precedent Does Support Commerce's Actions in This Redetermination

We disagree with Universal's premise that the Court has already rejected Commerce's explanation that the Federal Circuit's holdings in *JBF RAK* and *Borsuan* as well as a U.S. Court of International Trade (CIT) decision in *Nan Ya* support its approach. Federal Circuit cases present support that it was reasonable to apply the "inter-quarter comparison" and the "same-quarter comparison" in the same administrative review because the cause(s) of price differences

observed as part of the pattern requirement need not be discerned.  The Federal Circuit in JBF

RAK held:

> Section {777A(d)(1)(B) of the Act} does not require Commerce to determine the
> reasons why there is a pattern of export prices for comparable merchandise that
> differs significantly among purchasers, regions, or time periods, nor does it
> mandate which comparison methods Commerce must use in administrative
> reviews.  As a result, Commerce looks to its practices in antidumping duty
> investigations for guidance.  Here, {the Court} did not err in finding there is no
> intent requirement in the statute, and we agree with {the Court} that requiring
> Commerce to determine the intent of a targeted dumping respondent "would create
> a tremendous burden on Commerce that is not required or suggested by the
> statute."[30]

There may be many reasons for significantly different prices between purchasers, regions, or

time periods.  Changing production costs undoubtably may be one of these reasons.  The Federal

Circuit, however, has held that there is "no intent requirement in the statute" which would

obligate Commerce to divine the causes for such price differences under section 777A(d)(1)(B)

of the Act.  In other words, if Commerce finds that significant price differences exist between

purchasers, regions, or time periods, then there is no explaining away these differences based on

the reasons for them such that Commerce's finding is rendered invalid.  Such a finding is purely

factual; what may have caused a significant price difference cannot "excuse" it for purposes of

section 777A(d)(1)(B) of the Act.  Although changing production costs may have an impact on

changing prices, Federal Circuit precedent provides that Commerce need not evaluate the many

possible causes for significantly changing prices between purchasers, regions, or time periods.

In *JBF RAK*, plaintiff JBF RAK argued:

> because of its sales practice{s}, it could not target customers, regions or periods of
> time and the pricing pattern found by Commerce was the result of market
> conditions.  Thus, according to JBF RAK, it was "arbitrary, capricious and an abuse
> of discretion to refuse to consider evidence which would tend to establish that the

---

[30] *See JBF RAK*, 790 F.3d at 1368 (citing *JBF RAK* CIT, 991 F. Supp 2d at 1355); *see also Borusan*, 608 Fed. Appx. at 948-49.

pricing pattern was not due to targeted sales but, instead, was for a valid business purpose."[31]

Although not detailed in JBF RAK's argument, "valid business purpose{s}" could include covering changing COP.  In *Borusan*, however, there is no such ambiguity:

> Borusan on appeal challenges Commerce's decision to use the average-to-transaction method of {section 777A(d)(1)(B) of the Act} because, according to Borusan, Commerce failed to consider if the observed "pattern of export prices . . . that differ significantly among . . . periods of time," {section 777A(d)(1)(B) of the Act}, in Borusan's products occurred due to increases in raw material costs, and not due to Borusan's pursuit of any intentional targeted dumping scheme.  Borusan does not challenge Commerce's statistical analysis under {section 777A(d)(1)(B) of the Act} as applied to Borusan's products, and only contests Commerce's decision to perform the average-to-transaction targeted dumping analysis without also considering Borusan's alternate explanation for the observed pricing pattern.[32]

Thus, the Federal Circuit in *Borusan* held that section 777A(d)(1)(B) of the Act does not require Commerce to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods, even when changes in production costs are evidenced.[33]

Consistent with these opinions, if Commerce is not required to identify the reasons for a respondent's price differences under section 777A(d)(1)(B)(i) of the Act, then it follows that such reasons are not relevant to the price comparison analysis it performs under this section of the Act.  Consequently, even if a respondent's different prices across quarters may be (partially) explained by its changing production costs across these quarters, that does not make Commerce's "inter-quarter comparison" as part of the price difference test in any way distortive.  Because the reasons why a firm's prices differ significantly are simply not relevant under Commerce's

---

[31] *See JBF RAK*, 790 F.3d at 1368 (internal citations omitted).
[32] *See Borusan*, 608 Fed. Appx. at 949 (emphasis added).
[33] *Id.*

analysis pursuant to section 777A(d)(1)(B)(i) of the Act, these reasons, whatever they may be, cannot distort this analysis and its results.

Thus, while the fact that production costs significantly fluctuate and prices reasonably correlate with such fluctuations is relevant to Commerce's analysis "in a different context,"[34] and justify the use of quarterly cost-averaging periods, which leads to the "same-quarter comparison" of U.S. price with normal value to minimize potential distortions in that different context, *i.e.*, the comparison methodology to calculate the respondent's weighted-average dumping margin, they do not similarly justify deviating from Commerce's "inter-quarter comparison" for purposes of its price difference test in the context of section 777A(d)(1)(B)(i) of the Act.  As is clear from the text of the statue, and as supported by court precedent, the reasons why a respondent's prices differ significantly are not relevant to the price comparison performed in the context of section 777A(d)(1)(B)(i) of the Act, and accordingly cannot similarly introduce distortions into that analysis.

Consequently, it is "reasonable to apply the 'inter-quarter comparison' and the 'same quarter comparison' in the same administrative review" because they are applied in different contexts.  In only one of these contexts are the kinds of distortions due to significant cost fluctuations justifying resort to a "same-quarter comparison" relevant.  Conversely, in the context of section 777A(d)(1)(B) of the Act, they are not similarly relevant and thus do not justify departing from the "inter-quarter comparison" in the price difference test in that context.

---

[34] *See Nan Ya Plastics Corp. v. United States*, 128 F.Supp.3d 1345, 1351-52 (CIT 2015) ("If Commerce identifies a pattern of export prices or constructed export prices that differ significantly among purchasers, regions, or periods of time (whether through the Nails test or the newer differential pricing analysis), Commerce then considers whether the {A-to-A} comparison methodology can account for the observed price differences. . . . In a different context, Commerce acknowledged in the Preliminary Results that Nan Ya 'experienced significant changes' in its {COP} due to volatility in the prices of certain primary inputs {thereby leading to Commerce's decision to use its} 'quarterly costing approach.'" (emphasis added)).

**Comment 3:   Whether Commerce's Basis for its Price Difference Test Is Arbitrary**

*Universal's Comments*:

The following is the verbatim executive summary submitted by Universal.[35]  For further

details, *see* Universal Comments at 21-22.

> Commerce has announced that it has discontinued use of the Cohen's *d* test as part
> of its differential pricing analysis based on recent decisions by the U.S. Court of
> Appeals for the Federal Circuit that it is unreasonable to use the Cohen's *d* test
> when the test is applied to data that do not satisfy certain statistical criteria of
> normal distribution, equal variance, and sufficiently numerous data.  However,
> Commerce has provided no explanation or evidence to support the various
> percentages it has adopted as part of its "price difference test," "ratio test," and
> meaningful difference test.  In the final remand redetermination, Commerce should
> provide the explanations and substantial evidence used to support its change in
> practice.
>
> It has long been Commerce's practice that a "pattern" within the meaning of the
> statute exists only when apparent price differences are beyond something that might
> occur by chance.  That is, a "pattern of prices that differ significantly among
> purchasers, regions, or time periods" means that Commerce should examine the
> extent to which the prices, when ordered by purchaser, region or time period,
> exhibit differences that have meaning, that have or may have influence or effect,
> that are noticeably or measurably large, and that may be beyond something that
> occurs merely by chance.  The burden is on Commerce to establish that the results
> of its differential pricing analysis are not arbitrary, but are based on a recognizable
> pattern that is grounded in substantial evidence.   In the final remand
> redetermination, Commerce must establish how the results of its new price
> difference test allow Commerce to reject the hypothesis that any observed price
> differences reflect nothing more than random fluctuations.

**Commerce's Position:**  As an initial matter, the Federal Circuit has established that Commerce's

differential pricing analysis is evaluated under a reasonableness standard, not substantial

evidence.[36]  Universal asserts that the "'price difference' test applied by Commerce in the

differential pricing analysis in the Draft Redetermination (in place of the Cohen's *d* test) does not

---

[35] *See* Universal Comments at 4.
[36] *See Stupp Corp. v. United States*, 5 F.4th at 1353 ("Our precedents make clear that the relevant standard for
reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness, not substantial
evidence.") (citations omitted).

meet the statutory requirements for using average-to-transaction ({A-to-T}) comparisons" because the "two percent threshold of the price difference test does not provide a reasonable basis to determine if prices for comparable merchandise differ "significantly" among purchasers, regions, or time periods."[37]  We disagree.

Commerce determines to continue applying the modified differential pricing analysis, including the price difference test.  The price difference test is consistent with the statute.  The CIT has held that the language in section 777A of the Act affords Commerce flexibility to implement a test that it deems appropriate to identify significant price differences.[38]  A two percent threshold is a reasonable measure of significance and is consistent with other aspects of Commerce's practice in antidumping proceedings.

In the arm's-length test conducted pursuant to 19 CFR 351.403(c), Commerce finds that sales between affiliated parties in the comparison market are not at arm's length and fall outside the ordinary course of trade if the average, product-specific, comparison market prices to an affiliated customer are not within a range of 98 percent to 102 percent of the average, product specific, comparison market prices to unaffiliated customers (*i.e.*, a plus or minus a two-percent difference from the weighted-average price to unaffiliated customers).  In fact, Commerce has found that average prices to an affiliated customer that differ by at least two percent, and therefore fail the arm's-length test, "differ significantly" from market prices.[39]  The distinction between being within or outside of the ordinary course of trade is a significant difference, as

---

[37] *See* Universal Comments at 3, 21-22.
[38] *See Garg Tube Export LLP v. United States*, 740 F.Supp.3d 1355, 1366 (CIT 2024).
[39] *See Large Diameter Welded Pipe from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 84 FR 6382 (February 27, 2019), and accompanying IDM at Comment 4 ("the prices at issue differ significantly from the prices charged to an unaffiliated company (*i.e.*, they are not within 98 to 102 percent of the price charged for or by an unaffiliated party), which leads us to conclude that these prices are affected by the relationship between Borusan and Borusan Logistik.")).

sales which are found to be outside the ordinary course of trade are excluded from Commerce margin calculations, *e.g.*, excluded from the calculation of normal value.

Moreover, pursuant to sections 733(b)(3) and 735(a)(4) of the Act, the *de minimis* threshold for an estimated weighted-average dumping margin in an investigation is two percent. In other words, an estimated weighted-average dumping margin of at least two percent is significant, and not zero. Commerce has synonymously referred to non-*de minimis* levels of dumping as a "significant" amount of dumping.[40] If a weighted-average difference of two percent between U.S. prices and normal value is significant enough to warrant an affirmative determination of sales at less-than-fair-value, then it is reasonable to conclude that a two-percent difference is significant within the context of section 777A(d)(1)(b)(ii) of the Act. Furthermore, in an administrative review, the *de minimis* threshold is one half of one (0.5) percent, which suggests that the two percent threshold from investigations is more conservative.[41] As explained above, *Marmen* permits Commerce to use the differential pricing analysis without the Cohen's *d* test.[42] Thus, Commerce may use another test as a rough, initial measure of significance of price differences. Here, the price difference test does so.

Finally, regarding Universal's concern about random fluctuations, at least 33 percent of Universal's U.S. sales must pass the ratio test before Commerce determines there is a pattern. As such, if there are U.S. sales that pass the price difference test, Commerce will not find that there is a pattern until the passage rate reaches 33 percent.

---

[40] *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 26401 (June 6, 2019), and accompanying IDM at Comment 2 ("Under scenario (4), there is a significant (*i.e.*, non-*de minimis*) amount of dumping…").

[41] In an administrative review, Commerce will treat as *de minimis* any weighted average dumping margin that is less than 0.5 percent and will liquidate without regard to antidumping duties all entries during the relevant period of review, but dumping duties will be collected if the weighted-average dumping margin is 0.5 percent or more. *See* 19 CFR 351.106(c).

[42] *See Marmen*, 134 F.4th at 1348; *see also Stupp*, No. 2023-1663, 2025 WL 1178392 (Fed. Cir. April 23, 2025).

**Comment 4:  Whether Commerce's Ratio Test Is Inconsistent with the Statute**

*Universal's Comments*:

The following is the verbatim executive summary submitted by Universal.[43]  For further

details, *see* Universal Comments at 22-24.

> Nor does Commerce's "ratio" test comport with the requirements of the statute.
> Under Commerce's new test, Commerce incorrectly applied the "ratio test"
> conjunctively (examining whether there is a pattern of prices that differ
> significantly among purchases, regions, and time periods.  The statute, in contrast,
> is disjunctive ("or" rather than "and"); it requires a pattern of prices that differ
> significantly "among purchasers, regions, or period of time … ."  In the final
> remand redetermination, Commerce must find a pattern of significant price
> differences among "purchasers, regions, or periods of time," by calculating separate
> ratios for each of these groups.

**Commerce's Position:**  Commerce determines to continue applying the modified differential

pricing analysis, including the ratio test.  The ratio test is consistent with the ordinary meaning of

the word "pattern," which can be defined as "a frequent or widespread incidence."[44]  These

definitions support Commerce's approach because the ratio test quantifies the extent of the

significant price differences.[45]  The Federal Circuit has upheld the ratio test as a reasonable

method for addressing the pattern requirement of section 777A(d)(1)(B)(i) of the Act and has

held that Commerce "has discretion to determine a reasonable methodology to implement the

statutory directive."[46]  The Federal Circuit has also rejected the argument that the statute requires

Commerce "to determine the reasons why there is a pattern of export prices for comparable

merchandise that differs significantly among purchasers, regions, or time periods{.}"[47]  The

---

[43] *See* Universal Comments at 4.
[44] *See* Pattern, Merriam-Webster Online Dictionary, available at https://www.merriam-
webster.com/dictionary/pattern (last visited December 15, 2025).
[45] *See, e.g.*, *Large Residential Washers from Mexico:  Final Results of Antidumping Duty Administrative Review;
2018-2019*, 85 FR 81450 (December 16, 2020).
[46] *See Stupp*, 5 F.4th at 1354.
[47] *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015) (*JBF RAK*); *see also Borusan
Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 608 Fed. Appx. 948, 949 (Fed. Cir. 2015) (non-
precedential); and *Nan Ya Plastics Corp., Ltd. v. United States*, 128 F.Supp.3d 1345 (CIT 2015).

Federal Circuit agreed with the CIT that there is no intent requirement in the statute and that requiring Commerce to determine intent of targeted dumping "would create a tremendous burden on Commerce that is not required or suggested by the statute."[48]

In *Dillinger*,[49] the Federal Circuit addressed arguments that Commerce's ratio test fails to implement the pattern requirement because Commerce aggregates prices found to differ among different purchasers, different regions, and different time periods, into a single pattern. In construing 19 U.S.C. § 1677f-1(d)(1)(B), the Federal Circuit held that Commerce's "aggregation" methodology is the proper interpretation of the pattern requirement. Moreover, courts have long acknowledged that "or" can mean "and."[50]

In the previous version of the differential pricing analysis, Commerce found that there was a pattern when the percentage of the value of sales that pass the first test (i.e., that are at prices that differ significantly) to find whether prices differ significantly was greater than 33 percent.[51] How Commerce applied the alternative A-to-T method is not part of the definition of a pattern. Now, as before, a pattern is found to exist if more than 33 percent of the sales value is found to be a prices that differ significantly. If Commerce finds that a pattern exists, to be in closer alignment with the statute, Commerce now uses A-to-T for all U.S. sales.

---

[48] *See JBF RAK*, 790 F.3d at 1368.
[49] *See Dillinger France S.A. v. United States*, 981 F.3d 1318, 1325-26 (Fed. Cir. 2020) (*Dillinger*).
[50] *See, e.g.*, *United States v. Moore*, 613 F.2d 1029, 1040 (D.C. Cir. 1979); *De Sylva v. Ballentine*, 351 U.S. 570, 573 (1956).
[51] *See Preliminary Results* PDM at 12; unchanged in *Final Results*.

**Comment 5:   Commerce Must Provide Full Explanation of All the Aspects of Its New Differential Pricing Analysis**

*Universal's Comments*:

The following is the verbatim executive summary submitted by Universal.[52]  For further details, *see* Universal Comments at 25-26.

> In the final remand redetermination, Commerce also should provide an explanation for its use of a 33% threshold in its "ratio test" (to assess the extent of the significant price differences for all U.S. sales as measured by the price difference test) and its use of a 25 percent change in the weighted-average dumping margins between the A-A method and the A-T method for determining whether the weighted-average dumping margin between the two methodologies is meaningful.

**Commerce's Position:**  Commerce determines to continue applying the revised differential pricing analysis.  In the Draft Redetermination, Commerce explained how each step of the revised differential pricing analysis addresses the criteria set forth in section 777A(d)(1)(B) of the Act.[53]  The explanation provided is nearly identical to the explanation provided in the prior differential pricing analysis (first used in 2013),[54] but explicitly notes two changes:  we now identify prices that differ significantly according to the price difference test and we are discontinuing the use of a "mixed method" as a potential alternative comparison methodology. Following the Federal Circuit's decisions in *Marmen* and *Stupp*, Commerce sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing

---

[52] *See* Universal Comments at 5.

[53] *See* Draft Redetermination at 4-7.

[54] *See, e.g.*, *1-Hydroxyethylidene-1, 1-Diphosphonic Acid from India:  Preliminary Results of Antidumping Duty Administrative Review; 2011-2012; and Intent to Revoke Order (in Part)*, 78 FR 25699 (May 2, 2013), and accompanying PDM at 4-6; *Non-Oriented Electrical Steel from the Republic of Korea:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Negative Preliminary Determination of Critical Circumstances, and Postponement of Final Determination*, 79 FR 29426 (May 22, 2014), and accompanying PDM at 6-8; *Certain Cut-to-Length Carbon-Quality Steel Plate Products from the Republic of Korea:  Preliminary Results and Rescission in Part of Antidumping Duty Administrative Review; 2023- 2024*, 90 FR 21891 (May 22, 2025), and accompanying PDM at 4-7; and *Hard Empty Capsules from the Socialist Republic of Vietnam:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 90 FR 22708 (May 29, 2025), and accompanying PDM at 16-18.

analysis under section 777A(d)(1)(B)(i) of the Tariff Act of 1930, as amended (the Act), to identify whether prices for comparable merchandise differ significantly among purchasers, regions, and time periods.[55]

To comply with the Federal Circuit's holdings in *Marmen* and *Stupp*, Commerce discontinued the use of the Cohen's *d* test in administrative proceedings and adopted a new test for evaluating whether price differences among purchasers, regions, or time periods are significant.[56]  Additionally, and concurrent with this change, Commerce also discontinued the use of the "mixed method" in administrative proceedings.  In its revised differential pricing analysis, Commerce adopted the "price difference test" as part of its differential pricing analysis to determine whether prices differ significantly.

Additionally, Commerce released complete calculations for the Draft Redetermination detailing the implementation of the revised analysis.[57]

Regarding the basis for eliminating the use of the mixed comparison method, the mixed method was introduced when Commerce adopted the Cohen's *d* test in connection with the Cohen's *d* test.[58]  The statute does not require Commerce to use a mixed method as a comparison methodology.  While the statute permits Commerce's previous policy that adopted a hybrid version of the a standard A-to-A and the alternative A-to-T comparison methodologies, Commerce's new policy aligns more closely with the statutory text, which permits Commerce to use the A-to-T method when certain conditions set forth in section 777A(d)(1)(B) of the Act are satisfied.  In light of the foregoing, Commerce does not consider it necessary to continue to use

---

[55] *See Alternatives to the Use of Cohen's d; Request for Comment*, 90 FR 21277 (May 19, 2025).
[56] *See, e.g.*, *Certain Corrosion-Resistant Steel Products from the United Arab Emirates:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 90 FR 42226 (August 29, 2025), and accompanying IDM at Comment 2.
[57] *See* Universal Redetermination Analysis Memorandum.
[58] *See Xanthan Gum from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013), and accompanying IDM at 28.

the mixed method, particularly when discontinuation of the mixed method enhances the ability to address masked dumping, which is consistent with the objective of the statute, and more closely aligns with the statutory language that expressly authorizes the use of the A-to-T method when the requirements set forth in sections 777A(d)(1)(B)(i) and (ii) of the Act are satisfied. The Federal Circuit has recognized Commerce's "growing experience" in applying section 777A(d)(1)(B) of the Act as a basis for application of the alternative A-to-T comparison methodology.[59] In addition, these arguments are inconsequential to the outcome of our calculations, because the result of the ratio test for Universal is that more than 66 percent of value of its sales passed the price difference test.[60] Thus, even if we were to retain the mixed method, it would not apply to the respondent here. Regarding the price difference test, its use is consistent with the statute. The CIT has held that the language in section 777A of the Act affords Commerce flexibility to implement a test that it deems appropriate to identify significant price differences.[61] As more fully explained in Comment 3 above, the price difference threshold is a reasonable measure of significance, is used by Commerce in other contexts, and is consistent with other aspects of Commerce's practice in antidumping proceedings.

Commerce has previously explained that for the meaningful difference test, the 25 percent relative change, and the crossing of the *de minimis* threshold mirror Commerce's standard for whether a ministerial error is considered "significant" under 19 CFR 351.224(g).[62]

---

[59] *See Stupp*, 5 F.4th at 1355.
[60] *See* Universal Redetermination Analysis Memorandum.
[61] *See Garg Tube Export LLP v. United States*, 740 F.Supp.3d 1355, 1366 (CIT 2024).
[62] *See Certain Hot-Rolled Steel Flat Products from Japan*, 81 FR 53409 (August 12, 2016), and accompanying IDM at 38.

**Comment 6:  Whether Commerce Must Modify the Basis for Its New Price Difference Test**

*Universal's Comments*:

The following is the verbatim executive summary submitted by Universal.[63]  For further

details, *see* Universal Comments at 26-27.

> If Commerce continues to apply the new price difference test – Commerce should
> modify the test to find that prices of comparable merchandise differ significantly
> only when prices to given purchasers, regions, or time periods differ from the
> weighted-average prices to all other purchases, regions, and time periods by more
> than 25 percent.

**Commerce's Position:**  Universal asserts that Commerce should reconsider the significance test

for its differential pricing, and that Commerce should set a threshold of 25 percent for price

difference comparison rather than the existing two percent threshold.  We disagree.  As noted

above in Comment 3, Commerce has an established practice of utilizing the two-percent

threshold for determining significance.  For the same reasoning stated in Comment 3, we will

decline to change our established and affirmed practice of treating a two-percent difference as

significant.

**Comment 7:  Whether Commerce is Required to Respond to Comments from External
Parties When Implementing Its New Differential Pricing Analysis**

*Universal's Comments*:

The following is the verbatim executive summary submitted by Universal.[64]  For further

details, *see* Universal Comments at 27-28.

> Finally, in response to Commerce's solicitation of public input on how Commerce
> can meet the statutory requirements to identify if "there is a pattern of export prices
> (or constructed export prices) for comparable merchandise that differ significantly
> among purchasers, regions, or periods of time," we commented that Commerce
> should ensure that it does not adopt any methodology that permits the comparison
> of U.S. selling prices in different periods of time when Commerce separately
> determines to rely on the same periods of time to determine a respondent's average

---

[63] *See* Universal Comments at 5.
[64] *Id*.

costs and limits its comparison of U.S. prices to normal values to sales and costs during the same shorter periods of time. While Commerce does not appear to have incorporated these comments (or even considered these comments) in crafting its new differential pricing analysis, it has the opportunity to address them now – and should address them – in making its final remand redetermination.

**Commerce's Position:** Universal asserts that Commerce does not appear to have considered the comments it requested and received;[65] however, Universal misconstrues the process used by Commerce in developing its price difference test. Rather than issuing a formal Notice of Proposed Rule Making (NPRM), Commerce sought "information and public comment on how {Commerce could} meet the statutory requirement outlined in section 777A(d)(1)(B)(i)" of the Act. Thus, Commerce was not required to publicly address each significant submitted comment in developing the price difference test.[66] Additionally, in so far as Universal has restated its submitted comments in this proceeding, Commerce has addressed them above.

## V.    FINAL RESULTS OF REDETERMINATION

In consideration of the Court's *Remand Order*, we have discontinued use of the Cohen's *d* methodology, and are using the "price difference test" as part of our differential pricing analysis to determine whether prices differ significantly among purchasers, regions, and periods of time, pursuant to section 777A(d)(1)(B) of the Act and 19 CFR 351.414. As changes we have made from the *Final Results* have changed the dumping margin assigned to Universal for the

---

[65] *Id.* at 27.
[66] *See* 5 U.S.C. § 553(c).

POR, we intend to issue a *Timken*[67] notice should the court sustain these final results of redetermination.

1/16/2026

X *Chris J Abbott*

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
for Policy and Negotiations,
performing the non-exclusive functions and duties
of the Assistant Secretary for Enforcement and Compliance.

---

[67] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).