# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD.; THL TUBE AND PIPE INDUSTRIES LLC; AND KHK SCAFFOLDING AND FORMWORK LLC, | ) ) ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | Before: Jennifer Choe-Groves, Judge |
| UNITED STATES, | ) ) | Court No. 23-00113 |
| Defendant, | ) ) | |
| and | ) ) | |
| WHEATLAND TUBE COMPANY, | ) ) | |
| Defendant-Intervenor. | ) ) | |

**COMMENTS OF UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD.; THL TUBE AND PIPE INDUSTRIES LLC; AND KHK SCAFFOLDING AND FORMWORK LLC IN OPPOSITION TO THE U.S. DEPARTMENT OF COMMERCE'S REMAND REDETERMINATION**

Robert G. Gosselink
Jonathan M. Freed
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Universal Tube and
Plastic Industries, Ltd.; THL Tube
and Pipe Industries LLC; and KHK
Scaffolding and Formwork LLC

Dated:  March 20, 2026

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ..........................................................................................ii

INTRODUCTION ......................................................................................................... 1

    I. Background and Procedural History.................................................................. 2

        A.   The *Final Results* and the Court's Remand Orders................................. 2

        B.   Commerce's Proceedings on Remand .................................................... 4

STANDARD OF REVIEW ........................................................................................ 6

.ARGUMENT ........................................................................................................... 7

    I.   The *Remand Results* Do Not Follow the Specific Instruction of the Court ................ 7

    II.  The *Remand Results* Impermissably Include in the Differential Pricing Analysis Comparisons of Net Selling Prices in Different Quarters of the POR ...................... 10

        A.   Commerce Correctly Relied on a Quarterly Cost and Sales Comparison Methodology in This Administrative Review....................................... 10

        B.   Commerce's Differential Pricing Approach of Comparing Selling Prices Across POR Quarters Conflicts With Its Quarterly Price Comparison Approach .......... 13

        C.   Commerce Could Have Avoided Its Inconsistent Actions on Remand ................ 19

        D.   Commerce's *Remand Results* Do Not Comply With Both Court Remands.......... 20

    III. Commerce's New Price Difference Test Is Arbitary and Unsupported by Substantial Evidence ............................................................................................... 22

    IV. Commerce Did Not Provide a Rational Basis for Its New Price Difference Test .... 23

    V.  Other Aspects of Commerce's New Differential Pricing Analysis Also Are Unsupported by Substantial Evidence ................................................... 27

    VI. Commerce Must Modify the Basis for Its New Price Difference Test ..................... 29

CONCLUSION............................................................................................................. 30

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

Page

### Cases

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ................................................................ 7
*Good Samaritan Hospital v. Shalala*, 508 U.S. 402, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993)... 19
*United States v. Mead Corporation*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)..... 18
*Creswell Trading Co., Inc. v. United States*, 15 F.3d 1054 (Fed. Cir. 1994) .............................. 22
*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ...................................... 7
*Downhole Pipe & Equipment, L.P. v. United States*, 776 F.3d 1369 (Fed. Cir. 2015) .................. 7
*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ........................................... 7
*Koyo Seiko Co. v. United States,* 20 F.3d 1156 (Fed.Cir.1994) ................................................... 15
*Marmen Inc. v. United States*, 134 F. 4th 1334 (Fed. Cir. 2025) ................................. 4, 8, 9, 20, 21
*Prosperity Tieh Enterprise Co. v. United States*, 965 F.3d 1320 (Fed. Cir. 2020) ........................ 7
*Stupp Corporation v. United States*.  5 F.4th 1341 (Fed. Cir. 2021) ...................................... 27, 28
*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 121 F. Supp. 3d 1263 (Ct. Int'l Trade 2015) ................................................................................................................................. 6
*Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Ind., LLC, and KHK Scaffolding & Formwork, LLC v. United States,* 717 F. Supp.3d 1332 (Ct. Int'l Trade 2024) ..... 2, 3, 14, 21
*Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding & Formwork LLC. v. United States*, Court No. 23-00113, Order (Ct. Int'l Trade June 17, 2025) ..................................................................................................................... 1
*Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 968 F. Supp. 2d 1255 (Ct. Int'l Trade 2014) ................................................................................................................................. 7

### Statutes

19 U.S.C. § 1516a ........................................................................................................................ 6
19 U.S.C. § 1673d ...................................................................................................................... 25
19 U.S.C. § 1677 ........................................................................................................................ 14
19 U.S.C. § 1677b ...................................................................................................................... 10
19 U.S.C. § 1677f-1 .......................................................................................................... *passim*

### Regulations

19 C.F.R. § 351.102 .................................................................................................................... 13
19 C.F.R. § 351.106 .................................................................................................................... 25
19 C.F.R. § 351.224 ................................................................................................................ 28, 29
19 C.F.R. § 351.403(c) ............................................................................................................... 24
19 C.F.R. § 351.403(d) .............................................................................................................. 26
19 C.F.R. § 351.414(e) ............................................................................................................... 12
19 C.F.R. § 351.414(b)(1) .......................................................................................................... 14
19 C.F.R. § 351.414(b)(3) .......................................................................................................... 14
19 C.F.R. § 351.414(c)(1) .......................................................................................................... 14

19 C.F.R. § 351.525(b) ............................................................................................... 29
19 C.F.R. § 351.525(d) ............................................................................................... 29

### Other Authorities

*Antidumping Methodologies for Proceedings that Involve Significant Cost Changes Throughout the Period of Investigation (POI)/{POR} that May Require Using Shorter Cost Averaging Periods*, 73 Fed. Reg. 26,364 (Dep't Commerce May 9, 2008) ........................................ 11, 13

*Carbon and Certain Alloy Steel Wire Rod from Canada*, 71 Fed. Reg. 3,822 (Dep't Commerce Jan. 24, 2006) ................................................................................................. 10

*Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Negative Determination of Critical Circumstances*, 73 Fed. Reg. 40,480 (Dep't Commerce July 15, 2008) ................................ 25

*Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 28,483 (Dept. Commerce May 4, 2023) .................................................................................................. 2

*Large Diameter Welded Pipe from the Republic of Turkey*, 84 Fed. Reg. 6382 (Dep't Commerce February 27, 2019) ............................................................................. 24, 25

*Light-Walled Rectangular Pipe and Tube from Mexico*, 73 Fed. Reg. 35,649 (Dep't Commerce June 24, 2008) ................................................................................................ 25

*Steel Concrete Reinforcing Bar From Taiwan*, 82 Fed. Reg. 34,925 (Dep't Commerce July 27, 2017) ......................................................................................................... 11

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1 at 842–43, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4177–78 .................................... 15, 26

## INTRODUCTION

On behalf of Plaintiffs, Universal Tube and Plastic Industries, Ltd.; THL Tube and Pipe Industries LLC; and KHK Scaffolding and Formwork LLC (collectively, "Universal"), foreign producers and exporters of circular welded carbon-quality steel pipe from the United Arab Emirates (UAE), we comment in opposition to the U.S. Department of Commerce's remand redetermination. *See* Final Results of Redetermination Pursuant to Court Remand (Jan. 16, 2026) ("*Remand Results*"), ECF 58-1.[1]  Commerce prepared the *Remand Results* following the Court's order remanding for a second time the final results of Commerce's fifth administrative review of the antidumping duty order on circular welded carbon-quality steel pipe from the UAE.  *See Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding & Formwork LLC. v. United States*, Court No. 23-00113, Order (Ct. Int'l Trade June 17, 2025) ("*Universal II*").  On remand, Commerce reconsidered its application of the Cohen's *d* test as part of its differential pricing analysis and applied a new differential pricing analysis.  In so doing, Commerce revised Universal's margin calculation, resulting in an *increase* in Universal's weighted-average dumping margin from 2.63 percent to 3.64 percent.  As explained below, the Court should issue a third remand in this case because the *Remand Results* do not comply with the Court's remand order, are unsupported by substantial evidence, and are otherwise contrary to law.

---

[1]    Universal refers to the administrative review documents by the numbers in the record indices filed by Commerce on August 1, 2023. *See* ECF 22.  Public documents and public versions of confidential documents are identified by "PD" followed by the document number. Confidential documents are identified with "CD" followed by the relevant number. Universal identifies documents from the first remand record with "R1PD" or "R1CD" followed by the numbers assigned in the record indices filed on September 30, 2024. *See* ECF 40.  Universal identifies documents from the first remand record with "R2PD" or "R2CD" followed by the numbers assigned in the record indices filed on February 13, 2026. *See* ECF 59.

## I.       Background and Procedural History

### A.       The *Final Results* and the Court's Remand Orders

This appeal and the contested remand redetermination arise from Commerce's decision to conduct a differential pricing analysis for Universal by comparing selling prices in different quarters of the POR to determine whether there was a pattern of prices that differed significantly among purchasers, regions, and time periods.  Given that Commerce separately determined as part of a quarterly cost and price analysis that making selling price comparisons across quarters of the POR was neither appropriate nor lawful, Commerce's cross-quarterly comparison of selling prices for its differential pricing analysis was arbitrary and an abuse of discretion, and necessarily resulted in a determination unsupported by substantial evidence.  *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 FR 28483 (May 4, 2023) (*Final Results*), PD 129, and accompanying Issues and Decision Memorandum, PD 124.

In *Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries, LLC, and KHK Scaffolding & Formwork, LLC v. United States* ("*Universal I*"), the Court found that Commerce's use of the same-quarter comparison to determine dumping while comparing U.S. sales prices in different quarters for purposes of Commerce's differential pricing analysis was "inconsistent." 717 F. Supp.3d 1332, 1340 (Ct. Int'l Trade 2024) (finding that "if Commerce's comparison of costs and prices would lead to distortive results because of significant fluctuations from quarter to quarter, thus justifying the 'same-quarter comparison" examining sales prices only within specific quarters, it does not follow that costs and prices from sales in different quarters should be compared across quarters ('the inter-quarter comparison') in a different segment of the administrative review," and that "Commerce's internally inconsistent

determinations are not in accordance with law."). The Court found that "Commerce must either make consistent determinations in different provisions of the antidumping statute or provide a reasonable explanation for any inconsistencies, which Commerce failed to do," *see id.*, and thus remanded to Commerce to reconsider its decision or to provide further explanation for its internally inconsistent determinations to apply the inter-quarter comparison and the same-quarter comparison methodologies in the same administrative review. 717 F. Supp.3d at 1334.

On remand, Universal argued that Commerce's decision to depart from its normal U.S. price-normal value comparison methodology and to limit its price comparisons only to sales made within the same POR quarter was an intentional and permissible decision corresponding to the specific facts of this case. *See* Universal Comments on Draft Remand (Sept. 5, 2024), R1PD 2. But once Commerce decided that it would not conduct inter-quarter comparisons to determine dumping, then Commerce's decision to rely on inter-quarter comparisons as part of its differential pricing analysis to determine the methodology to be used to determine dumping was internally inconsistent. Nonetheless, Commerce concluded that "it is appropriate to continue to calculate Universal's weighted-average dumping margin as it did in the *Final Results*, as well as to perform the Cohen's *d* test as it did therein." U.S. Department of Commerce's Final Results of Redetermination (September 23, 2024) ("*Remand Results 1*"), ECF No. 39. But Commerce's justifications on remand for its internally inconsistent sales comparisons could not be ascribed to a difference in view or the product of agency expertise; nor did Commerce provide a reasonable explanation for its inconsistent approaches, as the Court instructed in its *Remand Order*. *See* Universal's Comments in Opposition to Remand Results (Oct. 18, 2024), ECF No. 41. Because Commerce did not provide a sufficient basis for its inconsistent approaches, Universal urged the Court to find that Commerce's calculation of Universal's dumping margin necessarily was

3

unsupported by substantial evidence and to remand again with instructions that Commerce not compare U.S. prices across POR quarters (i.e., not conduct inter-quarter comparisons) as part of its differential pricing analysis to determine whether the average-to-average dumping comparison methodology was appropriate for the administrative review.  *Id.*

Before the Court could issue a decision on the merits of *Remand Results 1*, the U.S. Court of Appeals for the Federal Circuit issued its opinion in *Marmen Inc. v. United States*, 134 F. 4th 1334 (Fed. Cir. 2025) ("*Marmen*"), holding that it was "unreasonable for Commerce to use Cohen's *d* as part of its differential pricing analysis when the test is applied to data sets that do not satisfy the statistical assumptions" on which Cohen's *d* is predicated.  *See Marmen*, 134 F.4th at 1348.  Based on this principle, the Court ordered that this case be "remanded to the U.S. Department of Commerce for further proceedings in conformity with the CAFC's opinion in *Marmen Inc. v. United States*, No. 2023-1877, 134 F.4th 1334 (2025)."

**B.    Commerce's Proceedings on Remand**

As described above, on June 17, 2025, the Court ordered that this case be remanded to Commerce "for further proceedings in conformity with the CAFC's opinion in *Marmen Inc. v. United States*, No. 2023-1877, 134 F.4th 1334 (2025)."  The Court further ordered that Commerce file its remand determination on or before January 9, 2026.  On New Year's Eve, December 31, 2026, more than six months after the Court issued its order, Commerce released its Draft Results of Redetermination Pursuant to Court Remand (December 30, 2025) ("*Draft Remand*"), R2PD 1, and gave parties two business days until January 5, 2026, to comment on the draft results.  Moreover, although Commerce indicated in the *Draft Remand* that "95.71 percent of the value of {Universal's} sales pass the price difference test," and that the "A-to-A method cannot account for such differences because there is a 25 percent relative change" between the

weighted-average dumping margins calculated under different approaches, *see Draft Remand*, at 7, Commerce did not make available any of the calculations or computer programs that it used to support these conclusions. On January 2, 2026, Commerce afforded parties an extension of time until January 9, 2026, to provide comments on the *Draft Remand*. Commerce Letter Extending Deadline, PD 3. Thereafter, on January 5, 2026, Commerce finalized its release of the full margin calculation programs and macro programs used to calculate Universal's revised weighted-average dumping margin. *See* Commerce Computer Programs Pertaining to Universal, R2PD 4, R2CD 1-5.

As part of its *Draft Remand*, Commerce asserted that the Federal Circuit had held in Marmen that it was "unreasonable for Commerce to use the Cohen's *d* test as part of its differential pricing analysis when the test is applied to data that do not satisfy the statistical criteria of normal distribution, equal variability, and equally and sufficiently numerous," and that the Federal Circuit instructed that "Commerce may re-perform a differential pricing analysis, and that analysis may not rely on Cohen's *d* test for data sets like those here {i.e., the data underlying the differential pricing analysis in the Marmen investigation that the Federal Circuit found do not conform to the three statistical criteria." *Draft Remand*, at 2. As such, Commerce indicated that it had discontinued the use of the Cohen's *d* test in administrative proceedings and had adopted a new "price difference test" for evaluating whether price differences among purchasers, regions, or time periods are significant as part of its differential pricing analysis. *Id.* at 3-4.

Although under the new "price difference test," Commerce continued to compare U.S. sales prices in *different* quarters for the differential pricing analysis at the same time that Commerce specifically prevented the use of the *same*-quarter comparison to determine Universal's dumping, Commerce never addressed – let alone explained – its internally

5

inconsistent determinations.  *See generally Draft Remand*.  In response, Universal submitted comments establishing that Commerce's comparison of U.S. sales from different POR quarters as part of its price difference test while separately intentionally *not* making such cross-quarterly sales comparisons as part of its dumping calculation was inconsistent and contradictory, and that by adopting this approach, Commerce disregarded – rather than followed – the principle established in *Marmen* that any differential pricing test may be applied only to data sets that satisfy the assumptions on which the test is predicated.  *See* Universal Comments on Draft Remand (Jan. 9, 2026), R2PD 6.   Universal also raised a number of legal and methodological issues with respect to Commerce's revised differential pricing analysis, which Commerce adopted on remand.  *Id.*

In its final results of redetermination, however, Commerce made no changes to the *Draft Remand*, and continued to rely on its new price difference test, resulting again in the concurrent application of the inter-quarter comparison methodology for determining differential pricing and the same-quarter comparison methodology for determining dumping.  *See Remand Results*, at 3-4, ECF 58-1.  Commerce's application of its new differential pricing analysis approach resulted in an *increase* in Universal's weighted-average dumping margin from 2.63 percent to 3.64 percent.  *See Remand Results*, at 3-4, ECF 58-1.

## STANDARD OF REVIEW

A remand redetermination will be set aside if it is found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 121 F. Supp. 3d 1263, 1268 (Ct. Int'l Trade 2015) (discussing the substantial evidence standard of review). Commerce's remand redeterminations also are reviewed for compliance with the

Court's remand order. *See, e.g.*, *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 968 F.

Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014) (citation omitted).

The substantial evidence standard requires Commerce to base its determination upon

such evidence that "a reasonable mind might accept as adequate to support a conclusion."

*Prosperity Tieh Enterprise Co. v. United States*, 965 F.3d 1320, 1326 (Fed. Cir. 2020) (*quoting*

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is defined as

"more than a mere scintilla," *Downhole Pipe & Equipment, L.P. v. United States*, 776 F.3d 1369,

1374 (Fed. Cir. 2015) (citation omitted), and requires that the agency take into account

"whatever in the record fairly detracts" from the weight of supportive evidence. *CS Wind*

*Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting *Gerald Metals, Inc.*

*v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997)).

## ARGUMENT

**I.      The *Remand Results* Do Not Follow the Specific Instruction of the Court**

On remand, Commerce did not consider carefully the language of the Court's June 17,

2025, Remand Order, and ultimately misconstrued the Court's instruction.  Specifically,

Commerce did not follow the broad direction of the Court's order and fashioned a remand

redetermination that deviated from that instruction.

In the *Remand Results*, Commerce claims that:

> On June 17, 2025, the Court ordered remand in this case for Commerce to
> reconsider its differential pricing analysis in light of *Stupp* and *Marmen*.

*Remand Results*, at 3.  Commerce also claims that:

> To comply with the Federal Court's holdings in *Marmen* and *Stupp*, Commerce
> discontinued the use of the Cohen's d test in administrative proceedings and
> adopted a new test for evaluating whether price differences among purchasers,
> regions, or time periods are significant.

*Remand Results*, at 28.  In its *Draft Remand Redetermination Analysis Memorandum for Universal* (Dec. 30, 2025) ("*Draft Remand Analysis*"), at 1, R2PD 4, Commerce's description of the instructions it followed on remand is even more specific:

> In the *Remand Order*, the CIT directed Commerce to discontinue the use of the Cohen's *d* methodology for differential pricing, in concordance with the Court of Appeals of the Federal Circuit's rulings in *Marmen* and *Stupp*.

While these quotations illustrate Commerce's confidence in what the Court directed, the problem is that the Court did not specifically instruct Commerce to discontinue the use of the Cohen's *d* methodology for differential pricing and simply choose another differential pricing path (nor, incidentally, did the Court instruct Commerce to reconsider its differential pricing analysis in light of *Stupp*).  Rather, in its June 17, 2025, order, the Court remanded this case to Commerce for "further proceedings *in conformity* with the CAFC's opinion in *Marmen Inc. v. United States*, No. 2023-1877, 134 F.4th 1334 (2025)."  Remand Order at 1.  The Court's directive thus was not as black and white as the Commerce quotations above suggest.  Rather, the Court's instruction to Commerce to act "in conformity with the CAFC's opinion in *Marmen*" was broad and nuanced, and indicated that the Court expected Commerce to proceed in accordance with the principles articulated in, and underlying, the Federal Circuit's decision in *Marmen*.  Specifically, in *Marmen*, the Federal Circuit held that it was "unreasonable for Commerce to use Cohen's *d* as part of its differential pricing analysis when the test is applied to data sets that do not satisfy the statistical assumptions" on which Cohen's *d* is predicated.  *See Marmen*, 134 F.4th at 1348.[2]  On remand, Commerce should have followed this principle in

---

[2]    Although all parties agreed at oral argument that the then ongoing appellate litigation before the Federal Circuit in *Stupp Corp. v. United States*, case number 23-1663, should not affect the outcome of this case, ECF 52, the Court recognized that the Federal Circuit's particular holding regarding datasets and assumptions in *Marmen* is directly relevant to this appeal. *See* Remand Order at 1.

fashioning an appropriate differential pricing analysis in this case.  But Commerce did not recognize or implement this approach nor even address it in its *Remand Results*.

In this case, it is undisputed that the inherent volatility of Universal's U.S. pricing during the four quarters of the period of review – which led Commerce to adopt a special quarterly cost and sales comparison approach in this proceeding – do not satisfy the statistical assumptions necessary to permit a reasonable application of Cohen's *d* in a differential pricing analysis: "normal distributions, equal variability, and equal and sufficiently numerous data."  As such, Cohen's *d* cannot be used to determine a pattern of export prices for comparable merchandise that differ significantly among purchasers, regions, or periods of time.  *See Marmen*, 134 F.4th at 1348; *see also* 19 U.S.C. § 1677f-1(d)(1)(B).  But for the same reasons, the inherent volatility of Universal's U.S. pricing during the four quarters of the period of review, which resulted in abnormal distributions of U.S. selling prices, unequal variability in U.S. selling prices, and unequal U.S. selling price data across the entire POR, similarly render invalid the application of Commerce's new "price difference test" to Universal's sales data.  Commerce's new price different test is based on the assumption that the pricing data to be compared are, in fact, "comparable."  But when the change in Universal's COM and selling prices between quarters in this case was so significant that Commerce changed its price comparison methodology to prevent any and all comparisons of selling prices among and between the different POR quarters, Commerce necessarily concluded that inter-quarter selling prices in fact are "not comparable."

By applying the new price difference test to Universal's specific variable quarterly sales data in the *Remand Results*, Commerce thus disregarded the principle established in *Marmen* that any differential pricing test may be applied only to data sets that satisfy the assumptions on which the test is predicated.  In the *Remand Results*, far from conducting "further proceedings *in*

9

*conformity* with the CAFC's opinion in *Marmen,*" Commerce makes the same statistical and

analytical error that was overturned in *Marmen*. Specifically, Commerce applied its new price

difference test to sales between and among the quarters of the POR that do not satisfy the

statistical assumption on which the test is based (*i.e.*, to inter-quarter sales that Commerce

separately deemed were not comparable). As such, it was thus both wrong and inconsistent for

Commerce to use its new price difference test and differential pricing analysis in this case to

determine whether a pattern of export prices for comparable merchandise differed significantly

among purchasers, regions, or periods of time. The Court therefore should remand this case to

Commerce again with instructions that Commerce should follow the principles underlying

*Marmen*, and, if necessary, apply a differential pricing test only to data sets that satisfy the

statistical assumptions on which the test is predicated.

II.    **The *Remand Results* Impermissibly Include in the Differential Pricing Analysis Comparisons of Net Selling Prices in Different Quarters of the POR[3]**

   A.    **Commerce Correctly Relied on a Quarterly Cost and Sales Comparison Methodology in This Administrative Review**

When determining normal value based on home market or third country sales, 19 U.S.C.

§ 1677b(b) requires that Commerce disregard sales that are made below the cost of production.

In conducting this analysis, Commerce usually compares prices to a weighted-average of costs

incurred throughout the entire POR (i.e., annual costs). *See Carbon and Certain Alloy Steel Wire*

*Rod from Canada*, 71 Fed. Reg. 3,822 (Dep't Commerce Jan. 24, 2006), Issues and Decision

---

[3]    The arguments in this section of Universal's comments will be familiar to the Court because most already were included in Universal's 56.2 Memorandum of Law (Oct. 26, 2023), ECF 23. But because Commerce changed its differential pricing analysis methodology on remand and calculated a new dumping margin for Universal, Universal presented these arguments to Commerce on remand (and Universal includes them again in these comments) to avoid any claims of failure to exhaust administrative remedies.

Memorandum, at Comment 5; *Antidumping Methodologies for Proceedings that Involve Significant Cost Changes Throughout the Period of Investigation (POI)/{POR} that May Require Using Shorter Cost Averaging Periods*, 73 Fed. Reg. 26,364, 26,365 (Dep't Commerce May 9, 2008) ("*Cost Averaging Methodology*").  According to Commerce, "{r}elying on an annual average cost tends to smooth out … short-terms per-unit fluctuations resulting in a normalized average production costs to be compared to sales prices over the same extended period of time." *Id.*, 73 Fed. Reg. at 26,365 (citations omitted).

Commerce deviates from this standard methodology, however, when Commerce determines that there are significant changes in costs during the POR.  *See generally id.*, 73 Fed. Reg. 26,364; *see also Steel Concrete Reinforcing Bar From Taiwan*, 82 Fed. Reg. 34,925 (Dep't Commerce July 27, 2017), Issues and Decision Memorandum, at Comment 2.  In such instances, Commerce typically relies on shorter quarterly-average costs, provided that there is a linkage (*i.e.*, a reasonable correlation) between the costs of production and the selling prices during the shorter averaging periods.  *See id.*  That is what happened in this administrative review, when Commerce concluded that record evidence showed that Universal had experienced significant cost changes (*i.e.*, changes that exceeded 25 percent) between the high and low quarterly COM during the POR; that there was linkage between Universal's changing selling prices and COM during the POR such that changes in selling prices correlated reasonably to changes in unit COM; and that it therefore was necessary for Commerce to employ an alternative costing methodology that relied on Universal's quarterly direct material costs.  *See Preliminary Decision Memorandum*, at 23-24, PD 105. As a fundamental part of this approach, Commerce also limited its price comparisons for purposes of calculating dumping to sales made only within the same quarter.  That is, because of the significant cost and selling price changes among and between

11

quarters, Commerce disregarded the regulatory contemporaneous month matching hierarchy of 19 C.F.R. § 351.414(e) (*i.e.*, same month, then three months back, and then two months forward), and modified its margin calculation program specifically to prevent any inter-quarter sales price comparisons. *See* Commerce's Market-Economy Macros Program (December 22, 2022), at Lines 4854 and 4971, CD 222. In the *Remand Results*, Commerce maintained this approach and continued to disregard the regulatory contemporaneous month matching hierarchy of 19 C.F.R. § 351.414(e); and also continued to modify its margin calculation program specifically to prevent any inter-quarter sales price comparisons. *See Draft Remand Analysis*, at pdf pages 39, 101, 240, and 242, R2PD 4, R2CD 3.

When a company experiences significant cost fluctuations during a POR, Commerce's practice is that evidence that the company's prices reacted to cost fluctuations during the POR suggests that the cost fluctuations impacted the company's pricing practices. In such cases, it is reasonable for Commerce to infer that cost fluctuations are germane to Commerce's inquiry into whether, and to what extent, the company engaged in underselling during the POR. In addition, it is reasonable for Commerce to find, based on such inferences, that the circumstances provide a compelling reason for Commerce to depart from its standard practice and to calculate an accurate dumping margin by calculating different costs for different quarters of the POR and limiting sales comparisons only to sales made within the same quarter. When a company's costs and prices change from quarter to quarter, it therefore is reasonable for Commerce to conclude that comparing sales across quarters is meaningless because the selling prices within each quarter are independent of selling prices in all other quarters.

In this review, Commerce determined that Universal's costs and prices changed so significantly from quarter to quarter that Universal's sales in different quarters were

"incomparable."  That is, the circumstances during the POR were such that Commerce

reasonably concluded that whether, and to what extent, Universal engaged in underselling during

the POR would ***not*** be discernible by comparing the selling prices of sales made in different

quarters because the selling prices in the United States and the UAE *in each quarter* were

independent of the selling prices levels in other quarters.  *See Preliminary Decision

Memorandum*, at 23-24, PD 105.  Under such circumstances, comparing selling prices across

quarters not only would have resulted in an inaccurate dumping margin, but also would have led

to distortive results.  Because record evidence in the administrative review supported

Commerce's conclusion that Universal's prices reacted to cost-fluctuations, and that restricting

selling price comparisons to sales made within the same quarter furthered Commerce's goal of

calculating a dumping margin that accurately reflected Universal's normal selling practices,

Commerce's judgment was reasonable and its departure from its standard methodology was

justified.  *See Cost Averaging Methodology*, 73 Fed. Reg. 26,365; 19 C.F.R. § 351.102.  In the

*Remand Results*, Commerce's decision to maintain this approach to depart from its standard

methodology is again justified.

> **B.**    **Commerce's Differential Pricing Approach of Comparing Selling
> Prices Across POR Quarters Conflicts With Its Quarterly Price
> Comparison Approach**

But after having determined that it is not appropriate to calculate Universal's dumping

margin by comparing the selling prices of U.S. and home market sales made in different POR

quarters, Commerce nonetheless did exactly that again in the *Remand Results*.  That is, for

purposes of its new "price difference test," Commerce again has compared the selling prices of

U.S. sales made in different POR quarters for purposes of its differential pricing analysis.  As the

Court found previously in its first remand, *Universal Tube and Plastic Industries, Ltd., THL*

*Tube and Pipe Industries, LLC, and KHK Scaffolding & Formwork, LLC v. United States*, Consol. Court No. 23-00113, Slip Op. 24-85 (Ct. Int'l Trade July 26, 2024) ("*Universal I*"), this approach is inconsistent with the modifications that Commerce made in its dumping margin calculation and thus renders Commerce's differential pricing analysis in the *Remand Results* unsupported by substantial evidence.

Under the antidumping statute, Commerce calculates a respondent's dumping margin by determining the "amount by which the normal value {i.e., home market price} exceeds the export price or constructed export price {i.e., U.S. price} of the subject merchandise. 19 U.S.C. § 1677(35)(A). The statute and regulations identify three methods for comparing normal value to export price or constructed export price: (1) the average-to-average ("A–A") comparison methodology; (2) the transaction-to-transaction ("T–T") comparison methodology; and (3) the average-to-transaction ("A–T") comparison methodology.

In administrative reviews, Commerce typically uses the A–A methodology, comparing the weighted-average of the normal values to the weighted-average of the export prices for comparable merchandise. *See* 19 U.S.C. § 1677f–1(d)(1)(A)(i); 19 C.F.R. § 351.414(b)(1); *see also* 19 C.F.R. § 351.414(c)(1) (providing that, in both investigations and administrative reviews, Commerce "will use the average-to-average method unless the {agency} determines another method is appropriate in a particular case"). In contrast, when using the A–T methodology, Commerce compares the weighted average of the normal values to the export prices in individual transactions. 19 U.S.C. § 1677f–1(d)(1)(B); 19 C.F.R. § 351.414(b)(3).

The statute authorizes Commerce to use the A–T comparison methodology as an exception to the other two methodologies. *See* 19 U.S.C. § 1677f–1(d)(1)(B). Specifically, Commerce may use the A–T methodology in cases involving "masked" dumping – that is, where

14

a respondent sells its goods in the United States at dumped prices "to particular customers or regions {or at particular times}, while selling at higher prices to other customers or regions {or at other times}." *See* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1 at 842–43, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4177–78.  When a respondent's sales are structured in this fashion, use of the A–A methodology might understate actual dumping by measuring average dumping over the review period as a whole, while masking dumping from discrete, specific targeted sales.  In contrast, use of the A–T methodology unmasks such dumping by, among other things, determining a dumping margin for each individual sale.  *See, e.g., Koyo Seiko Co. v. United States,* 20 F.3d 1156, 1159 (Fed.Cir.1994) (explaining "masked dumping," and noting that, "{b}y using individual U.S. prices in calculating dumping margins, Commerce is able to identify a merchant who dumps {its} product intermittently – sometimes selling below the foreign market value and sometimes selling above it," which is pricing behavior generally not captured by Commerce's A–A methodology).

Pursuant to the statute, Commerce may use the A–T methodology where (i) "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and (ii) {Commerce} explains why such differences cannot be taken into account" using one of the other methodologies.  19 U.S.C. § 1677f–1(d)(1)(B)(i)–(ii).  In this second remand redetermination, Commerce again has applied a "differential pricing" analysis to determine whether the "pattern" and "significant difference" criteria of 19 U.S.C. § 1677f–1(d)(1)(B)(i) are satisfied, and whether application of the alternate A-T comparison method is appropriate.  But instead of using the "Cohen's *d*" test as part of its differential pricing analysis as Commerce did in the *Final Determination*, Commerce applied a

15

new "price difference test."  Specifically, Commerce defined purchasers based on Universal's

reported consolidated customer codes, and compared Universal's sales to individual customers to

Universal's sales to all customers throughout the POR *regardless of when the sales occurred.*

*Draft Remand Analysis*, at pdf page 283, R2CD 3.  Commerce determined regions based on

Universal's zip codes, and compared Universal's sales to certain regions to Universal's sales to

all regions throughout the POR *regardless of when the sales occurred.  Draft Remand Analysis*,

at pdf page 266, R2CD 3.  Finally, Commerce defined time periods by the quarter within the

POR based upon the U.S. date of sale, and compared Universal's sales made in *individual*

quarters to Universal's sales made in *all the remaining quarters of the POR.  Draft Remand*

*Analysis*, at pdf page 274, R2CD 3.

In the first stage of the differential pricing analysis, Commerce applied the "price

difference test" to determine whether the prices differ significantly.  *Remand Results*, at 6.  For

comparable merchandise, Commerce examined whether the weighted-average net price to a

given purchaser, region, or time period is within two percent of the weighted-average net price to

all other purchasers, regions, or time periods.  Commerce explained that if the weighted-average

net price to the given purchaser, region, or time period falls outside of the plus or minus two

percent band around the weighted-average net price to all other purchasers, regions, or time

periods, then Commerce would presume that the prices to that given purchaser, region, or time

period  differ significantly and those sales to the given purchaser, region, or time period "pass"

the price difference test.  *Remand Results*, at 6.  Using this approach, Commerce determined that

95.71 percent of the value of Universal's U.S. sales passed the price difference test.  *Id.* at 7.[4]

---

[4]  Such a high percentage is not surprising given that Commerce already had determined that
"Universal experienced significant cost changes (i.e., changes that exceeded 25 percent)
between the high and low quarterly COM during the POR" and that there was linkage

But, as discussed above, Commerce already determined in this review (1) that Universal had significant cost changes between its high and low quarterly costs of manufacturing during the POR, (2) that there was a close linkage between Universal's changing selling prices and quarterly costs of manufacturing for the same periods, and that the average quarterly net price variance for Universal's top five U.S. market CONNUMs was more than 80 percent, and (3) that these differences in Universal's costs of manufacturing and selling prices between and among quarters were so significant that it was necessary for Commerce to modify its margin calculation program specifically to prevent comparisons of sales in different quarters.  *See* Commerce's Market-Economy Macros Program (December 22, 2022), at Lines 4854 and 4971, CD 222; *see also Draft Remand Analysis*, at pdf pages 39, 101, 240, and 242, R2CD 3.  Having already concluded that the selling prices of sales made in different POR quarters could not be compared for purposes of calculating Universal's margin, it is again inconsistent and contradictory for Commerce to compare the selling prices of Universal's U.S. sales across the four quarters of the POR as part of its *Remand Results* new differential pricing analysis.

The main question in this case is when Commerce has determined that inter-quarter comparisons of costs and prices would lead to distortive margin results because of significant fluctuations from quarter to quarter – thus justifying a margin calculation methodology that compares selling prices only within quarters – can selling prices in different quarters be reliably compared across quarters for purposes of establishing a pattern of prices that differs significantly for comparable merchandise among time periods?  Commerce posits that "the pattern requirement" resulting from its new price difference test does not itself identify masked dumping

---

between "Universal's changing sales prices and COM during the POR."  *Preliminary Decision Memorandum*, at 23-24, PD 105.

and serves only as a "canary in the coal mine" to alert Commerce to the possibility that masked dumping may be distorting results of the margin calculations. *Remand Results*, at 15. But when Commerce has determined that it cannot compare sales between quarters in its dumping calculation because inter-quarter comparisons of prices would lead to distortions, it is unreasonable for Commerce to find a pattern of prices based on those same inter-quarter comparisons to be reliable. In short, Commerce has not explained in the *Remand Results* why the "alert" resulting from such pattern of pricing would be accurate or dependable. Commerce claims that any discovered differences in pricing among purchasers, regions, or time periods show only whether "conditions exist" that could lead to masked dumping. *Remand Results*, at 15. But Commerce cannot find that masked dumping exists unless if *first* determines that conditions exist where masked dumping might occur. And if the former finding is based on flawed data or improper comparisons, then it is not reasonable to conclude that the latter finding is legitimate. In every antidumping proceeding, the results determined are only as good as the data used to generate them. Here, Commerce ignores in the *Remand Results* that improper sales comparisons might lead to a *false* finding of a pattern of price differences, and fails to explain to the Court why it is reasonable to rely on a pattern of prices among quarters resulting from and established by a comparison of non-comparable selling prices.

It is a core legal requirement that agencies adopt positions that are internally consistent. *See United States v. Mead Corporation*, 533 U.S. 218, 228, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) ("the fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, *its consistency*, formality, and relative expertise, and to the persuasiveness of the agency's

position") (emphasis added).[5]  In *Universal I*, the U.S. Court of International Trade already concluded that Commerce acted inconsistently and contrary to law when it compared U.S. sales from different POR quarters as part of its differential pricing analysis when Commerce already had resolved that it could *not* make such cross-quarterly sales comparisons as part of its dumping calculation.  In the *Remand Results*, Commerce again has adopted these inconsistent positions simultaneously without explanation or justification.  Thus, without even addressing the latter stages of Commerce's new price difference test, the *Remand Results* thus is arbitrary and contrary to law.  For the same reason that the Court found in *Universal I*, i.e., that Commerce's decision to compare U.S. sales from different POR quarters as part of its price difference test when Commerce separately determined that it *cannot* make such cross-quarterly sales comparisons as part of its dumping calculation was inconsistent and contradictory, the *Remand Results* similarly are inconsistent and cannot be deemed supported by substantial evidence.

### C.     Commerce Could Have Avoided Its Inconsistent Actions on Remand

Importantly, the antidumping duty statute does not *require* Commerce to consider *quarterly* price comparisons in its differential pricing analysis under 19 U.S.C. § 1677f-1(d)(1)(B) to determine if "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time." That it, the statute does not mandate that Commerce "must*"* measure whether there is a pattern of prices that differ significantly or why the A–A method or the T–T method cannot account for such differences.  Rather, the use of the permissive "may" in 19 U.S.C. § 1677f-1(d)(1)(B) means that there are circumstance where Commerce need not consider certain criteria, such as

---

[5]    *See also Good Samaritan Hospital v. Shalala*, 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) ("{T}he consistency of an agency's position is a factor in assessing the weight that position is due").

periods of time, when evaluating whether a pattern of prices that differ significantly existed.

This case involves just such a circumstance. But Commerce's *Remand Results* did not consider alternate periods of sales comparisons in its differential pricing analysis or consider that it would be more appropriate not to consider periods of time at all. Instead, Commerce selected the *exact same* POR quarterly periods of time that it separately determined (as part of its quarterly cost and sales methodology) to be specific periods of time across which comparisons of selling prices *may not be made*. Because Commerce's *Remand Results* adopt an approach under 19 U.S.C. § 1677f-1(d)(1)(B) that is inconsistent with its decision not to compare selling prices across quarters of the POR and also contrary to the principles articulated by the Federal Circuit in *Marmen*, the results of Commerce's differential pricing analysis in the *Remand Results* are arbitrary and inconsistent, and cannot be sustained.[6]

### D.    Commerce's Remand Results Do Not Comply with Both Court Remands

In Universal's 56.2 brief before the Court, Universal explained that it was challenging "the arbitrary and inconsistent decision by Commerce to proceed with cross-quarterly selling price comparisons under one provision of the statute while refusing to make such cross-quarterly comparisons under another." The Court agreed, concluding that using the same-quarter comparison to determine dumping while comparing U.S. sales prices in different quarters for

---

[6]    In *Universal I*, the Court rejected Commerce's claim that it is reasonable to apply an "inter-quarter comparison" and the "same quarter comparison" in the same administrative review because Commerce is not required to investigate a respondent's intention or subjective reasons for differing prices, *i.e.*, that the causes of price differences observed as part of the pattern requirement need not be discerned. The Court also rejected Commerce's claim that its decision to use a quarterly cost methodology was made "in a different context" from its decision to compare inter-quarterly pricing as part of its differential pricing analysis. Neither of these claims would justify the inconsistency resulting from Commerce's new price different test.

purposes of Commerce's differential pricing analysis was "inconsistent," *Universal I*, at 17.  The

Court therefore remanded for Commerce to reconsider its decision or to provide further

explanation for its internally inconsistent determinations to apply the inter-quarter comparison

and the same-quarter comparison methodologies in the same administrative review.  *See*

*Universal I*, at 17 ("Commerce must either make consistent determinations in different

provisions of the antidumping statute or provide a reasonable explanation for any

inconsistencies, which Commerce failed to do."); see also *Universal I*, at 2, 10 (discussing the

internal inconsistency in Commerce's determination that was not in accordance with law).  In its

June 17, 2025, Order, the Court remanded again for "further proceedings in conformity with the

CAFC's opinion in *Marmen Inc. v. United States*, No. 2023-1877, 134 F.4th 1334 (2025)."  But

the Court's remand for Commerce to conduct further proceedings in conformity with *Marmen*

did not mean that Commerce could ignore the Court's previous remand.  The Court's two

remand orders were not separate or alternative directives.  Rather, Commerce should have

followed both remands, and implemented the Court's instructions contained therein uniformly

and concurrently.  But the *Remand Results* do not address sufficiently the same-quarter/inter-

quarter sales comparison inconsistency, and fail to provide any explanation or justification for

Commerce to continue to compare prices across quarters for its new differential pricing analysis

at the same time that it precludes all cross-quarterly comparisons in its dumping margin

calculations.  Because Commerce adopted an approach in the *Remand Results* that is inconsistent

and fails to provide a reasonable explanation at all for its internally inconsistent determinations,

the Court should find that the final remand redetermination is unsupported by substantial

evidence.  The Court should remand to Commerce again with instructions to re-calculate

Universal's weighted-average dumping margin and not to implement any differential pricing

21

analysis that relies on inter-quarter comparisons of Universal's U.S. sales data.

### III.   Commerce's New Price Difference Test Is Arbitrary and Unsupported by Substantial Evidence[7]

Commerce's Remand Results are unsupported by substantial evidence because in applying its new differential pricing analysis to determine whether prices differed significantly among purchasers, regions, or time periods pursuant to section 777A(d)(1)(B)(i) of the Tariff Act of 1930, Commerce failed to provide a full explanation for the basis used in the "price difference test" to determine whether prices differ significantly. Specifically, the two percent threshold is arbitrary, does not comport with any reasonable understanding of the term "significant," and does not indicate that prices differ significantly.

It has long been Commerce's practice that a "pattern" within the meaning of the statute exists only when apparent price differences are beyond something that might occur by chance. That is, a "pattern of prices that differ significantly among purchasers, regions, or time periods" means that Commerce should have examined the extent to which the prices, when ordered by purchaser, region or time period, exhibited differences that have meaning, that have or may have influence or effect, that are noticeably or measurably large, and that may be beyond something that occurs merely by chance. And the burden was on Commerce to establish that the results of its differential pricing analysis were not arbitrary, but were based on a recognizable pattern that is grounded in substantial evidence. *See*, *e.g.*, *Creswell Trading Co., Inc. v. United States*, 15 F.3d 1054, 1060-61 (Fed. Cir. 1994) ("The 'if' clause … sets forth on its face a statutory condition that Commerce must establish before it may exercise its right to levy a countervailing

---

[7]   If the Court concludes that the Remand Results are unsupported by substantial evidence according to the arguments presented in Sections I and II of these comments, the Court might determine that it need not address the arguments presented in Sections III through VI.

duty against an investigated party, as opposed to an exception into which that party must prove its actions fall.  The ultimate burden of proof is thus upon Commerce to establish by a preponderance of the evidence" that the statutory condition has been satisfied).  In other words, a "pattern" exists within the meaning of the statute only when the record evidence allows Commerce to reject the hypothesis that any observed price differences reflect nothing more than random fluctuations.  Commerce's new price difference test in the *Remand Results* is not based on this principle.

The randomness of Commerce's new price difference test is evident when the results of Commerce's different differential pricing analyses are compared.  Whereas Commerce in the *Final Results* of the administrative review found that 65.42 percent of the value of Universal's U.S. sales passed the Cohen's d test, *Final Results Calculation for Universal* (April 27, 2023), at 5, Commerce found that 95.71 percent of the value of Universal's U.S. sales passed the new price difference test.  *Remand Results*, at 7.  That is, the percentage of sales that "differed significantly" *increased* substantially.  In the *Remand Results*, Commerce provided no explanation of its basis to conclude that it had established reliable patterns of pricing when the results of its new price difference test changed so dramatically from the test previously applied.  Because Commerce failed to demonstrate that its new price difference test did not generate arbitrary and random results, the results of Commerce's differential pricing analysis are not supported by substantial evidence.

## IV. Commerce Failed to Provide a Rational Basis for Its New Price Difference Test

In the *Remand Results*, Commerce stated that in the first stage of its new differential pricing test, a "price difference test" is applied to determine whether prices differ significantly. *Remand Results*, at 6.  For comparable merchandise, Commerce's new price difference test examines whether the weighted-average net price to a given purchaser, region, or time period is

within two percent of the weighted average net price to all other purchasers, regions, or time periods. *Id.* Commerce indicated that if the weighted-average net price to the given purchaser, region, or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions, or time periods, then the prices to that given purchaser, region, or time period thus "differ significantly" and those sales to the given purchaser, region, or time period pass the price difference test. *Id.* But Commerce did not explain *with substantial evidence* why it chose a "two percent" test or why a "two percent" difference in weighted-average net prices constitutes a "significant" difference within the meaning of the statute. Perhaps most importantly, Commerce did not explain why a difference of two percent should be considered significant when prices within the "base" group used as a reference (*i.e.*, the weighted-average net price to all other purchasers, regions, or time periods) may themselves vary by more than 2 percent.

Commerce suggests that "a two percent threshold is a reasonable measure of significance and is consistent with other aspects of Commerce's practice in antidumping proceedings." *Remand Results*, at 23, positing, for example, that sales between affiliated parties in the comparison market are not at arm's length if the average, product-specific comparison market prices to an affiliated customer are not within a "plus or minus" two-percent difference from the weighted-average price to unaffiliated customers, and that this thus is a significant difference. *See id.* But the purpose of the arm's-length test conducted pursuant to 19 C.F.R. § 351.403(c) (which does not mention "significant") is not to assess significance, but instead to determine whether the affiliated party sales are made in the ordinary course of trade such that they can be used to calculate normal value. Although Commerce cites to the arm's length test standard and the term "significantly" in one case, *Large Diameter Welded Pipe from the Republic of Turkey*,

24

that reference is inapplicable because Commerce was describing *freight services* provided by an affiliate, not *selling prices*.  *See Remand Results*, at 23 n.39.

Commerce also references the *de minimis* threshold of two percent in antidumping investigations as relevant for establishing "significance." *Remand Results*, at 24. But Commerce has it completely backwards.  That two percent is the threshold for Commerce to conclude in an investigation that a dumping margin is so low that it is "*de minimis*" and should be "disregarded" supports the exact opposite conclusion:  that two percent is trivial and ***not*** significant.[8] Moreover, Commerce already considered and rejected use of a two percent threshold to determine if a price difference is "significant" when it discarded the "P/2" test in favor of the "*Nails*" test, which preceded the Cohen's *d* test.[9]

Commerce even has deemed a five percent threshold to be small. For example, when assessing whether respondents must report sales to affiliates or their resales to unaffiliated customers in the comparison market, Commerce's regulations confirm that, if the sales to affiliates are less than five percent, they are considered small enough that the respondent can

---

[8]    *See* 19 U.S.C. § 1673d(a)(4); 19 C.F.R. § 351.106.

[9]    *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Light-Walled Rectangular Pipe and Tube from Mexico*, 73 Fed. Reg. 35,649 (Dep't Commerce June 24, 2008), accompanying Issues and Decision Memorandum at Comment 2 ("While petitioners advocate the use of two percent as the threshold for measuring significance of price differences in the instant investigation, the Department did not adopt or establish the two-percent test from CFS Paper Korea as a standard"); *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Negative Determination of Critical Circumstances*, 73 Fed. Reg. 40,480 (Dep't Commerce July 15, 2008), accompanying Issues and Decision Memorandum at Comment 23.C ("The P/2 test relies on a single, bright-line price threshold of two percent to define targeted dumping that does not account for price variations specific to the market in question").

forego the reporting of resales.[10]  If five percent is considered too low to require such reporting, then two percent cannot be considered a significant threshold

Because Commerce's use of two percentage points is unsupported by substantial evidence and inconsistent with long-established practice of what Commerce considers "significant," the Court should remand to Commerce with instructions to provide explanations – based on substantial evidence – why a "two percent" difference in weighted-average net prices constitutes a "significant" difference within the meaning of the statute and why a difference of two percent should be considered significant when prices within the "base" group used as a reference (*i.e.*, the weighted-average net price to all other purchasers, regions, or time periods) may themselves vary by more than 2 percent.  The Court also should direct Commerce to explain why the two percentage points it chose to evaluate the difference in pricing of comparable products is appropriate for Universal *in this particular remand proceeding*.  A "one size fits all" two-percent approach is not consistent with the "case by case" approach mandated by the Statement of Administrative Action; nor does it make sense to apply the same standard to different industries and different products.  *See* H.R. Doc. No. 103-316, at 842-43 (1994) ("the Administration intends that in determining whether a pattern of significant price differences

---

10  *See* 19 C.F.R § 351.403(d) (Commerce "normally will not calculate normal value based on the sale by an affiliated party if sales of the foreign like product by an exporter or producer to affiliated parties account for less than five percent of the total value (or quantity) of the exporter's or producer's sales of the foreign like product in the market in question…."); *see also* Letter from Rebecca Janz to Universal Tube and Plastic Industries, Ltd. et al., re: *Administrative Review of the Antidumping Duty Order on Circular Welded Carbon-Quality Steel Pipe: Initial Questionnaire*, at B-2 (Mar. 18, 2022) ("If your aggregate sales to all affiliated customers in the comparison market constitute less than five percent of your total sales in the comparison market, report your sales to the affiliated customers rather than the affiliates' resales to unaffiliated customers") ("Commerce AD Questionnaire"), PD 23.

exist, *Commerce will proceed on a case-by-case basis*, because small differences may be significant for one industry or one type of product, but not for another.") (emphasis added).

## V.    Other Aspects of Commerce's New Differential Pricing Analysis Also Are Unsupported by Substantial Evidence

The remaining aspects of Commerce's revised differential pricing analysis similarly are unsupported by substantial evidence, and the Court should remand again for Commerce to provide further explanations or change its approach.  In particular, the Court should instruct Commerce on remand to provide a full explanation supported by substantial evidence for its use of a 33% threshold in its "ratio test" (to assess the extent of the significant price differences for all U.S. sales as measured by the price difference test).  Under the statute, Commerce is permitted to compare weighted-average normal values to individual export prices or constructed export prices (the A-T method) only if Commerce finds that "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, *or* periods of time."  19 U.S.C. § 1677f-1(d)(1)(B) (emphasis added).  This means that in order to apply the A-T method, Commerce needs to find "a pattern" of prices that differ significantly either among purchasers or among regions or among periods of time.

In the *Remand Results*, Commerce explains that "{i}f more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of prices existed during the period of review." *Remand Results*, at 7. But this is simply an assertion, and Commerce provided no *explanation* for why it found that a pattern of price differences existed during the period of investigation when more than 33 percent of the total value of U.S. sales passes the price difference test.  Moreover, the reduction in the threshold for the application of the A-T price comparison method to all sales to 33% is inconsistent with the position taken by Commerce in *Stupp Corporation v. United States*.  5 F.4th 1341, 1533 (Fed.

27

Cir. 2021).  There, Commerce stated that it was reasonable to apply the A-T method to all sales if it found 66% of sales were "significantly different" because "when two-thirds or more of a respondent's sales are at prices that differ significantly, then the extent of these sales is so pervasive that" the normal average to average method would not permit Commerce "to separate the effect of the sales where prices differ significantly from those where prices do not differ significantly."  Commerce also stated that when it "finds that between one third and two thirds of U.S. sales are at prices that differ significantly … the effect of this pattern can reasonably be separated from sales whose prices do not differ significantly."  *Id.* at 1355.  In the *Remand Results*, Commerce has provided no justification for why this rationale no longer applies and why it now is appropriate to apply the A-T method when it finds that merely 33% of sales "differ significantly."  On remand, Commerce needs to provide an explanation supported by substantial evidence why its previous rationale no longer applies and why the new lower 33% threshold specifically identifies whether a pattern of pricing exists.

The Court also should instruct Commerce on remand to provide an explanation *supported by substantial evidence* for its use of a 25 percent change in the weighted-average dumping margins between the A-A method and the A-T method for determining whether the weighted-average dumping margin between the two methodologies is meaningful.  Curiously, in the *Remand Results*, Commerce's only justification for its use of a 25 percent relative change in dumping margins for its "meaningful different test" is that the 25 percent change "mirrors Commerce's standard for whether a ministerial error is considered 'significant' under 19 CFR 351.224(g)," *Remand Results*, at 29, a standard that Commerce ignored when applying the two percent standard in its new price difference test (see section IV above).

28

Finally, the Court should instruct Commerce on remand to explain why – if the purpose of its price difference test is to unmask masked dumping – Commerce includes in the numerator of its analyses the quantities of sales that are not dumped.

## VI.    Commerce Must Modify the Basis for Its New Price Difference Test

On remand, the Court should instruct Commerce that to the degree that Commerce continues to apply its new price difference test to determine whether Universal's prices differed significantly among purchasers, regions, or time periods, Commerce must limit its consideration that prices differ significantly only to those comparisons where the prices differ by at least 25 percent.  Such an approach would be consistent with Commerce's regulations and practice, which – unlike Commerce's use of two percent in its new price difference test – include numerous situations where a change must be at least 25 percent to be considered "significant." For example, a ministerial error is definitionally "significant" under 19 C.F.R. § 351.224(g) only when a correction of the error would alter the margin by at least 25 percent.  In the context of 19 C.F.R. §351.525(b), a 25 percent threshold is used to determine whether a subsidy is considered to have a significant effect on the production of subject merchandise due to cross-ownership between a utility provider and the producer (i.e., when "the producer of subject merchandise purchases a substantial percentage, normally defined as 25 percent or more").  In addition, countries experience "high" inflation under the regulations only when the rate change is "greater than 25 percent per annum."  *See* 19 C.F.R. §351.525(d).  Furthermore, as particularly relevant in this case, it is longstanding Commerce practice that a "25 percent difference" between the high and low quarterly costs of manufacture is Commerce's threshold percentage for determining whether changes in COM during the POI are "significant."

Because Commerce's regulations contain numerous instances where "significance" actually is defined as 25 percent, the Court should direct Commerce to modify its *Remand*

*Results* approach and use 25 percent instead of two percent in the "price difference test" to determine whether prices differ significantly.  Specifically, Commerce should determine that the weighted-average net price to a given purchaser, region, or time period will "differ significantly" only when that price falls outside of a plus or minus 25 percent band around the weighted-average net price to all other purchasers, regions, or time periods.

## CONCLUSION

For the reasons stated above, it is not lawful for Commerce to conduct a differential pricing analysis for Universal by comparing Universal's selling prices in different quarters of the POR to determine whether a pattern of prices existed that differed significantly among purchasers, regions, and time periods when Commerce already determined (1) in the administrative review as part of its quarterly cost and price analysis, and (2) as part of the *Remand Results* that it is not permissible in this particular proceeding to compare selling prices across the different quarters of the POR.  Because Commerce's price difference test conflicts with the method Commerce adopted to calculate Universal's dumping margin, the differential pricing analysis that Commerce adopted in its *Remand Results* is unreasonable and unsupported by substantial evidence, and the Court should remand this case again with instructions to Commerce to change its differential pricing approach to eliminate all inter-quarter comparisons of net U.S. selling prices in determining whether there is a pattern of export prices for comparable merchandise that differ significantly among purchasers, regions, or periods of time.

For the reasons stated above, it was unlawful for Commerce to conduct a differential pricing analysis for Universal by comparing Universal's selling prices in different quarters of the POR to determine whether a pattern of prices existed that differed significantly among purchasers, regions, and time periods when Commerce separately determined as part of its

quarterly cost and price analysis that selling price comparisons of Universal's sales across quarters of the POR were not permissible.  As a result of this inconsistent approach, Commerce's differential pricing analysis was unreasonable and unsupported by substantial evidence, and the Court should remand to Commerce for further consideration.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink
Jonathan M. Freed
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C.  20003
(202) 223-3760

Counsel to Universal Tube and
Plastic Industries, Ltd.; THL Tube
and Pipe Industries LLC; and KHK
Scaffolding and Formwork LLC

Dated:  March 20, 2026

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD.; THL TUBE AND PIPE INDUSTRIES LLC; AND KHK SCAFFOLDING AND FORMWORK LLC,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>UNITED STATES,<br><br>　　　　　Defendant,<br><br>　　and<br><br>WHEATLAND TUBE COMPANY,<br><br>　　　　　Defendant-Intervenor. | Before: Jennifer Choe-Groves, Judge<br><br>Court No. 23-00113 |

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel at Trade Pacific PLLC certifies that the attached Comments in Opposition to Commerce's Remand Redetermination, dated March 20, 2026, comply with the word-count limitation described in the Standard Chambers Procedures.  The memorandum of law contains 9,566 words according to the word-count function of the word-processing software used to prepare the memorandum.

　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　/s/ Robert G. Gosselink
　　　　　　　　　　　　　　　　Robert G. Gosselink

　　　　　　　　　　　　　　　　**TRADE PACIFIC PLLC**
　　　　　　　　　　　　　　　　700 Pennsylvania Avenue, SE, Suite 500
　　　　　　　　　　　　　　　　Washington, D.C.  20003
　　　　　　　　　　　　　　　　(202) 223-3760

　　　　　　　　　　　　　　　　Counsel to Plaintiffs

Dated:  March 20, 2026