THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC, <br><br>          Plaintiffs, <br>   v. <br><br>UNITED STATES, <br><br>          Defendant, <br>   and <br><br>WHEATLAND TUBE COMPANY, <br><br>          Defendant-Intervenor. | Court No. 23-00113 |

**ORDER**

Upon consideration of the Department of Commerce's second remand redetermination pursuant to remand, all responses thereto, and all other pertinent papers, it is hereby

ORDERED that the second remand results are sustained in their entirety; and further

ORDERED that final judgment is entered in favor of the United States.

Dated: _____ 2026
     New York, NY                     JENNIFER CHOE-GROVES, JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC,<br><br>    Plaintiffs,<br>  v.<br><br>UNITED STATES,<br><br>    Defendant,<br>  and<br><br>WHEATLAND TUBE COMPANY,<br><br>    Defendant-Intervenor. | Court No. 23-00113 |

**DEFENDANT'S CORRECTED REPLY TO COMMENTS ON REMAND REDETERMINATION**

<table>
<tr><td></td><td>BRETT A. SHUMATE<br>Assistant Attorney General</td></tr>
<tr><td></td><td>PATRICIA M. McCARTHY<br>Director</td></tr>
<tr><td></td><td>CLAUDIA BURKE<br>Deputy Director</td></tr>
<tr><td>OF COUNSEL:<br>PAUL THORNTON<br>Attorney<br>Department of Commerce<br>Office of Chief Counsel for Trade<br>Enforcement & Compliance<br>1401 Constitution Avenue, NW<br>Washington, DC 20230<br><br>May 18, 2026</td><td>TATE NATHAN WALKER<br>Trial Attorney<br>Commercial Litigation Branch<br>U.S. Department of Justice<br>Civil Division<br>P.O. Box 480<br>Ben Franklin Station<br>Washington, D.C., 20044 Tel:<br>(202) 307-0163<br>Email: Tate.Walker@usdoj.gov<br><br>*Attorneys for Defendant*</td></tr>
</table>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

BACKGROUND ...................................................................................................................2

    I.       Administrative Determination under Review and Remand Order ................................2

    II.     First Remand Redetermination Proceedings ...............................................................4

    III.   Second Remand Redetermination Proceedings ............................................................4

ARGUMENT .........................................................................................................................6

I.      Standard of Review ...............................................................................................................6

II.    Commerce's Application of Its Differential Pricing Practice Is Supported by Substantial Evidence and Is in Accordance with Law ...........................................................................................................7

    A.     Relevant Statutory Framework of Commerce's Differential Pricing Analysis Methodologies ...........................................................................................................7

    B.     Commerce's Revised Differential Pricing Analysis .................................................9

    C.     Commerce's Second Remand Redetermination Results Comply with *Marmen* and The Court's Remand Order ...............................................................................................12

III.   Because Commerce Lawfully Applied Its Differential Pricing Analysis in Evaluating Universal's U.S. Sales Prices on Remand ........................................................................ 14

    A.     Commerce Fully Explained Its Revised Differential Pricing Tests .......................15

           1.     The Commerce's Statutory Authority To Devise A Differential Pricing Test ...............................................................................................................15

           2.     Universal's Argument that Commerce Look To The Reasons Why Its U.S. Prices Might Fluctuate Has Been Rejected ..............................................17

    B.     Commerce's Two Percent Benchmark Is Well Within Its Discretion to Establish 19

    C.     Commerce's Ratio and Meaningful Difference Tests Are Reasonable and Have Already Been Affirmed by The Federal Circuit ................................................. 22 .

IV.     Commerce Fully Explained Using Same-Quarter Comparisons for Its Cost Averaging
Methodology and Inter-Quarter Comparisons for Its Differential Price Test ...................26

CONCLUSION............................................................................................................................32

**TABLE OF AUTHORITIES**

Page(s)

<u>Cases</u>

*Beijing Tianhai Indus. Co., Ltd. v. United States*,
106 F. Supp. 3d 1342 (Ct. Int'l Trade 2015) .............................................................. 17

*Bio-Lab, Inc. v. United States*,
776 F. Supp. 3d 1315 (Ct. Int'l Trade 2025) .............................................................. 16

*Borusan Mannesmann Boru Sanayi v. Ticaret A.S.*,
608 Fed. Appx. 948 (Fed. Cir. 2015) ........................................................................ 18

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*,
5 F.4th 1367 (Fed. Cir. 2021) ................................................................................... 16

*BYD (H.K.) Co. v. United States*,
785 F. Supp. 3d 1359 (Ct. Int'l Trade 2025) .............................................................. 15

*Dillinger France S.A. v. United States*,
981 F.3d 1318 (Fed. Cir. 2020) ........................................................................... 19, 22

*DynaEnergetics U.S. Inc. v. United States*,
298 F. Supp. 3d 1363 (Ct. Int'l Trade 2018) ............................................................... 6

*Elkton Sparkler Co. v. U.S. Dept. of Com.*,
17 C.I.T. 344 (Ct. Int'l Trade 1993) .......................................................................... 13

*Fujitsu Gen. Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996) ................................................................................... 16

*Garg Tube Export LLP v. United States*,
740 F. Supp. 3d 1355 (Ct. Int'l Trade 2024) ................................................... 16, 17, 21

*Golden Dragon Precise Copper Tube Group, Inc. v. United States*,
37 I.T.R.D. 1927, 2015 WL 4927515 (Ct. Int'l Trade 2015) ..................................... 18

*HiSteel Co., Ltd. v. United States*,
653 F. Supp. 3d 1341 (Ct. Int'l Trade 2023) ......................................................... 12, 23

*Huvis Corp. v. United States*,
570 F.3d 1347 (Fed. Cir. 2009) ................................................................................. 24

*Industriales de Aceitunas de Mesa v. United States*,
102 F.4th 1252 (Fed. Cir. 2024) .......................................................................... 15, 16

*JBF RAK LLC v. United States*,
790 F.3d 1358 (Fed. Cir. 2015) .......................................................................... 17, 30

*JBF RAK LLC v. United States,*
   991 F. Supp. 2d. 1343 (Ct. Int'l Trade 2014) ........................................................................... 17

*Marmen Inc. v. United States,*
   134 F.4th 1334 (Fed. Cir. 2025) ................................................................................. *passim*

*Melamine Chemicals, Inc. v. United States,*
   732 F.2d 924 (Fed. Cir. 1984) ........................................................................................ 15

*Mid Continent Nail Corp. v. United States,*
   712 F. Supp. 2d 1370 (Ct. Int'l Trade 2010) ............................................................... 20

*Mosaic Co. v. United States,*
   160 F.4th 1340 (Fed. Cir. 2025) ...................................................................................... 7

*Nan Ya Plastics Corp., Ltd. v. United States,*
   128 F. Supp. 3d 1345 (Ct. Int'l Trade 2015) ................................................................ 18

*Nexteel Co. v. United States,*
   28 F.4th 1226 (Fed. Cir. 2022) ...................................................................................... 16

*Samsung Electronics Co. v. United States,*
   72 F. Supp. 3d 1359 (Ct. Int'l Trade 2015) ................................................................. 25

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., CO,*
   605 U.S. 168 (2025) ................................................................................................. 7, 31

*Smith-Corona Group v. United States,*
   713 F.2d 1568 (Fed. Cir. 1983) ..................................................................................... 16

*Stupp Corp. v. United States,*
   5 F.4th 1341 (Fed. Cir. 2021) ................................................................................. *passim*

*Stupp Corp. v. United States,*
   No. 2023-1663, 2025 WL 1178392 (Fed. Cir. April 23, 2025) ..................................... 13

*Timken Co. v. United States,*
   968 F. Supp. 2d 1279 (Ct. Int'l Trade 2014) ........................................................... 24, 25

*Union Steel v. United States,*
   713 F.3d 1101 (Fed. Cir. 2013) ....................................................................................... 7

*ApexFrozen Foods Priv. Ltd. v. United States,*
   862 F.3d 1337 (Fed. Cir. 2017) .............................................................................. *passim*

*Universal Tube and Plastic Industries, Ltd., et al. v. United States,*
   717 F. Supp. 3d 1332 (Ct. Int'l Trade July 26, 2024) .................................................... 1

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*,
  968 F. Supp. 2d 1255 (Ct. Int'l Trade 2014) ................................................................ 6

Statutes

19 U.S.C. § 1516a(b)(1)(B) ........................................................................................... 6

19 U.S.C. § 1673........................................................................................................... 7

19 U.S.C. § 1673(2)(B)................................................................................................. 7

19 U.S.C. § 1673b(b)(3) ............................................................................................. 20

19 U.S.C. § 1673d(a)(4)............................................................................................. 20

19 U.S.C. § 1677b...................................................................................................... 2, 3

19 U.S.C. § 1677f-1 .................................................................................................... 17

19 U.S.C. § 1677f-1(a)................................................................................................ 17

19 U.S.C. § 1677f-1(b) ............................................................................................... 17

19 U.S.C §§ 1677a(a)................................................................................................... 7

Regulations

19 C.F.R. § 351.224(g)(1) .......................................................................................... 31

19 C.F.R. § 351.403(c)................................................................................................ 19

19 C.F.R. § 351.414(c)(1) ............................................................................................ 8

19 C.F.R. § 351.525(b)........................................................................................... 31, 32

Other Authorities

*Antidumping Duties; Countervailing Duties*, 96 Fed. Reg. 27,296 (Dep't of Commerce May 19,
  1997). ......................................................................................................................... 31

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to
  Request Administrative Review and Join Annual Inquiry Service List*, 88 Fed. Reg. 83,917,
  (Dep't of Commerce Dec. 1, 2023)............................................................................. 10

*Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277 (Dep't of
  Commerce May 19, 2025). .......................................................................................... 5

*Differential Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720 (May 9, 2014)........ 23

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*, 90 Fed. Reg. 30,050 (Dep't of Commerce July 8, 2025).............................................................. 5

*Light-Walled Rectangular Pipe and Tube From Mexico:  Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 15,665 (March 14, 2023) ........................... 30

*Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 43,290 (Dep't of Commerce July 7, 2023)................................................. 10

*Raw Honey from Argentina:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 Fed. Reg. 22,179 (April 14, 2022)  30

Statement of Administrative Action (SAA), H.R. Doc. No. 103-316, vol. 1 (1994) at 842, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178 ................................................................................ 8

*Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 33,351 (Dep't of Commerce June 4, 2013)...................................................................................................................... 9

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |  |
|---|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| UNITED STATES, | ) ) | Court No. 23-00113 |
| Defendant, | ) ) | |
| and | ) ) | |
| WHEATLAND TUBE COMPANY, | ) ) | |
| Defendant-Intervenor. | ) ) | |

**DEFENDANT'S CORRECTED REPLY TO COMMENTS ON REMAND REDETERMINATION**

Defendant, the United States, respectfully submits this response to the comments submitted by plaintiffs Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding and Formwork LLC (collectively, Universal) (ECF No. 62) (Univ. Cmts.), concerning the Department of Commerce's remand redetermination.  *See Final Results of Redetermination* (Jan. 16, 2026) (ECF No. 58-1) (P.P.R.R. 7) (Second Remand Redetermination).  As discussed below, the second remand redetermination complies with this Court's first and second remand orders, is supported by substantial evidence, and is in accordance with law.  *See Universal Tube and Plastic Industries, Ltd., et al. v. United States*, Court No. 23-00113 (Ct. Int'l Trade Jun. 17, 2025) (ECF No. 53) (Second Remand Order); *Universal Tube and Plastic Industries, Ltd., et al. v. United States*, 717 F. Supp. 3d 1332 (Ct.

Int'l Trade July 26, 2024) (ECF No. 38) (First Remand Order).  Accordingly, the Court should

sustain Commerce's remand redetermination.

## BACKGROUND

**I.      Administrative Determination under Review and Remand Order**

On February 4, 2022, Commerce initiated an administrative review of its antidumping

duty order on circular welded carbon-quality steel pipe from the United Arab Emirates.  *See*

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 91 Fed. Reg. 8,186,

8,189 (Dep't of Commerce Feb. 4, 2022) (P.R. 7).[1]  Commerce initially selected Universal for

individual examination as a mandatory respondent based on U.S. Customs and Border Protection

(CBP) data.  *See* Respondent Selection Memorandum (Mar. 18, 2022) (P.R. 22, C.R. 4).

On December 20, 2022, Commerce published its initial preliminary results.  *See Circular*

*Welded Carbon-Quality Steel Pipe from the United Arab Emirates:  Preliminary Results of*

*Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 79,862 (Dep't of Commerce

Dec. 20, 2022) (P.R. 104), and accompanying Preliminary Decision Memorandum (PDM) (P.R.

105).  In accordance with its practice for calculating the normal value for the subject

merchandise, Commerce excluded from its calculation sales made at less than the cost of

production.  19 U.S.C. § 1677b (b).  To calculate cost of production, Commerce normally

calculates an annual weighted-average cost for the period of review.  PDM at 23.  However, in

its preliminary results, Commerce concluded that Universal experienced significant cost changes

---

[1] Public documents on the administrative record are designated as "P.R." and confidential documents are designated as "C.R."  All P.R. and C.R. references in this brief cite to the administrative review record.  References to the public documents on the administrative record for the first remand redetermination are designated as "P.R.R."  References to the public documents on the administrative record for the second remand redetermination are designated as "P.P.R.R." and confidential documents are designated as "C.C.R.R."

from quarter to quarter during the administrative review and determined that a shorter cost-averaging period approach, based on a quarterly average cost of production was appropriate. PDM at 23-24.  Commerce therefore used quarterly weighted-average costs to determine the cost of production for each quarter to determine which sales to exclude from its calculation of the normal value.  *Id.*  Commerce also performed its differential pricing analysis of Universal's U.S. sales, pursuant to 19 U.S.C. § 1677f-1(d)(1)(B).  PDM at 10-12.

As a result of the differential pricing analysis, Commerce determined that 65.95 percent of the value of U.S. sales passed the Cohen's d test—the former first step of Commerce's price differential test.  PDM at 12.  Commerce applies its differential pricing analysis to determine which comparison method—average-to-average (A-A) or average-to-transaction (A-T)—is appropriate to fulfill its statutory mandate to unmask potential dumping.  Here, Commerce determined that for any U.S. sales that passed the Cohen's *d* test, it would then apply the A-T method to those U.S. sales and, for any sales that did not pass the Cohen's *d* test, Commerce would then apply A-A.  *Id.*

On May 4, 2023, Commerce published its final results, in which it continued to use the quarterly cost methodology and the A-T comparison method.  *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2020- 2021*, 88 Fed. Reg. 28,483 (Dep't of Commerce May 4, 2023) (P.R. 123), and accompanying Issues and Decision Memorandum (IDM) (P.R. 124).

Universal challenged Commerce's final results before this Court, arguing that it was inconsistent for Commerce to calculate cost of production on a quarterly basis as part as of its normal value calculation while also comparing sales across quarters for the purpose of its differential pricing analysis.  First Remand Order at 9-10.  The Court concluded that Commerce

3

had failed to explain why it was reasonable to compare prices across quarters for its differential pricing analysis while rejecting price comparisons across quarters in its normal value calculation. *Id.* at 16-18.  The Court remanded for reconsideration or further explanation.  *Id.* at 18.

## II.    First Remand Redetermination Proceedings

On August 29, 2024, Commerce issued draft remand results and invited interested parties to comment.  *See* First Draft Remand Redetermination (Aug. 29, 2024) (P.R.R. 1).  On September 5, 2024, Universal submitted draft remand comments.  *See* Universal First Draft Remand Cmts. (Sept 5, 2024) (P.R.R. 2).  After considering the draft remand comments, Commerce issued its remand results on September 23, 2024.  *See* First Remand Results, ECF No. 39.  Commerce explained that unlike how quarterly prices are used within Commerce's differential pricing test, "the quarterly cost test involves a more limited examination of a subset of U.S. prices, the purpose of which is to determine whether costs fluctuate significantly and does not determine the significance of the differences in U.S. prices."  *Id.* at 24.

While this Court was considering whether to sustain the first remand results in this case, on April 22, 2025, the Federal Circuit invalidated the application of Cohen's *d* test, a component of Commerce's differential pricing analysis.  After holding oral argument and considering the parties' comments on the First Remand Results, this Court remanded this case "for further proceedings in conformity with the CAFC's opinion in *Marmen*."  *See* Second Remand Order; *Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025).

## III.    Second Remand Redetermination Proceedings

Following the Federal Circuit's decision in *Marmen*, Commerce changed its differential pricing practice.[2]  Commerce first sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under 19 U.S.C. § 1677f-1(d)(1)(B)(i), to identify whether prices for comparable merchandise differ significantly among purchasers, regions, and time periods.  *Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277 (Dep't of Commerce May 19, 2025).  Then, to comply with the Federal Circuit's holding in *Marmen*, Commerce discontinued the use of the Cohen's *d* test in antidumping proceedings and adopted the "price difference" test as the new test for determining whether price differences among purchasers, regions, or time periods are significant.  *See, e.g.*, *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*, 90 Fed. Reg. 30,050 (Dep't of Commerce July 8, 2025), and accompanying issues and decision memorandum at 2-5 (applying the price difference test for the first time).

On December 30, 2025, Commerce issued its second draft remand results, applying the price difference test as part of its differential pricing analysis, and invited interested parties to comment.  *See* Second Draft Remand Redetermination (Dec. 30, 2025) (P.P.R.R. 1).

On January 9, 2026, Universal submitted comments on the second draft remand.  *See* Universal Second Draft Remand Cmts. (Jan. 9, 2026) (P.P.R.R. 6).  After considering the comments on the second draft remand, Commerce issued its second final remand results on January 16, 2026.  *See* Second Remand Redetermination.  In the second remand Redetermination, following its new practice, Commerce applied the "price difference" and

---

[2] *Marmen* had a profound effect on Commerce's practice, affecting hundreds of segments of antidumping proceedings.  Consistent with 19 U.S.C. § 1677f-1(d)(1)(B), because statistical assumptions discussed by the Federal Circuit in *Marmen* are unlikely to be valid in exporters' pricing data, the Federal Circuit's decision to condition the use of the Cohen's *d* test on such assumptions, rendering the Cohen's *d* test unusable in antidumping proceedings.

"ratio" tests to Universal's U.S. sales and found that "95.17 percent of the value of U.S. sales pass the price difference test, and {this} confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods." *Id.* at 7-8. Commerce then applied the meaningful difference test and found that the A-A method cannot account for differences in the respondent's pricing behavior in the U.S. market because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the A-A method and when calculated using the A-T method. *Id.* at 6-8. Commerce applied the A-T comparison method to Universal's U.S. sales and calculated a new estimated weighted-average dumping margin of 3.64 percent. *Id.* at 1-3.

Commerce also provided further explanation as to why it was reasonable to use same-quarter comparison when comparing normal value with U.S. price while using inter-quarter comparisons when comparing U.S. prices with other U.S. prices. *See* Second Remand Redetermination at 13-21.

## ARGUMENT

### I.    Standard of Review

The Court sustains any determination, finding, or conclusion found by Commerce unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B). This standard applies to remand redeterminations. *DynaEnergetics U.S. Inc. v. United States*, 298 F. Supp. 3d 1363, 1367-68 (Ct. Int'l Trade 2018). Remand redeterminations are also reviewed for compliance with the Court's order. *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014). Moreover, "'when an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard.'"

*Mosaic Co. v. United States*, 160 F.4th 1340, 1346 (Fed. Cir. 2025) (quoting *Seven Cnty.*

*Infrastructure Coal. v. Eagle Cnty., CO*, 605 U.S. 168, 179-80 (2025)).

**II.    Commerce's Application of Its Differential Pricing Practice Is Supported by Substantial Evidence and Is in Accordance with Law**

The Court remanded this case to allow for Commerce to reconsider its reliance on the

Cohen's *d* test in light of *Marmen*.  In this remand, Commerce identified a new analysis that

replaced the Cohen's *d* test—the price difference test—that squarely addresses the Federal

Circuit's concern in *Marmen*.  Commerce's second remand redetermination complies with this

Court's remand order, is lawful, and supported by substantial evidence.

**A.    Relevant Statutory Framework of Commerce's Differential Pricing Analysis Methodologies**

The Tariff Act of 1930, as amended, establishes a remedial regime to combat unfair trade

practices.  The antidumping provisions provide relief for domestic manufacturers by imposing

duties upon imports of foreign products that are sold in the United States at less than fair value.

19 U.S.C. § 1673.  Therefore, in an antidumping proceeding, Commerce must evaluate whether

imported products are sold in the United States at unfairly low prices.  19 U.S.C. § 1673; *see also*

*Union Steel v. United States*, 713 F.3d 1101, 1103 (Fed. Cir. 2013).  If Commerce concludes that

the U.S. sales are "at less than fair value"—meaning that the product is dumped into the U.S.

market, it will direct the United States Customs and Borders Protection (CBP) to assess an

"antidumping duty."  19 U.S.C. § 1673(2)(B).  A sale is at "less than fair value" when, in

general, the price charged in the U.S. market—the "U.S. price"—is less than the price charged in

the home market—the "{normal value}."  *See* 19 U.S.C. § 1677b(a)(l)(B)(i); 19 U.S.C

§§ 1677a(a), (b).  The antidumping duty is equal to the "amount by which the {normal value}

exceeds the {U.S. price} for the merchandise."  19 U.S.C. § 1673(2)(B).

In determining whether subject merchandise is being sold at less than fair value, Commerce generally employs two primary methods.  The first is the A-A method.  Commerce compares "the weighted average of the {normal values} to the weighted average of the {export prices (and constructed export prices)} for comparable merchandise" unless it determines another method is appropriate.  19 U.S.C. § 1677f-1(d)(1)(A)(i); 19 C.F.R. § 351.414(c)(1).

One downside of the A-A method is that it may fail to detect instances of  "masked" dumping, which may occur when an exporter sells at a dumped price to some customers, regions, or time periods, while selling at higher prices to other customers, regions, or time periods.  *See Stupp Corp. v. United States*, 5 F.4th 1341, 1345 (Fed. Cir. 2021) (Stupp 2021) (citing *Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1341 (Fed. Cir. 2017)).  When Commerce uses the A-A method, higher-priced U.S. sales can mask these lower-priced U.S. sales that are dumped, which could potentially leave the domestic industry without a remedy from unfair trade practices.  *See* Statement of Administrative Action (SAA), H.R. Doc. No. 103-316, vol. 1 (1994) at 842, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178 ("In part, the reluctance to use an average-to-average methodology has been based on a concern that such a methodology could conceal 'targeted dumping.'  In such situations, an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions.").  In an investigation, for example, if the full extent of dumping is masked, then the domestic industry may not receive the relief that the statute affords when the calculated weighted-average dumping margin based on the A-A method falls below the two percent *de minimis* threshold.

Congress addressed this problem by enacting 19 U.S.C. § 1677f-1(d)(1)(B).  *See Apex*, 862 F.3d at 1342.  Section 1677f-1(d)(1)(B) allows Commerce to compare "the weighted average of the {normal values} to {U.S. prices} of individual transactions for comparable

merchandise if (i) there is a pattern of {U.S. prices} for comparable merchandise that differ significantly among purchasers, regions or periods of time, and (ii) {Commerce} explains why such differences cannot be taken into account using {the A-A method or transaction-to-transaction method}." 19 U.S.C. § 1677f-1(d)(1)(B)(i)-(ii).  But Congress did not specify how Commerce was to determine whether there exists a pattern of prices that differs significantly among purchasers, regions, or time.  Nor did Congress mandate that Commerce must use statistical tests or techniques in determining if conditions specified in 19 U.S.C. § 1677f-1(d)(1)(B) exist.  The SAA explains that Commerce should proceed "on a case-by-case basis, because *small differences* may be significant for one industry or one type of product, but not for another."  SAA at 843 (emphasis added).

### B.    Commerce's Revised Differential Pricing Analysis

To determine whether there is a pattern of prices that significantly differs across purchasers, regions, or time periods, Commerce devised its "differential pricing analysis," and included a statistical methodology, the Cohen's *d*, test to test if prices differ significantly.[3]  *See Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 33,351, 33,352 (Dep't of Commerce June 4, 2013) and accompanying IDM at Comment 3; *Xanthan Gum from Austria*, 78 Fed. Reg. 33,354, 33,355 (Dep't of Commerce June 4, 2013).

On this second remand, Commerce abandoned its prior reliance on the Cohen's *d* test as part of its differential pricing analysis and instead adopted a price difference test that compares weighted-average prices across purchasers, regions, and time periods.  *See* Second Remand Redetermination at 3-8.  Commerce explained that using the revised approach—the price

---

[3] Commerce formerly also used a metric, called the "mixed comparison method," that is not included in its revised differential pricing analysis.  *See* below at 22-23.

difference test—does not depend on statistical assumptions regarding data distribution or variability and therefore addresses the concerns identified by the court in *Marmen*. *Id.* at 11; 134 F.4th at 1348. Commerce further explained how the revised methodology evaluates whether meaningful price differences exist and how these differences inform the subsequent stages of the differential pricing analysis. *Id.*

After this adoption of the revised approach, Commerce now employs a three-part test to address the statutory requirements under 19 U.S.C. § 1677f-1(d)(1)(B). In the first stage of the current differential pricing analysis, Commerce employs its own "price difference test" to determine whether prices differ significantly. *See* Second Remand Redetermination at 6. For comparable merchandise, the price difference test examines whether the weighted-average net price to a given purchaser, region, or time period is within two percent of the weighted-average net price to all other purchasers, regions, or time periods. *Id.* This is a mathematical test, not a statistical test like the Cohen's *d* test. *See id.*; *see also Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 43,290 (Dep't of Commerce July 7, 2023)*,* and accompanying PDM at 17 ("The Cohen's *d* coefficient is a generally recognized *statistical measure* of the extent of the difference between the mean (*i.e.*, weighted-average price) of a test group and the mean (*i.e.*, weighted-average price) of a comparison group.") (emphasis added). Commerce concluded the first step of this analysis by explaining that if:

> the weighted-average net price to the given purchaser, region, or time period falls outside of the plus or minus two percent band around the weighted average net price to all other purchasers, regions, or time periods, then the prices to that given purchaser, region, or time period are found to differ significantly and those

10

> sales to the given purchaser, region, or time period pass the price
> difference test.

Second Remand Redetermination at 6.

Next, the "ratio test" assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. *Id.* The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of U.S. sales by the respondent during the period of review. *Id.* If 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the A-T method. *Id.* If more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of prices existed during the period of review. *Id.* at 7. Consequently, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-A method and using the alternative A-T method. *Id.*

Then, if both tests in the first stage (*i.e.*, the price difference test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that the A-T method could be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the A-A method can account for such differences. *Id.* In considering this question, Commerce examines whether using the A-T method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-A method. *Id.* If the difference between the two calculations is meaningful, then this demonstrates that the A-A method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the A-T method may be appropriate. *Id.* A difference in the weighted-average dumping margins is considered meaningful if:  (1) there is a 25 percent relative change in the

11

weighted-average dumping margins between the A-A method and the A-T method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-A method and the A-T method move across the *de minimis* threshold.  *Id.*; *see also HiSteel Co., Ltd. v. United States*, 653 F. Supp. 3d 1341, 1348 (Ct. Int'l Trade 2023).

Thus, even if the sale prices of a particular test group pass the price difference test, it does not mean that Commerce will apply an alternative comparison method because the sales passing the price difference test must be sufficiently numerous to also pass the ratio test demonstrating that a pattern exists.  Furthermore, Commerce must determine that the standard A-A method cannot account for the price differences that are the result of the respondent's pricing behavior in the U.S. market.

> **C.     Commerce's Second Remand Redetermination Results Comply with *Marmen* and The Court's Remand Orders**

This Court remanded the issue of application of Cohen's *d* test as part of Commerce's differential pricing methodology for further proceedings in conformity with the Federal Circuit's decision in *Marmen*.  *See* Second Remand Order at 1.  Commerce's second remand results fully comply with *Marmen's* instructions.  134 F.4th at 1348.  Commerce "reconsidered its application of the Cohen's *d* test as part of its differential pricing analysis {and} {a}s a result of our analysis, we made revisions to Universal's margin calculations."  Second Remand Redetermination at 1.

Universal contends that Commerce's Second Remand Redetermination does not comply with the Court's order because was prohibited from replacing the Cohen's *d* test with the new mathematical test. Univ. Cmts. at 8 ("{T}he Court did not specifically instruct Commerce to discontinue the use of the Cohen's *d* methodology for differential pricing and simply choose another differential pricing path").  Universal's contentions are unfounded.  Commerce fully complied with the Court's remand instructions by reconsidering its differential pricing analysis

12

in light of *Marmen*, abandoning Cohen's *d* test which *Marmen* found lacking due to its reliance on particular data, and providing a reasoned explanation for its revised methodology. *Compare Marmen*, 134 F.4th at 1348, *with* Second Remand Redetermination at 1. Upon remand, Commerce identified a new analysis tool to replace the Cohen's *d* test—the price difference test —that squarely addresses the Federal Circuit's concern in *Marmen* by abandoning the realm of statistics and instead employing a simpler mathematical test. *Compare* Second Remand Redetermination at 3 *with Marmen*, 134 F.4th at 1348.

The Federal Circuit held that "Commerce may re-perform a differential pricing analysis, and that analysis may not rely on Cohen's *d* test for data sets like those here {*i.e.*, data that did not satisfy normal distribution, equally variable, and equally and sufficiently numerous observations}," and it also held that "Commerce {may}{} fashion{} and justify{}" a different analysis "as long as the *resulting analysis* is itself justified as sound for gauging differences in the data sets at issue." *Id*. (emphasis added). Additionally, in *Stupp Corp.*, the Federal Circuit remanded "to Commerce, which may re-perform a differential pricing analysis without relying on Cohen's *d*." *Stupp Corp. v. United States*, No. 2023-1663, 2025 WL 1178392, at *3 (Fed. Cir. April 23, 2025) (*Stupp 2025*); *see id.* at *2 n.1 (The Federal Circuit did not require Commerce to simply perform the average-to-average methodology, but it may instead, on remand, "re-perform a differential pricing analysis without using Cohen's *d*, which may result in the use of the average-to-transaction comparison or a hybrid methodology.").[4]

---

[4] To the extent that Universal suggests that considering the Federal Circuit's decision in *Stupp* was somehow improper, "{s}ince the remand order did not bar Commerce" from considering Federal Circuit precedent in line with *Marmen*, Commerce did not exceed the scope of the remand order. *Elkton Sparkler Co. v. U.S. Dept. of Com.*, 17 C.I.T. 344, 346 (Ct. Int'l Trade 1993)(discussing Commerce's ability to consider arguments brought to it in a remand proceeding); Univ. Cmts. at 8 ("nor . . . did the Court instruct Commerce to reconsider its differential pricing analysis in light of *Stupp*."). *Stupp 2025* is fully consistent with *Marmen*.

13

Thus, abandoning the pricing differential test is not only in line with this Court's second remand order, *Marmen,* and *Stupp*, it is required by them. Universal implies that Commerce has established some new statistical test that must rely on "normal distribution, equal variability, and equally and sufficiently numerous data." Univ. Cmts. at 9. But this is why Commerce adopted a simple mathematical test that does not rely on statistical principles, but instead it performs a simple pass or fail mechanism. *See* Second Remand Redetermination at 14-15 (explaining that Commerce is only seeking to find a "pattern" of differing sale prices exist across the three criteria).

Universal mischaracterizes both the scope of the remand and Commerce's obligations. The Court did not direct Commerce to abandon differential pricing altogether, nor did it prescribe any specific alternative methodology. *See* Second Remand Order at 1. Rather, the Court required Commerce to reconsider its analysis consistent with the CAFC's opinion in *Marmen*, in which the Federal Circuit explicitly permitted Commerce to replace Cohen's *d* test with a different test in conducting its differential pricing analysis. *Marmen*, 134 F.4th at 1348. Commerce did precisely that and complied with the remand order.

III.     **Commerce Lawfully Applied Its Differential Pricing Analysis in Evaluating Universal's U.S. Sales Prices on Remand**

Commerce lawfully applied the differential pricing analysis in evaluating Universal's U.S. sale prices. Commerce found that 95.71 percent of the value of U.S. sales pass the price difference test, confirming the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods. Second Remand Redetermination at 7-8 (citing Universal Draft Redetermination Analysis Memorandum (Dec. 30, 2025) at 2 (C.R.R.R. 1, P.P.R.R. 4). Applying the results of the differential pricing analysis overall, Commerce relied on the alternative comparison method based on the A-T method to all Universal's U.S. sales to calculate

14

Universal's weighted-average dumping margin.  *Id*. at 8.  Commerce determined that the A-A

method does not account for the pattern of prices that differ significantly (which indicates that

potential masked dumping may exist) because "there is a 25 percent relative change between the

weighted-average dumping margin calculated using the A-to-A method and the weighted-

average dumping calculated using the A-to-T method" where both rates are above the *de minimis*

threshold.  Second Remand Redetermination at 6-7.

### A.    Commerce Fully Explained Its Revised Differential Pricing Test

Universal's argument that Commerce failed to provide a full explanation supported by

substantial evidence of its new differential pricing is contradicted by the Federal Circuit's

application of the reasonableness standard in reviewing Commerce's selection of statistical tests

and numerical cutoffs.  *Compare* Univ. Cmts. 22-30, *with Stupp 2021*, 5 F.4th at 1353 ("Our

precedents make clear that the relevant standard for reviewing Commerce's selection of

statistical tests and numerical cutoffs is reasonableness."), *and Marmen*, 134 F.4th at 1338

(same).  As this Court concluded, "the {C}ourt's role is to ensure that the {agency's} action is

both reasonable and reasonably explained."  *BYD (H.K.) Co. v. United States*, 785 F. Supp. 3d

1359, 1377 (Ct. Int'l Trade 2025) (appeal pending) (quotation modified).

### 1.    Commerce's Statutory Authority To Devise A Differential Pricing Test

Here, there is an open-ended grant of authority through use of "general" statutory

language.  *See, e.g.*, *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United

States*, 102 F.4th 1252, 1260-61 (Fed. Cir. 2024)(*Asemesa*).  As the Federal Circuit has

recognized, the statute is often written in general terms because Congress is not "prescient" and

cannot anticipate in legislation all the factual and legal intricacies that may arise in each

proceeding.  *See Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 930 (Fed. Cir. 1984).

15

For this reason, Commerce has "broad discretion in executing the law" in line with the "general standards" set by Congress. *Smith-Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983) (decided one year prior to *Chevron*). Commerce's discretion to develop methodologies within its delegated authority to carry out general statutory directives is distinct from *Chevron* deference. *Accord Nexteel Co. v. United States*, 28 F.4th 1226, 1239 (Fed. Cir. 2022) ("Commerce has selected a methodology consistent with the statutory language, which we afford greater deference than under the *Chevron* framework") (citing *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996); *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367, 1374-75 (Fed. Cir. 2021). Therefore, terms such as "significant" are indefinite, open-ended, or general terms that implicitly delegate authority to Commerce and leave Commerce with flexibility. *Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d 1315, 1329 (Ct. Int'l Trade 2025). The provision at issue here, 19 U.S.C. § 1677f-1(d)(1)(B), is written in general terms that leave open-ended how Commerce may assess whether a "pattern" exists and whether prices differ "significantly"—indicating that Congress "intended to delegate the question of whether particular facts satisfy the statute's requirements to Commerce." *See Asemesa*, 102 F.4th at 1259.

This Court reached the same conclusion in *Garg Tube*, finding that "{t}he text of the statute and its legislative history indicate that Congress gave Commerce flexibility by its use of the one-ended term 'differ significantly.'" *Garg Tube Export LLP v. United States*, 740 F. Supp. 3d 1355, 1366-67 (Ct. Int'l Trade 2024) (citation omitted). As the Court explained, "Congress' mandate to Commerce to assess not merely whether prices differ, but whether they differ 'significantly' necessarily affords Commerce flexibility to assess the degree of difference depending on the particular context." *Id.* at 1367. This Court then observed that the SAA

16

provides that Commerce will proceed on a case-by-case basis, which confirms the flexibility provided by the words of the statute. *Id.* (citing SAA at 843). Finally, this Court found that the context in which the phrase "differ significantly" appears, alongside the subsection that allows Commerce to decline taking into account insignificant adjustments, 19 U.S.C. § 1677f-1(a), and another subsection that exclusively allows Commerce to select averages and statistically valid samples, 19 U.S.C. § 1677f-1(b), further confirms that Congress meant to afford the agency with flexibility and discretion. *Id.* Therefore, this Court held that "Congress delegated to Commerce the power to use its discretion when determining whether prices differ significantly under 19 U.S.C. § 1677f-1." *Id.* In line with this precedent, Commerce provided the Court a detailed decisional document that illuminates its reasonable decisional pathway.

### 2. Universal's Argument that Commerce Should Look To The Reasons Why Its U.S. Prices Might Fluctuate Has Been Rejected

Universal's argument that a "'pattern' exists within the meaning of the statute only when the record evidence allows Commerce to reject the hypothesis that any observed price differences reflect nothing more than random fluctuations" of U.S. prices due to market changes conflicts with Federal Circuit precedent. *Compare* Univ. Cmts. 22-23, *with JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015) (holding that Commerce is not required "to determine the reasons why there is a pattern of {export prices} for comparable merchandise that differs significantly among purchasers, regions, or time periods" in part because it would create a "tremendous burden on Commerce that is not required or suggested by the statute.").

Universal's argument, like the plaintiff in *Beijing*, that "here, the 'pattern' of price differences was caused by a valid commercial reason (i.e., not dumping), necessarily fails." *Beijing Tianhai Indus. Co., Ltd. v. United States*, 106 F. Supp. 3d 1342, 1352 (Ct. Int'l Trade 2015)(citing *JBF RAK LLC v. United States*, 991 F. Supp. 2d. 1343, 1355 (Ct. Int'l Trade 2014));

17

Univ. Cmts. at 18 (faulting poor data or flawed comparisons as leading to a false flag of potential dumping); *see* Second Remand Redetermination at 19 (discussing how variable production costs could cause prices to differ significantly but Commerce had no requirement to divine such a reason behind the costs fluctuation.); Second Remand Redetermination at 21.[5]

Universal's worry about its own "flawed {U.S. sales} data" is puzzling. Univ. Cmts. at 18. Presumably, Universal provided accurate data, and, as this Court has well explained "insofar as the trade laws are concerned, agreed-upon prices are always a matter of one's own choosing." *Golden Dragon Precise Copper Tube Group, Inc. v. United States*, 37 I.T.R.D. 1927, 2015 WL 4927515, at *8 (Ct. Int'l Trade 2015). Thus, Universal's U.S. prices are set on its own volition and part of a strategy in light of ever-changing market conditions.

Thus, Commerce need only to determine that there is a pattern of significant price differences and not divine the reason why. *See Borusan Mannesmann Boru Sanayi v. Ticaret A.S.*, 608 Fed. Appx. 948, 949 (Fed. Cir. 2015)("Nothing in the language of the statute requires Commerce to take the extra analytical step proposed by Borusan—consideration of Borusan's alternate explanations for the pricing patterns"). This includes any fluctuation for "increases in raw material costs." *Id*. Universal's arguments "impose on Commerce mandates beyond the express dictates of the statute" for "Commerce is under no obligation to consider evidence that factors other than targeted dumping may account for price patterns that the agency identifies through targeted dumping analyses." *Nan Ya Plastics Corp., Ltd. v. United States*, 128 F. Supp. 3d 1345, 1358 (Ct. Int'l Trade 2015).

---

[5] Universal also argues that Commerce did not comply with this Court's first remand order. Univ. Cmts. at 19. However, this Court ordered that Commerce should "reconsider or provide further explanation" as to its reliance on same-quarter comparisons and inter-quarter comparisons in the same review. First Remand Decision at 18. This is exactly what Commerce provided. Second Remand Redetermination at 18-21.

Universal next suggests that Commerce should not even conduct its comparison using time at all.  Universal Cmts. at 19-20.  However, the Federal Circuit has already affirmed Commerce's methodology that uses the full statutory criteria—purchasers, regions, and time periods— to determine what price differences might be occurring across any of these three. *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1325 (Fed. Cir. 2020) (Rejecting the argument that "Commerce's ratio test improperly aggregated sales across categories (purchasers, regions, or time periods) and that comparing aggregated sales across categories cannot be done to establish a pattern.").  The Court in Dillinger held that "{s}uch aggregation is not inconsistent with the statute" in upholding Commerce's ratio test.).

In the whole, Universal's argument that Commerce is required to determine why U.S. prices are differing across periods, purchasers, and time falls flatly against this precedent.

### B.    Commerce's Two Percent Benchmark Is Well Within Its Discretion to Establish

Universal's argument that "Commerce did not explain *with substantial evidence* why it chose a 'two percent' test" again conflates the standard of review and disregards both binding Federal Circuit precedent and Commerce's reasoned explanation for adopting this numerical threshold in the price difference test as a reasonable measure of significance.  *Compare* Univ. Cmts. at 24, *with Stupp 2021*, 5 F.4th at 1353, *Marmen*, 134 F.4th at 1338, *and* Second Remand Redetermination at 22-24.

In the second remand redetermination, Commerce explained the reasons for adopting this numerical threshold in the price difference test as a reasonable measure of significance.  *Id.* at 14-15; *see also Marmen*, 134 F.4th at 1338 (holding that the standard for reviewing numerical cutoffs is "reasonableness.").  Specifically, Commerce identified other areas of its practice like the arms-length test in 19 C.F.R. § 351.403(c) that embraced the two percent threshold.  The

19

arms-length test is designed to find sales that are not at arm's length and that fall outside the ordinary course of trade if the average, product-specific, comparison market prices to an affiliated customer are not within a range of 98 percent to 102 percent of the average, product specific, comparison market prices to unaffiliated customers (*i.e.*, a plus or minus a two-percent difference from the weighted-average price to unaffiliated customers). Second Remand Redetermination at 23-24.

Additionally, Commerce explained that under 19 U.S.C. § 1673b(b)(3) and 19 U.S.C. § 1673d(a)(4), "the *de minimis* threshold for an estimated weighted-average dumping margin in an investigation is two percent." *Id.* at 24.[6] Commerce added that this threshold is higher than the *de minimis* threshold in an administrative review, which suggests that the two percent threshold in an investigation is a more conservative measure. *Id.* at 24. Commerce further explained that it has synonymously referred to non-*de minimis* levels of dumping as a "significant amount of dumping." *Id.* (citing *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 84 Fed. Reg. 26,401 (Dep't of Commerce June 6, 2019), and accompanying issues and decision memorandum at comment 2 ("Under scenario (4), there is a significant (*i.e.*, non-*de minimis*) amount of dumping"). Commerce explained that if a two percent difference between U.S. price and normal value (typically a price in the comparison market) is sufficient to make an affirmative finding of sales at less than fair value (and impose antidumping duties if material injury is found by the International Trade Commission), then it is reasonable to

---

[6] This Court has affirmed Commerce past percentage gap test, in the context of a prior pricing differential test called the Nails test, when it justified the chosen percentage was used in other AD contexts to "measure significance for AD purposes." *Mid Continent Nail Corp. v. United States*, 712 F. Supp. 2d 1370, 1379 (Ct. Int'l Trade 2010).

conclude that a two-percent price difference is significant in the context of 19 U.S.C. § 1677f-1(d)(1)(B).  Second Remand Redetermination at 24.[7]

Moreover, in interpreting this term, this Court held that "{t}he word 'significantly' is an open-ended qualifier, akin to 'appropriate' or 'reasonable.'"  *Garg Tube*, 740 F. Supp. 3d at 1366-67 (citation omitted).  This Court explained that "Congress' mandate to Commerce to assess not merely whether prices differ, but whether they differ 'significantly' necessarily affords Commerce flexibility to assess the degree of difference depending on the particular context."  *Id*

Universal also argues that "'one size fits all' two-percent approach is not consistent with the 'case by case' approach mandated by the {SAA}."  Univ. Cmts. at 26.  The logical extension of Universal's argument is that the agency is prohibited from applying the same standard (*i.e.*, the same numerical threshold) in its analysis and must use some unspecified, yet distinct, numerical thresholds for each separate case.  Contrary to Universal's contentions, the revised differential pricing analysis already considers prices on a case-by-case basis and, thus, is consistent with language in the SAA.  Universal's argument ignores Commerce's explanation that the price difference test requires a comparison to case-specific averages dependent on the customer, region, and time period data provided by the respondent, specific to the period under examination and to the merchandise, and thus, the market under consideration.  Second Remand Redetermination at 19.  Moreover, far from adopting a "one size fits all" approach, Commerce

---

[7] The Federal Circuit has also affirmed Commerce's use of the *de minimis* threshold in the latter part of the differential pricing test – the meaningful difference test.  *Apex*, 862 F.3d at 1346.  *Apex* held that it reasonable to consider the *de minimis* threshold in Commerce's analysis under this statutory provision (albeit in a different part of Commerce's analysis).  *Id.* ("{W}e agree that the difference in the actual antidumping rates that would be assessed – below *de minimis* when calculated with the {A-to-A} methodology; above *de minimis* when calculated with an alternative methodology – indeed informs the question of whether the {A-to-A} methodology can adequately account for a pattern of significant price differences").

21

expressly stated that it "will continue to evaluate its approach in this area based on comments received and the application of the differential pricing analysis on a case-by-case basis" *Id.* at 5. Universal's argument that Commerce's differential pricing analysis fails to consider case-specific factors is unsupported.[8]

### C.  Commerce's Ratio and Meaningful Difference Tests Are Reasonable and Have Already Been Affirmed by The Federal Circuit

Universal argues that Commerce's ratio test and meaningful difference test are not supported by substantial evidence, again ignoring the Federal Circuit precedent and mistaking the correct standard of review. *Compare* Univ. Cmts. 27-30, *with Stupp 2021*, 5 F.4th at 1353 (holding that the appropriate standard is not substantial evidence, but reasonableness). Importantly, the Federal Circuit has sustained the ratio and meaningful difference tests. *Stupp 2021*, 5 F.4th at 1356 ("we affirm Commerce's use of the meaningful difference test."); *Id.* at 1355 ("we hold that Commerce's ratio test reasonably implements the statutory requirement"); *Dillinger*, 981 F.3d at 1325-26 (sustaining Commerce's ratio test as a reasonable interpretation of the statute); *Apex*, 862 F.3d at 1345-46 (finding Commerce's differential pricing analysis reasonable in addressing challenges to the meaningful difference test)*;* Univ. Cmts. at 27-28. Moreover, both *before and after* Commerce's revision of the differential pricing analysis pursuant to *Marmen*, the ratio test finds evidence that a pattern exists when more than 33 percent of the total sales value pass the price difference test, *i.e.*, these sales are at prices that differ significantly.

---

[8]  Belying its argument, Universal offered no industry-specific information, argument or analysis as to why using two percent threshold would not be appropriate with respect to its industry.

Indeed, Commerce has used the same 33 percent threshold in the "ratio test," to identify if there is a *pattern* of significant price differences even before it eliminated the mixed method. Universal seizes upon the elimination of the mixed method, formerly used in the ratio test, arguing that "Commerce has provided no justification for why this rational no longer applies". Univ. Cmts. at 28. However, Universal confuses both Commerce's former and current practice.

If more than 33 percent but less than 66 percent of the respondent's sales passed the now abandoned Cohen's *d* test, Commerce found that a pattern existed but formerly took a hybrid approach, applying the A-T method to those U.S. sales passing the Cohen's *d* test, and the A-A method to the remainder, but *only* if the meaningful difference test, the last step of the differential pricing analysis, was met. *See HiSteel Co., Ltd. v. United States*, 653 F. Supp. 3d 1341, 1348 (Ct. Int'l Trade 2023) (citing *Differential Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720 (May 9, 2014); *see also* Second Remand Redetermination at 4 (Commerce also "discontinued the . . . 'mixed method'").

Importantly, because 95.71 percent of the value of Universal's U.S. sales passed the price difference test and ratio test, the mixed comparison method, if it still existed, would not have altered the remand result. *See* Second Remand Redetermination at 29. This is what Universal fails to grasp. Univ. Cmts. at 28. Thus, this makes Universal's argument in consequential.

Additionally, despite Universal's concern about random fluctuations in its own U.S. prices effecting the price differences test, at least 33 percent of a respondent's U.S. sales must pass the ratio test before Commerce determines there is a pattern of U.S. prices that differ significantly. *Id.* at 23; Second Remand Redetermination at 24. Thus, Universal's claim that Commerce's revised differential pricing analysis is disputed by the fact that the overwhelming majority of Universal's U.S. sales passed the price difference test and the 33 percent threshold of

23

the ratio test. *Id.* Because some 90% passed the price difference test, this indicates that such differences were not simply random fluctuations of the U.S. sales price across the three statutory factors. Second Remand Redetermination at 29.

Departing from the mixed methodology also more closely aligns Commerce with the statute, which it was neither required nor prohibited by the statute to employ the mixed methodology. *See* 19 U.S.C. § 1677f-1(d)(1)(B) ("The administering authority *may* determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the {normal values} to the {export prices (or constructed export prices)} of individual transactions for comparable merchandise") (emphasis added); *see also Timken Co. v. United States*, 968 F. Supp. 2d 1279, 1290-91 (Ct. Int'l Trade 2014) ("{R}elying on the word 'may' in the statute . . . {t}he sufficiency test serves as a tool to guide Commerce's exercise of its discretion in choosing whether to depart from its normal practice of using the {A-A} methodology."). Thus, when Commerce discontinued the mixed method, replacing it with A-T method for all sales as a matter of administrative policy for all of its antidumping proceedings, including this remand, Commerce aligned its application of the alternative A-T method more closely with the statutory language.

As demonstrated, Commerce explained the revisions in its differential pricing analysis. The revised methodology (including elimination of the mixed method) more closely aligns with the language and purpose of 19 U.S.C. § 1677f-1(d)(1)(B), enabling Commerce to enhance the accuracy in calculations by addressing masked dumping more effectively. *Huvis Corp. v. United States,* 570 F.3d 1347, 1355 (Fed. Cir. 2009) (recognizing "improv{ing} accuracy" is generally a good reason for a change in methodology).

Nor is it a particularly new development.  Indeed, both the Federal Circuit and this Court have previously affirmed Commerce's application of the A-to-T method to all U.S. sales to "remedy" "masked dumping" under the *Nails* test, a predecessor to the differential pricing analysis.[9]  *See Apex*, 862 F.3d at 1349; *Samsung Electronics Co. v. United States*, 72 F. Supp. 3d 1359, 1375 (Ct. Int'l Trade 2015).  In *Samsung*, for example, this Court assessed whether Commerce's application of the A-to-T method to all U.S. sales under the *Nails* test was consistent with the statute.  *See id.* at 1373-76.  The plaintiffs in *Samsung* had argued (1) that Commerce could not apply the A-to-T method to U.S. sales not passing the *Nails* test because "the phrase 'such differences' does not apply to those other transactions that do not have such differences," *id.* at 1374, and (2) that the statute "'creates a strong presumption'" for using the A-to-A or T-to-T methodologies because the A-to-T methodology is a 'limited exception.'"  *Id.* at 1375.

This Court disagreed with the plaintiffs in *Samsung*.  Analyzing 19 U.S.C. §§ 1677f-1(d)(1)(B)(i) and (ii), the Court reasoned the statute establishes "preconditions that must exist before Commerce may apply the A-to-T methodology."  *Id.* at 1374-75.  It explained, however, that the statutory language, does not "instruct Commerce on how to apply the A-to-T methodology" after the preconditions are met.  Rather, 19 U.S.C. § 1677f-1(d)(1)(B) "permits Commerce to {apply the A-to-T method} without specifying whether those export prices or constructed prices must be drawn only from targeted sales."  *Id.* at 1375.  The Federal Circuit reached substantially the same conclusion in *Apex*, 862 F.3d at 1349.

---

[9]  Although the *Nails* test was at issue in *Samsung*, as explained earlier, the *Nails* test used a 33 percent threshold to determine whether there was a pattern of significant price differences, which is similar to Commerce's current differential pricing methodology.  *Compare Timken*, 968 F. Supp. 2d at 1283, *with Marmen*, 134 F.4th at 1345, *and Stupp 2021*, 5 F.4th at 1347.

Although Commerce has continued to refine various aspects of its differential pricing analysis over the years, the broad discretion conveyed in the statute remains the same.  Here, Universal does not identify any clear statutory language prohibiting Commerce from applying the A-to-T method to all U.S. sales under circumstances presented here or any unreasonableness in Commerce's decision to eliminate the mixed method and apply the A-to-T method to all U.S. sales.

IV.    **Commerce Fully Explained Using Same-Quarter Comparisons for Its Cost Averaging Methodology and Inter-Quarter Comparisons for Its Differential Price Test**

As a threshold matter, the Court did not specifically remand this issue, but Commerce addressed it in the context of its new meaningful difference test in part because Universal raised the issue in the second remand proceeding.  *See* Universal Second Draft Remand Cmts. at 8-17. Even if the Court determines Commerce should not have addressed it, it is substantively equivalent to Commerce's first remand redetermination, although it contains further explanation.

Universal objects to how Commerce analyzed price differences among time periods. Specifically, Universal argues that, in assessing existence of significant price differences among time periods, Commerce's Second Remand Redetermination impermissibly include comparisons of net selling prices in different quarters of the period of review and that Commerce's use of inter-quarter comparisons is internally inconsistent with Commerce's use of quarterly costs in calculating normal value.  *Id.* at 10, 13.  Importantly, Universal has not demonstrated that its sales passed the price difference test passed solely or primarily because of comparisons between quarters and did not provide the breakdown of sales that passed the test by each category.

Consistent with the Court's first remand order, Commerce provided further explanation as to why it was reasonable to only compare U.S. prices to normal value within the same quarter

and explained the reasonableness of also identifying U.S. prices that differ significantly among time periods by comparing U.S. prices also across quarters.  Second Remand Redetermination at 13.; First Remand Redetermination at 23-28.

Commerce explained that "{t}he kind of distortions that can result from significantly fluctuating production costs between two quarters within the POR are relevant in the separate 'context' of Commerce's margin calculations, namely in the determination of normal value, because price-based normal value is compared to cost in the sales-below-cost test, and constructed value-based normal value is based on cost."  Second Remand Redetermination at 13. The second remand redetermination further clarified that because of "{f}luctuating production costs, the determination of normal value, and the comparison of normal value with U.S. price is used to calculate a respondent's weighted-average dumping margin, and, thus, production costs are part of Commerce's determination whether the {A-A} method can account for any differences in a respondent's pricing behavior in the U.S. market"  Second Remand Redetermination at 13.  Commerce further explained that it "has resorted to quarterly cost-averaging periods and the resulting changes to its margin calculations, including limiting the normal value to the same quarter as the U.S. date of sale, *i.e.*, 'same-quarter comparisons,'" and, that "the quarterly cost methodology is part of the comparison methodology in an administrative review, whether based on A-to-A comparisons, A-to-T comparisons, or even transaction-to-transaction (T-to-T) comparisons."  *Id.* at 17.  Accordingly, in conducting the "meaningful difference" test, "Commerce is comparing two margin calculation approaches that *both use a "same-quarter comparison," i.e.*, two dumping margin calculations that *both* limit the normal value to the quarter of the U.S. date of sale as a result of the changes in the respondent's

27

production costs over the POR." *Id.* (emphasis in the original). Commerce further explained that in:

> the meaningful difference test, Commerce determines that the A-to-A method cannot account for the respondent's pricing behavior in the U.S. market, such result is *not* due to changes in the respondent's production costs over the POR, which have been controlled for in the underlying 'same-quarter comparisons' in each of the comparison methodologies (*i.e.*, the A-to-A method and an alternative comparison method based on A-to-T comparisons) examined in the meaningful difference test."

*Id.* at 17-18 (emphasis in the original).

Similarly, with respect to the price difference and ratio tests, Commerce explained that "the 'inter-quarter comparison' in the modified differential pricing test does not introduce potential distortions into Commerce's margin calculations, as there is no margin calculation performed as part of the differential pricing and ratio tests." *Id.* at 18. Regardless of whether cost fluctuations warrant the use of annual or quarterly cost averages in calculating normal value, neither the price difference test nor ratio test compares U.S. price to normal value. The two calculations, which we described in detail in our prior brief, *see* ECF No. 27 at 8-14, occur in different contexts. Comparing U.S. prices across quarters is not distortive in identifying a pattern of prices that differ significantly among time periods, but rather it is a reasonable way to effectuate the statutory directive. Second Remand Redetermination at 18; First Remand Results at 7, 27-28.

Universal next contends that Commerce's modified differential pricing analysis is internally inconsistent because Commerce relied on inter-quarter comparisons to identify a pattern of prices that differ significantly while limiting comparisons to within-quarter sales when calculating dumping margins. Universal Comments at 13-14.

28

Universal's disagreement with Commerce's reasoning does not render Commerce's explanation inadequate. Universal's argument fails to grapple with the explanations that Commerce provided and mischaracterizes Commerce's revised differential pricing methodology. Second Remand Redetermination at 13-18; *see also* First Remand Results at 11-16. Commerce explained that the differential pricing analysis operates as a preliminary assessment tool designed to identify whether "prices differ significantly among purchasers, regions, or time periods" to determine if conditions exist that may indicate masked dumping, rather than to calculate dumping margins themselves. Second Remand Redetermination at 14.

The differential pricing analysis is designed to identify potential patterns of prices that differ significantly among certain categories, whereas the dumping margin calculation is intended to ensure accurate price to price comparability between markets. These analytical steps serve distinct purposes within the overall dumping analysis. As Commerce stated, the pattern analysis functions as a "canary in the coal mine" that alerts Commerce to the possibility that price differences may exist among purchasers, regions, or time periods and, thus, conditions may exist for potential masked dumping. Second Remand Redetermination at 14-15.

Commerce specifically explained that the differential pricing analysis does not calculate dumping margins but instead evaluates whether price differences exist that may warrant the use of an alternative comparison methodology. Second Remand Redetermination at 19. In this context, Commerce reasonably compared weighted-average prices across multiple quarters to determine whether a pattern of price differences among time periods existed over the period of review. *Id.* Commerce further explained that this broader comparison is appropriate because price patterns may manifest across time periods and limiting the analysis to the same-quarter

29

comparisons could obscure meaningful differences.  Second Draft Remand at 7; Second Remand

Redetermination at 15.

Nothing in the statute requires Commerce to apply identical comparison criteria at each

stage of the differential pricing analysis.  To the contrary, the statute provides for different types

of inquiries (*e.g.*, whether price difference are significant, whether a pattern exists, or whether A-

to-A comparison method accounts for such differences) and grants Commerce discretion to

select methodologies for each analytical objective.  *See* 19 U.S.C. § 1677f-1(d)(1)(B)

(Commerce "may" apply the alternative methodology where statutory criteria are satisfied).

Courts have repeatedly upheld Commerce's practice of identifying patterns of price differences

without determining their causes.  *See JBF RAK*, 790 F.3d at 1368.

Because these analytical stages serve different purposes and this stage does not determine

the margin of dumping, Commerce reasonably employed broader comparisons (among quarters

of the period of review) to assess whether price differences in U.S. prices differed significantly

among time periods.  Accordingly, Commerce reasonably explained that its use of the inter-

quarter comparisons in certain components of the differential pricing analysis is not inconsistent

with its same-quarter comparisons of U.S. price and NV in margin calculations.[10]  Commerce's

---

[10]  Moreover, Commerce's explanation is consistent with its practice of using an inter-quarter comparison in its differential pricing analysis while using various cost averaging periods (*e.g.*, monthly, quarterly, annual) depending on the circumstances of the segment.  *Compare Raw Honey from Argentina:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 Fed. Reg. 22,179 (April 14, 2022) (Final Determination), and accompanying IDM at Cmts. 3, 6 (using an inter-quarter comparison in the differential pricing analysis while using monthly averages to determine quarterly and annual costs); *and Light-Walled Rectangular Pipe and Tube From Mexico:  Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 15,665 (March 14, 2023) (Final Determination), and accompanying IDM at Cmts. 6, 15 (using an inter-quarter comparison in the differential pricing analysis and a quarterly cost methodology).

explanation reflects a permissible exercise of its methodological discretion, is supported by substantial evidence, and directly addresses the concerns raised in Universal's Comments.

Finally, Universal argues that this "Court should instruct Commerce that to the degree that Commerce tontines to apply its new price different test . . ., Commerce must limit is consideration . . . to those comparisons where the prices differ by at least 25 percent." Univ. Cmts. at 29. But Court does not have the power to order specific relief when it finds that Commerce lacks substantial evidence. Rather, the Court may only remand for reconsideration of the evidence or to open the record. *See Seven Cnty.*, 605 U.S. at 169 (explaining that under the arbitrary-and-capacious standard of review "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices . . .. Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness.").

Regardless of Universal's defiance of this standard, Universal's argument is flawed. Universal argues that instead of a two percent test for its price differences test, Commerce should adopt a 25 percent threshold. Univ. Cmts. at 28-29. Universal posits that this 25 percent threshold is supported by looking to the threshold for ministerial errors in dumping margins in other areas of Commerce's antidumping duty practice. However, this argument is misplaced because a specific regulation, 19 C.F.R. § 351.224(g)(1), creates that 25 percent framework to address errors, and their impact on rates, for correcting rates in the preliminary determinations.[11] *See* Univ. Cmts. at 29. Similarly, Universal's references to 19 C.F.R. § 351.525(b) for more

---

[11] A higher threshold for correcting or amending preliminary determinations is appropriate, given that ministerial errors regardless of their magnitude can be corrected in the final and amended final determinations. *Antidumping Duties; Countervailing Duties*, 96 Fed. Reg. 27,296, 27,327 (Dep't of Commerce May 19, 1997).

support to its 25 percent threshold is wishes this Court to impose are also unconvincing, *id.,* as section 351.525(b)(6)(v) refers to "substantial" rather than "significant" and does not apply to antidumping margins.  Rather, 19 C.F.R. § 351.525(b)(6)(v) contemplates a test for subsidy attribution of the purchase of utility products in countervailing duty cases.  Thus, contrary to Universal's argument, Commerce's selection of a two-percent test, instead of a twenty-five percent test, is a reasonable methodology.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand redetermination and enter judgment in favor of the United States.

<div style="margin-left:50%;">

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

s/ Tate N. Walker
TATE N. WALKER
Commercial Litigation
Branch U.S. Department of
Justice  Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C., 20044
Tel: (202) 307-0163
Email: tate.walker@usdoj.gov

</div>

OF COUNSEL:
PAUL THORNTON
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20230

May 18, 2026                              *Attorneys for Defendant*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limitation of Court of International

Trade Standard Chambers Procedures § 2(B)(1) and contains 9,480 words, excluding the parts of

the brief exempted from the word limitation.  In preparing this certificate of compliance, I have

relied upon the word count function of the word processing system used to prepare the brief.

<u> s/ Tate N. Walker</u>