**Slip Op. 26-98**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES, LLC, and KHK SCAFFOLDING & FORMWORK, LLC,**<br><br>**Plaintiffs,**<br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant,**<br>**and**<br><br>**WHEATLAND TUBE COMPANY,**<br><br>**Defendant-Intervenor.** | **Before: Jennifer Choe-Groves, Judge**<br><br>**Court No. 23-00113** |

**OPINION AND ORDER**

[Sustaining the U.S. Department of Commerce's Second Remand Redetermination.]

Dated: August 19, 2026

Robert G. Gosselink, Jonathan M. Freed, and MacKensie R. Sugama, Trade Pacific, PLLC, of Washington, D.C., for Plaintiffs Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries, LLC, and KHK Scaffolding & Formwork, LLC.

Tate N. Walker, Trial Attorney, Commercial Litigation Branch, U.S. Department of Justice, Civil Division, of Washington, D.C., for Defendant United States. With

him on the brief were Brett A. Shumate, Assistant Attorney General, Patricia M. McCarthy, Director, and Claudia Burke, Deputy Director. Of counsel on the brief was Paul H. Thornton, III, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C. Vania Y. Wang, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C., also appeared.

Roger B. Schagrin, Luke A. Meisner, and Alessandra A. Palazzolo, Schagrin Associates, of Washington, D.C., for Defendant-Intervenor Wheatland Tube Company. Maliha Khan, Schagrin Associates, of Washington, D.C., also appeared.

Choe-Groves, Judge: This action concerns the final determination published by the U.S. Department of Commerce ("Commerce") in the administrative review on the antidumping duty order on circular welded carbon-quality steel pipe from the United Arab Emirates. See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates ("Final Determination"), 88 Fed. Reg. 28,483 (Dep't of Commerce May 4, 2023) (final results of antidumping duty administrative review; 2020–2021), ECF No. 22-4, and accompanying Issues and Decision Memorandum for the Final Results of the 2020–2021 Administrative Review of the Antidumping Duty Order on Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates (Dep't of Commerce Apr. 27, 2023) ("Final IDM"), ECF No. 22-5.

Before the Court are Commerce's Final Results of Redetermination Pursuant to Court Remand ("Second Remand Redetermination"), ECF No. 58-1. On second remand and pursuant to the Court's remand order following the U.S. Court of

Appeals for the Federal Circuit's ("CAFC") opinion in Marmen Inc. v. United States ("Marmen III"), 134 F.4th 1334 (Fed. Cir. 2025), Commerce reformulated its differential pricing analysis and provided further explanation as to why it was reasonable to apply the "inter-quarter comparison" and the "same-quarter comparison" in the same administrative review. See Second Remand Redetermination; Order (June 17, 2025), ECF No. 53; see also Final Results of Redetermination Pursuant to Court Remand ("Remand Redetermination"), ECF No. 39-1; Marmen Inc. v. United States ("Marmen I"), 45 CIT __, 545 F. Supp. 3d 1305 (2021); Marmen Inc. v. United States, ("Marmen II"), 47 CIT __, 627 F. Supp. 3d 1312 (2023); Marmen Inc. v. United States, ("Marmen IV"), 50 CIT __, No. 20-00169, 2026 WL 1726609 (June 15, 2026).

For the following reasons, the Court sustains the Second Remand Redetermination.

## BACKGROUND

The Court presumes familiarity with the underlying facts and procedural history of this case and recites the facts relevant to the Court's review of the Second Remand Redetermination. See Universal Tube & Plastic Indus., Ltd. v. United States ("Universal Tube I"), 48 CIT __, 717 F. Supp. 3d 1332 (2024).

Commerce conducted an administrative review into circular welded carbon-quality steel pipe from the United Arab Emirates for the period covering December

1, 2020, through November 30, 2021. Initiation of Antidumping and Countervailing Duty Administrative Reviews, 87 Fed. Reg. 6487, 6492 (Dep't of Commerce Feb. 4, 2022), PR 7.[1] In the Final Determination, Commerce assigned a weighted-average dumping margin of 2.63% to Universal Tube and Plastic Industries, Ltd. ("Plaintiff" or "Universal").[2] 88 Fed. Reg. at 28,484. Commerce calculated the cost of production using the "same-quarter comparison" and the "inter-quarter comparison" to determine whether there was a pattern of export prices that differed significantly across purchasers, regions, or time periods in its differential pricing analysis. Final IDM at 10–11, 14–15.

The Court remanded in Universal Tube I for Commerce to reconsider or further explain its use of the "inter-quarter comparison" and the "same-quarter comparison" in the same administrative review and held that Commerce's internally-inconsistent determinations were not in accordance with law. 48 CIT at

---

[1] Citations to the administrative record reflect the public administrative record ("PR"), remand public administrative record ("RPR"), and second remand public record ("SRPR") document numbers in this case, ECF Nos. 35, 47, 68.

[2] Commerce collapsed Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries, LLC, and KHK Scaffolding & Formwork, LLC into a single entity, Universal, in a prior investigation and treated Universal as one respondent. See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates, 81 Fed. Reg. 36,881, 36,881 (Dep't of Commerce June 8, 2016) (affirmative preliminary determination of sales at less than fair value and postponement of final determination). For the current period of review, Commerce continued to collapse Universal. See 2020–2021 Antidumping Duty Administrative Review of Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Selection of Respondents for Individual Examination (Mar. 18, 2022) at 1 n.2, PR 22.

__, 717 F. Supp. 3d at 1340. In Marmen III, the CAFC vacated and remanded Marmen II for Commerce to fashion a differential pricing analysis that did not rely on the Cohen's *d* test. 134 F.4th at 1343–48. Commerce discontinued its use of the Cohen's *d* test and reformulated its differential pricing analysis to consist of three steps: (1) a new "price difference test" in place of the prior Cohen's *d* test; (2) the "ratio test;" and (3) the "meaningful difference test." Second Remand Redetermination at 3–7. Commerce's new analysis revised the margin calculation for Universal, which resulted in a weighted-average dumping margin of 3.64%. Id. at 1–2. Commerce also provided further explanation as to why it was reasonable to apply the "inter-quarter comparison" and the "same-quarter comparison" in the same administrative review. Id. at 13–20.

## JURISDICTION

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting the final results of an administrative review of an antidumping duty order. The Court shall hold unlawful any determination found to be unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). The Court also reviews determinations made on remand for compliance with the Court's remand order. Ad Hoc Shrimp Trade Action Comm.

v. United States ("Ad Hoc Shrimp"), 38 CIT 727, 730, 992 F. Supp. 2d 1285, 1290 (2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

**DISCUSSION**

To comply with the CAFC's opinion in Marmen III, Commerce discontinued its use of the Cohen's *d* test and replaced it with a new "price difference test" for evaluating whether price differences are significant among purchasers, regions, or time periods, which is the first step of Commerce's differential pricing analysis. Second Remand Redetermination at 3–6. Commerce adopted the "price difference test" as step one of its differential pricing analysis in the Second Remand Redetermination as follows:

> The differential pricing analysis used in these preliminary results examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods. The analysis evaluates all U.S. sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists. If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the [average-to-average ("A-to-A")] method to calculate the weighted-average dumping margin. The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise. Purchasers are based on the reported consolidated customer codes. Regions are defined using the reported destination code (*i.e.*, ZIP code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau. Time periods are defined by the quarter within the period of review based upon the reported date of sale. For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number and all

> characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between [export price (or constructed export price)] and [normal value] for the individual dumping margins.
>
> In the first stage of the differential pricing analysis used here, the "price difference test" is applied to determine whether prices differ significantly. For comparable merchandise, the price difference test examines whether the weighted-average net price to a given purchaser, region, or time period is within [2%] of the [weighted-average] net price to all other purchasers, regions, or time periods. If the weighted-average net price to the given purchaser, region, or time period falls outside of the plus or minus [2%] band around the weighted-average net price to all other purchasers, regions, or time periods, then the prices to that given purchaser, region, or time period are found to differ significantly and those sales to the given purchaser, region, or time period pass the price difference test.
>
> Next, the "ratio test" assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the period of review. If [33%] or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the [average-to-transaction ("A-to-T")] method. If more than [33%] of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of prices existed during the period of review. Consequently, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-to-A method and using the alternative A-to-T method.
>
> If both tests in the first stage (*i.e.*, the price difference test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that the A-to-T method could be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the A-to-A method can account for such differences. In considering this question, Commerce examines whether using the A-to-T method yields a meaningful difference in the

> weighted-average dumping margin as compared to that resulting from the use of the A-to-A method. If the difference between the two calculations in meaningful, then this demonstrates that the A-to-A method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the A-to-T method may be appropriate. A difference in the weighted-average dumping margins is considered meaningful if: (1) there is a [25%] relative change in the weighted-average dumping margins between the A-to-A method and the A-to-T method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-to-A method and the A-to-T method move across the *de minimis* threshold.

Id. at 5–7.

Commerce determined that 95.71% of the value of U.S. sales for Universal passed the "price difference test." Id. at 7. Commerce determined that this percentage confirmed the existence of a pattern of prices that differed significantly among purchasers, regions, or time periods. Id. at 7–8. In the Second Remand Redetermination, Commerce determined that the A-to-A method could not account for such differences because there was "a [25%] relative change between the weighted-average dumping margin calculated using the A-to-A method and the weighted-average dumping [margin] calculated using the A-to-T method." Id. at 8. Accordingly, Commerce applied the A-to-T method to calculate the weighted-average dumping margin for Universal. Id.

Universal argues that the Second Remand Redetermination did not follow the Court's remand instructions. Cmts. Univ. Tube Plastic Indus. Ltd. THL Tube Pipe Indus. LLC KHK Scaffolding Formwork LLC Opp'n U.S. Dept. Commerce's

Remand Redetermination ("Pls.' Br.") at 7–10, ECF No. 62. Universal contends that Commerce did not provide a rational basis for the "price difference test" and that the "price difference test" and differential pricing analysis are arbitrary and unsupported by evidence. Id. at 22–30. Universal avers that Commerce's Second Remand Redetermination impermissibly included in the differential pricing analysis comparisons of net selling prices in different quarters of the period of review. Id. at 10–22.

Universal agrees that Commerce correctly relied on quarterly cost and sales comparison methodologies because of significant changes in costs of production during the period of review. Id. at 10–13. However, Universal asserts that Commerce's differential pricing analysis, which compared selling prices across period of review quarters, conflicts with Commerce's quarterly price comparison approach. Id. at 13–19.

Defendant United States ("Defendant") maintains that Commerce's application of its differential pricing analysis is supported by substantial evidence and in accordance with law. Def.'s Reply Cmts. Remand Redetermination ("Def.'s Br.") at 7–26, ECF No. 66. Defendant argues that Commerce fully explained its decision to use the "same-quarter comparison" for its cost averaging methodology and "inter-quarter comparison" for its differential pricing analysis. Id. at 26–32. Defendant-Intervenor Wheatland Tube Company contends that Commerce

complied with the Court's remand instructions and correctly applied both its quarterly cost methodology and its "price difference test." Def.-Interv.'s Cmts. Supp. Final Results Redetermination Pursuant Court Remand at 1–4, ECF No. 65.

## I. Commerce's Application of the "Same-Quarter Comparison" and the "Inter-Quarter Comparison"

This Court remanded to Commerce to "reconsider or provide further explanation" why it was reasonable to apply the "inter-quarter comparison" and the "same-quarter comparison" in the same administrative review. Universal Tube I, 48 CIT at __, 717 F. Supp. 3d at 1340. In holding that Commerce's internally-inconsistent determinations were not in accordance with law, the Court stated:

> Similar to [NSK Ltd. v. United States, 390 F.3d 1352 (Fed. Cir. 2004)], Commerce here must either make consistent determinations, or reasonably explain any inconsistency in why Commerce should be permitted to calculate Universal's cost of production using the "same-quarter comparison," while then comparing the sales prices of U.S. sales made in different quarters using the "inter-quarter comparison" for purposes of Commerce's differential pricing analysis. Commerce's explanation that Universal's costs and prices changed so significantly from quarter to quarter that Commerce had to deviate from calculating the cost of production using an annual weighted-average costs because of possible distortions suggests that applying the "same-quarter comparison" is inconsistent with Commerce's later "inter-quarter comparison" analyzing sales prices made in different quarters for the differential pricing analysis. The Court observes that if Commerce's comparison of costs and prices would lead to distortive results because of significant fluctuations from quarter to quarter, thus justifying the "same-quarter comparison" examining sales prices only within specific quarters, it does not follow that costs and prices from sales in different quarters should be compared across quarters (the "inter-quarter comparison") in a different segment of the administrative review.

Id.

Commerce explained why it was reasonable to only compare U.S. prices to normal value within the same quarter and explained the reasonableness of identifying U.S. prices that differ significantly among time periods by comparing U.S. prices across quarters. Second Remand Redetermination at 13. Commerce stated that "[t]he kind of distortions that can result from significantly fluctuating production costs between two quarters within the [period of review] are relevant in the separate 'context' of Commerce's margin calculations, namely in the determination of normal value, because price-based normal value is compared to cost in the sales-below-cost test, and constructed value-based normal value is based on cost." Id. Commerce stated that production costs are part of Commerce's determination whether the A-to-A method can account for any differences in a respondent's behavior in the U.S. market under the "meaningful difference" requirement of 19 U.S.C. § 1677f-1(d)(1)(B)(ii) because "[f]luctuating production costs, the determination of normal value, and the comparison of normal value with U.S. price [are] used to calculate a respondent's weighted-average dumping margin[.]" Id. Commerce determined, however, that fluctuating productions costs "do not introduce distortions into the comparison of U.S. prices with other U.S. prices in the ['price difference test' and 'ratio test'] performed under [19 U.S.C. § 1677f-1(d)(1)(B)(i)]." Id.

Plaintiffs argue that Commerce's Second Remand Redetermination impermissibly included in the differential pricing analysis comparisons of net selling prices in different quarters of the period of review. Pls.' Br. at 10. Plaintiffs contend that the Second Remand Redetermination is inconsistent and arbitrary because Commerce compared the selling prices of Universal's U.S. sales across the four quarters of the period of review in the "price difference test" after Commerce had already concluded that the selling prices of sales made in different period of review quarters could not be compared for purposes of calculating Universal's dumping margin. Id. at 17. Specifically, Plaintiffs assert that:

> Commerce defined purchasers based on Universal's reported consolidated customer codes, and compared Universal's sales to individual customers to Universal's sales to all customers through the [period of review] regardless of when the sales occurred. Commerce determined regions based on Universal's zip codes, and compared Universal's sales to certain regions to Universal's sales to all regions through the [period of review] regardless of when the sales occurred. Finally, Commerce defined time periods by the quarter within the [period of review] based upon the U.S. data of sale, and compared Universal's sales made in individual quarters to Universal's sales made in all the remaining quarters of the [period of review].

Id. at 16 (emphasis and internal citations omitted).

Commerce determined that it was reasonable to use the "inter-quarter comparison" method in the "price difference test" and the "same-quarter comparison" method in the margin calculation, given the different purposes of each in Commerce's dumping analysis, because only the margin calculations have

distortions due to significant cost fluctuations justifying the "same-quarter comparison" method. Second Remand Redetermination at 21. Commerce explained that the "the comparison of U.S. prices between quarters within the [period of review], *i.e.*, 'inter-quarter comparisons,' or between purchasers or regions, introduces no 'distortions' in the results of Commerce's margin calculations." Id. at 16. Commerce reasoned that if the "inter-quarter comparison" "reveals significant differences in U.S. prices between different quarters of the [period of review], or purchasers or regions," then there is a reasonable indication that "conditions exist where masked, or 'targeted,' dumping may be occurring, warranting further investigation." Id. (emphasis omitted). Commerce stated that the "pattern requirement" of the differential pricing analysis, as determined through the "price difference test" and "ratio test," does not impact Commerce's individual margin calculations because "there is no normal value involved in the ['price difference test' or 'ratio test'] and no comparison of U.S. price with normal value." Id. at 15. Commerce explained that the "inter-quarter comparison" in the differential pricing analysis "does not introduce potential distortions into Commerce's margin calculations, as there is no margin calculation performed as part of the ['price difference' and 'ratio test']." Id. at 18.

Additionally, Commerce cited to JBF RAK LLC v. United States ("JBF RAK"), 790 F.3d 1358 (Fed. Cir. 2015) as support that it was reasonable to apply

the "inter-quarter comparison" and the "same-quarter comparison" in the same administrative review "because the cause(s) of price differences observed as part of the pattern requirement need not be discerned." Id. at 18–19.[3] Commerce explained that "[b]ecause the reason why a firm's prices differ significantly are simply not relevant under Commerce's analysis pursuant to [19 U.S.C. § 1677f-1(d)(1)(B)], these reasons, whatever they may be, cannot distort this analysis and its results." Id. at 20–21.

Commerce determines antidumping duties by calculating the amount by which the normal value of subject merchandise exceeds the export price or the constructed export price for the merchandise. 19 U.S.C. § 1673. When reviewing antidumping duties in an administrative review, Commerce must determine: (1) the normal value and export price or constructed export price of each entry of the subject merchandise; and (2) the dumping margin for each such entry. Id. at §§ 1675(a)(1)(B), (a)(2)(A). The statute dictates the steps by which Commerce

---

[3] In JBF RAK, the CAFC concluded that: "Section 1677f–1(d)(1)(B) does not require Commerce to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods, nor does it mandate which comparison methods Commerce must use in administrative reviews. As a result, Commerce looks to its practices in antidumping duty investigations for guidance. Here, the [court] did not err in finding there is no intent requirement in the statute, and we agree with the [court] that requiring Commerce to determine the intent of a targeted dumping respondent 'would create a tremendous burden on Commerce that is not required or suggested by the statute.'" (internal quotation marks and citation omitted). 790 F.3d at 1368.

shall calculate normal value "to achieve a fair comparison" with the export price or constructed export price. Id. at § 1677b(a).

The statute specifies the methodology by which Commerce determines which sales should be considered and disregarded in calculating normal value. Normal value is "the price at which the foreign like product is first sold . . . in the exporting country . . . in the ordinary course of trade[.]" Id. at § 1677b(a)(1)(B)(i). Sales outside of the ordinary course of trade are excluded from normal value. "Ordinary course of trade" is defined in Section 1677(15) as excluding: (1) sales made at less than the cost of production, and (2) sales that cannot be compared properly with the export price or constructed export price due to a particular market situation. Id. at §§ 1677(15)(A), (C). Section 1677b(b) requires Commerce to disregard sales that are made below the cost of production when determining normal value. Id. at § 1677b(b).

Commerce determines whether subject merchandise is being sold at less than fair value through specified methodologies enumerated in 19 U.S.C. § 1677f-1(d). Section 1677f-1(d)(1)(B) provides an exception to the methodologies outlined in Section 1677f-1(d)(1)(A), when Commerce may resort to the A-to-T method if "there is pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time," and Commerce explains "why such differences cannot be taken

into account using a method described in paragraph (1)(A)(i) or (ii)." Id. at § 1677f-1(d)(1)(B). Commerce's "price difference test" determines whether prices differ significantly and the "ratio test" assesses the extent of the significant price differences as measured by the "price difference test." See Second Remand Redetermination at 6–7.

Sections 1677b(b) and 1677f-1(d)(1)(B) concern "normal value" but the two sections have different purposes. Section 1677b(b) states a specific goal of disregarding sales made at less than the cost of production in calculating the amount by which the normal value of subject merchandise exceeds the export price or constructed export price, while Section 1677f-1(d)(1)(B) permits Commerce to resort to the A-to-T method to determine whether subject merchandise is being sold at less than fair value if there is a pattern of export prices that differ significantly. See 19 U.S.C. §§ 1677b(b), 1677f-1(d)(1)(B). A distortion resulting from fluctuating production costs between two quarters within the period of review is relevant to Commerce's margin calculation because Commerce is determining whether to disregard sales that were made below the cost of production pursuant to 19 U.S.C. § 1677b(b). In identifying such sales, it is reasonable for Commerce to account for a distortion resulting from comparisons between same-quarter production costs and same-quarter sales prices. While the A-to-T method involves

the normal value, the differential pricing analysis itself is independent of the normal value.

Resorting to the "same-quarter comparison" methodology due to fluctuating production costs when calculating dumping margins has an impact on the normal value determination, whereas the "inter-quarter comparison" method has no impact on the normal value determination. Commerce described the use of inter-quarter comparisons as the "initial warning sign" phase of the differential pricing analysis, akin to comparing U.S. prices between purchasers and regions. Second Remand Redetermination at 15. This phase demonstrates "whether conditions exist where masked dumping might occur" and is distinct from Commerce's use of the same-quarter comparison. Id. Commerce's application of the "inter-quarter comparison" and the "same-quarter comparison" in the same administrative review is in accordance with law.

Accordingly, the Court concludes that Commerce reasonably explained why it was appropriate to apply the "inter-quarter comparison" and the "same-quarter comparison" in the same administrative review in accordance with the Court's remand instructions in Universal Tube I. Ad Hoc Shrimp, 38 CIT at 730, 992 F. Supp. 2d at 1290.

## II. Reasonableness of Commerce's Differential Pricing Analysis

The relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness. See Stupp Corp. v. United States ("Stupp"), 5 F.4th 1341, 1353 (Fed. Cir. 2021) ("Our precedents make clear that the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness, not substantial evidence.") (citing Mid Continent Steel & Wire, Inc. v. United States, 940 F.3d 662, 667 (Fed. Cir. 2019) ("In carrying out its statutorily assigned tasks, Commerce has discretion to make reasonable choices within statutory constraints."); Apex Frozen Foods Priv. Ltd. v. United States ("Apex Frozen Foods"), 862 F.3d 1337, 1346 (Fed. Cir. 2017) (holding Commerce's "meaningful difference" test to be "reasonable")). Further, the CAFC applied a "reasonableness" standard in evaluating whether it was "unreasonable for Commerce to use [the] Cohen's *d* test as part of its differential pricing analysis[.]" Marmen III, 134 F.4th at 1345. Accordingly, the Court reviews Commerce's Second Remand Redetermination and its "price difference test" under the reasonableness standard.

Commerce shall determine whether subject merchandise is being sold at less than fair value:

> (i) by comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise, or

> (ii) by comparing the normal values of individual transactions to the export prices (or constructed export prices) of individual transactions for comparable merchandise.

19 U.S.C. § 1677f-1(d)(1)(A). Section 1677f-1(d)(1)(B) provides an exception, when Commerce:

> may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—
>
> (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and
>
> (ii) the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).

Id. at § 1677f-1(d)(1)(B).

Congress implemented subsection (d) to address the concern that the A-to-A method for calculating dumping margins "could conceal 'targeted dumping.'" Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1 at 842–83 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4177–78 ("SAA"). Under subsection (d), Commerce is allowed to calculate dumping margins using the A-to-T method in situations when the A-to-A method "cannot account for a pattern of prices that differ significantly among purchasers, regions, or time periods, i.e., where targeted dumping may be occurring[,]" but only after Commerce first "establish[es] and provide[s] an explanation why it

cannot account for such differences through the use of [the A-to-A method]." Id. at 4178 (emphasis omitted). The SAA provides that "Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another." Id. "The rationale behind that statutory exception is that targeted dumping is more likely to be occurring when export prices fit a pricing model that differs significantly among different periods of time, different purchasers, or different regions of the United States." Stupp, 5 F.4th at 1345 (citing Apex Frozen Foods, 862 F.3d at 1347). Accordingly, the Court reviews Commerce's differential pricing analysis under a reasonableness standard.

Commerce discontinued its application of the Cohen's *d* test and instead applied a new "price difference test" as the first step in Commerce's differential pricing analysis. See Second Remand Determination at 3–4. Under the "price difference test," if:

> the weighted-average net price to the given purchaser, region, or time period falls outside of the plus or minus [2%] band around the weighted-average net price to all other purchasers, regions, or time periods, then the prices to that given purchaser, region, or time period are found to differ significantly and those sales to the given purchaser, region, or time period pass the price difference test.

Id. at 6. Commerce explained that the 2% threshold is a reasonable measure of significance and is consistent with other aspects of Commerce's practice in antidumping proceedings. Id. at 23. Commerce referred to the arm's length test

conducted pursuant to 19 C.F.R. § 351.403(c), when Commerce determines that sales between affiliated parties in the comparison market are not at arm's length and fall outside the ordinary course of trade and are therefore excluded from the calculation of normal value. Id. at 23–24; see 19 C.F.R. § 351.403(c). The Second Remand Redetermination explained that Commerce will determine that sale prices to an affiliated customer in the comparison market are not at arm's length and fall outside the ordinary course of trade "if the average, product-specific, comparison market prices to an affiliated customer are not within a range of [98%] to [102%] of the average, product specific, comparison market prices to unaffiliated customers[.]" Id. at 23. Commerce reasoned that average prices for an affiliated customer that "differ by at least [2%], and therefore fail the arm's-length test, 'differ significantly' from market prices." Id. As further support of the 2% threshold in the "price difference test," Commerce explained that pursuant to 19 U.S.C. §§ 1673b(b)(3) and 1673d(a)(4), the *de minimis* threshold for an estimated weighted-average dumping margin is 2% and has been synonymously referred to by Commerce as a "significant" amount of dumping. Id. at 24; see 19 U.S.C. §§ 1673b(b)(3), 1673d(a)(4). Commerce also explained that the *de minimis* threshold in administrative reviews is 0.5%, suggesting that the 2% threshold from investigations is more conservative. Id.

Universal argues that the "purpose of the arm's-length test conducted pursuant to 19 C.F.R. § 351.403(c) (which does not mention 'significant') is not to assess significance, but instead to determine whether the affiliated party sales are made in the ordinary course of trade such that they can be used to calculate normal value." Pls.' Br. at 24. Universal contends that Commerce's reliance on the *de minimis* threshold of 2% supports the conclusion that 2% is trivial and not significant because the 2% threshold, as used to show *de minimis*, indicates that a dumping margin is so low that it should be disregarded. Pls.' Br. at 25 (citing 19 U.S.C. § 1673d(a)(4); 19 C.F.R. § 351.106). Universal notes that in a previous case, Commerce rejected the 2% threshold to determine if a price difference was "significant" when Commerce discarded the "P/2 test." Id. at 25.

The CAFC has affirmed Commerce's use of the *de minimis* threshold in another part of the differential pricing test, the "meaningful difference test." See Apex Frozen Foods, 862 F.3d at 1346 ("[W]e agree that the difference in the actual antidumping rates that would be assessed—below *de minimis* when calculated with the [A-to-A] methodology; above *de minimis* when calculated using an alternative methodology—indeed informs the question of whether the [A-to-A] methodology can adequately account for a pattern of significant price differences 'because [A-to-A] masked the dumping that was occurring as revealed by the [A-to-T] calculated margin.'") (quoting Apex Frozen Foods Priv. Ltd. v. United States, 40

CIT __, __, 144 F. Supp. 3d 1308, 1333 n.24 (2016)). Based upon the explanation offered by Commerce in the Second Remand Redetermination and the CAFC's opinion in Marmen III, the Court concludes that Commerce's adoption of the 2% threshold in the first stage of its differential pricing analysis in the new "price difference test" is reasonable and complies with Marmen III. Because Commerce adequately explained how its methodology was reasonable, the Court holds that Commerce's application of the "price difference test" to determine whether there is a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods, applied as a component of its differential pricing analysis, is in accordance with law.

Commerce "discontinued the use of the 'mixed method' in administrative proceedings" and applied the "ratio test" as step two of its differential pricing analysis. Second Remand Redetermination at 4, 6–7. The "ratio test" "assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test" by calculating the ratio of the total value of sales that pass the "price difference test" to the total value of sales by the respondent in the U.S. during the period of review. Id. at 6. If "[33%] or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the A-to-T method." Id. at 6–7. However, "[i]f more than [33%] of the total value of U.S. sales passes the price difference

test, then Commerce will find that a pattern of prices existed during the period of review." Id. at 7. Commerce will then "examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-to-A method and using the alternative A-to-T method." Id.

Plaintiffs argue that Commerce provided "no explanation for why it found that a pattern of price differences existed during the period of investigation when more than [33%] of the total value of U.S. sales passes the price different test." Pls.' Br. at 27. Plaintiffs contend that a remand is necessary for Commerce to provide an explanation supported by substantial evidence as to why its previous rationale of 66% no longer applies and why the new lower 33% threshold identifies whether a pattern of pricing exists. Id. at 28. Specifically, Plaintiffs assert that the reduction in the threshold for the application of the A-to-T price comparison method to all sales to 33% is inconsistent with the position taken by Commerce in Stupp. Id. at 27–28.

In Marmen III, the CAFC concluded that, on remand:

> Commerce may re-perform a differential pricing analysis, and that analysis may not rely on [the] Cohen's *d* test for data sets like those here. This conclusion, of course, does not preclude Commerce from fashioning and justifying a statistical analysis that uses some of the ideas underlying Cohen's analysis of group differences as long as the resulting analysis is itself justified as sound for gauging differences in the data sets at issue.

134 F.4th at 1348. Commerce stated that, "[w]hile the statute permits Commerce's previous policy that adopted a hybrid version" of the A-to-A method and the alternative A-to-T method, "Commerce's new policy aligns more closely with the statutory text, which permits Commerce to use the A-to-T method when certain conditions . . . are satisfied." Second Remand Redetermination at 28.

Section 1677f-1(d)(1)(B) provides that Commerce may apply the A-to-T method, rather than the A-to-A method, if there is a pattern of export prices that differ significantly among purchasers, regions, or periods of time, so long as Commerce "explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii)." 19 U.S.C. § 1677f-1(d)(1)(B). The exception in Section 1677f-1(d) refers to determining margins through the A-to-A methodology or the A-to-T methodology and makes no reference to a "mixed method" when Commerce applies both. See id. § 1677f-1(d). This absence of statutory language referring to a mixed method supports Commerce's determination to discontinue the use of its "mixed method." Additionally, the SAA refers to the use of one methodology over the other, but makes no reference to the simultaneous application of the A-to-A method and the A-to-T method. See SAA at 842–43, 1994 U.S.C.C.A.N. at 4178.[4]

---

[4] "New section 777A(d)(1)(B) provides for a comparison of average normal values to individual export prices or constructed export prices in situations where an [A-to-A] or [T-to-T] methodology cannot account for a pattern of prices that differ

Relying on the statutory language and the legislative history, the Court concludes that Commerce permissibly revised its differential pricing analysis to discontinue use of the "mixed method" and to apply the "ratio test" in accordance with Marmen III. The Court observes that the CAFC has previously upheld the "ratio test" as a reasonable method for Commerce to implement the statutory requirement to determine whether there is a pattern of export prices that differ significantly among purchasers, regions, or periods of time. Stupp, 5 F.4th at 1355. The Court concludes that Commerce provided a reasonable explanation for abandoning the "mixed method" and applying the "ratio test," and that Commerce complied with the CAFC's opinion in Marmen III. Ad Hoc Shrimp, 38 CIT at 730, 992 F. Supp. 2d at 1290. Because Commerce adequately explained how its methodology was reasonable, the Court holds that Commerce's application of the "ratio test" to determine the extent of the significant price differences of all U.S. sales as measured by the "price difference test" applied as a component of its differential pricing analysis is in accordance with law.

In the "meaningful difference test," which is the third step of Commerce's differential pricing analysis, if both the "price difference test" and the "ratio test" demonstrate the existence of a pattern of prices that differ significantly "such that

---

significantly among purchasers, regions, or time periods, *i.e.*, where targeted dumping may be occurring." SAA at 843, 1994 U.S.C.C.A.N. at 4178.

the A-to-T method could be considered, . . . Commerce examines whether using only the A-to-A method can account for such differences." Second Remand Redetermination at 7.

Plaintiffs argue that the Court should remand to Commerce to "provide an explanation supported by substantial evidence for its use of a [25%] change in the weighted-average dumping margins between the [A-to-A] and the [A-to-T] method for determining whether the weighted-average dumping margin between the two methodologies is meaningful." Pls.' Br. at 28 (emphasis omitted). Plaintiffs request that the Court instruct Commerce on remand to explain why Commerce includes in the numerator of its analyses the quantities of sales that are not dumped "if the purpose of its price difference test is to unmask masked dumping[.]" Id. at 29.

Commerce accomplished the "meaningful difference test" by examining whether "the A-to-T method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method." Second Remand Redetermination at 7. A difference in the weighted-average dumping margins is considered "meaningful" if: "(1) there is a [25%] relative change in the weighted average dumping margins between the A-to-A method and the A-to-T method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-

to-A method and the A-to-T method move across the *de minimis* threshold." Id. Commerce explained that the "[25%] relative change, and the crossing of the *de minimis* threshold mirror Commerce's standard for whether a ministerial error is considered 'significant' under 19 C.F.R. § 351.224(g)." Id. at 29 (citation omitted); see 19 C.F.R. § 351.224(g).

In summary, Commerce conducted the differential pricing analysis here in three steps: the new "price difference test," the "ratio test," and the "meaningful difference test." The CAFC has held previously that Commerce's "ratio test" "reasonably implements the statutory requirement that Commerce determine whether there is a 'pattern of export prices' 'differ[ing] significantly among purchasers, regions, or periods of time' before selecting the [A-to-T]." Stupp, 5 F.4th at 1355 (alteration in original) (quoting 19 U.S.C. § 1677f-1(d)(1)(B)(i)). The CAFC reasoned that the "ratio test" is a "conventional method for quantifying comparisons across discrete groups: counting the number of divergent sales prices, as identified by an effect-size test, and calculating the population percentage of those divergent sales prices." Id. at 1354. The CAFC further held that Commerce's selection of the 33% and the 66% cutoffs in the "ratio test" is reasonable. Id. at 1354–55. The CAFC has also held that the "meaningful difference test," step three of the differential pricing analysis, is reasonable. Id. at 1356 (citing Apex Frozen Foods, 862 F.3d at 1348–49); see also Toyo Kohan Co.,

Ltd. v. United States, 50 CIT __, Slip Op. 26-54 (May 22, 2026) (sustaining Commerce's differential pricing analysis using the new "price difference test" instead of the Cohen's *d* test after Marmen III); Marmen IV; Gov't of Canada v. United States, 50 CIT __, No. 23-00187, 2026 WL 2161176 (July 27, 2026).

With respect to the new "price difference test" that replaced the Cohen's *d* test and is the first step in Commerce's differential pricing analysis, Commerce explained that the "price difference test" is intended to determine whether prices differ significantly among purchasers, regions, or time periods. Second Remand Redetermination at 10. Commerce stated that if average prices to an affiliated customer differ by at least 2% from market prices, then Commerce considers that 2% threshold to be a significant difference. Id. at 10–11. As noted above, the CAFC in Stupp held that Commerce's selection of statistical tests and numerical cutoffs must be reasonable. Stupp, 5 F.4th at 1353.

In Commerce's new "price difference test," Commerce determined that a 2% difference in pricing would be considered significant. Because Commerce applied the new "price difference test" on a case-by-case basis and determined that 95.71% of the value of U.S. sales for Universal passed the "price difference test," Commerce reasonably determined that prices differed significantly. Second Remand Redetermination at 7. Accordingly, the Court concludes that Plaintiffs' arguments that the "price difference test" is inconsistent with the best reading of

the statutory requirements for using the A-to-T method and fails to satisfy Congress' intent for a case-by-case differential pricing analysis thereby producing arbitrary results, are not persuasive.

Moreover, Plaintiffs assert that the reduction in the threshold for the application of the A-to-T price comparison method to all sales to 33% in the "ratio test" is inconsistent with the position taken by Commerce in Stupp. Pls.' Br. at 27–28. The CAFC stated in Marmen III that Commerce could revisit its differential pricing analysis, which is what Commerce did on remand in this case. Marmen III, 134 F.4th at 1348 ("Commerce may re-perform a differential pricing analysis[.]"). Commerce's determination to alter the "mixed method" within its differential pricing analysis was reasonable when refashioning a new analytical framework to implement 19 U.S.C. § 1677f-1(d)(1)(B).

The Court concludes that Commerce's Second Remand Redetermination is reasonable and in accordance with law and sustains the differential pricing analysis.

**CONCLUSION**

For the foregoing reasons, Commerce's Second Remand Redetermination is sustained. Judgment will be entered accordingly.

/s/ Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated: August 19, 2026
New York, New York